### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |
|---|---|
| AMERICAN COKE AND COAL CHEMICALS INSTITUTE and COKE OVEN ENVIRONMENTAL TASK FORCE, <br><br> Petitioners, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY, <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **Case No. 24-1287 (consolidated with Nos. 24-1288, 24-1290)** |

_____

### MOTION BY THE AMERICAN COKE AND COAL CHEMICALS INSTITUTE AND THE COKE OVEN ENVIRONMENTAL TASK FORCE FOR STAY AND EMERGENCY RELIEF PENDING REVIEW OF A FINAL AGENCY ACTION

As authorized by Federal Rule of Appellate Procedure (FRAP) 18 and Circuit Rule 18, the American Coke and Coal Chemicals Institute (ACCCI) and the Coke Oven Environmental Task Force (COETF) (together "Movants") hereby move for an order staying the final agency action challenged in these consolidated cases entitled "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries;

Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55684-55757 (July 5, 2024) (the "Coke Rule"). In the Coke Rule, the U.S. Environmental Protection Agency (EPA) unlawfully promulgated numerous unachievable emission limitations and arbitrary operating conditions, monitoring requirements, and other requirements purportedly under Clean Air Act (CAA) §§ 112(d)(2)-(3) and 112(d)(6), 42 U.S.C. §§ 7412(d)(2)-(3) and 7412(d)(6), applicable to the metallurgical coke production facilities owned and operated by Movants' members.

The Coke Rule is demonstrably unlawful and, if it remains in effect, will result in immediate and irreparable harm to Movants' member companies who own and operate the directly impacted metallurgical coke production facilities; to the broader steel industry that relies on coke as an essential ingredient to make the steel that forms the backbone of U.S. infrastructure and national defense; and to the communities who depend on the many good-paying jobs created by Movants' member companies, all without *any* demonstrated benefit to public health or the environment. Even though EPA made a determination under CAA § 112(f), 42 U.S.C. § 7412(f), that there was *no unacceptable risk with an ample margin of safety* to public health or the environment associated with hazardous air pollutant (HAP) emissions from the coke oven battery pushing, quenching, and battery stacks (PQBS) source category, *see* 89 Fed. Reg. at 55686, EPA nevertheless

imposes 21 new and unachievable "maximum achievable control technology" (MACT) standards in the Coke Rule, *see id*. at 55723, which EPA asserts will not result in *any* reduction in HAP emissions or *any* public benefit. *See id*. The Coke Rule also unlawfully tightens existing standards for coke oven doors, lids, and offtakes in violation of CAA § 112(d)(6) and imposes unlawful coke facility fenceline monitoring and corrective action requirements.

Movants submitted detailed factual and legal comments, valid test data, numerous technical submissions, and other information to EPA during the rulemaking process demonstrating the numerous legal and technical flaws that are central to this rulemaking, but EPA failed to consider or fully address these fundamental flaws in the final Coke Rule. EPA also arbitrarily set a short *18-month* compliance deadline for all of the new standards and other requirements in the Coke Rule, notwithstanding that CAA § 112(i)(3)(A), 42 U.S.C. § 7412(i)(3)(A), allows up to three years for compliance. *See* 89 Fed. Reg. at 55722. The arbitrarily shortened compliance deadline forces Movants' members into immediate steps to plan, engineer, procure, fabricate, and install add-on pollution controls and other measures in an effort to meet such a short compliance deadline.

Absent an order from this Court staying the Coke Rule pending review, the Coke Rule puts an essential industry at greater risk of economic, job, and business

harm and threatens to drive coke and steelmaking jobs and manufacturing capacity overseas, all to the detriment of the U.S. economy, local communities, national defense, and national security.

Movants filed a timely petition for administrative reconsideration and stay of the Coke Rule on September 3, 2024. *See* Ex. A, pp. 3-4, 22-24; FRAP 18(a)(1), (a)(2)(A). EPA acknowledged receipt of Movants' petition, but has not acted upon or otherwise substantively responded to the petition as of the September 30, 2024 deadline for filing procedural motions in this case. *See* ECF 2072646.

After conferring with counsel: (i) counsel representing EPA stated that EPA is still considering its position on this Motion; (i) petitioner SunCoke Energy, Inc. (Case No. 24-1288) supports this Motion and is filing a separate motion for stay; (ii) environmental petitioners PANIC and Clean Air Council (Case No. 24-1290) state that they oppose this Motion; and (iii) the remaining environmental petitioners in Case No. 24-1290 did not respond with a position before this Motion was filed.

## STANDARD FOR GRANTING A STAY

This Court weighs four factors in considering a motion to stay an agency rule pending judicial review: (i) the likelihood that the moving party will prevail on the merits; (ii) the prospect of irreparable injury to the moving party if relief is withheld; (iii) the possibility of harm to other parties if relief is granted; and

(iv) the public interest. *See* Circuit R. 18(a)(1). These factors are considered together and balanced with one another; a "stay may be granted with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985). As discussed below, all four factors weigh heavily in favor of staying the Coke Rule.

## **MOVANTS ARE LIKELY TO PREVAIL ON THE MERITS**

The CAA and Administrative Procedure Act (APA) prohibit an agency from taking action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or without observance of procedure required by law. 42 U.S.C. § 7607(d)(9); *see also*, 5 U.S.C. § 706(2)(A). Movants are likely to prevail on their arguments that the Coke Rule is substantively and procedurally unlawful in multiple respects.

**1. EPA did not consider relevant factors, including its acceptable risk determination and the exorbitant cost of add-on control technology, when making its determination whether to revise "as necessary" as is required under CAA § 112(d)(6).**

CAA § 112(d)(6) provides that "[t]he Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years." 42 U.S.C. § 7412(d)(6). Misapplying *Louisiana Environmental Action Network* v. *EPA,* 955 F.3d 1088 (D.C. Cir. 2020) (*LEAN*) and an impermissible interpretation of CAA § 112(d)(6), EPA refused to consider any

5

factors, including its now complete acceptable risk determination or the cost and benefits (if any) of the new standards. *See* 89 Fed. Reg. at 55710. First, EPA's argument mischaracterizes the Court's *LEAN* decision – the issue of whether public health risk and cost to industry are factors to be considered under § 112(d)(6) was not before the Court in *LEAN*, so the decision in that case does not preclude EPA from considering risk or costs, as EPA claims.

Second, EPA's reading of § 112(d)(6) fails to give full meaning to the Congressional directive to "review, and revise as necessary." When interpreting the CAA, this Court applies the best reading of the statutory text and does not defer to EPA's interpretation. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. __ (2024), Slip. Op. at 35. EPA's interpretation that it is not required to consider factors like risk and cost plainly is not the best reading of § 112(d)(6) because (i) the language "review, and revise as necessary" does not expressly foreclose EPA from considering any relevant factors – including developments in technology, public health risk, and cost – in making a decision whether to revise a standard; and (ii) the "as necessary" directive is broad, open-ended language that presumptively includes considering factors such as public health risk and cost unless clearly and specifically prohibited by other language in § 112(d)(6). As a result of a faulty interpretation of § 112(d)(6), EPA failed to consider all of the relevant factors and "entirely fail[ed] to consider an important aspect of the

problem." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

Finally, EPA improperly relied on CAA §§ 112(d)(2)-(3), which address the process for *setting* MACT floors, to argue that risk and costs cannot be considered under § 112(d)(6). *See* 89 Fed. Reg. at 55687, 55710. This argument improperly conflates EPA's obligation under § 112(d)(6) to determine whether revising a standard is "necessary" with the process for setting the level of a MACT standard under §§ 112(d)(2)-(3). Whether risk, cost, or other factors are considered when setting the level of a MACT standard under §§ 112(d)(2)-(3) is separate and distinct from the factors to be considered when deciding whether it is "necessary" to revise a standard in the first instance.

In sum, EPA's argument that the mandate to "review, and revise as necessary" such standards every eight years permits the Agency to disregard important factors such as acceptable public health risk and exorbitant cost is not the best (or even a permissible) reading of § 112(d)(6). To the contrary, it is consistent with the broad nature of this Congressional directive and the statutory structure of §§ 112(d) and 112(f) to conclude that EPA must consider such factors in its decision to revise a standard. Congress certainly would have been aware that – eight years after the original MACT standards were promulgated and after a residual risk evaluation is completed under § 112(f) – EPA would have

7

information about any remaining public health risks and about the costs and benefits of using its authority under § 112(d)(6) to revise existing standards.

**2. The Coke Rule does not satisfy the fundamental requirement that standards promulgated under CAA § 112(d)(2) must be achieved by the best controlled similar sources under all foreseeable circumstances.**

The data EPA used to set the newly promulgated MACT standards were too limited in number to account for variability in the inherent characteristics of the raw material (*i.e.*, the coal that is processed to create coke) which directly affect HAP emissions from coke ovens. *See* COETF Comments, 3, 55-59 (Oct. 2, 2023); Decl. of M. DeLibero ¶¶ 12-14 (Ex. B); Decl. of M. Long ¶¶ 4,7 (Ex. C); Decl. of I. Donaldson ¶¶ 4, 7-9 (Ex. D). As such, it was arbitrary and capricious and contrary to the requirements of CAA § 112(d)(2) for EPA to establish standards using such limited test data without adjusting its upper prediction limit (UPL) calculations to account for such variability in coal characteristics that directly influence HAP emissions.

An analysis performed by Trinity Consultants, which was submitted to EPA during the rulemaking, provided data on concentrations of naturally-occurring mercury (Hg), chlorine (Cl), and fluorine (Fl) in coals used by the coke making facilities that EPA included in the MACT floor database. *See* Decl. of I. Donaldson ¶¶ 4, 7-9 and Exhibit A "Upper Prediction Limit Calculations with Intra-Mine Variability Factor" (May 3, 2024), https://tinyurl.com/yc52rcj5. Using

well-established EPA precedent to address such raw material variability, the Trinity analysis provided fully calculated variability factors for Hg, Cl, and Fl for EPA to use in its UPL calculations. *See* COETF Comments at 5-7; Decl. of I. Donaldson ¶ 4. This submission explained that while EPA's UPL calculation accounts for variability *in the test run data* (*i.e.*, variability of measurement within a single test or test run-to-test run variability), the UPL calculation *does not* account for variability caused by longer-term differences in raw materials at a source or between sources. In other similar rules (*e.g.*, those regulating the cement, lime, and brick industries), EPA accounted for this variability in the content of HAPs (or HAP precursors) in raw materials sourced from different locations by using so-called "intra-quarry variability" factors – factors very similar to the Trinity-developed variability factors provided to EPA for the Coke Rule. *See* COETF Comments at 5-7.

In the Coke Rule, EPA disregarded the coke industry's concerns and did not revise the Agency's final UPL calculations to account for variability of Hg, Cl, and FL concentrations in coals used by the MACT floor facilities. In doing so, EPA incorrectly claimed that this Court's decisions in *U.S. Sugar* v. *EPA*, 830 F.3d 579 (D.C. Cir. 2016), and *Sierra Club* v. *EPA*, 895 F.3d 1 (D.C. Cir. 2018), had already addressed this issue. *See* 89 Fed. Reg. at 55713. However, EPA's reliance on *U.S. Sugar* and *Sierra Club* is entirely misplaced. The decision in *U.S. Sugar* only dealt

with the specific circumstances of UPL calculations for one source category (industrial boilers). *See* 830 F.3d at 401-402. Likewise, the *Sierra Club* decision only held that EPA had sufficiently explained the *general* application of the UPL *to limited datasets*. *See* 895 F.3d at 14. *Sierra Club* did not decide that EPA's UPL method is sufficient in every application, much less in the MACT floor calculations for the Coke Rule.

Even more significant, *U.S. Sugar* and *Sierra Club* did not hold that EPA's UPL calculation adequately addresses *all forms of variability* in HAP emissions – as are present in the Coke Rule – specifically, the UPL does not address longer-term variability due to changes in naturally occurring elements in coal sourced from different mines and different veins within the same mine. According to EPA's own assessment, the UPL calculation only accounts for short-term fluctuations or run-to-run variability, not longer-term variability due to changes in the characteristics of raw materials sourced from different locations between and within mines. Per EPA, the UPL calculation accounts for variability that "… occurs due to a number of factors, including measurement variability (both sampling and analysis) and *short-term* fluctuations in the emission levels that result from *short-term* changes in fuels, processes, combustion conditions, and controls." 89 Fed. Reg. at 55714 (emphasis added).

The issue of whether EPA's UPL calculation adequately accounts for coal mine raw material variability in HAP emissions simply was not before the Court in either *U.S. Sugar* or *Sierra Club*. Therefore, EPA's reliance on *U.S. Sugar* and *Sierra Club* and its reasoning for not accounting for coal mine variability in the Coke Rule is a fundamental misinterpretation or misuse of this Court's prior decisions – either way, the resulting MACT standards must be set aside as contrary to CAA § 112(d)(2), arbitrary and capricious, and an abuse of agency discretion.

**3. EPA arbitrarily and capriciously subcategorized coke facilities based on irrelevant factors and revised standards without identifying any development in practices, processes, or control technology in violation of CAA § 112(d)(6).**

The rule in effect prior to the Coke Rule contained emission limitations in terms of allowable percentages of leaking coke oven doors, lids, and offtakes that were established in accordance with the specific provisions in § 112(d)(8)(B) for coke ovens. *See* 58 Fed. Reg. 57898 (Oct. 27, 1993). In the Coke Rule, EPA departed from this approach by (i) revising those existing standards to create a new subcategory (of only one facility) based on annual coke production, and (ii) further lowering the existing standards for doors, lids, and offtakes for all coke batteries. *See* 89 Fed. Reg. at 55701-02. However, in revising these standards, EPA looked exclusively to data showing that coke batteries comply with the existing emission limits and "inferred" from these data that there must have been "improvements in leak control." *Id*. Yet EPA could not identify or describe *any* development in leak

control practices, processes, or control technology explaining the leak rate data, as is required for revising a standard under § 112(d)(6).

Responding to commenters, including ACCCI/COETF, who objected that compliance data showing that coke facilities are generally performing better than the existing emission limitations are not by themselves a development in practices, processes, or control technology, EPA attempted to shift the burden to industry to disprove EPA's claimed inference: "Industry commenters have not suggested any alternative explanation. It is therefore reasonable to infer that lower leak rate values reflect developments in work practices to control leaks." *Id*. at 55702.

Further, EPA used the same "inference" approach to set even more stringent limits for the one "large" facility with >3 million tons/year coke production. *See id*. To select this threshold, EPA simply looked at the size of the largest coke plant and claimed that 3 million tons/year production capacity was a clear breakpoint that aligned with the data. *See id*. However, there is only one such coke facility – the U.S. Steel Clairton, PA facility – with >3 million tons/year coke production, and EPA failed to identify any different or improved leak control work practices that are unique to this facility. *Id*. To the contrary, EPA received comments that this facility employs the same leak control practices used by the rest of the industry. *See id*. at 55701; COETF Comments, 43-44; *see also*, Decl. of M. DeLibero, ¶¶ 7-10 (Ex. B). Further, EPA's conclusion that this facility's higher

coke production capacity leads to lower leak rates is counterintuitive because facilities with higher coke production have more coke batteries with a larger number of ovens in operation, with more cycles of charges and pushes, etc. *See* COETF Comments at 44; Decl. of M. DeLibero, ¶ 11 (Ex. B). EPA failed to address these industry concerns and offered no plausible basis for "inferring" that the opposite conclusion is true. Indeed, EPA did not describe any effort to identify or evaluate any specific "improved work practices" it claimed lead to fewer leaking doors, lids, and offtakes, relying instead on conclusory inferences that do not satisfy the statutory basis required to revise regulations under § 112(d)(6).

Therefore, the revised emission limits for coke oven doors, lids, and offtakes were promulgated without statutory authority, and EPA's failure to provide a rational basis for concluding that leak rate data alone reflect developments in work practices to control leaks is arbitrary and capricious.

**4. The Coke Rule imposes unlawful coke facility fenceline monitoring requirements based on EPA's interpretation that CAA § 114 provides authority to codify fenceline monitoring requirements in a § 112(d)(6) rule.**

The Coke Rule promulgates first-for-the-industry coke facility fenceline emission monitoring and reporting requirements for coke oven batteries and other sources – namely, coke byproduct recovery plants, which are not among the source categories listed under CAA § 112(c). Responding to commenters who pointed out that EPA lacks authority under CAA § 112(d)(6) to impose monitoring and

corrective action requirements on HAPs from source categories that are not listed pursuant to § 112(c) for regulation under § 112, EPA shifted and claimed that fenceline monitoring requirements are authorized by EPA's "ample authority" to require information collection under CAA § 114. 89 Fed. Reg. at 55697. However, contrary to EPA's new claim, CAA § 114, 42 U.S.C. § 7414, authorizes information collection requests for the purpose of developing or enforcing certain standards as enumerated under § 114(a), but it does not contain authority for EPA to codify permanent information collection requirements in a § 112(d)(6) regulation in order to mandate never-ending fenceline monitoring for an entire industry. EPA fails to identify any language in CAA § 114 supporting the novel claim that EPA has authority to codify permanent fenceline monitoring requirements in the Coke Rule.

**5. EPA's fenceline monitoring requirements use an unlawful and arbitrarily established benzene "action level" to trigger corrective action requirements.**

The Coke Rule's fenceline monitoring requirements employ a benzene "action level" to mandate when coke plant operators must undertake corrective action to identify and reduce emissions that exceed the action level. This action level is unlawful in two respects: (i) the action level is based on *actual* emission rates, instead of *allowable* emission rates, so an exceedance of the action level would mandate emission reductions even when a facility is operating within

permitted levels; and (ii) the action level was established using improperly located property boundary modeling receptors resulting in an overly stringent threshold to undertake corrective actions.

EPA's decision to use actual rather than allowable emissions to set the fenceline action level exceeds the Agency's statutory authority and is arbitrary and capricious because it forces coke facility operators to undertake root cause assessments and implement corrective actions to reduce emissions even when facilities are operating within their lawful, permitted emissions levels. Allowable emissions are authorized under each facility's permits and create an upper limit of emissions for each regulated pollutant. Using actual emissions to set the fenceline action level results in a de facto mandate to reduce emissions below permitted levels without following required procedures for amending permits. It will cause facilities to be out of compliance with the Coke Rule's corrective action requirements when they increase facility operations or coke production levels but still remain within the production levels and emission levels authorized by their permits.

In addition, EPA arbitrarily promulgated a more stringent fenceline action level by placing the property boundary modeling receptors, which are used to calculate the highest fenceline benzene concentration, in the wrong location at each modeled facility. Based on fenceline modeling conducted by AECOM and

provided to EPA, EPA knew the exact receptor location on the modeled facility property line that resulted in the highest modeled benzene concentration – the location was clearly identified and labeled on Figure 4 of the AECOM modeling submitted to EPA. *See* AECOM "Evaluation of Modeling Methodology Used by EPA to Determine a Benzene Fenceline Monitoring Proposed Action Level in the Coke Ovens Proposed Rule," pp. 3-4 and Fig. 4 (Feb. 2, 2024) (Ex. E). However, in its final modeling for the Coke Rule, EPA failed to place a receptor at or near that location, which predictably produced a lower modeled benzene concentration (*i.e.*, 7 μg/m3 compared to 11.3 μg/m3) and, consequently, resulted in EPA setting a significantly lower (*i.e.*, more stringent) action level. EPA failed to acknowledge this error or provide a reasoned explanation for not using the receptor location that represents in the highest modeled fenceline benzene concentration.

## ABSENT A STAY, THE RULE WILL CAUSE IMMEDIATE AND IRREPARABLE HARM

The legal and technical flaws in the Coke Rule are so material, and the resulting harm to Movants' members so substantial, that a stay is necessary to ensure a complete correction of these defects to avoid immediate and irreparable economic impacts, job impacts, and business disruption to Movants' members and harm to national economic and national security interests.

According to the air pollution control feasibility and cost analyses performed by Trinity Consultants and submitted to EPA, the projected cost to the Movants'

members of adding air pollution controls to comply with the Coke Rule is nearly $1.3 billion in capital costs, and more than $220 million in annual operating costs. *See* Decl. of M. DeLibero ⁋ 20 (Ex. B); Decl. of M. Long ⁋⁋ 7, 15 (Ex. C); Decl. of I. Donaldson (Ex. D) ⁋⁋ 11-13 and Tables 1-2. Absent a stay, Movants' members will be forced to take immediate steps to design, engineer, test, procure, and construct the projects needed to comply with new MACT floor limits and more stringent leak rate standards. These measures would have to be commenced even though there is a substantial probability that the Coke Rule will be reversed and vacated on review. Facilities will be forced to procure and install new add-on control technologies in an effort to comply with the new standards, assuming compliance is possible at all. *See* Decl. of M. DeLibero ⁋⁋ 22-26 (Ex. B); Decl. of M. Long ⁋⁋ 8-14 (Ex. C); Decl. of I. Donaldson ⁋⁋ 7-10 (Ex. D). Regardless of the outcome on appeal, these costs would not be recouped and the new controls and equipment would be impractical to remove from coke batteries once installed. These costs and burdens would substantially impact local and national economies and undermine the coke and steel sectors' vital role in creating and supporting critical national infrastructure and securing national defense.

The importance of avoiding these harms is emphasized in a June 14, 2024 bipartisan letter from six U.S. Senators urging EPA to reconsider the Coke RTR Rule and two other rules targeting the steel industry and warning that "[a]bsent a

stay, the steel industry will be forced to proceed with planning and spending for unproven technologies and work practices while the final provisions of the rules remain uncertain.  Given that these regulations will impact nearly every aspect of the integrated iron and steelmaking process, it is imperative that EPA grant both the petitions for reconsideration and requests for stay of the rules."  Letter from U.S. Senators to Admin. Regan, p. 2 (June 14, 2024) (Ex. F).  In a second bipartisan letter, eight U.S. Senators warned that absent reconsideration and stay, the rules "would dramatically undermine the domestic steel industry and national security while driving production overseas likely resulting in no net reduction in emissions from the steel industry globally."  Letter from U.S. Senators to Admin. Regan, p. 1 (Dec. 6, 2023) (Ex. G).  These same concerns are echoed in letters to EPA from the Chair and Vice Chair of the Congressional Steel Caucus and from the International President of the United Steelworkers.  *See* Letter from Congressional Steel Caucus to Admin. Regan, p. 1 (Dec. 18, 2023) (Ex. H); Letter from D. McCall, United Steelworkers, to Admin. Regan, p. 1-2 (June 24, 2024) (Ex. I); *see also*, Decl. of M. DeLibero ¶¶ 27-34 (Ex. B); Decl. of M. Long ¶¶ 10-14, 16 (Ex. C).  These injuries will be borne both by integrated steel companies that operate coke plants and also by smaller, independently owned and operated "merchant" coke producers that produce coke for sale on the open market.

## A STAY WILL NOT HARM ANY OTHER PARTY

No other parties are likely to suffer harm due to a stay of the Coke Rule. EPA says that it does not expect there to be *any* HAP emission reductions and, therefore, no benefits due the Coke Rule. *See* 89 Fed. Reg. at 55723 ("There are no measurable air quality impacts from this rule that can be guaranteed" … "EPA has not quantified any benefits associated with this final rule … ."). Although Movants dispute EPA's claim that the standards in the Coke Rule reflect the levels that EPA is charged with establishing under the CAA, EPA cannot credibly claim that staying the Coke Rule would harm public health or the environment or that any meaningful public benefit would be achieved by leaving the Coke Rule in place during review. Moreover, EPA's residual risk review determination confirmed that the PQBS source category remains acceptable risk with an ample margin of safety for public health and the environment, even before any new standards and requirements imposed by the Coke Rule go into effect. *See id.* at 55686. Therefore, further HAP emission reductions are not needed to ensure adequate protection of public health and the environment.

## A STAY WILL ADVANCE THE PUBLIC INTEREST

Staying the Coke Rule pending judicial review will also serve significant public interests.

First, a stay will allow an appeal to proceed while maintaining the regulatory and economic conditions existing prior to the unlawful agency action. *See, e.g., Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006). The public interest is best served by preserving a strong, competitive coke manufacturing industry and avoiding irreparable harm to the steel industry that is vital to maintaining critical infrastructure and U.S. national security and defense. The strong public interest weighing in favor of a stay is emphasized in the letters to EPA referenced above from law makers and trade union leadership alike: (1) maintaining a strong domestic steelmaking industry, (2) avoiding measures that lead to coke and steel shortages and resulting supply chain impacts, (3) promoting economic and job growth made possible by the coke and steel industries, and (4) avoiding wasteful commitments of resources on mandates that provide no discernable public benefit. A stay will advance all of these public interests while the Coke Rule is on appeal. *See* Decl. of M. DeLibero ¶¶ 27-35 (Ex. B); Decl. of M. Long ¶ 16 (Ex. C).

Second, granting relief from immediate implementation will help preserve meaningful judicial review and ensure the Court's power to fashion an appropriate remedy to unlawful agency action. Staying an underlying action on appeal is "not simply '[a]n historic procedure for preserving rights during the pendency of an appeal,' but also a means of ensuring that appellate courts can responsibly fulfill their role in the judicial process." *Nken v. Holder*, 129 S. Ct. 1749, 1757 (2009).

In CAA § 112(i)(3), Congress authorized EPA to provide up to three years to comply with any new or revised standards like those in the Coke Rule. However, EPA disregarded public comments that a full three-year compliance period was necessary and provided only 18 months (from July 5, 2024) to achieve all the new requirements.

There is no demonstrated control technology to achieve many of the new standards in the Coke Rule, and efforts to identify a potential pathway to compliance must start years before the compliance deadline. Therefore, an appeal cannot be decided and an appropriate remedy granted before Movants' members are forced to incur significant and irreversible economic burdens and other harm. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Absent a stay, EPA's unreasonably short compliance schedule – one-half the time permitted under the statute – threatens to compromise the Court's important role in ensuring meaningful review and correction of unlawful agency action.

## CONCLUSION

For the reasons discussed above, (i) Movants' claims have a likelihood of success on the merits; (ii) Movants' members will suffer immediate and irreparable harm absent a stay; (iii) no other parties are likely to suffer harm if a stay is granted; and (iv) a stay will advance significant public interests. Movants

respectfully request that this Court issue an order staying the Coke Rule, 89 Fed. Reg. 55684-55757 (July 5, 2024), until final resolution of the consolidated petitions for review.

Dated:  September 30, 2024

Respectfully submitted,

 /s/  Jeffrey A. Knight
Jeffrey A. Knight
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036-3006
(202) 663-9152
jeffrey.knight@pillsburylaw.com

*Counsel for ACCCI and the COETF*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type volume requirements of FRAP 27(d)(2)(A) because it contains 4,890 words, excluding any accompanying documents authorized by FRAP 27(a)(2)(B). Further, this motion complies with the typeface and type style requirements of FRAP 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman and 14-point font.

Dated: September 30, 2024

Respectfully submitted,

 /s/  Jeffrey A. Knight
Jeffrey A. Knight

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2024 I electronically filed the foregoing with the Clerk of the Court using the Case Management/Electronic Case File (CM/ECF) system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 30, 2024

Respectfully submitted,

 /s/  Jeffrey A. Knight
Jeffrey A. Knight

# **Exhibit A**

# U.S. ENVIRONMENTAL PROTECTION AGENCY

---

IN RE: PETITION FOR RECONSIDERATION AND STAY OF THE NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR COKE OVENS: PUSHING, QUENCHING, AND BATTERY STACKS: RESIDUAL RISK AND TECHNOLOGY REVIEW, AND COKE OVEN BATTERIES: PERIODIC TECHNOLOGY REVIEW
89 FED. REG. 55684-55757 (JULY 5, 2024)
DOCKET NOS. EPA-HQ-OAR-2002-0085 AND EPA-HQ-OAR-2003-0051

---

## I.        INTRODUCTION

Pursuant to § 307(d)(7)(B) of the Clean Air Act (CAA),[1] the American Coke and Coal Chemicals Institute (ACCCI) and Coke Oven Environmental Task Force (COETF) petition the U.S. Environmental Protection Agency ("EPA" or "Agency") to reconsider central aspects of the final rule entitled "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55684-55757 (July 5, 2024) (the "Coke RTR Rule" or "Final Rule").  The Coke RTR Rule finalizes the residual risk and technology review conducted for the Coke Ovens: Pushing, Quenching, and Battery Stacks source category[2] and the periodic technology review for the Coke Oven Batteries source category.[3]  Pursuant to § 705 of the Administrative Procedure Act (APA),[4] ACCCI and the COETF also petition EPA for stay of the effective date of the Coke RTR Rule pending judicial review and promulgation of regulations replacing the Coke RTR Rule.

The COETF is an ACCCI-led coalition of ACCCI member companies with a primary purpose to address major environmental issues affecting the byproduct recovery coke industry and to advocate on its members' behalf in legislative, regulatory, and other legal matters affecting the industry.  The COETF's members own and operate all six of the U.S. byproduct recovery cokemaking facilities that are the object of the Coke RTR Rule.  Together these companies produced nearly 7.3 million tons of metallurgical coke in 2023, a vital ingredient used in making the steel that is the backbone of U.S. investments in infrastructure, electrification of the transportation sector, and our national security and defense.[5]

---

[1] 42 U.S.C. § 7607(d)(7)(B).
[2] Codified at 40 C.F.R. Part 63, Subpart CCCCC.
[3] Codified at 40 C.F.R. Part 63, Subpart L.
[4] 5 U.S.C. § 705.
[5] Comments submitted by ACCCI/COETF (Oct. 2, 2023), available at https://www.regulations.gov/comment/EPA-HQ-OAR-2003-0051-1380 ("COETF Comments").

As detailed in this petition, the Coke RTR Rule:

1. Fails to consider all relevant factors, including the acceptable risk determination, costs, and cost effectiveness, when making an "as necessary" determination under CAA § 112(d)(6) and establishing standards under CAA § 112(d)(2);

2. Fails to satisfy the fundamental achievability requirement for establishing maximum achievable control technology (MACT) floors for hazardous air pollutants (HAPs) by setting MACT floors without regard to data submitted by the COETF showing significant intra-mine variability (IMV) in coal characteristics that directly affects the emission performance of battery stacks and pushing emission controls (PECs);

3. Contains upper prediction limit (UPL) calculation errors that make the hydrogen cyanide (HCN) MACT limit for PECs significantly more stringent;

4. Arbitrarily and capriciously declined to continue using the existing opacity standard as a surrogate for HAP metals in particulate matter (PM) emissions from battery stacks;

5. Fails to consider or adopt a health-based emission limit (HBEL) for hydrochloric acid (HCl);

6. Fails to consider or provide for site-specific alternative standards for entities which demonstrate that the MACT limits are impractical to achieve;

7. Revises limits for leaking coke oven doors, lids, and offtakes without identifying any cognizable development in practices, processes, or control technology in violation of CAA § 112(d)(6);

8. Arbitrarily and capriciously subcategorizes facilities for door leak standards based upon coke production capacity and without any rational basis supported by evidence in the rulemaking record;

9. Imposes fenceline monitoring requirements based on a new claim that CAA § 114 provides legal justification for monitoring benzene emissions from non-categorical sources that was not subject to notice and comment and is not supported by the Clean Air Act;

10. Imposes fenceline monitoring requirements that set the benzene fenceline action level using actual (as opposed to allowable) emission rates and by using improperly placed property boundary receptor locations;

11. Fails to include provisions and appropriately respond to comments pertaining to the use of work practice standards in lieu of numerical standards during startup, shutdown, and malfunction (SSM) operating conditions; and

12. Imposes an unreasonable compliance schedule timeline.

Given that these objections affect the form and stringency of nearly all of the newly promulgated requirements, and so are centrally relevant to the outcome of the Coke RTR Rule, EPA must grant reconsideration on the issues identified in this petition and stay the effective date of the Coke RTR Rule, so that EPA can revise the rule and reset the compliance deadlines through an appropriate and legally defensible supplemental rulemaking process.

## II.  STANDARD FOR RECONSIDERATION AND STAY OF THE COKE RTR RULE

Under CAA § 307(d)(7)(B), EPA must convene a proceeding for reconsideration of a final action when it was "impracticable" for a petitioner to raise an objection within the period allowed for public comment and the objection is of "central relevance" to the outcome of the rule.[6]  The rulemaking requirements under CAA § 307(d) apply to the Coke RTR Rule.[7]  EPA also has inherent authority under CAA § 112 to initiate a rulemaking to address legal and technical errors in the Coke RTR Rule and to revise compliance dates to allow affected sources the time needed to comply with new requirements.[8]

The Coke RTR Rule includes new requirements and new claims of legal authority that were not present in the proposed rule.  *See* National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 88 Fed. Reg. 55858 (Aug. 16, 2023) (the "Proposed Rule").  These changes from the Proposed Rule violate CAA § 307 and administrative law principles of notice-and-comment rulemaking.  EPA cannot show that the changes are a "logical outgrowth" of the Proposed Rule – *i.e.*, that the public "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."[9]

CAA § 307(d)(7)(B) contains authority for EPA to stay the effective date of the Coke RTR Rule for up to three months during the reconsideration process.[10]  In addition, § 705 of the APA provides independent authority for EPA to postpone the effective date of the Coke RTR Rule when the Administrator "finds that justice so requires."[11]  Likewise, CAA § 301(a) gives EPA authority to undertake a supplemental rulemaking to amend the Coke RTR Rule and to establish a parallel stay where the stay is necessary to preserve the status quo so as to ensure that the amendments are a complete cure, especially to avoid imminent harm and waste of resources attempting to comply with a defective rule.[12]

---

[6] 42 U.S.C. § 7607(d)(7)(B).
[7] *See* 42 U.S.C. § 7607(d)(1)(C).
[8] *See* 42 U.S.C. §§ 7412(d)(1), (d)(6).
[9] *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (internal quotations omitted).
[10] 42 U.S.C. § 7607(d)(7)(B).
[11] 5 U.S.C. § 705.
[12] *See* 42 U.S.C. § 7601(a).

The issues raised in this petition meet the standards for reconsideration and stay under CAA § 307(d)(7)(B), APA § 705, and CAA § 301(a).  Therefore, EPA should take all necessary action to stay the Coke RTR Rule and to initiate a supplemental rulemaking to develop replacement regulations addressing these objections.


## III.  GROUNDS FOR RECONSIDERATION

### A.  EPA's Rulemaking Process and Final Coke RTR Rule

When the Proposed Rule was published on August 16, 2023, EPA provided a public comment period of only 45 days.[13]  On August 28, 2023 the COETF requested an extension of the comment period,[14] citing multiple reasons why the 45-day comment period was inadequate:

1. The lengthy (46-page) Proposed Rule involved several separate proposed actions on which EPA requested public comment, including (i) the residual risk review of the PQBS source category; (ii) the first technology review of the PQBS source category; (iii) the periodic technology review of the coke oven doors, lids, and offtakes source category; (iv) a review of potential "gaps" after the decision in *Louisiana Env't Action Network v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020); and (v) newly proposed fenceline monitoring and work practice standards, a first for the coke manufacturing sector.  Each of these proposed actions and requests for comment raised technical and legal issues and concerns for commenters.  While EPA has discretion to combine multiple regulatory actions into a single proposed rulemaking, in doing so, EPA must provide a reasonable comment period and one significantly longer than 45 days.

2. The Proposed Rule had two separate rulemaking dockets that (at that time) contained over 2,300 documents, many of which were lengthy and complex compilations and analyses of emissions and modeling data that had to be carefully reviewed for data accuracy and completeness.  Although a small number of data files were posted to EPA's public website a few days before the Proposed Rule was published, the vast majority of the supporting information and other materials were not available for public review until they were docketed the day the Proposed Rule was published in the Federal Register.

3. The Proposed Rule's comment period coincided with several other regulatory actions impacting the same industry sectors and many of the same individual companies.  EPA published proposed National Emissions Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review[15] just days before

---

[13] 88 Fed. Reg. 55858.
[14] COETF Request for 30-Day Extension of Public Comment Period for the Coke Ovens Proposed Rule (Aug. 28, 2023), available at https://www.regulations.gov/document/EPA-HQ-OAR-2002-0085-1572.
[15] 88 Fed. Reg. 49402 (Jul. 31, 2023).

the Proposed Rule was published. EPA also published a proposed National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments[16] with a comment period just prior to the Integrated Iron and Steel proposed rule comment period. These rules impact the same industry sectors and directly regulate many of the same companies affected by the Coke RTR Rule. The comment periods overlapped markedly, making it impractical to generate and submit all the data and information supporting the COETF's objections to the Proposed Rule.

4. Finally, CAA § 307(h) provides that "[i]t is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, *including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days,* except as otherwise expressly provided in [inapplicable sections]."[17] Section 307(h) makes clear that 30 days is the minimum reasonable time for a public comment period, even for the simplest of proposed rulemakings and even for rulemakings subject to deadlines. The Proposed Rule clearly was not a simple proposal – it contained a combination of multiple proposed actions within two separate regulations, data review, modeling and standards calculations, and EPA requests for public input on various specific topics.

EPA denied the COETF's extension request on September 19, 2023 without explanation.[18] EPA's delay in publishing the Proposed Rule and its rush to issue the Final Rule made it impracticable for the COETF to gather and submit all the data and other information needed to support its objections before the end of the public comment deadline. In view of this, the COETF's comments on the Proposed Rule once again raised objections to the inadequate public comment period, made another request that EPA extend the comment period, and noted that additional post-comment supporting data and analysis would be submitted to EPA.[19]

Nonetheless, EPA did not respond to the COETF's second request for an extension of the comment period until the Response to Comments document was posted to the docket on July 5, 2024. EPA's complete response to the COETF's objections was:

"We disagree with the commenter. Because of the court-ordered deadline, we were not able to provide more comment time. However, even though we have had a tight court-ordered deadline, we met the APA and statutory requirements for information/data gathering, comment, and rulemaking procedures. We proposed feasible solutions that are based on the data available to the EPA or asked for comment on those issues where input

---

[16] 88 Fed. Reg. 30917 (May 15, 2023).

[17] 42 U.S.C. § 7607(h) (emphasis added).

[18] EPA Denial Letter of COETF 30-Day Extension of Public Comment Period (Sept. 19, 2023), available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1937.

[19] COETF Comments, 3-6.

to the solution was needed. The final rule is based on the comments received on all topics."[20]

To the contrary, the comment period was unreasonably short for the reasons detailed above; and EPA denied multiple requests for a reasonable extension of the comment period, which violates the APA and CAA § 307(h) rulemaking requirements. Therefore, EPA is required to consider and respond to all significant comments received after the comment period. In addition, EPA's specific requests after the comment period for additional information from the COETF, and EPA's consideration of some (but not all) test data and information received in post-comment period submissions, effectively re-opened the administrative record, requiring EPA to consider all of the significant information and comments received after the comment period, rather than selectively considering some and disregarding others. The Final Rule, EPA's preamble, and the Response to Comments document inadequately responded – or did not respond at all – to important objections raised in the COETF's comments and post-comment submissions; and those objections are of central relevance to outcome of the Final Rule. Selectively disregarding and failing to respond to significant data and analysis EPA received after the comment period violates CAA § 307(d)(6), so EPA must initiate a reconsideration process in order to address these important objections.

Further, EPA also raised a new claim for the first time in the Final Rule, specifically that CAA § 114 provides authority for EPA's fenceline monitoring requirements.[21] Although this is clearly a "major legal interpretation[] … underlying the proposed rule,"[22] the Proposed Rule contained no indication that EPA was relying upon CAA § 114 or that § 114 formed the basis for EPA's fenceline monitoring requirements. EPA's failure to raise its reliance on CAA § 114 in the Proposed Rule deprived the COETF of the opportunity to comment on this important issue of statutory interpretation.

EPA might have corrected these errors given more time; but it did not do so, and the Final Rule contains unlawful, arbitrary, and capricious actions that cannot withstand judicial review. The COETF has timely filed a petition for review challenging the Coke RTR Rule.[23] Therefore, this petition seeks EPA reconsideration of the issues set forth below.

---

[20] EPA "Summary of Public Comments and Responses for Coke Ovens: Pushing, Quenching, and Battery Stacks Residual Risk and Technology Review, and Coke Oven Batteries Periodic Technology Review" ("Response to Comments") (July 5, 2024), available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1966, p. 230.

[21] 89 Fed. Reg. 55697.

[22] 42 U.S.C. § 7607(d)(3)(C).

[23] *See* enclosed Petition for Review and Rule 26.1 Disclosure Statements filed on August 30, 2024 with the U.S. Court of Appeals for the D.C. Circuit (Att. A).

1. **Consideration of all relevant factors, including acceptable risk determinations, costs, and cost effectiveness, when making a "revise as necessary" determination under CAA § 112(d)(6) and setting MACT floors under CAA § 112(d)(2)**

CAA § 112(d)(6) provides that "[t]he Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years."[24] When making this determination in the Final Rule, and relying upon the decision in *Louisiana Environmental Action Network* v. *EPA*, 955 F.3d 1088 (D.C. Cir. 2020), EPA did not consider any factors such as its acceptable risk determination for the PQBS source category, the cost of complying with new MACT standards, or how those costs compare with the benefits (if any) from the HAP reductions achieved by the new standards. EPA failed to explain how its interpretation gives full meaning to the "revise as necessary" language in § 112(d)(6), or why the best reading of "revise as necessary" does not include consideration of other relevant factors.

The COETF's comments on the Proposed Rule objected to the notion that CAA § 112(d)(6) prohibits EPA from considering all relevant factors – including risk, costs, and benefits – when making a decision about whether it is "necessary" to revise the existing standard. EPA's reading is not grounded in a plain language reading of the statute – the words "as necessary" do not foreclose EPA from considering any factors that are relevant to the decision whether or not to revise a standard.[25]

In the Final Rule, EPA offered four reasons why it did not take risk, costs, or benefits into account when deciding whether to revise the standards:

- *First*, EPA observes that it has an independent obligation to conduct the technology review under CAA § 112(d)(6) separate from its authority to conduct a residual risk review under § 112(f). Then EPA concluded that a finding of acceptable risk with an ample margin of safety under the residual risk review "in no way obviates the EPA's obligation to require more stringent standards under the technology review where developments warrant such standards."[26] But this does not respond to the issue – the fact that EPA has an obligation to perform a technology review even after an acceptable risk determination is not in question. The issue is whether § 112(d)(6) requires EPA to consider all the relevant factors – including risk, cost, and other factors – in deciding whether it is "necessary" to establish a new standard or revise an existing one.

- *Second*, EPA correctly observed that it has considered risk as a factor in other technology reviews, but said that fact "does not compel the Agency to do so in this rulemaking."[27] To the contrary, EPA is compelled to adhere to the statutory requirements of CAA § 112(d)(6) in all technology reviews, and it must provide a rational, non-arbitrary, and non-capricious basis for a decision that risk is a relevant factor to be considered

---

[24] 42 U.S.C. § 7412(d)(6).
[25] COETF Comments, 52-53.
[26] 89 Fed. Reg. 55709-10.
[27] *Id*. at 55710.

sometimes, just not this time. EPA failed to grapple at all with whether it is lawful and rational to consider risk in other technology review actions, but decline to do so here.

- *Third*, EPA offered a statutory language and structure argument – that EPA must ensure an ample margin of safety through the one-time risk review, and also continue to perform technology reviews on a periodic basis thereafter, "demonstrates that Congress anticipated that the EPA would strengthen standards based on technological developments even after it had concluded that the revision was not warranted under CAA section 112(f)."[28] But nothing in the statutory framework providing for ongoing technology reviews after the risk review suggests that Congress intended that EPA *would* revise standards based on later technological developments – only that it *could* revise standards if doing so was "necessary" based on risk and other relevant factors. This is to say that the statutory framework indicates that Congress intended risk to be a factor – but not the deciding factor – in making "as necessary" determinations. Other developments in practices, processes, and control technologies, such as the introduction of a suitable low-cost no HAP substitute product, could reasonably outweigh the fact that a source category is acceptable risk with an ample margin of safety.

- *Last*, EPA pointed to the "prescriptive and clear process" set forth in CAA § 112(d)(2) and (d)(3) for *setting* a MACT floor and concluded that risk and costs cannot be considered under CAA § 112(d)(6).[29] This argument improperly conflates EPA's obligation under § 112(d)(6) to determine whether a revision is "necessary" with the process for setting the level of a MACT standard under § 112(d)(2)-(d)(3). Whether or not risk and cost can be considered when setting a MACT floor, this is a separate determination from whether to revise a standard in the first instance. This is the best reading of § 112(d)(6), and it is entirely consistent with the statutory text and structure to conclude that Congress intended EPA to consider risk, cost, and other factors when deciding whether to revise a standard. Congress was certainly aware that EPA would have significantly more information about source category risk and about the costs and benefits of using § 112(d)(6) to revise existing standards *after* having set the original MACT floor standards and completed a residual risk review.

The Final Rule failed to satisfy all of the statutory criteria under CAA § 112(d)(6) and under § 112(d)(2) when performing the technology review, including considering and responding rationally regarding whether further HAP reductions are necessary due low risk of the source category, the cost of adding controls, and whether a standard would be cost effective due to the minimal HAP reductions in that would be achieved by the standard. Considering these factors is of central relevance to a determination as to whether any of the 18 final standards should have been promulgated; thus, EPA must grant reconsideration to give further consideration regarding these factors.

---

[28] *Id*.
[29] *Id*.

## 2. Achievability of MACT floors and use of intra-mine variability (IMV) factors for mercury, chlorine, and fluorine in metallurgical coals

The COETF's comments on the Proposed Rule raised objections that the emissions performance data used to set the proposed MACT floors were too limited in number to account for variability in raw material (*i.e.*, coal) characteristics, meteorological factors, and process changes (e.g., normal vs. extended coking times), each of which affects achievability of the final standards.[30] For example, there were three individual test runs in the battery stack test data that were more than 90% of the proposed limits, and one of the test runs was nearly equal to the limit.[31] As such, it was not appropriate to establish standards using such limited test data without including additional variability factors in the UPL calculations. The comments also noted that, due to the unreasonably short public comment period, the COETF did not have sufficient time to complete the additional testing and analysis needed to provide alternate UPL calculations within the comment period.[32]

During a November 28, 2023 meeting with EPA and in several post-comment submissions, the COETF provided EPA with additional data and analysis substantiating this raw material, meteorological, and process variability. *See* Trinity Consultants "Upper Prediction Limit Calculations with Intra-Mine Variability Factor" (May 3, 2024), available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1882 (Trinity UPL IMV White Paper); "Intra-Mine Variability Factor for Mercury in Metallurgical Coals" (Apr. 2, 2024), available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1885 (Trinity IMV Hg White Paper); and the COETF "Coke Ovens RTR Proposed Rule: White Paper on Proposed Standards" (Dec. 29, 2023), available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1884 (Variability White Paper).

The Trinity UPL IMV White Paper and Trinity IMV Hg White Paper included data on concentrations of mercury (Hg), chlorine (Cl), and fluorine (Fl) in coals used by facilities included in the MACT floor and, using EPA precedent to address raw material variability, provided fully calculated IMV factors for Hg, Cl, and Fl for EPA to use in its UPL calculations. These submissions explained that while EPA's UPL calculation method accounts for variability *in the test run data* (*i.e.*, stack test measurement variability or run-to-run variability), EPA's method does not account for variability caused by longer-term differences in raw materials at a source or between sources. In other RTR rules (*e.g.*, those regulating the cement, lime, and brick industries), EPA accounted for variability of HAP content in raw materials sourced from different locations by using so-called "intra-quarry variability" factors very similar to the IMV factors developed by Trinity for the Coke RTR Rule. Like in these other industries, the concentrations of Hg, Cl, and Fl in coals sourced from different mines (or from different areas within a mine) for processing by byproduct recovery coke plants have a direct impact on emissions of Hg, HCl, and HF from battery stacks and PECs. Therefore, incorporating this variability into the standard UPL calculation for Hg, HCl, and HF is critical to ensuring that the

---

[30] COETF Comments, 3, 55-59.
[31] *Id.* at 56.
[32] *Id.* at 59.

calculated MACT floors are representative of raw material variability and actual emissions performance over the long term and achievable at all times.[33]

In the final Coke RTR Rule, EPA did not revise the UPL calculations to account for intra-mine variability in setting the level of the final standards. EPA's preamble states that:

> "The use of the UPL to account for variability was upheld in *U.S. Sugar* v. *EPA,* 830 F.3d 579 (D.C. Circuit, 2016) … First, the floor standards reasonably account for variability in the emissions of the sources used to calculate the standards. This variability occurs due to a number of factors, including measurement variability (both sampling and analysis) and short term fluctuations in the emission levels that result from short-term changes in fuels, processes, combustion conditions, and controls."[34]

The preamble also claims that EPA addressed its UPL calculations in the Final Rule:

> "… per the procedures in the memorandum *Approach for Applying the Upper Prediction Limit to Limited Datasets.* In *Sierra Club* v. *EPA* 895 F.3d 1, 14 (D.C. Circuit, 2018), the Court decided that the EPA had sufficiently explained the general application of the UPL to small/limited datasets and denied the petition for review as to the general application of the upper prediction limit to limited datasets as defined by the EPA: 'We deny the Environmental Petitioner's petition for review as to the general application of the upper prediction limit to limited datasets as defined by the EPA.'"[35]

This response fails to address or even acknowledge: (1) the COETF's objection that EPA's UPL method alone does not account for variability of naturally occurring elements (*e.g.*, Hg, Cl, and Fl) in raw materials processed by the MACT floor facilities; (2) the data provided to EPA in the Trinity white papers on concentrations of Hg, Cl, and Fl in coals used by MACT floor facilities; (3) the IMV factors provided to EPA in the Trinity white papers; and (4) the fact that EPA has accounted for raw materials variability in rules for at least three other industry sectors under circumstances very similar to the coke sector.

EPA's reliance on *U.S. Sugar* and *Sierra Club* is likewise misplaced. The decision in *U.S. Sugar* is limited to the specific circumstances of the boiler source category UPL calculations (*i.e.*, metallurgical coals are processed into coke not used as fuel);[36] and the *Sierra Club* decision only held that EPA had sufficiently explained the *general* application of the UPL to limited datasets.[37] *Sierra Club* did not decide – nor could it – that EPA's UPL method is sufficient in every application or in each specific MACT floor calculation. Likewise, *U.S. Sugar* and *Sierra Club* did not hold that EPA's UPL method adequately addresses *all* forms of variability – specifically longer-term variability due to changes in naturally occurring elements in coal sourced from different mines and different veins within the same mine. By EPA's own explanation, its UPL

---

[33] Trinity UPL IMV White Paper, 2-3.
[34] 89 Fed. Reg. 55713-14.
[35] 89 Fed. Reg. 55714.
[36] *See* 830 F.3d at 401-402.
[37] *See* 895 F.3d at 14.

method only accounts for short-term fluctuations or run-to-run variability: "… variability occurs due to a number of factors, including measurement variability (both sampling and analysis) and *short term* fluctuations in the emission levels that result from *short-term* changes in fuels, processes, combustion conditions, and controls."[38]

The quality and representativeness of the data used to set the MACT floors, and whether long-term variability in emissions is adequately accounted for, are of central relevance to the outcome of the Final Rule. This is not an instance where EPA tried but failed to collect the requisite data to address variability. The COETF supplied, and EPA had in its possession during the rulemaking, the data and calculations needed to apply the IMV factors that should have been used in the MACT floor UPL calculations. However, EPA did not consider or respond to the COETF's submissions on the issue.

EPA's failure to address and incorporate the data and IMV factors provided in the COETF's post-comment submissions significantly affected the level of the final MACT limits as evidenced by the MACT floor calculations prepared by Trinity. Therefore, EPA must grant reconsideration in order to address these issues.

### 3. UPL calculation errors for the HCN limit for PECs

In the Final Rule EPA changed the proposed MACT floor limits based on revised UPL calculations.[39] The revised UPL calculations considered additional stack test data provided by a COETF member company for battery stacks and PECs at its EES River Rouge facility.[40] In reviewing the final UPL calculations, the COETF has identified an error with respect to the UPL calculation for HCN emissions from existing PECs which significantly impacts the final MACT limit currently set at 0.0015 lb/ton coke.

Specifically, in the final UPL calculations, EPA incorrectly characterized the distribution of this pollutant/source combination as a "normal" distribution.[41] However, using EPA's UPL calculation workbook for distributions with more than three datapoints (*i.e.*, "n>3Distribution" tab), the HCN test data for PECs are properly characterized as a "lognormal" distribution as summarized in Figure 1 below. The procedure to identify the distribution type is consistent with that performed for the other newly established PECs and battery stack MACT limits.

---

[38] 89 Fed. Reg. 55714 (emphasis added).
[39] EPA "Maximum Achievable Control Technology Standard Calculations, Cost Impacts, and Beyond-the-Floor Cost Impacts for Coke Ovens Facilities under 40 CFR Part 63, Subpart CCCCC" (May 1, 2024), available at https://www.regulations.gov/document/EPA-HQ-OAR-2002-0085-1618.
[40] *See id.* at C-24.
[41] *Id.* at B1-B3.

**Figure 1. Existing Source HCN Distribution Determination for PECs**

| Runs | Raw Data | | | | |
|---|---|---|---|---|---|
| | SC-Middletown-OH | AKS-Middletown-OH | AM-Monessen-PA | AM-Burnsharbor-IN | EES-RiverRouge-MI |
| 1 | 2.13E-05 | 1.37E-04 | 7.08E-04 | 7.71E-04 | 1.50E-03 |
| 2 | 2.58E-05 | 1.28E-04 | 9.04E-04 | 9.06E-04 | 1.60E-03 |
| 3 | 2.50E-05 | 8.26E-05 | 5.99E-04 | 8.49E-04 | |
| 4 | | 1.09E-04 | | | |

| KURTOSIS CALCULATIONS FOR SAMPLE SETS WITH n > 3 ONLY | | | | |
|---|---|---|---|---|
| Testing Normality | Raw Data | Logtransformed | | |
| Sample Size | 15.00 | 15.00 | | |
| Kurtosis | -0.55 | -1.35 | | |
| SE Kurtosis | 1.20 | 1.20 | | |
| Result Kurtosis | normal | normal | | |
| Skewness | 0.69 | -0.47 | | |
| SE Skewness | 0.58 | 0.58 | | |
| Result Skewness | normal | normal | | |
| S/SES | 1.19 | 0.81 | | |
| | Result Raw Data | Result Log Data | Final Result | |
| | Normal | Normal | Lognormal | |

The UPL calculation prescribed by EPA is different for normal and lognormal distributions. Using EPA's methodology for lognormal distributions (*i.e.*, "Lognormal Template" tab in the EPA UPL calculation workbook), the resulting UPL for HCN is 0.0068 lb/ton coke. Corrected UPL calculations are provided in the attached Trinity UPL Calculations Post-Publishing of Final Rule Workbook (Att. B) and Trinity UPL Calculations Post-Publishing of Final Rule Table (Att. C) and summarized in Figure 2 below.

**Figure 2. Existing Source HCN UPL Calculation for PECs**

| PROCESS_ID | No. of Sources with Data | No. of Sources in MACT Floor | No. Data Points in MACT Floor | Average of Top Source | Variance of Top Source | UPL | Unit of Measure | Data Distribution | Rounded Floor | Floor Based On |
|---|---|---|---|---|---|---|---|---|---|---|
| Pushing | 5 | 5 | 15 | 0.00056 | 2.9E-07 | 0.0068 | lb/ton coke | lognormal | 0.0068 | UPL |

EPA must revise the MACT floor limit for HCN emissions from PECs using the proper data distribution consistent with the procedures employed for all other final MACT floor limits developed in this rulemaking. Therefore, EPA should grant reconsideration in order to address this issue.

### 4. Site-specific alternative standards for sources demonstrating that MACT floor limits are impractical to achieve

The COETF's comments on the Proposed Rule,[42] and its post-comment submissions to EPA,[43] objected that the proposed MACT floor limits were based on very limited test data reflecting a snapshot in time, and that EPA's UPL calculations do not account for inherent variability in raw materials (*i.e.*, coal), meteorological, and operational factors. The comments noted that sources are not expected to be able to achieve the proposed limits on a consistent basis because EPA did not account for this variability, and because there are no demonstrated or feasible add-on pollution control technologies for controlling these HAPs.[44] Consequently, there is no identified pathway to compliance with these overly stringent limits.

To address this concern, the COETF requested that EPA include a provision in the Final Rule allowing site-specific alternative standards for entities which demonstrate that the limits are not achievable.[45] During a post-comment period meeting with the COETF on March 14, 2024, EPA requested additional information regarding this alternative standard approach, which the COETF submitted to EPA on March 22, 2024.[46] In its March 22 submission, the COETF again requested that EPA provide for approved alternative standards in the Final Rule based on EPA's authority to subcategorize source categories (including subcategories that include single sources) under CAA §§ 112(d)(3) and (d)(6) and provided an example where EPA had used this approach in the Surface Coating of Metal Furniture NESHAP.[47] The Surface Coating of Metal Furniture rule contains a "no organic HAP" MACT floor standard for coatings but allows an operator to request an approved alternative standard if the no organic HAP standard cannot be met in the operator's specific circumstances.[48]

In the Final Rule, EPA did not respond to these submissions or otherwise address the need for an alternative standard, and EPA gave no indication why it did not incorporate an alternative standard provision. Site-specific alternatives are particularly important if EPA proceeds with a rule that is founded on such limited data. Congress did not intend the NESHAP program to "drive sources to the brink of shutdown."[49] When EPA promulgates standards on insufficient data that are, in reality, not achievable, it does precisely that. Therefore, EPA must grant reconsideration to address approved alternative standards to the final MACT limits.

---

[42] COETF Comments, 56-59.
[43] Variability White Paper.
[44] *Id.* at 3.
[45] *See* COETF email "Follow-up on Coke Sector RTR" dated Mar. 22, 2024 (the "March 22, 2024 Email") (Att. D). The COETF notes that this document does not appear in the two rulemaking dockets. The COETF requests that the March 22, 2024 Email be added to dockets EPA-HQ-OAR-2002-0085 and EPA-HQ-OAR-2003-0051, as well as to the administrative record for judicial review in order to comply with the requirements of CAA §§ 307(d)(3) and (6)(A) that EPA include all the data, information, and documents underlying the Final Rule.
[46] *See id.*
[47] Codified at 40 C.F.R. Part 63 Subpart RRRR.
[48] *See* 40 C.F.R. 63.4890(b).
[49] H. Rept. 101-490, pt. 1, p. 328.

### 5. Existing opacity standard as a surrogate for PM/HAP metals

As pointed out in the COETF's comments, the PQBS NESHAP has long included opacity limits for battery stacks – specifically a 15% daily average opacity limit for batteries on normal coking cycles and a 20% daily average opacity limit for batteries on battery-wide extended coking (§ 63.7333(e)(1)). The COETF objected to EPA's proposal to add filterable PM limits for battery stacks and pointed to numerous studies supporting the use of opacity as a surrogate.

In the Final Rule EPA responded that the studies identified by the COETF "assess the relationship between PM and opacity, and not between opacity and metals emissions" and that "[t]he direct measurement of PM emissions, rather than the use of second-order surrogacy to metal emissions is appropriate because of the additional uncertainty inherent in the second order relationship."[50] However, this response dodged the issue and impermissibly ignored that the existing opacity standards in the PQBS NESHAP act as surrogate standards for non-Hg HAP metals. Indeed, EPA's response contradicts its prior conclusion that "[b]attery stack opacity is perhaps the best single indicator of the maintenance status of coke ovens and could be considered as an indicator of fugitive and excess HAP emissions from coke oven batteries."[51]

Furthermore, EPA failed to provide any factual support for its claim that there is sufficient "uncertainty inherent in the second order relationship" between opacity and non-Hg HAP metals to warrant rejecting using the existing opacity standards as a surrogate. Given the existing opacity standards in the PQBS NESHAP and the fact that EPA did not raise the issue in the Proposed Rule, the COETF and other commenters could not have anticipated that EPA would reverse its long-standing reliance on opacity as surrogate standards in the PQBS NESHAP.

Opacity is an existing and effective surrogate for PM emissions and for non-Hg HAP metals, which EPA has recognized for decades. Because using the existing opacity standards as a surrogate standard would eliminate the need for new filterable PM emission limits, this issue is of central relevance to the outcome of the final standards for battery stacks. Thus, EPA must grant reconsideration on this issue.

### 6. HCl as a surrogate for HF and an HBEL for HCl

The COETF's March 22, 2024 submission also requested that EPA use HCl as a surrogate for HF (in lieu of establishing a separate limit for HF) and establish an HBEL for HCl (in lieu of a MACT floor-based limit).[52] This request was based on newly released EPA determinations in two separate rulemakings. First, in the (then pre-publication) final RTR rule for the Integrated Iron and Steel source category, EPA determined that the "numerical standard for HCl being finalized in this rule shall act as a work practice (or surrogate) for HF, as control of HCl will also

---

[50] Response to Comments, 21-22.
[51] 88 Fed. Reg. 55883.
[52] *See id.*

control HF."[53]  This determination was not publicly announced or known to the COETF until EPA published the pre-publication version of the Integrated Iron and Steel rule on March 3, 2024.  Upon learning this, the COETF requested that EPA use the same HCl surrogate approach in the Coke RTR Rule.[54]

The COETF also urged EPA to adopt an HBEL for HCl because EPA had recently announced a supplemental notice of proposed rulemaking for the Lime Manufacturing source category, where EPA proposed a mass-based HBEL for HCl in lieu of a technology-based limit.[55]  In deciding whether to set an HBEL for HCl emissions in the Lime Manufacturing source category, EPA reviewed the conclusions on whether HCl would cause adverse health effects in the 2020 RTR for the Lime Manufacturing source category.  Because the hazards associated with HCl were acceptable with an ample margin of safety in the 2020 RTR, EPA stated that it would propose to set an HBEL.[56]

The COETF commented that it would be appropriate to establish an HBEL for the Coke RTR Rule for the same reasons due to EPA's acceptable risk (including an ample margin of safety) determination in the Coke RTR Rule and because using an HBEL would address the limited data and emissions variability problems plaguing the proposed MACT floors for HCl (as acid gases).[57]  To set an HBEL for HCl, EPA could similarly establish an emission standard to ensure that levels of HCl remain below the concentrations at which any adverse impacts would be expected to occur.  As an example, an appropriate approach to setting a health-based threshold would be to establish a mass-based standard, which could include both a tons per year limit as well as a pounds per hour limit to ensure protection from both chronic and acute impacts.  The EPA memorandum titled "Risk Approach to Assess a Health-Based Emission Limitation for Hydrochloric Acid for the Lime Manufacturing Source Category," documented a risk assessment performed to determine an HBEL for hydrochloric acid (HCl) for the Lime Manufacturing source category which followed this methodology.[58]  In its supplemental proposed and final rules for the Lime Manufacturing source category, EPA did not identify any technical or legal flaw in setting an HBEL for HCl.

EPA impermissibly failed to respond to the COETF's comments or otherwise address these concerns with the final limits, and EPA gave no indication why it did not consider HCl as a surrogate for HF in the Final Rule (as it had done in the Integrated Iron and Steel rule) or consider setting an HBEL for HCl (as similarly proposed in the Lime Manufacturing rule).  An

---

[53] "National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review," p. 63, available at https://www.epa.gov/stationary-sources-air-pollution/integrated-iron-and-steel-manufacturing-national-emission.

[54] See March 22, 2024 Email.

[55] See "National Emission Standards for Hazardous Air Pollutants: Lime Manufacturing Plants Amendments," 89 Fed. Reg. 9088 (Feb. 9, 2024).

[56] EPA did not identify any need to update the results of the 2020 HCl risk assessment in the 2024 final rulemaking or supplemental proposal.

[57] See March 22, 2024 Email.

[58] See EPA, "Risk Approach to Assess a Health-Based Emission Limitation for Hydrochloric Acid for the Lime Manufacturing Source Category" (Nov. 6, 2023), available at https://www.regulations.gov/document/EPA-HQ-OAR-2017-0015-0194.

HBEL would provide meaningful improvement to the final acid gas limits and so is centrally relevant to both the form and stringency of the final limits. Therefore, EPA must grant reconsideration as to the final acid gas limits.

## 7. Revised limits for coke oven doors, lids, and offtakes and subcategorization of facilities with >3 million tons/year coke production

In its comments on the Proposed Rule, the COETF raised objections to EPA's proposal to lower allowable leak limits for coke battery doors, lids, and offtakes and to subcategorize facilities based on annual coke production.[59] The proposal relied solely on leak rate data showing compliance with the existing MACT standards as evidence of so-called "improvements in leak control;" but it failed to identify any specific development in practices, processes, or control technology that was not previously identified and considered during development of the original MACT standards.[60]

The COETF's comments informed EPA that there were no identified improvements in leak control practices that are used in the industry and that the same practices in use today were in use and considered during development of the original MACT standards.[61] Under the technology review methodology employed by EPA, the following may be considered a "development" under § 112(d)(6):

- Any add-on control technology or other equipment that was not identified and considered during development of the original MACT standards;

- Any improvements in add-on control technology or other equipment (that were identified and considered during development of the original MACT standards) that could result in additional emissions reduction;

- Any work practice or operational procedure that was not identified or considered during development of the original MACT standards;

- Any process change or pollution prevention alternative that could be broadly applied to the industry and that was not identified or considered during development of the original MACT standards; and

- Any significant changes in the cost (including cost effectiveness) of applying controls (including controls the EPA considered during the development of the original MACT standards).[62]

---

[59] COETF Comments, 3, 41-43.
[60] 88 Fed. Reg. 55884.
[61] COETF Comments, 41.
[62] 88 Fed. Reg. 55867.

The COETF comments objected that leak data showing compliance with the original MACT standards does not qualify as a development under any of these definitions.

EPA applied a wholly different technology review approach in the Final Rule, arguing for the first time that it can "infer" from compliance data showing fewer leaking doors, lids, and offtakes that there are "improved work practices for observing leaks during operations, and more quickly and efficiently sealing and adjusting doors, or other practices related to door leaks."[63] EPA also attempted to shift the burden to industry commenters to disprove this claimed inference: "Industry commenters have not suggested any alternative explanation. It is therefore reasonable to infer that lower leak rate values reflect developments in work practices to control leaks."[64] EPA used the same "inference" to set even more stringent limits for the one "large" facility with >3 million tons/year coke production.[65]

EPA's "inference-based" approach was neither explained nor supported in the Proposed Rule. Nor does the final Coke RTR Rule address the COETF's comments that: (1) there have been no changes or identified improvements in the leak control practices used in the industry; (2) the same leak control practices used by facilities today were in use and considered during development of the original MACT standards; and (3) EPA has not identified, nor is the COETF aware of, any different or specialized work practices conducted at the one "large" coke plant that are not practiced at other coke plants.[66] These failures require reconsideration of the revised limits.

In addition, EPA arbitrarily selected a 3 million ton/year production capacity threshold to create a subcategory of one facility. To pick a number, EPA simply looked at compliance data for the largest coke plant and claimed that 3 million ton/year production capacity is a clear breakpoint that aligns with the data. But there is only one such coke facility with >3 million tons/year coke production, and EPA failed to identify any different or improved work practices that are unique to this facility. The COETF's comments objected to this proposed subcategorization approach and informed EPA that the one "large" facility employs the same leak control practices used by the rest of the industry.[67] The comments also explained why it is counterintuitive for EPA to believe that higher coke production capacity leads to lower leak rates – indeed, one would expect the "large" facility to have similar or higher leak rates compared to smaller capacity facilities due to the larger number of ovens in operation, with more cycles of charges and pushes, etc.[68] EPA failed to address these comments and also offered no plausible basis for "inferring" that the opposite is true.

Finally, the Final Rule does not describe any effort by EPA to identify and evaluate the specific "improved work practices" it claims lead to fewer leaking doors, lids, and offtakes. Conclusory

---

[63] 89 Fed. Reg. 55701-02.
[64] *Id.*
[65] 89 Fed. Reg. 55695.
[66] Nothing has occurred since the rulemaking that changes these conclusions. *See* Decl. of Matthew J. DeLibero, U.S. Steel, ¶¶ 7-10 (Att. E); Decl. of Michael E. Long, Cleveland-Cliffs, ¶ 5 (Att. F).
[67] COETF Comments, 43-44; *see also* Decl. of Matthew J. DeLibero, U.S. Steel, ¶ 11.
[68] *Id.* at 44.

inferences without identifying any developments in practices, processes, and control technologies do not satisfy the statutory basis required to revise regulations under CAA § 112(d)(6). EPA's promulgation of revised limits without any showing of improvements in practices, processes, and control technologies renders the revised limits beyond EPA's statutory authority. Moreover, EPA's failure to provide a rational basis for its decision renders the revised limits arbitrary and capricious. Therefore, EPA must grant reconsideration as to the lowered leak limits for coke oven doors, lids, and offtakes and subcategorization of facilities based on coke production.

### 8. Fenceline monitoring and corrective action requirements

The COETF submitted comments to EPA on the proposed fenceline monitoring requirements challenging EPA's claim of authority to impose monitoring, reporting, and root cause and corrective action work practices on emissions from onsite non-categorical sources, including emissions from byproduct recovery sources.[69] The COETF also objected to EPA's method of setting a fenceline concentration "action level" using actual (as opposed to allowable) benzene emissions and improperly placed model receptors that failed to identify the actual highest modeled concentration at the true property boundary.[70]

During an EPA site visit on January 18, 2024 with COETF member company Cleveland-Cliffs, EPA requested additional information showing how modeling the true facility fenceline and using allowable benzene emissions from byproduct recovery plant sources would impact the resulting fenceline benzene action level. The COETF provided this evaluation in a white paper prepared by AECOM dated February 2, 2024.[71] In this white paper, AECOM remodeled the Cleveland-Cliffs Warren, Ohio facility using receptors located at the facility's true fenceline (as opposed to EPA's polar grid receptors) and emissions based on whole facility allowable emissions estimated by applying a throughput scale-up to actual emissions for the byproduct recovery facility.[72] As shown on Figure 4 of the AECOM report, the highest modeled fenceline concentration was 11.3 μg/m$^3$, which is nearly four times EPA's proposed benzene action level of 3 μg/m$^3$.[73]

EPA made three changes in the Final Rule regarding the fenceline monitoring requirements that require reconsideration:

---

[69] COETF Comments, 2, 28-32.

[70] *Id.* at 33-34.

[71] *See* AECOM "Evaluation of Modeling Methodology Used by EPA to Determine a Benzene Fenceline Monitoring Proposed Action Level in the Coke Ovens Proposed Rule" (Feb. 2, 2024) ("AECOM White Paper") (Att. G). This document is also missing from the docket, although the email transmitting the AECOM White Paper to EPA and AECOM's modeling files do appear in the docket. *See* COETF "AECOM's Evaluation of Modeling Methodology" (Feb. 3, 2024), available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1883. We request that EPA add the AECOM White Paper into the dockets and the administrative record for judicial review.

[72] *See id.*

[73] *Id.*

- *First*, EPA for the first time grounded fenceline monitoring in EPA's authority under CAA § 114.[74] This rationale is fundamentally different from the claimed statutory basis in the Proposed Rule, which made no mention of CAA § 114.[75] This appears to be the first time EPA has asserted such an interpretation of CAA § 114 in the context of a CAA § 112(d)(6) review, and EPA clearly failed to put the interested public on notice of this novel reading in the Proposed Rule. EPA's failure to explain what it believed to be the legal basis for its proposed standards deprived commenters of the ability to engage EPA on its faulty interpretations of CAA §§ 112(d)(6) and 114.

  Furthermore, EPA made no effort to reconcile the text of CAA § 114 with the claim that it has "ample authority"[76] to require monitoring of non-categorical sources (*i.e.*, coke byproduct recovery plants) in a CAA § 112(d)(6) technology review, which legally governs only those sources within the PQBS and Coke Oven categories. Neither category covers coke byproduct recovery plants. EPA's claim that it can codify CAA § 114 information collection requirements in a regulation so as to mandate never-ending monitoring for an entire source category is not supported by the best reading of CAA § 114 and, therefore, is beyond EPA's statutory authority. The statutory authority EPA claims for its action is centrally relevant to the scope of the action EPA can take. Here, after public comment EPA switched the basis for its authority to a provision that does not authorize its action.

- *Second*, EPA remodeled the Cleveland-Cliffs Warren, Ohio facility using the facility boundary (vs. polar grid);[77] however, EPA continued using actual (not allowable) benzene emissions *and* placed the property boundary receptors in the wrong locations. Based on the AECOM White Paper EPA knew the receptor location that represented the highest modeled benzene concentration – it is clearly identified on Figure 4 of the AECOM White Paper.[78] But EPA failed to place a receptor at or near that location in its modeling, which predictably produced a lower (understated) modeled benzene concentration and, consequently, a lower action level.

  In addition, EPA's use of actual rather than allowable emissions to set the fenceline action level exceeds EPA's statutory authority and is arbitrary and capricious because it forces facilities to undertake root cause assessments and implement corrective actions to reduce emissions even though the facilities are operating within their permitted emissions levels. Allowable emissions are authorized under the facilities' permits and create an upper limit of emissions for each regulated pollutant. Using actual emissions to set the fenceline action level is a de facto reduction in permitted emission limits without following required procedures for amending permits and would result in facilities being

---

[74] 89 Fed. Reg. 55697.
[75] 88 Fed. Reg. 55885.
[76] 89 Fed. Reg. 55697.
[77] Response to Comments, 120.
[78] AECOM White Paper, p. 6, Fig. 4.

out of compliance when they increase operations or production levels but remain within the production levels authorized by their permits.

- *Third*, EPA announced for the first time in the Final Rule that facilities must employ "appropriate real-time monitoring techniques" (1) in their site-specific monitoring plans if they plan to account for proximate onsite sources of benzene emissions, and (2) to locate the cause of an action level exceedance if a root cause determination has not been made within 30 days.[79] EPA did not raise the use of real-time monitors in the Proposed Rule, and real-time monitors are not widely used in the cokemaking industry. The Final Rule failed to address multiple issues with real-time monitors, including the technical feasibility of locating and installing real-time monitors, the difficulty using real-time benzene monitor data and the 2-week average benzene monitor data at the fenceline to determine an appropriate delta c, the complexity of using these monitors at coke facilities, and the cost of installing and operating monitors. The COETF had no opportunity to raise objections to this change or to provide information on the feasibility and reasonableness of requiring real-time monitors for these purposes. Had EPA provided this opportunity, the COETF would have provided information on the cost and infeasibility of real-time monitors, demonstrating that it is unreasonable to include a real-time monitoring requirement.[80]

In view of the above, EPA must grant reconsideration of the final fenceline monitoring requirements in order to take comment on EPA's claim of authority under CAA § 114, to revisit the modeling issue and action level considering all of the comments provided in the AECOM White Paper, and to reconsider the use of real-time monitoring techniques.

9. **Work practice standards for startup, shutdown, and malfunction (SSM) operating conditions**

EPA eliminated all SSM provisions from the Final Rule, making the numerical MACT floor emissions limits apply at all times, including during SSM events. In its comments on the Proposed Rule, the COETF objected to eliminating SSM provisions without also adopting a work practice standard for SSM operating periods because a significant malfunction could result in a violation of numerical emission standards that were not established taking into consideration SSM conditions and emissions.[81] The COETF requested that EPA establish a work practice standard requiring facilities to create and follow a malfunction work plan with site-specific best practices that must be followed, unless doing so would not be possible due to safety considerations.[82]

In the preamble to the Final Rule, EPA responded that "commenters did not provide a description of specific situations where work practice standards, or any specific work practices,

---

[79] 89 Fed. Reg. 55740; *see also id.* at 55697.
[80] *See* Decl. of Matthew J. DeLibero, U.S. Steel, ¶ 18.
[81] COETF Comments, 62-63.
[82] *Id.*

would be more appropriate than the numerical emissions standards we are finalizing in this rule (or standards that were already in the NESHAP) that would be appropriate during startup or shut down."[83] Insofar as this relates to the COETF's comments, EPA's response is clearly in error – the COETF's comments specifically requested that a work practice standard be adopted for malfunction conditions and that such standard should require a facility-specific work plan containing the practices to be followed during a malfunction. Indeed, the COETF's recommended approach is essentially the same one EPA adopted for emissions of PAH, D/F, and VOHAP from battery stacks – the Final Rule contains a work practice standard for these HAP that requires facilities to follow site-specific good combustion practices.[84] The Final Rule does not prescribe the specific work practices that must be followed – and none were identified by EPA in the Proposed Rule – but instead requires that facilities identify and implement a set of site-specific good combustion work practices for each battery.

EPA failed to give adequate consideration to the COETF's request to use the same site-specific work practice approach for SSM events, and also failed to explain why a similar "good practices" work practice standard is appropriate for battery stacks but not appropriate for SSM events.[85] The use of work practices in lieu of numerical emission limits is centrally relevant to the form and stringency of the final limits, so EPA must grant reconsideration on this issue.

### 10. Compliance schedule

Given the numerous concerns regarding the achievability of EPA's proposed standards, the COETF's comments requested a three-year compliance schedule for the newly promulgated standards, because additional time beyond EPA's one-year schedule will be necessary for facilities to evaluate the need for additional emission controls and to assess feasibility and technical risks and to test, trial, design, engineer, permit, procure, fabricate, and install the new equipment before compliance is required.[86] Additional compliance time is also needed in order to retrofit new equipment into existing facilities with limited space and to allow facilities to streamline and consolidate compliance testing of battery stacks and PECs with other required source testing.[87]

During a February 6, 2024 post-comment period meeting, EPA requested that the COETF provide additional information and examples supporting the need for a three-year compliance schedule. The COETF submitted this information to EPA on February 9, 2024 with an analysis focusing on the need for time to comply with: (1) all of the new MACT floor limits for battery stacks and PECs, (2) fenceline monitoring requirements, and (3) revised limits for leaking coke oven doors/lids/offtakes.[88] In support, the Compliance Concerns White Paper included an

---

[83] 89 Fed. Reg. 55718.

[84] *Id*. at 55707-08.

[85] *See* Decl. of Matthew J. DeLibero, U.S. Steel, ⁋ 15.

[86] COETF Comments, 64.

[87] *Id*.

[88] *See* COETF, "Compliance Schedule Concerns and Examples," dated Feb. 9, 2024 (Compliance Concerns White Paper) (Att. H). This document also is not in the docket, and we request that be added to the dockets and the administrative record for judicial review.

analysis comparing the proposed MACT floor standards to the 99% UPL of the unit test data that EPA used to develop the proposed standards, showing that three of the five MACT floor facilities would not be expected to comply with all of the proposed MACT floor limits. Based on tis information, the proposed standards would not be consistently achievable (even by MACT floor facilities) without additional add-on controls, operational changes, or both.[89]

The Compliance Concerns White Paper detailed multiple reasons why a minimum three-year compliance schedule is needed:

- Controls for the relevant pollutants/sources have not been demonstrated for the coke byproduct recovery industry, either in the US or internationally;

- Controlling multiple pollutants and retrofitting controls into existing operations add complexity and time due to interactions in the requirements for control, including pollutant interactions, flow rates, chemistry, and temperatures;

- Control technologies for HCN are not technically feasible in the industry;

- Extensive engineering and physical modifications will be needed for add-on controls, and additional controls would require permitting from the local permitting agency, with permitting taking 6 to 12 months after engineering is completed;

- Each facility will need to add emission controls and new leak detection/repair programs to comply with the proposed fenceline monitoring action level; and

- More than one year is needed to develop and implement facility-specific fenceline monitoring plans.[90]

Although EPA asked the COETF to submit these compliance schedule concerns and examples, EPA did not include the Compliance Concerns White Paper in the docket and did not respond to the concerns raised by the COETF. EPA's response focused, instead, only on the time that facilities would need to perform testing to confirm that they *can meet* the new limits – which EPA concluded is 18 months[91] – without addressing the specific concerns raised regarding facilities that *cannot meet* all the new standards without costly and time-consuming projects to install additional control equipment and other measures. Although EPA revised some of the final MACT limits in the Final Rule, the Hg limit for PECs is unchanged from proposal and EPA did not address the COETF's concerns regarding raw material and process variability when it revised the final MACT limits. Facilities that cannot meet EPA's unachievable standards will have wholly inadequate time to complete the testing, design, engineering, procurement, and installation of equipment needed to do so, assuming compliance is even feasible. The compliance schedule is clearly centrally relevant to the Final Rule; therefore, EPA should

---

[89] Compliance Concerns White Paper, 1.
[90] *Id*. at 2-4.
[91] 89 Fed. Reg. 55722.

provide reconsideration in order to fully evaluate the time needed to implement necessary controls.


## IV.    GROUNDS FOR STAY

The Administrator has authority under CAA § 307(d)(7)(B) to postpone the effective date of the Coke RTR Rule for an initial three-month period if reconsideration is granted.[92]  Such a stay is appropriate in this instance based upon the same grounds underlying a decision to grant reconsideration and to avoid regulatory uncertainty while EPA reconsiders the rule.

In addition, ACCCI and the COETF request that EPA stay the effective date of the Coke RTR Rule under APA § 705, which authorizes EPA to stay the effective date of an action where "justice so requires" in order to allow for full judicial review of the Final Rule and the promulgation of replacement regulations.[93]  Fundamental principles of justice and of sound rulemaking strongly support granting a stay.

- *First*, there is a strong likelihood that the ACCCI/COETF petition for review will be granted on its merits. The Final Rule contains multiple new requirements and limitations that exceed EPA's statutory authority to issue regulations under CAA § 112, including: (1) promulgating MACT floor limits that are unachievable by the best controlled similar sources; (2) failure to consider all relevant factors, including cost and cost effectiveness; (3) promulgating revised limits for coke oven doors/lids/offtakes without identifying a corresponding development in practices, processes, or control technologies in violation of CAA § 112(d)(6); (4) arbitrary subcategorization of facilities based on coke production; (5) promulgating fenceline monitoring and corrective action requirements for non-categorical sources that are contrary to CAA § 112; (6) promulgating an arbitrary and capricious fenceline monitoring action level; and (7) failure to follow required notice-and-comment rulemaking procedures.  In each of these instances, there is a strong likelihood of success on the merits because EPA acted in excess of statutory authority, failed to satisfy all statutory criteria, and/or acted in an arbitrary and capricious manner in failing to make rational decisions and to support its decisions with adequate evidence and failing to observe rulemaking procedure as required by law.

- *Second*, these failures are so substantial that a stay of the Final Rule is necessary to ensure a complete correction of the defects in the rule and to avoid significant and irreparable economic impacts, job impacts, and business disruption to the COETF's members and the steel sector more generally.  The projected costs to the COETF's members of adding air pollution controls for battery stacks and PECs is nearly $1.3 Billion in capital costs, and more than $220 Million in annual operating costs.[94]  Absent a

---

[92] 42 U.S.C. § 7607(d)(7)(B).
[93] 5 U.S.C. § 705.
[94] *See* Decl. of Matthew J. DeLibero, U.S. Steel, ¶¶ 20-22; Decl. of Michael E. Long, Cleveland-Cliffs, ¶ 13; Decl. of Ian Donaldson (Att. I), Trinity, ¶¶ 11 and Tables 1-2.

stay, facilities will be forced to take immediate steps to come into compliance with new MACT floor limits and more stringent leak rate standards that will operate to cause irreparable and unjustifiable harm, *even if* EPA or the D.C. Circuit ultimately decide that the Coke RTR Rule is defective. Some facilities will be forced to install new add-on control technology in an effort to comply with new standards, assuming compliance is possible at all.[95] If EPA ultimately revises or repeals those standards during reconsideration, or if the D.C. Circuit vacates and remands the Coke RTR Rule, the cost of the installed controls would not be recouped and the controls themselves would be impractical to remove. These regulatory costs associated with the Final Rule will substantially impact local and national economies and would undermine the coke and steel sectors' vital role in creating and supporting our national infrastructure and national security.

The importance of avoiding these harms is emphasized in the June 14, 2024 bipartisan letter from U.S. Senators Brown, Braun, Casey, Vance, Klobuchar, and Young urging EPA to reconsider the Coke RTR Rule and two other rules targeting the steel industry and warning that "[a]bsent a stay, the steel industry will be forced to proceed with planning and spending for unproven technologies and work practices while the final provisions of the rules remain uncertain. Given that these regulations will impact nearly every aspect of the integrated iron and steelmaking process, it is imperative that EPA grant both the petitions for reconsideration and requests for stay of the rules."[96] In a separate letter, these six Senators plus Senators Manchin and Capito warned that the three rules "would dramatically undermine the domestic steel industry and national security while driving production overseas likely resulting in no net reduction in emissions from the steel industry globally."[97] Similar concerns are echoed in letters to EPA from Representatives Crawford and Mrvan (the Chair and Vice Chair, respectively, of the Congressional Steel Caucus)[98] and from the International President of the United Steel Workers.[99] EPA plainly has authority to avoid these serious and irreparable harms by issuing a stay of the Final Rule.

- *Third*, no other interested parties are likely to suffer harm due to a stay of the rule. EPA's residual risk review confirmed that the PQBS source category is acceptable risk with an ample margin of safety. Therefore, any additional emission reductions are not necessary to ensure adequate protection of public health and the environment.

  Further, EPA contends that the 18 new MACT floor limits and lowered leak rate standards are already being achieved – if so, then no further HAP emission reductions

---

[95] *See* Decl. of Matthew J. DeLibero, U.S. Steel, ¶¶ 22-25; Decl. of Michael E. Long, Cleveland-Cliffs, ¶ 6-12; Decl. of Ian Donaldson, Trinity, ¶¶ 7-10.

[96] Letter from U.S. Senators Brown, Braun, Casey, Vance, Klobuchar, and Young to Administrator Regan, p. 2 (June 14, 2024) (Att. J). *See also* Decl. of Matthew J. DeLibero, U.S. Steel, ¶¶ 26-33.

[97] Letter from U.S. Senators Brown, Vance, Braun, Manchin, Casey, Klobuchar, Capito, and Young to Administrator Regan, p. 1 (Dec. 6, 2023) (Att. K).

[98] Letter from Congressional Steel Caucus to Administrator Regan, p. 1 (Dec. 18, 2023) (Att. L).

[99] Letter from D. McCall, United Steel Workers, to Administrator Regan, p. 1-2 (June 24, 2024) (Att. M).

(and any corresponding public health benefit) would be achieved by the rule remaining in place pending review. Therefore, allowing the Coke RTR Rule to remain in effect pending review would impose substantial costs and burdens on regulated entities that will not be recouped, while providing no demonstrable benefit to the general public or the environment.

- *Fourth,* a stay would further the public interest in maintaining a strong, competitive coke manufacturing sector and avoiding irreparable harm to an industry that is vital to maintaining critical infrastructure and U.S. national security and defense. The strong public interests that weigh in favor of a stay are stressed in the letters to EPA from law makers and United Steel Workers leadership referenced above: (1) maintaining a strong domestic steelmaking industry, (2) avoiding measures that might lead to coke and steel shortages and resulting supply chain impacts, (3) promoting economic and job growth made possible by the coke and steel industries, and (4) avoiding wasteful commitments of resources on mandates that provide no discernable public benefit. A stay of the rule would advance all of these public interests as EPA reconsiders critical aspects of the Final Rule and pending judicial review.[100]

Moreover, EPA has parallel authority under CAA §§ 112 and 301(a) to undertake a process to correct a rule and establish a stay where one is necessary to preserve the status quo so as to ensure that the correction is a complete cure, especially to avoid irreparable harm and waste of resources in complying with a legally defective rule.[101] Section 301(a) authorizes EPA to issue such rules as are necessary to carry out its CAA functions, one of which is to ensure that the standards are lawful and that the regulated community is not forced to comply with unlawful requirements.[102]

## V. CONCLUSION

For all the reasons set forth above, the following actions are unlawful, arbitrary, and capricious and must be reconsidered by EPA:

1. Failing to consider all relevant factors, including risk, costs, and cost effectiveness under CAA § 112(d)(6) and costs under CAA § 112(d)(2);

2. Setting unachievable MACT floors without considering and including factors to account for intra-mine variability in coal characteristics, consistent with EPA precedent in rules for other industrial sectors;

---

[100] *See also* Decl. of Matthew J. DeLibero, U.S. Steel, ¶¶ 26-35; Decl. of Michael E. Long, Cleveland-Cliffs, ¶ 14.
[101] *See* 42 U.S.C. §§ 7412, 7601(a).
[102] *See, e.g.*, 76 Fed. Reg. 4780, 4800 (Jan. 26, 2011) (citing CAA § 301(a) as a source of authority to stay a final rule).

3. Making UPL calculation errors for the HCN limit for PECs;

4. Failing to provide for site-specific alternative standards for entities which demonstrate that the MACT limits are impractical to achieve;

5. Failing to use the existing opacity standard as a surrogate standard in lieu of a new filterable PM limit for battery stacks;

6. Failing to use HCl as a surrogate for HF and to adopt an HBEL for HCl;

7. Lowering limits for coke oven doors/lids/offtakes without identifying any development in practices, processes, or control technology and subcategorizing facilities based upon coke production capacity;

8. Raising novel and unsupported legal interpretations that CAA § 114 gives EPA authority to impose ongoing fenceline monitoring of benzene emissions from non-categorical sources in a CAA § 112(d)(6) rule;

9. Failing to include allowable emission rates and using improper model receptor locations to set the fenceline benzene action level and requiring facilities to use real-time monitoring;

10. Failing to adopt a site-specific work practice standard for SSM operating conditions; and

11. Failing to address compliance schedule concerns and adopting arbitrary and unreasonable compliance deadlines.

It was impractical for commenters to identify and generate all of the data and analysis supporting these objections during the public comment period because EPA only provided a 45-day comment period, denied multiple requests for extensions, and then did not consider or respond to important data and analysis provided to EPA after the comment period. EPA also made numerous changes for the first time in the Final Rule, which made it impossible to raise objections regarding these changes during the comment period. These objections are centrally relevant to the outcome of the Coke RTR Rule as they directly affect the outcome of virtually all the new requirements applicable to the COETF's members.

Therefore, in order to comply with CAA § 307(d)(7)(B), EPA must grant reconsideration of the issues raised in this petition. EPA also must add the following missing documents to the rulemaking dockets and the record for judicial review: (1) COETF's March 22, 2024 Email (Att. D), (2) the AECOM White Paper (Att. G), and (3) the COETF's Compliance Concerns White Paper (Att. H).

Finally, EPA should stay the effective date of the Coke RTR Rule pending judicial review so that EPA can revise the Final Rule and reset the compliance deadlines through an appropriate and legally defensible supplemental rulemaking.

ACCCI and the COETF reserve the right to supplement this petition with additional information and/or additional or supplemental declarations in support.

September 3, 2024

Respectfully submitted,


David C. Ailor, P.E.
President
AMERICAN COKE AND COAL CHEMICALS INSTITUTE
25 Massachusetts Avenue, NW, Suite 800
Washington, DC  20001
(703) 795-3541
dailor@accci.org

Jeffrey A. Knight
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC  20036
(202) 663-9152
jeffrey.knight@pillsburylaw.com

# Exhibit B

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |  |
|---|---|---|
| ) | | |

AMERICAN COKE AND COAL CHEMICALS
INSTITUTE and COKE OVEN
ENVIRONMENTAL TASK FORCE,

      Petitioners,

            v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY and MICHAEL S. REGAN,
ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY,

      Respondents.

_____ )

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.24-1287
(consolidated with
Nos. 24-1288, 24,
1290)**

### DECLARATION OF MATTHEW J. DeLIBERO

I, Matthew J. DeLibero, am over 18 years of age and make the following

declaration pursuant to 28 U.S.C. § 1746:

1.      I am the Director, Environmental, Reliability and Operational Excellence, at

United States Steel Corporation ("U.S. Steel") for Mon Valley Works, where

I am responsible for ensuring compliance and reporting requirements are

met in accordance with federal, state, and local environmental permits and

regulations.  I have worked for U.S. Steel for 19 years in increasing roles

and responsibilities across the Mon Valley Works facilities.

2. I am providing this declaration on behalf of the petition of American Coke and Coal Chemicals Institute and Coke Oven Environmental Task Force for reconsideration and stay of the United States Environmental Protection Agency's ("EPA's") National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed. Reg. 55,684 (July 5, 2024) ("Rule").

3. The Rule amends National Emission Standards for Hazardous Air Pollutants ("NESHAP") for two source categories both located at Cokemaking facilities: (1) coke oven pushing, quenching and battery stacks ("PQBS") (40 CFR Part 63, Subpart CCCCC); and (2) coke oven batteries ("COB") (40 CFR Part 63, Subpart L). 89 FR 55,684.

4. EPA promulgated COB NESHAP regulations in 1993 and finalized its residual risk and technology review in 2005. 70 FR 19,992 (April 15, 2005).

5. As further explained in this declaration, the Rule requires immediate actions by U. S. Steel that unfairly burden U. S. Steel; imposes actions that are either impossible, impractical, or are ineffective; and requires U. S. Steel to spend millions of dollars on implementation to meet deadlines that cannot reasonably be met.

6.     This declaration is based on my personal knowledge of facts and information

pertaining to U. S. Steel's business and the implications of the Rule.  My

knowledge is based on my history with U. S. Steel and analysis U. S. Steel

has conducted of the Rule and review of analysis conducted by the

American Coke and Coal Chemicals Institute ("ACCCI") and Coke Oven

Environmental Task Force ("COETF"), of which U. S. Steel is a member.

I.     **The Rule Unfairly Burdens U. S. Steel.**

7.     The Rule imposes substantially lower door leak limits on all by-product coke

oven batteries, with even lower limits for coke oven batteries with

production capacity of greater than or equal to 3 million tons per year of

coke.  To my knowledge, these latter limits apply only to U. S. Steel's

Clairton Plant.

8.     EPA states these revisions are based on "developments in practices,

processes, and control technologies" since the last COB technology review

was completed in 2005.  I am aware of no development that this statement

could be referring to, either in the industry generally or specifically as to

facilities with production capacity of greater than or equal to 3 million tons

per year of coke.

9.   Since EPA's last technology review, in which it concluded there had been no developments in practices, processes, and control technologies, Clairton Plant has not:

   a.   Changed its practice for controlling door leaks. These practices consist of routine door and jamb cleaning, cosmetic sealing, packing and tamping of kaowool (if necessary) and inspection of doors for troubleshooting.

   b.   Changed the process for coking coal.

10.   To my knowledge, since EPA's last technology review, there has been no practice, process, or control technology implemented at any other by-product coke facility that could be considered a development in the practices, processes, and control technologies for door leaks; nor has EPA identified any such developments per my review of the Rule and materials in the dockets.

11.   EPA's more stringent standards for coke batteries with production capacity at or greater than 3 million tons per year is inexplicable. To my knowledge, there is no correlation between production capacity and door leaks, and I have seen none in the data EPA provided with the Rule. There is no correlation between actual coke production capacity and Battery door leak rates at the Clairton Plant. Further, EPA's assertion that it is reasonable to

infer that a larger capacity facility may be able to invest more resources in leak control practices is unfounded. No practice or process for the control of door leaks is implemented at Clairton Plant based on its production capacity.

**II.**     **The Rule Imposes Impossible Requirements.**

12. The Rule imposes requirements that in my experience are not possible to implement.

13. For example, the MACT floor datasets are too limited, are not representative of the metallurgical coke industry, and do not adequately reflect variability in operating conditions (e.g., normal coking time vs. extending coking time) or variability in raw material inputs, such as coal characteristics. As a result, the numeric emission limits are not achievable under all reasonably foreseeable conditions.

14. As noted in a memo submitted to EPA on April 2, 2024, by the COETF, mercury emissions from Battery Stacks and Pushing Emission Controls ("PECs") at byproduct recovery coke plants are directly related to the mercury content of the raw materials (metallurgical coals) required to produce quality coke. EPA's established methodology for incorporating intra-mine or intra-quarry variability into MACT standards for other industries should be applied to the proposed mercury limits for coke Battery Stacks and PECs.

15.     The Rule also removed startup, shutdown, and malfunction provisions that were important to Clairton Plant's ability to meet the existing limits.  For example, with the loss of beneficial carbon in the battery during startup, shutdown, and malfunction ("SSM") events, stack, charging and potentially other emissions are adversely affected.  In addition, during certain SSM events, flares must be used, which EPA already has recognized as a necessary practice.

16.     There are technical concerns with implementing the required stack testing to demonstrate compliance with the new HAP limits.  The stack testing requirements are impracticable and exorbitantly expensive.

17.     Due to the number of pollutants and test methods required for MACT testing (HCl, HF, HCN and PAHs), stack test events will be extremely difficult and lengthy to complete.  The testing will require 12 sampling trains, 8 Fourier-Transform Infrared ("FTIR") spectrometers, GCs, and extensive personnel to complete.  Due to the additional equipment required to meet the test methods, a test that typically takes three days will be extended to several weeks.  In addition, the test methods require more sample volume than traditional stack testing pollutants, which will further extend the testing effort.

18. In addition, the Rule's new, never proposed real-time fenceline monitoring trigger (from the passive two-week monitoring) is not practicable nor was it anticipated as it was not proposed. The ACCCI/COETF and U. S. Steel were unable to comment on this new requirement.

### III. The Rule Will Require U. S. Steel to Incur Immediate and Significant Costs

19. It is not possible to place exact cost estimates on compliance, but the Rule greatly underestimates the cost of compliance.

20. As noted in a March 6, 2024, submittal to EPA by the COETF, the cost of adding air pollution controls for Battery Stacks and PECs would be exorbitant and would not be assured of achieving compliance with the final limits. The resulting total capital costs for the byproduct recovery coke industry are estimated to be nearly $1.3 Billion, and industry-wide annual costs are estimated to be more than $220 Million/year.

21. The removal of COMS as a surrogate and the imposition of PM stack testing is unsupported by the record, and the costs associated with the requirement are unjustified.

22. Because the Rule is based upon insufficient data, continuous compliance with the new HAP limits will require the addition of controls. Furthermore, even with the installation and operation of additional controls, continuous compliance with the new limits remains uncertain. The estimated cost

effectiveness of control for the byproduct recovery coke industry would be unprecedented and exorbitant. Because the new HAP limits are not based upon proven technologies as contemplated when establishing MACT standards, U. S. Steel must incur substantial unrecoverable costs now in its attempts to design and implement controls that will meet the new limits in an unreasonable time period.

23. Without the Rule, U. S. Steel would not need to incur these costs.

## IV. The Implementation Schedule for the Rule is Insufficient

24. The Rule imposes compliance obligations that cannot reasonably be met by the deadlines in the Rule.

25. As noted in a February 9, 2024, memo submitted to EPA by the COETF, a minimum 3-year compliance schedule is needed because:

   a. Controls for these pollutants/sources have not been demonstrated for the coke byproduct recovery industry, either in the US or internationally.

   b. Controlling multiple pollutants and retrofitting controls into existing operations add complexity and time due to interactions of the requirements for control, including pollutant interactions, flow rates, chemistry, and temperatures.

26. As noted in the above referenced Trinity memo, extensive engineering and physical modifications will likely be needed at each coke plant. These efforts would likely require battery outages; and for a plant like Clairton, outages will require staggering across batteries to prevent upset conditions at downstream processes.

## V. **The Cumulative Burdens of the Rule and Other Federal Requirements Compound the Harm from the Rule and Could Have an Impact on Critical Infrastructure, National Security, and U. S. Steel Operations.**

27. The U.S. steel industry is responsible for over $520 billion in economic output, supporting over 2 million jobs. It generates over $56 billion in tax revenues annually.

28. In a study conducted under Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. §1862), the U.S. Department of Commerce determined that domestic steel production is essential for national security; and that domestic steel production depends on a healthy and competitive U.S. industry.

29. The Cybersecurity & Infrastructure Security Agency has identified the iron and steel industry as a core critical infrastructure industry impacting transportation systems, electric power grid, water systems, and energy generation systems. *See* https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/critical-manufacturing-sector.

30. Coke is critical to maintaining the nation's domestic steel production.

31. Implementation of the Rule, when at the same time implementing new rules upon all facets of domestic steel manufacturing also potentially jeopardizes thousands of good-paying United Steelworkers jobs.

32. U. S. Steel is committed to continuing to work with federal partners to develop and implement scientifically sound regulations that effectively and demonstrably benefit the environment.

33. EPA's promulgation of overlapping Clean Air Act regulations without adequate consideration of their interaction undermines these efforts.

34. At the same time that EPA promulgated the Rule, where it is imposing significant costs and burdens on the coke industry, EPA has also imposed new MACT standards for integrated iron and steel making facilities and taconite iron ore processing facilities, requiring the installation of controls through strict emission limitations, costly monitoring and changes in work practices that will interference with operation and in some cases are unsafe or impossible to implement, separately imposed costly pollution controls at reheat furnaces and boilers at iron and steel mills, lowered the NAAQS standard for PM2.5, and announced review of other standards. Combined, these actions could have a material impact on the domestic steel industry, significantly affect the schedule for achieving these requirements, and result

in a shortage of available technical support for implementation of these rules.

**VI.**   **Conclusion**

35.   In my opinion, the Rule is not realistic and underestimates the time needed for compliance by several years.  If emission units cannot achieve compliance by the scheduled deadlines and the deadlines are not stayed or extended, those emission units will be required to curtail operation.  As a result, U. S. Steel is already required to incur substantial costs in order to prepare for the upcoming Rule deadlines despite pending petitions for reconsideration and judicial review that may affect the applicability of the Rule and the obligations that it imposes on coke facilities.

36.   A stay of the Rule will mitigate these harms.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: September 30, 2024

Matthew J. DeLibero
Director Environmental, Reliability, and Operational Excellence
United States Steel Corporation

# **Exhibit C**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |  |
|---|---|---|
| AMERICAN COKE AND COAL CHEMICALS INSTITUTE and COKE OVEN ENVIRONMENTAL TASK FORCE, | ) ) ) ) ) | |
| Petitioners, | ) ) | Case No. 24-1287 (consolidated with Nos. 24-1288, 24-1290) |
| v. | ) ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) ) | |
| Respondents. | ) ) | |

_____

## DECLARATION OF MICHAEL E. LONG

1.      My name is Michael E. Long. I am the Sr. Director Environmental Strategy and Technical Services for Cleveland-Cliffs, Inc.

2.      As Sr. Director, I support our integrated iron and steel segment, including our metallurgical coke manufacturing facilities with respect to environmental matters, including environmental permitting, regulatory and operational compliance.

3.      I have 40 years of experience in various roles in the iron and steel industry, including operating, maintenance, and environmental matters with Cleveland-Cliffs and predecessor companies (ArcelorMittal).

4.   The U.S. Environmental Protection Agency (EPA) National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 89 Fed. Reg. 55684 - 55757 (July 5, 2024) (Final Rule) establishes, in part, new and/or more stringent Hazardous Air Pollutant (HAP) emission limits purportedly based on Maximum Achievable Control Technology (MACT). These limits apply to byproduct recovery battery stacks and pushing emission controls (PEC) and are not achievable, technologically infeasible, and economically unreasonable for multiple Cleveland-Cliffs' facilities. The new limits will likely require installation of unproven control technologies that have never been installed domestically or internationally for these source categories.

5.   The Final Rule also establishes more stringent standards for leaking coke oven doors, lids, and offtakes that are not based upon any identified changes or improvements in leak control practice, processes, or control technologies. The more stringent standards are not achievable at all times for all Cleveland-Cliffs facilities without the installation of new equipment and/or changes in operating procedures.

6.     In February 2024, the COETF supplied EPA with a 99% UPL statistical analysis of the limited data used by EPA.[1] That analysis demonstrated that the affected sources (i.e., Battery Stacks and PEC Systems) are incapable of consistently achieving compliance with the proposed standards without the use of air pollution control (APC) technologies or other (unidentified) operational changes. A chart summarizing the UPL statistical analysis is provided below.




[1] Compliance Schedule Concerns 020924.pdf, submitted by the COETF to EPA on February 9, 2024.

3

7.   According to the March 6, 2024 Trinity memo, no control technologies are currently in use within the byproduct recovery coke industry, either in the U.S. or globally, that control emissions of Hg, AGs, HCN, or PAHs from Battery Stacks or PEC Systems. For control systems that theoretically could be used to control these target HAPs, the estimated cost effectiveness of control for the byproduct recovery coke industry would be exorbitant and would far exceed the cost effectiveness for HAP reduction that EPA has historically considered acceptable, particularly given that EPA has determined that risk to public health associated with the entire PQBS source category is low and acceptable and provides an ample margin of safety.[2]

8.   Due to the Final Rule's implementation and compliance schedule for these standards, Cleveland-Cliffs faces irreparable harm and is in an impossible position of designing and engineering systems with unproven technology within only 18 months after the effective date of the Final Rule. This design and engineering work needs to begin immediately, causing irreparable harm to Cleveland-Cliffs.

---

[2] *See* Trinity, "Air Pollution Control Technology Review for Coke Battery Stacks and Pushing Emissions Under EPA's Proposed Coke Ovens Risk & Technology Review" (March 6, 2024) (Ex. A, page 4).

9. EPA does not provide a technical basis demonstrating that the new limits are achievable without additional pollution controls, nor does it evaluate the disproportionately high cost of such controls. Because of its reliance on under-representative data, and its failure to account for the impact of raw material and process variability on emissions, EPA operates under the misconception that additional controls will not be needed to achieve compliance with the new MACT standards for pushing and battery combustion stacks. EPA also fails to demonstrate that the more stringent standards for coke oven doors, lids, and offtakes can be achieved at all times for all Cleveland-Cliffs facilities without the installation of new equipment and/or costly changes in operating procedures.

10. Development of new emissions controls is anticipated to be needed at Cleveland-Cliffs' facilities due to the requirement to achieve continuous compliance with these standards. The amount of work leading up to the January 2026 compliance date is enormous. Cleveland-Cliffs must evaluate, develop, trial, permit, design, procure, fabricate, and install novel technology and emission control systems and related equipment. This industry-specific technology – which has not been demonstrated for the cokemaking industry – needs to be developed for the first time. Therefore, it is unlikely that pollution

control equipment suppliers will guarantee that their equipment will actually achieve the new standards.

11. Cleveland-Cliffs will need to undertake the activities described below prior to the 18-month compliance deadline in the Final Rule:

- Additional stack testing to assess pollutant loading and to better determine process and emission variability;

- Technology review and selection;

- Pilot or slip-stream testing;

- Site-specific engineering and planning;

- Equipment design;

- Environmental permitting.

- Equipment procurement

- Equipment fabrication and delivery;

- Increased demand for the equipment, which raises costs;

- Increased demand tying up niche contractors that serve the industry;

- Construction and site-specific modification; and

- Startup and shakedown of new equipment.

12. Because the limited data relied on by EPA to establish the MACT limits does not account for demonstrated variability in raw materials and process changes, additional stack testing will need to occur at each affected Cleveland-Cliffs

facility. Testing must be conducted under the worst reasonably foreseeable circumstances to provide data needed to evaluate pollutant loading and potential control technologies. There are limited stack testing firms, limited production opportunities to provide "worst-case" conditions, and extensive time needed to complete even a single stack test and obtain results. For example, performing a single 3-run stack test for a PEC for our Warren Coke operation requires approximately 30 days of stack testing to satisfy the testing protocol to complete.

13.    The 18-month compliance schedule provides inadequate time to stack test, trial, design, engineer, procure, and install untested control systems for the cokemaking industry. This work will require additional time needed to implement and conduct pilot testing of potential controls prior to the January 2026 compliance deadline. Such pilot tests are necessary across each affected source, at each facility, considering raw material and process variability, existing equipment variability, and internal and external customer specifications, to ensure that any adopted control technologies can work across the expected operating conditions.

14.    To install new technologies, Cleveland-Cliffs must engage in comprehensive engineering and design evaluations to customize the technology to the needs of each respective facility. Absent a stay of the Final Rule, such engineering

evaluations take time and cannot wait for the completion of judicial review.

15.    Due to the multiple HAP at issue and the lack of demonstrated control technologies available to control these emissions, if all byproduct recovery coke facilities require installation of new emission control equipment, the total initial cost of installing pollution controls will be approximately $1.3 billion in capital investment and $222 million in annual operating costs.[3]  It is estimated that approximately one-half of this cost will be imposed on Cleveland-Cliffs facilities.

16.    These estimates show the exorbitant costs Cleveland-Cliffs will incur in the near term due to the Final Rule.  Because EPA is implementing emission standards that are unachievable without the installation of unproven technologies, Cleveland-Cliffs will suffer irreparable harm because it must immediately begin designing and installing new air emissions control technology, at exorbitant cost, without sufficient time under the 18-month compliance schedule in the Final Rule.

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[3] *See* Trinity, "Air Pollution Control Technology Review for Coke Battery Stacks and Pushing Emissions Under EPA's Proposed Coke Ovens Risk & Technology Review" (March 6, 2024) (Ex. A).

Dated: September 30, 2024

Michael E. Long
Sr. Director Environmental Strategy and Technical Services
Cleveland-Cliffs, Inc.

# **Exhibit A**

# COKE OVEN ENVIRONMENTAL TASK FORCE (COETF)

## White Paper - Air Pollution Control Technology Review for Coke Battery Stacks and Pushing Emissions under EPA's Proposed Coke Ovens Risk & Technology Review

**Prepared By:**

**TRINITY CONSULTANTS**
4500 Brooktree Road
Suite 310
Wexford, PA 15090

March 6 2024



# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**                                                    **2**

**INTRODUCTION**                                                         **5**

**CONTROL TECHNOLOGY REVIEW PROCESS**                                   **10**

**CONTROL TECHNOLOGY REVIEW – BATTERY STACK EMISSIONS**                 **15**

**CONTROL TECHNOLOGY REVIEW – PUSHING EMISSIONS CONTROL SYSTEMS**       **21**

**CONCLUSIONS**                                                         **25**

**REFERENCES**                                                          **28**

**APPENDIX A. APC COST DATA BACKUP**                                     **A**

**APPENDIX B. VENDOR OUTREACH**                                          **B**

**APPENDIX C. MODEL BATTERY PARAMETERS**                                 **C**

On August 16, 2023, the U.S. Environmental Protection Agency (EPA) proposed revisions to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for the Coke Ovens: Pushing, Quenching, and Battery Stacks (PQBS) source category, 40 CFR 63 Subpart CCCCC, and the NESHAP for the Coke Oven Batteries source category, 40 CFR 63 Subpart L. As part of the proposed Subpart CCCCC rule, EPA proposed new standards for several previously unregulated hazardous air pollutants (HAPs), including new limits for the following HAPs: mercury (Hg), acid gases (AGs) (including hydrochloric acid [HCl] and hydrofluoric acid [HF]), hydrogen cyanide (HCN), and polycyclic aromatic hydrocarbons (PAHs). The proposed rule also includes a proposed particulate matter (PM) limit for Battery Stacks.

The Coke Oven Environmental Task Force (COETF), which represents all four companies that operate byproduct recovery coke plants in the U.S., previously submitted comments setting forth concerns with EPA's proposed rule[1] and also has submitted supplemental comments to EPA regarding an analysis of the lack of achievability of the proposed limits.[2] In summary, the COETF's concerns are that EPA is not required by Clean Air Act section 112(d), or by any mandated interpretation of the *LEAN* decision,[3] to set new "gap filling" standards where, as here:

- Further reductions of the target pollutants are not necessary due to very low risk of the PQBS source category;

- Controlling these pollutants has not been demonstrated for any byproduct recovery coke plant in the U.S. or globally;

- The proposed limits cannot continuously be met without controls (and even considering controls, the proposed limits are not achievable because the target pollutant concentrations are low and beyond the capability of current technology);

- The proposed limits were based on a very limited database of test results that do not account for demonstrated variability in operating conditions, coal blend characteristics, and other factors;

- The cost of adding air pollution controls for Battery Stacks and Pushing Emissions Control (PEC) Systems would be exorbitant and would not be assured of achieving compliance with the proposed limits; and

- The proposed limits are not cost-effective in terms of cost per lb/ton of pollutant reduced due to the extreme cost of controls and the minimal reductions in target pollutants that would be achieved.

---

[1] Comments of the Coke Oven Environmental Task Force (COETF) on the Proposed Rule National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (Docket Nos. EPA-HQ-OAR-2002-0085, EPA-HQ-OAR-2003-0051), Oct. 2, 2023.

[2] See the "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024. The COETF also has commented separately on EPA's proposed technology review of Subpart L, noting that (i) EPA lacks authority to lower the limits for doors/lids/offtakes because there has not been any development in practices, processes, or control technologies that would authorize a change; and (ii) EPA's proposed limits are based on annual average leak rate data that do not adequately account for shorter-term process, raw material, and seasonal variability. See the "Coke Battery Leak Rates.pdf" submitted to EPA on February 5, 2024.

[3] The COETF's comments note that nothing in the *LEAN* decision alters EPA's obligations under section 112(d) to consider, among other things, costs, non-air quality impacts and achievability, when completing its residual risk and technology review and establishing standards under 112(d). However, when proposing the new standards and gap filling, EPA has not followed Congress' direction as it has failed to appropriately consider such factors.

The COETF's concerns are heightened because there are no air pollution control (APC) technologies currently employed by the industry (or, in some cases, by any other industry), that can achieve the low concentrations of the proposed new HAP limits (i.e., for Hg, AGs, HCN, and PAHs).

Prompted by these concerns, the COETF retained Trinity Consultants (Trinity) to perform an evaluation of the potentially available air pollution control technologies that have either been demonstrated within the byproduct recovery coke industry or that have been demonstrated in other industries to control the proposed target HAPs and to calculate control costs and cost effectiveness values for each potential control technology and target HAP.

As part of this evaluation, Trinity communicated with several technology equipment vendors to identify potential control technologies for Hg, AGs, HCN, and PAHs from Battery Stacks and PEC Systems. Based on the information provided by these vendors, Trinity identified activated carbon injection with fabric filter, and dry sorbent injection with fabric filter as the only technologies potentially feasible for controlling Hg, AGs, and PAHs. No technology was identified that would be feasible to control HCN emissions.

Based on Trinity's experience with the byproduct recovery coke industry and this evaluation of potential APC technologies and costs, coupled with COETF's expertise and input, a significant number of feasibility, engineering, and cost issues were identified. For example, a multipollutant control approach would be required under EPA's proposed rule; however, no single APC technology exists to control all of the target HAPs. As discussed in this paper, control technology for the multiple pollutants proposed in EPA's "beyond the floor" control analysis is not feasible. In addition to multiple pollutant considerations, costs to the industry as a result of the proposed new limits would be exorbitant and unreasonable.

As summarized in Table ES-1 below, the resulting total capital costs for the byproduct recovery coke industry are estimated to be nearly $1.3 Billion, and industry-wide annual costs are estimated to be more than $220 Million/year. These exorbitant control costs result in excessive cost effectiveness values, particularly in light of the minimal HAP reductions that would be achieved. The lb/ton costs of each target pollutant removed are over $1 Million/ton for AGs from Battery Stacks, over $1.1 Million/lb for Hg from Battery Stacks, and over $193 Million/ton for PAHs from PEC Systems. These cost effectiveness values are drastically higher than those EPA has historically determined to be acceptable.

**Table ES-1. Summary of Estimated Control Costs to Byproduct Recovery Coke Industry**

| Target Pollutant | Source/Control Technology | Industry Total TCI* ($) | Industry Total TAC * ($) | Industry Total $/lb or $/Ton Removed |
|---|---|---|---|---|
| Hg | PEC – ACI/Fabric Filter<br><br>Battery Stacks - ACI/Fabric Filter | 643,397,417 | 111,046,008 | 1,117,163 ($/lb) |
| PAHs | PEC – ACI/Fabric Filter | 305,355,132 | 52,315,324 | 193,359,544 ($/ton) |
| AGs | PEC – DSI/Fabric Filter<br><br>Battery Stack - DSI/Fabric Filter | 652,509,917 | 111,006,874 | 1,867,859 ($/ton) |
| **Total Industry Costs[4]** | | **1,295,907,334** | **222,052,882** | |

*TCI = Total Capital Investment; TAC = Total Annual Cost

In conclusion, no control technologies are currently in use within the byproduct recovery coke industry, either in the U.S. or globally, that control emissions of Hg, AGs, HCN, or PAHs from Battery Stacks or PEC Systems. For control systems that theoretically could be used to control these target HAPs, the estimated cost effectiveness of control for the byproduct recovery coke industry would be exorbitant and would far exceed the cost effectiveness for HAP reduction that EPA has historically considered acceptable, particularly given that EPA has determined that risk to public health associated with the entire PQBS source category is low and acceptable and provides an ample margin of safety.

---

[4] Total Industry Costs are calculated as the sum of total costs for Hg and AGs shown above. The combination of controls evaluated for PAH emissions from PEC Systems would theoretically be the same combination of controls used for Hg from PEC Systems; therefore, the Total Industry Costs calculation does not include the total costs shown above for PAHs in order to avoid duplication.

EPA has proposed amendments to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Coke Ovens: PQBS source category [40 CFR 63 Subpart CCCCC], and the NESHAP for the Coke Oven Batteries source category [40 CFR 63 Subpart L].[5] EPA's proposed rule presents the results of a residual risk and technology review (RTR) for the PQBS source category, and a periodic technology review for the Coke Oven Batteries source category.

In the proposed rule, EPA has determined that risks due to emissions of HAPs from the PQBS source category are acceptable and that the existing PQBS NESHAP protects public health with an ample margin of safety. Under the technology review for the PQBS NESHAP, EPA concluded that there are no developments in practices, processes, or control technologies that necessitate revision of standards for this source category.

However, EPA has proposed new standards for several previously unregulated HAPs for Battery Stacks and PEC Systems, as summarized in Table 1 below.

**Table 1. Proposed Standards for Existing Sources**

| Source or Process | Pollutant | Existing Affected Source Standard | Units for Standard |
|---|---|---|---|
| Pushing | Acid gases (AGs) | 0.0052 | Lbs/ton coke |
| Pushing | Hydrogen Cyanide (HCN) | 0.011 | Lbs/ton coke |
| Pushing | Mercury (Hg) | 8.97E-07 | Lbs/ton coke |
| Pushing | Polycyclic Aromatic Hydrocarbons (PAHs) | 3.4E-04 | Lbs/ton coke |
| Battery Stacks | Acid gases (AGs) | 0.083 | Lbs/ton coke |
| Battery Stacks | Hydrogen Cyanide (HCN) | 0.0039 | Lbs/ton coke |
| Battery Stacks | Mercury (Hg) | 5.8E-05 | Lbs/ton coke |
| Battery Stacks | Particulate Matter (PM) | 0.10 | gr/dscf |

Trinity's evaluation confirms EPA's conclusion that there are no identified developments in practices, processes, or control technologies for the PQBS source category.[6] Yet, EPA has proposed new HAP emission standards for Battery Stacks and PEC Systems, despite EPA's determination that the entire PQBS source category presents low and acceptable risk to public health with an ample margin of safety.

EPA's proposed standards for Battery Stacks and PEC Systems were established based on very limited data of emissions stack testing for the byproduct recovery coke industry that are not representative of all such

---

[5] Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

[6] Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

coke batteries, the varying composition of raw materials used in these batteries (namely, differing coal blends), and other operational considerations.[7]

In February 2024, the COETF supplied EPA with a 99% UPL statistical analysis of the limited data used by EPA.[8] That analysis demonstrated that the affected sources (i.e., Battery Stacks and PEC Systems) are incapable of consistently achieving compliance with the proposed standards without the use of air pollution control (APC) technologies or other (unidentified) operational changes. Slide 1 summarizing the UPL statistical analysis is provided below.

---

[7] As addressed in comments that the COETF submitted to EPA on October 2, 2023, only 25% of operating by-product coke plants in the U.S. had test data for some subset of the newly proposed limits.

[8] "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024.

## Compliance Schedule Concerns for Combustion Stacks and Pushing Emissions

▪ COETF member companies have very little test data regarding the proposed standards for combustion stacks (AGs, HCN, Hg, and PM) and pushing emission control devices (PECs) (AGs, HCN, Hg, and PAH). Only 25% of combustion stacks and PECs were tested as part of the Section 114 ICRs.

▪ Available data exhibit substantial variability and show that the proposed standards are not consistently achievable for all pollutants without additional controls, operational changes, or both. The figures below show the 99% UPL for individual <u>units</u> (for units with 99% UPL exceeding the proposed standards). The confidence level lower than 99% at which the <u>unit UPL</u> equals the proposed standards also is shown. This analysis shows that additional controls and/or operational changes would be needed for these pollutants/sources:

- ▪ Combustion stacks –
  - ▪ PM – New baghouse + fans (depending on PM size fraction)
  - ▪ Acid Gases – Dry sorbent injection and new baghouse + fans
  - ▪ HCN – No practical controls
  - ▪ Hg – Activated carbon injection and new baghouse + fans
- ▪ Pushing –
  - ▪ Hg – Activated carbon injection + existing baghouse
  - ▪ Acid Gases – Dry sorbent injection + existing baghouse
  - ▪ HCN – No practical controls
  - ▪ Replacement of existing mobile traveling controls with new fixed controls (baghouse or scrubber) and traveling hood





To more fully evaluate the potential APC technologies for Battery Stack and PEC System emissions, Trinity examined the feasibility of various APC technologies for the target pollutants and their capital and annual costs. This evaluation focused on technologies specifically targeting control of air emissions from Battery Stacks and PEC Systems for which EPA is proposing new numerical HAP emission limits for byproduct recovery coke plants. A summary of the technical assessment is presented in the Control Technology Review Process section of this paper.

Based on Trinity's experience with byproduct recovery coke plants and air emissions control technologies, together with EPA's assessment of technologies for the coke making industry sector, Trinity concludes that:

- Byproduct recovery coke plants are already using the latest practices and control technologies to minimize emissions from PQBS sources.

- Emissions data used by EPA to support the proposed HAP limits are insufficient to justify any new MACT standards.

- Although no air pollution controls are currently employed in the coke making industry to reduce Hg, AGs, HCN, and PAHs from Battery Stacks or PEC Systems, several potential control technologies exist. Total control costs and cost effectiveness values, in $/ton of pollutant removed, that Trinity generated from cost data obtained for these technologies are dramatically higher than those EPA has historically determined to be acceptable.

In light of these findings, EPA should revise the proposed standards for AGs, PAHs, Hg, HCN, and PM because:

▶ No existing control technologies are utilized at any byproduct recovery coke plants in the U.S. or globally to control the target pollutants from Battery Stacks and PEC Systems.

▶ No other control technologies have been identified that are technically feasible for Battery Stacks and PEC Systems to achieve the proposed standards.

▶ Compliance with the proposed limits cannot continuously be met without controls. However, even considering controls, the proposed limits are not consistently achievable because the target pollutant concentrations are too low for current technology application.

▶ The proposed limits were based on very limited testing data that do not account for demonstrated variability in operating conditions, coal blend characteristics, and other factors.

In the proposed rule, EPA also considered several approaches for employing control technologies for achieving "beyond the floor" levels – that is, determining whether or not more stringent MACT limits should be proposed as standards for certain subcategories in the industry, based on achievability and cost-effectiveness. EPA concluded that there were no cost-effective "beyond the floor" options for byproduct recovery coke plants.

In evaluating technical feasibility and costs for "beyond the floor" levels, EPA evaluated the following technologies:

- Activated Carbon Injection (ACI);

- Wet Alkaline Scrubbing (WAS);

- Regenerative Thermal Oxidation (RTO); and

- Fabric Filter/Baghouse Technologies.

Trinity conducted a similar evaluation, considering numerous potential control technologies aimed at controlling emissions of AGs, PAHs, Hg, and HCN. Tables 2 and 3 below present a summary of control technologies evaluated by Trinity for controlling emissions sufficiently to meet EPA's proposed limits for AGs (HCl and HF), HCN, Hg, and PM for Battery Stacks; and AGs (HCl and HF), HCN, Hg, and total PAHs for PEC Systems, respectively. Cost estimates for evaluated technologies are provided in Appendix A. As presented in these tables, most of the technologies evaluated are not technically feasible for reducing emissions from Battery Stacks and PEC Systems, due to one or more of the following inherent limitations:

► Very low pollutant concentrations within gas streams;

► Need for additional equipment (such as a heat exchanger) or complimentary control equipment (such as a second baghouse) with many of the APCs evaluated;

► Physical space limitations within the coke oven battery area; and

► Multipollutant control technology constraints, including equipment limitations and restrictions associated with one pollutant vs. another pollutant (e.g., Hg vs. PAH and AGs vs. $SO_2$ insofar as their competing for sorbent reactions), and due to Battery Stack and PEC System emissions characteristics and conditions (including pollutant interactions, flow rates, chemistry, and temperatures, and constraining available technologies).

These limitations, along with other control technology considerations, are discussed below.

To identify potential APC technologies for the evaluation, Trinity first conducted a screening assessment of technologies currently in place at byproduct recovery coke plants globally, as well as in other industry sectors such as utility power generation, steel and ferroalloy manufacturing, and other metals and non-metals industry production processes. The breadth of this screening process targeted control technologies used in cokemaking operations; but, for purposes of potential technology transfer, it looked outside the targeted byproduct recovery coke industry for theoretically compatible APC systems.

To achieve greater consistency in evaluating a large variety of control technologies, Trinity developed a "model battery" utilizing actual battery operating data and conditions for Battery Stacks, as well as PEC systems. These parameters for the "model battery" are included in Appendix C. The model battery data were used to evaluate control options based on existing real data.

To compile and consolidate the data, operating conditions from all six currently operating byproduct recovery coke plants were reviewed. Data presented in EPA's coke ovens RTR were included in the data analysis, and basic statistics were applied to the data for the purpose of developing a model battery for obtaining feedback from control technology vendors. Finally, utilizing the available data, averages and means were calculated for exhaust gas flow in dry standard cubic feet per minute (dscfm), temperatures in degrees Fahrenheit (°F), and percent moisture. Similarly, stack test results for target pollutants were evaluated to establish a range of concentrations for PAHs, HCN, Hg, AGs, and PM, as defined in the proposed rule.[9]

Tables 2 and 3 below present the results of the initial control technology identification and screening process for Battery Stacks and PEC Systems, respectively. No such control technologies were found to be utilized at any existing byproduct recovery coke plants either in the U.S. or globally. Trinity then identified candidate controls that showed the best potential for theoretical application to Battery Stack and PEC System emissions. The technologies identified by Trinity for consideration in this screening process included:

- Wet Alkaline (Caustic) Scrubbing;

- Dry Scrubbing with and without Fabric Filtration (e.g., baghouse) and Auxiliary Equipment, such as heat exchangers (HTX);

- Activated Carbon Injection (ACI) with and without Fabric Filtration (e.g., baghouse);

- Wet/Reagent Oil Absorption/Scrubber;

- ACI with Specialty Reagent, with and without Fabric Filtration (e.g., baghouse);

- Fabric Filtration with Thermal Oxidation/Incineration; and

- Carbon Adsorption.

Several control technology vendors (see Appendix B. [Vendor Outreach]) were presented with preliminary concepts for controlling the targeted pollutants from both of the byproduct recovery coke plant emission sources being evaluated. The actual "model battery" data in Appendix C, along with the proposed limits for the targeted pollutants, were provided to the vendors. The vendors were asked to provide information on

---

[9] Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC, July 1, 2023.

technical feasibility and, if deemed potentially feasible, estimated costs for conceptual pollutant control equipment designs. The conclusions presented in Tables 2 and 3 include consideration of vendor input.

## **General Limitations and Constraints of the Evaluated Technologies for Controlling Emissions**

*Technology Limitations and Constraints*

Trinity identified several recurring limitations for controlling the targeted pollutants. Notable limitations are discussed below and in later sections of this paper.

Conventional wet scrubbers, such as wet alkaline scrubbers, theoretically can be used for controlling Hg emissions. However, at the very low Hg concentrations and relatively high flow rates present in the exhaust for both source types, this technology will not be effective. A packed-bed type unit would be recommended over a plate/tray tower or spray tower; but, it would have a low capture effectiveness using caustic solution. Vendors were not supportive of using this technology for these exhaust gas streams.

For example, with respect to Hg emissions control, the type (or species) of Hg present in Battery Stack and PEC System emissions is not apparent from testing and public information. Mercury can be either elemental (Hg) or ionic (a.k.a. mercurous) (Hg+) in nature. The Hg species characterization is important, because it dictates which control technology is more effective -- powdered activated carbon (PAC) or powdered activated carbon with Bromide (or another selected reagent). With respect to carbon or reagent injection technologies, Hg capture occurs primarily within the filter cake dust layer; and the accumulation of mercury at this dust layer is dependent on the Hg species contained in the exhaust gases (i.e., Hg capture efficiency onto activated carbon sites). The removal efficiency (and, therefore, the cost) is greatly related to the dose rate (lb/mmacfm) of carbon and the reagent being used. This presents a significant unknown in the cost evaluation for controlling Hg in either of the target gas streams.

For "acid gases" (AGs), as defined in the proposed rule, control typically is accomplished by reaction with a mineral-based basic reagent (e.g., calcium hydroxide or sodium bicarbonate) through a gas/solid surface reaction. The reaction occurs as the gases and reagent are suspended in-flight between the injection point and a particulate collection device (e.g., fabric filter). The efficiency of the reaction is largely related to the gas temperature, acid gas concentration, and the time of suspension. Sulfur dioxide ($SO_2$) in the flue gas will also react with the sorbent. The concentration of the target acid gases in a byproduct recovery coke plant's gas stream would be very low and would require a high sorbent-to-acid gas ratio (lb/lb) and a predicted reaction time of greater than 12 seconds. This configuration would require a long reaction time and duct run for effective capture. Due to the need for long residence times, additional equipment would have to be incorporated into existing byproduct recovery coke plant footprints, which are typically very limited in available physical space.

*Planning and Engineering Constraints*

For any APC system equipment, including any necessary auxiliary equipment, additional cost will be incurred for:

- Redundant equipment (for use during required periodic maintenance or in case of failure), particularly for sources like coke batteries that operate continuously and cannot be idled or taken out of production without risk of significant damage;

- Electrical power supply or transmission limitations, or both; and

- Risk management relative to catastrophic events associated with new equipment or configuration.

For example, the requirement for continuous compliance necessitates the inclusion of redundant equipment to support compliance during planned maintenance of the primary control device, and in case of malfunction or failure of components or equipment. Redundant systems require additional physical space and essentially a doubling of capital investment. In this paper, the costs for purchasing and installing the necessary technical components for redundant systems have been estimated, but not fully addressed; they should be included in final cost evaluations.

Similarly, it will be necessary to assess whether adding an exhaust system or ancillary equipment to a battery will cause catastrophic or other adverse impacts to the heating process, which will affect coke production and, potentially, damage the battery's refractory brick. Indeed, the risk of compromising the integrity of a battery could make any retrofitting for such emission controls infeasible.

Upgrades to electrical power supply may be needed in order to install additional fans and baghouses or other equipment. Depending on site-specific electrical supply requirements, byproduct recovery coke plants may not have enough power to support large fans without an upgrade of the power systems. Addressing any significant electrical supply needs would be a huge undertaking and very expensive. Although cost assumptions were made for electrical supply, specific cost evaluations for any new equipment will require careful planning to obtain costs for implementation. This level of costing was not within the scope of this evaluation.

Finally, costs relative to any lost production have not been incorporated into this evaluation, as they will be driven by the site-specific Battery Stack or PEC System to be controlled, and the length of time that the coke production may need to be idled for installation of controls. Site-specific considerations, including space and electric power constraints, will drive the timeline for such control implications and the resulting costs of lost production.

**Table 2. Summary of Battery Stack Control Evaluation Matrix**

| Pollutant | AIR POLLUTION CONTROL TECHNOLOGIES | | TECHNICAL FEASIBILITY | TECHNICAL FEASIBILITY TIER[1,4] | FURTHER ASSESSMENT? |
|---|---|---|---|---|---|
| | Control Technology | Control Technology Description | Technical Feasibility and Limitations | 1, 2, or 3 | (Yes/ No) |
| Acid Gases (HF/HCl) | Wet Caustic Scrubbing | Conventional water-based absorption technology. Process where a soluble pollutant is dissolved into a non-volatile liquid with or without chemical reaction. The rich (i.e., contaminated) stream would be further processed, reused, or treated in a wastewater treatment system or other final destruction method.[2] | Not technically feasible due to low pollutant concentrations, generally less than 250 ppmv. | Tier 3 | No |
| Acid Gases (HF/HCl) | Dry Sorbent (DS) Injection (e.g., Dry Scrubbing) and Fabric Filter (FF) and HTX) | Inject dry, alkaline or other selected chemical sorbent into flue gas, upstream of fabric filter. Dry sorbent injection avoids potential wet scrubbing issues, including wastewater treatment, corrosion and steam plume problems, and delivery nozzle plugging (spray dryer absorption). DS/FF has more efficient sorbent utilization, relative simplicity, and a small footprint. | Technology will require FF and heat exchanger, but is feasible. Relative to sorbent reaction time, distance between injection point and fabric filter will determine control efficiency. A circulating sorbent reactor (CSR) could potentially be used to increase removal efficiency if space permits. Related technologies include spray dryer absorption, wet scrubbers, and furnace sorbent injection. | Tier 2 | Yes |
| HCN, Mercury, and PM | Activated Carbon and Fabric Filter (baghouse) | Conventional application of a baghouse with activated carbon injection (ACI) upstream of baghouse. Fabric filter to allow desired reaction within dust layer. | Design and ducting configuration of the new baghouse will need to be developed. To help capture HCN, a special reagent (i.e., metalized carbon, bromide) may be needed. $SO_2$ interferes with HCN capture and control, requiring desulfurized coke oven gas (COG); units with undesulfurized COG will require either additional operating cost (for reagent), or additional sulfur control or both. | Tier 3 | No |
| HCN, Mercury, and PM | Reagent-specific (Bromide) Activated Carbon and Fabric Filter (baghouse) | Fabric filter and ACI with special brominated reagent to efficiently capture mercury, HCN, and PAHs. Fabric filter to allow desired reaction within dust layer. | Bromide target reagent; but other metals possible, just not commercially available. Bromide has the potential for higher removal efficiency than traditional injection. $SO_2$ interferes with HCN capture and control, requiring desulfurized coke oven gas (COG); units with undesulfurized COG will require either additional operating cost (for reagent), additional sulfur control, or both. | Tier 3 (HCN) <br> Tier 2 (Others) | Yes |
| HCN, Mercury, and PM | Fabric Filter (baghouse) and Thermal Oxidation/Incineration | Application of a baghouse with a subsequent incineration device; thermal destruction for HCN will be post PM removal. | Due to Hg concentrations generally below 100 ppb, the removal efficiency of mercury expected to be low. The high flow rate and low concentration makes the destruction of HCN by incineration impractical. $SO_2$ interferes with HCN capture and control, requiring desulfurized coke oven gas (COG); units with undesulfurized COG will require either additional operating cost (for reagent), additional sulfur control or both. | Tier 3 | No |
| PM | Fabric Filter (baghouse)[5] | Application of traditional baghouse/fabric filter technology. | Technically feasible in theory; however, the technology would need to be combined with other APC technologies to address other pollutants of concern. | Tier 2 | Yes |
| Mercury | Fixed Carbon Bed/ Regenerative Carbon Bed | Using the adsorption process, gaseous pollutants are removed from an air stream by transferring the pollutants to the solid surface of an adsorbent, usually activated carbon. Other commonly used adsorbents include zeolites and polymers. Adsorbents typically are regenerated (desorbed/removed) either off-site or on-site. | Requires significant space for carbon beds and regeneration process, given the flow rates in question. Saturation capacity (the maximum capacity the adsorbent can hold) and breakthrough capacity (the amount of pollutant that can be adsorbed before a significant pollutant concentration exits or breaks through the bed) must be determined for relevant pollutants. | Tier 3 | No[3] |
| Mercury | Fabric Filter Carbon-embedded Bags | Hg captured by carbon embedded in fabric structure and bags replaced when break through occurs. | Can be included in baghouse filter design; will inherently reduce PM (and other pollutants to a lesser degree. including acid gases (chlorides/fluorides) and HCN, depending on chemistries). | Tier 3 | No |

NOTES:
1. Technical Feasibility Tier, where: Tier 1 [Technically Feasible and Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; Tier 2 [Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; and Tier 3 [Technically Not Feasible and Not Demonstrated Anywhere in the U.S. or Globally].
2. EPA-450/2-77-019, Sept. 1977. EPA Guideline Series, control of sulfuric acid mist emissions from existing sulfuric acid production units.
3. Trinity contacted several vendors regarding this technology, including those specializing in carbon adsorption technology. Also, other vendors tried to gain insights into the technology's viability for these pollutants and from these exhaust streams. These efforts have not identified compatible carbon adsorption technology.
4. Concerns identified during site-specific engineering may result in certain technologies being determined technically infeasible (Tier 3), rather than potentially technically feasible (Tier 2). Some of these potential concerns are noted in this paper.
5. PM particle sizes less than 1 µm might be captured with wet ESP technology. However, this technology is less practical in any other circumstance and was not considered further in this evaluation.

**Table 3. Summary of Pushing Emissions Control System Control Evaluation Matrix**

| Pollutant | Control Technology | Control Technology Description | Technical Feasibility and Limitations | Technical Feasibility Tier[1,5] | Further Assessment? |
|---|---|---|---|---|---|
| | **Air Pollution Control Technologies** | | **Technical Feasibility** | | |
| | Control Technology | Control Technology Description | Technical Feasibility and Limitations | 1, 2, or 3 | (Yes/ No) |
| Acid Gases (HF/HCl) | Wet Scrubbing | Conventional water-based absorption technology. | Not technically feasible due to low pollutant concentrations generally less than 100 ppmv. Multiple reaction vessels required and would not be practical. | Tier 3 | No |
| Acid Gases (HF/HCl) | Dry Sorbent Injection (i.e., Dry Scrubbing (DS) and Existing Fabric Filter (FF))[4] | Inject a dry, alkaline or other selected chemical sorbent into flue gas, upstream of fabric filter. Dry sorbent injection avoids potential wet scrubbing issues, including wastewater treatment, corrosion and steam plume problems, and delivery nozzle plugging (spray dryer absorption). DS/FF has more efficient sorbent utilization, relative simplicity, and a small footprint. | Technology is feasible. Relative to sorbent reaction time, distance between injection point and fabric filter will determine control efficiency. A circulating sorbent reactor (CSR) could potentially be used to increase removal efficiency if space permits (compatible with capture systems utilized by four COETF member company plants). | Tier 2 | Yes |
| HCN, Mercury, and PAHs | Activated Carbon and Existing Fabric Filter (baghouse)[4] | Conventional application of a baghouse with activated carbon injection (ACI) upstream of baghouse. Fabric filter to allow desired reaction within dust layer. | The air:cloth ratio on existing baghouse may not be sufficient. To help capture HCN, selective reagent (i.e., metalized carbon, bromide) may be needed. SO₂ interferes with HCN capture and control – requires desulfurized coke oven gas (COG); units with undesulfurized COG will require additional operating cost (for reagent) and/or additional sulfur control. | Tier 3 (HCN) Tier 2 (Others) | Yes |
| HCN, Mercury, and PAHs | Reagent-specific (Bromide) Activated Carbon and Existing Fabric Filter (baghouse)[4] | Fabric filter and ACI with special metalized reagent (e.g., bromide) to efficiently capture mercury, HCN, and PAHs. Fabric filter to allow desired reaction within dust layer. | The air:cloth ratio on existing baghouse may not be sufficient. Mercury species will dictate whether a conventional ACI or reagent (e.g., bromide) system will be required. This technology will not work with coke plants lacking a desulfurization process. SO₂ interferes with HCN capture and control – requires desulfurized coke oven gas (COG); units with undesulfurized COG will require additional operating cost (for reagent) and/or additional sulfur control. | Tier 3 (HCN) Tier 2 (Others) | Yes |
| HCN and PAHs | Thermal Oxidation (TO)/Incineration | TO/incineration would be situated post existing fabric filter (assuming HCN and PAHs not controlled with ACI system). | The low sensible heat of exhaust will require substantial natural gas to combust HCN and PAHs. Will likely substantially increase CO₂. | Tier 3 | No |
| PAHs | Wet Oil/Reagent Scrubbing | Conventional oil-based absorption technology. Soluble pollutant is dissolved into scrubbant (oil wash). The rich (i.e., contaminated) stream would be further processed, reused, or treated in a wastewater treatment system or sent offsite for destruction/disposal. | Not feasible for low concentrations and multi-pollutant control systems. | Tier 2 | No |
| Mercury | Fixed Carbon Bed after Existing Fabric Filter[4] | Using the adsorption process, gaseous pollutants are removed from an air stream by transferring the pollutants to the solid surface of an adsorbent, usually activated carbon. Other commonly used adsorbents include zeolites and polymers. Adsorbents typically are regenerated (desorbed/removed) either off-site or on-site. | Requires significant space for carbon beds and regeneration process equipment. Saturation capacity (the maximum capacity the adsorbent can hold) and breakthrough capacity (the amount of pollutant that can be adsorbed before a significant pollutant concentration exits or breaks through the bed) must be determined for relevant pollutants. | Tier 3 | No[3] |
| Mercury | Regenerative Carbon Bed after Existing Fabric Filter[4] | Adsorption technology with activated carbon or other media that can be regenerated/reactivated onsite with steam or chemical treatment. | Requires significant space for carbon beds and regeneration process equipment, given the flowrates in question. Saturation capacity (the maximum capacity the adsorbent can hold) and breakthrough capacity (the amount of pollutant that can be adsorbed before a significant pollutant concentration exits or breaks through the bed) must be determined for relevant pollutants. | Tier 3 | No[3] |
| Mercury & PAHs | Fabric Filter Carbon-embedded Bags after Existing Fabric Filter[4] | Hg captured by carbon embedded in fabric structure. Bags replaced when breakthrough occurs. | Commercial use appears rare or non-existent. Retrofit alternatives need further evaluation. Has potential to enhance multipollutant control, including PM and other pollutants. Research² addresses all EPA-proposed PAHs except perylene, but does include Benzo(g,h,i) perylene. | Tier 3 | No |

NOTES:
1. Technical Feasibility Tier, where: Tier 1 [Technically Feasible and Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; Tier 2 [Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; and Tier 3 [Technically Not Feasible and Not Demonstrated Anywhere in the U.S. or Globally].
2. SZhen-Shu Llu, Journal of Environmental Engineering, May 2006.
3. Trinity contacted vendors regarding this technology, including those specializing in carbon adsorption technology. Also, other vendors tried to gain insights into the technology's viability for these pollutants and from these exhaust streams. These efforts have not identified compatible carbon adsorption technology.
4. At least one byproduct recovery coke plant does not have an existing baghouse for its PEC System and would require a new movable hood, ductwork, baghouse and related high voltage power line and substation for new equipment.
5. Concerns identified during site-specific engineering may result in certain technologies being technically infeasible (Tier 3) rather than potentially technically feasible (Tier 2). Some of these potential concerns are noted in this paper.

# CONTROL TECHNOLOGY REVIEW – BATTERY STACK EMISSIONS

In assessing a control strategy for Battery Stack emissions, Trinity performed additional evaluation of the Tier 2 technologies (Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally) presented in Table 2, including:

- Activated Carbon Injection (ACI) with Reagent-specific addition combined with Fabric Filter (for Hg and PM); and

- Dry Sorbent Injection (DSI) combined with Fabric Filter (for AGs [HCl] and PM).

An application evaluation of the technologies was considered by vendors, and preliminary control technology designs and configurations were developed based on the above discussed model battery and proposed emissions limits. Costs for these preliminary designs/configurations were developed based on equipment vendor data, EPA cost estimating techniques, and general APC technology concepts.

Regarding the dry scrubbing technologies (i.e., DSI), challenges associated with controlling AGs from Battery Stacks include:

- Due to the required long reaction time between sorbent and pollutants, a recirculating sorbent reactor vessel would be required between the injection point and fabric filter to increase time for reaction; this would overcome the poor removal efficiency. This approach would have physical space constraints.
- Physical space available near most Battery Stacks is limited such that placement of a control system (such as injectors, fabric filter, ID fan, and stack) would be problematic.

## Technical and Economic Considerations for Battery Stacks

Controlling emissions from Battery Stacks presents several physical and control chemistry challenges which limit the ability to implement controls. The general design of battery underfire combustion systems include coke oven gas (COG) burners for individual ovens and regenerative heat exchangers (i.e., "checkers") for flue gas heat recovery and preheating of combustion air. After heat recovery, the flue gases are directed to waste gas collection mains and pass underground through a refractory-lined duct to the Battery Stack. The gases are then exhausted by natural draft suction to the Battery Stack. Because the existing waste gas duct at all byproduct recovery coke plants is located underground, the gases would need to be diverted to an above-ground abatement system for connection, which would require a scheduled battery outage for construction and tie-in of the diversion. During the outage, most batteries will need to purchase natural gas to keep the battery hot (cost for this is not included in this study); all coke production would cease; and battery refractory brick and other equipment could suffer unanticipated damage, the repairing of which would add expense. The costs of any repairs or lost production are not included in EPA's evaluation.

Adding equipment such as sorbent injection systems, fabric filtration, and heat exchangers (HEX) would interrupt this balance by adding static pressure loss, necessitating use of an induced draft (ID) fan to overcome the increased static pressure loss. The impacts of added fans and equipment require more study beyond this evaluation to ensure adequate heating of the batteries and enough physical space to install additional equipment. Finally, to accommodate equipment to address the natural draft exhaust and route the stream through new APC(s), a new Battery Stack likely will be needed after these new gas cleaning steps.

In summary, the challenges associated with controlling emissions from Battery Stacks include:

1) Physical redesign of the battery underfire combustion heating system and waste gas ducting, which would require installation of an ID fan;

2) Battery outage for construction and tie-in;

3) Construction or modification of Battery Stacks;

4) Challenges of adding APCs to existing equipment; the byproduct recovery coke industry has never attempted to add the APCs in question (EPA addressed this in its assumptions using a severely understated retrofit cost factor);

5) Potential need for expanded or upgraded electrical power supply;

6) Costs and space constraints for redundant systems to continuously meet emission limits; and

7) Costs to repair any damage to refractory brick and other equipment that occur as a result of any battery outage.

Based on the limited data available (which are discussed in previous COETF comments on the proposed rule),[10] the fact that none of these controls have been demonstrated in the byproduct recovery coke industry (either domestically or globally), and the low concentrations of pollutants that will have to be removed, it is likely that any selected APC system will fail to achieve the desired destruction or removal efficiency and continually achieve the levels in the proposed rule (see Table 1).

In evaluating the technical feasibility and cost estimates across the byproduct recovery coke industry, Trinity considered the following elements for a "model" Battery Stack to normalize the emissions from the various Battery Stacks:

- Underfire heat input and coke oven gas (COG) heat value that are oven-specific (i.e., based on the number and size of ovens, and COG's higher heating value); and

- For the "model" Battery Stack, the number of ovens, coal charge/oven ratios, rates of coke produced per oven, COG generation rates (cubic feet/ton coal charge or coke produced), and the percentage of COG fired in the underfire heating system.

These elements, together with the technical challenges described above, result in significant uncertainties in APC technology efficiencies. The issues related to controlling the target emissions are further complicated by multipollutant control challenges. No single APC technology is able to control all the targeted pollutants covered by the proposed rule.

Along with the technical challenges of new APC technologies and auxiliary equipment, the available physical space at existing byproduct recovery coke plants is very limited. Depending on the equipment configurations and layouts at existing plants, additional engineering and planning are crucial to overcoming the physical space limitations associated with the placement of any new APC device and auxiliary equipment. As a general matter, all the above factors will likely result in costs higher than those presented in Table 4, which are already more than those estimated by EPA.

---

[10] An equipment redundancy cost of 50% was applied to the capital investment figures to account for redundant components.

**Control Cost Estimation Approach**

Trinity reviewed all of the control cost estimates for existing sources that EPA provided as part of the rulemaking docket. Trinity utilized information in document EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx to supplement vendor supplied information and cost data and to serve as the starting point for the evaluation. Using the general approach contained in EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx ensured a consistent approach, where possible, to that used by EPA with respect to control cost estimating methods as well as assumed pre- and post-control emission rates. The resulting cost estimates and cost effectiveness calculations are presented in Appendix A and summarized in Table 4 below. Key differences between Trinity's methods and those presented by EPA in the proposed rule include the following:

- ACI
    - o Trinity's analysis used updated 2024 total capital investment (TCI) based on a preliminary budget estimate provided by a vendor.
    - o Trinity applied a redundancy cost of 50% to the capital investment figures to account for redundant components.
    - o Trinity updated the exhaust gas flow rate to only include the average for byproduct recovery coke batteries that are still in operation.
    - o Trinity updated the ACI injection rate to approximately 6 lb/mmacf based on an updated study by Sargent & Lundy.[11] The derivation of this injection rate is included in Appendix A and is based on heat input data from 2016 ICR testing conducted by one byproduct recovery coke plant on its Battery Stack. This impacts the Total Annual Cost (TAC), which includes use of EPA's approach for capital recovery considering equipment life and interest rates. Trinity's analysis retained EPA's assumptions for equipment life and interest rates.

- DSI
    - o Trinity added calculations in lieu of the use of a wet scrubber (EPA's assumed control) for the reasons noted in Table 2 above.
    - o Trinity used cost methodology similar to that used for ACI, with the exception of TCI and sorbent costs.
    - o Considering that AG reductions using DSI are highly variable (particularly in exhaust streams with $SO_2$), Trinity assumed 90% control, given uncertainties regarding application of this technology to the byproduct recovery coke industry.
    - o Trinity assumed that TCI was based on a budget estimate provided by a vendor in 2024.
    - o A redundancy cost of 50% was applied to the capital investment figures to account for redundant components.
    - o Trinity assumed a sorbent injection rate based on a formula contained in the Portland Cement NESHAP docket (in document EPA-HQ-OAR-2002-0051). $SO_2$ can compete for agent reaction, thus lowering the effectiveness of AG controls without increased injection. The resulting increased injection rate would also substantially increase annual operating costs. This limitation is amplified for any byproduct recovery coke batteries without desulfurization.

---

[11] IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, Sargent & Lundy, LLC; March 2023

As such, two annual operating costs were developed: one for a Battery Stack at a site with an existing desulfurization system; and one at a site without an existing desulfurization system. For the desulfurization scenario, $SO_2$ emissions for this equation were based on the average Battery Stack emissions for calendar year 2020 operations at the Monessen (PA) and Clairton (PA) byproduct recovery coke plants (i.e., based on readily available data). For the scenario without desulfurization, actual emissions from the Burns Harbor (IN) Plant were used for the $SO_2$ emissions in the equation.

- Fabric Filter
  - o Trinity determined that a fabric filter was the most likely candidate control technology, whereas EPA did not assume an additional PM control device was needed for Battery Stacks.
  - o Trinity computed capital costs for a new baghouse based on https://www.epa.gov/system/files/documents/2021-09/attachment_5-7_pm_control_cost_development_methodology.pdf.[12]
  - o Trinity applied a redundancy cost of 25% to the capital investment figures to account for redundant components (fans, oversizing of compartments, etc.).
  - o Trinity utilized operating costs for a fabric filter based on EPA's baghouse cost template in Attachment 5 referenced above (cost for electricity and air excluded for simplicity).

- Ductwork
  - o Trinity used EPA's cost for ductwork; however, EPA's costs are severely understated. The cost for ductwork will increase due to the complexities of retrofitting or installing a control device or auxiliary equipment (such as a heat exchanger) in the space-constrained area of byproduct recovery coke batteries.

- "Cost of Controls" Summary Table
  - o Baseline emissions for cost effectiveness calculations are those taken from EPA's control costs evaluation (EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx).
  - o Additional costs for retrofitting were not included due to the need for further site-specific evaluations. These costs include, but are not limited to, costs for heat exchangers to reduce the temperature to the desired inlet temperature; significant costs associated with battery outages, including natural gas needed to keep the battery hot; costs for new or modified Battery Stacks; and costs for potential vertical construction or relocation of other assets. The cost for a new Battery Stack was included, based on readily available information for replacing a Battery Stack at one existing coke plant.
  - o There will be a need for redundant equipment (i.e., key portions of the emission control system) to continuously comply with the limits. The costs for these redundant systems are addressed, to the extent possible, as noted above.
  - o Trinity utilized a retrofit factor of 1.25, consistent with EPA's control cost calculations for ductwork. But, the actual retrofit factor, while undefined now, would be much greater than 1.25 due to space constraints, costs due to loss of production, and other factors.
  - o Based on vendor-supplied information, Trinity determined that HCN control was not available or quantifiable.

---

[12] IPM Model – Updates to Cost and Performance for APC Technologies, Particulate Control Cost Development Methodology Final, Sargent & Lundy, LLC; April 2017

- o Byproduct recovery coke batteries that have been permanently closed were removed from the cost evaluations. These include batteries in Follansbee, WV; Middletown, OH; Birmingham, AL (Bluestone Coke); and Clairton, PA (Batteries 1-3).

- o Costs and technologies were updated per the Trinity assessment. Given the assumptions made in these updated control costs calculations, and significant technical impediments not included due to the site-specific engineering necessary to adequately address them, the costs presented are conservatively low.

**Table 4. Battery Stack Control Options Summary (Cost Per Application)[13]**

| Technology | TCI Est.* (EPA) | TAC Est.* (EPA) | TCI Est.* (Trinity)** | TAC Est.* (Trinity) | Target Pollutants |
|---|---|---|---|---|---|
| ACI with Fabric Filter and New Stack | $81,498 | $167,201 | $22,536,152 | $3,915,379 | Hg |
| DSI with Fabric Filter and New Stack (Sites with Desulfurization) | Not evaluated | Not evaluated | $22,873,652 | $3,701,624 | AGs |
| DSI with Fabric Filter and New Stack (Sites without Desulfurization)[14] | Not evaluated | Not evaluated | $22,873,652 | $5,044,042 | AGs |

*TCI = Total Capital Investment; TAC = Total Annual Cost
**Cost includes conservatively low assumptions for redundancy (50% for ACI and DSI; 25% for fabric filter).

---

[13] Costs are understated based on the technical concerns discussed in this evaluation (e.g., battery idling, space constraints, rerouting of combustion exhaust, etc.). Trinity applied a retrofit factor of 1.25 consistent with EPA's value for duct work. Once site-specific engineering is conducted, it is possible that certain technologies may be infeasible.

[14] Total Annualized Costs for certain technologies (i.e., ACI and DSI) may have substantial additional operating costs. These costs are further complicated by the potential interference caused by $SO_2$ in the exhaust stream. DSI costs have been estimates for coke plants with and without desulfurization systems. It is possible that a desulfurization unit may be necessary for the injection system to achieve the proposed standards. This cost is not included in this evaluation.

# CONTROL TECHNOLOGY REVIEW – PUSHING EMISSIONS CONTROL SYSTEMS

As with the evaluation of APC technologies for Battery Stack emissions, Trinity performed an assessment of the Tier 2 technologies (Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally) for PEC Systems as presented in Table 3, including:

- Activated Carbon Injection (ACI) with and without Reagent-Specific Addition, combined with Fabric Filter (for Hg, PAHs); and

- DSI combined with Fabric Filter (for AGs).

Trinity assessed preliminary control technology designs and configurations for these technologies. Capital and operating costs for these preliminary designs were developed based on equipment vendor data, EPA cost estimating techniques, and general APC technology concepts.

## Technical and Economic Considerations for PEC Systems

Controlling emissions from PEC Systems presents physical and control chemistry challenges similar to those for Battery Stack emissions. With one exception, the general design of PEC Systems at existing byproduct recovery coke plants relies on pushing emissions capture-and-control via a fabric filter baghouse. While the end-of-pipe control device is similar (that is, a baghouse), there are several different types of emissions capture devices in use, as indicated below. The one exception to the PEC System baghouse is a byproduct recovery coke plant that uses a mobile scrubber car system.

For PEC Systems that currently use a fabric filter baghouse to control pushing emissions, the four types of systems include:

1) Moveable hood, belt sealed duct (to fabric filter);

2) Moveable hood, dampered ports (to fabric filter);

3) Stationary shed (to fabric filter); and

4) Enclosed coke guide and scrubber car (not included in this evaluation).

Based on this evaluation, it is acknowledged that existing control systems may not be adequate to address the additional loading from proposed injection systems. As such, Table 5 costs account for installation of a new fabric filter system at each site. The costs presented reflect a "model" PEC System at a byproduct recovery coke plant.

## Control Cost Estimation Approach

Similar to the analysis performed for Battery Stacks, Trinity reviewed existing control cost estimates provided by EPA as part of the rulemaking docket. Trinity referenced document EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx to supplement vendor supplied information and cost data, and to serve as the starting point for the updated evaluation. The resulting cost estimates and cost effectiveness calculations are presented in Appendix A and summarized in Table 5. Key differences between Trinity's methods and those in the proposed rule include the following:

- ACI
  - Trinity updated the 2024 TCI based on a preliminary budget estimate provided by a vendor.
  - Trinity applied a redundancy cost of 50% to the capital investment figures to account for redundant components.
  - Trinity updated the exhaust gas flowrate to only consider the average for the byproduct recovery coke batteries that are still in operation.
  - Trinity updated the ACI injection rate to 6 lb/mmacf. Based on similar flowrates and small concentration loading, this value was retained from the Battery Stacks analysis.
- DSI
  - Trinity added these calculations in lieu of assuming the use of a wet alkaline scrubber (EPA's assumed control) for the reasons noted in Table 3.
  - Trinity used a cost methodology similar to that used for ACI, with the exception of TCI and sorbent costs.
  - Because AG reductions using DSI are highly variable, Trinity assumed 90% control, given the uncertainties regarding application of this technology to the byproduct recovery coke industry.
  - Trinity used a 2024 TCI based on a budget estimate provided by a vendor.
  - Trinity applied a redundancy cost of 50% to the capital investment figures to account for redundant components.
  - Trinity used a sorbent injection rate based on a formula included in the Portland Cement NESHAP docket (in document EPA-HQ-OAR-2002-0051). $SO_2$ emissions for this equation were based on the average PEC System emissions for calendar year 2020 operations at the Monessen (PA) and Clairton (PA) byproduct recovery coke plants (i.e., from readily available data).
- Fabric Filter
  - Trinity assumed that each byproduct recovery coke plant will need to include a new fabric filter.
  - Capital costs are based on estimates for application of new technology to the Warren (OH) plant's PEC system.
  - The costs for electricity and air were excluded from total annual costs for simplicity.
- Ductwork
  - Trinity used EPA's cost for ductwork, but that cost is significantly understated (as noted previously).
- "Cost of Controls" Summary Table
  - Baseline emissions for cost effectiveness are those taken from EPA's control costs evaluation (EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx).
  - Additional costs for retrofitting, for known engineering considerations that were not included due to the need for further site-specific evaluations, include, but are not limited to: heat exchangers to increase temperature to the desired inlet temperature; and potential vertical construction or relocation of other assets.

- Trinity utilized a retrofit factor of 1.25, consistent with EPA's control cost calculations for ductwork. The actual retrofit factor, while not estimated in this paper, would be significantly greater than 1.25 due to space constraints, costs due to loss of production, etc.

- Based on vendor discussions, HCN control was determined not to be available or quantifiable.

- There will be a need for redundant equipment (i.e., key portions of the emission control system) to continuously comply with the limits. The costs for these redundant systems are addressed, to the extent possible, as noted above.

- Byproduct recovery coke batteries that have been permanently closed were removed from the cost evaluations. These include batteries in Follansbee, WV; Middletown, OH; Birmingham, AL (Bluestone Coke); and Clairton, PA (Batteries 1-3).

- Costs and technologies were updated per the Trinity assessment. Given the assumptions made in these revised control cost calculations, and significant technical impediments not included due to the site-specific engineering necessary to adequately address them, the costs presented are conservatively low.

**Table 5. PEC Systems with Existing Baghouse Options Summary (Cost Per Application)[15]**

| Technology | TCI Est.* (EPA) | TAC Est.* (EPA)[16] | TCI Est.* (Trinity)** | TAC Est.* (Trinity) | Target Pollutants |
|---|---|---|---|---|---|
| ACI with New Fabric Filter | Not evaluated | Not evaluated | 25,446,261 | 4,359,610 | Hg, PAHs |
| DSI with New Fabric Filter[13] | Not evaluated | Not evaluated | 25,783,761 | 4,064,202 | AGs |

*TCI = Total Capital Investment; TAC = Total Annual Cost
**Cost includes conservatively low assumptions for redundancy (50% for ACI and DSI).

---

[15] Costs are understated based on the technical concerns discussed in this analysis (e.g., space constraints). Trinity applied a retrofit factor of 1.25 consistent with EPA's value for duct work. Once site-specific engineering is conducted, certain technologies may be infeasible.

[16] Total Annualized Costs for certain technologies (i.e., ACI and DSI) may have substantial operating costs. These costs are further complicated by the potential interference caused by $SO_2$ in the exhaust stream.

Trinity evaluated several potential APC systems to control emissions from Battery Stacks and PEC Systems, as presented in Tables 2 and 3. Table 6 below summarizes the estimated costs for several APC systems that were selected for further evaluation, including a technical and economic feasibility review, with technology vendors. The potential APC systems selected for further evaluation, and some of the technical (and schedule) concerns with them, were summarized in "Compliance Schedule Concerns" comments that the COETF provided to EPA on February 9, 2024.[17]

In an effort to obtain realistic input on APC technology applications and associated costs, Trinity obtained information from several APC technology vendors and reached the following conclusions:

1) None of the identified APC technologies are currently demonstrated in the byproduct recovery coke industry, either in the U.S. or globally.

2) Wet alkaline scrubbers cannot adequately address AGs, considering the low exhaust stream concentrations with high exhaust flow rates common with these streams.

3) Due to equipment configurations and layouts at existing byproduct recovery coke plants, additional engineering and planning will be crucial to overcoming limitations of physical space associated with the placement of any new APC device and auxiliary equipment.

4) Significant challenges exist with respect to control of Battery Stack emissions, including the need to perform a planned battery outage and address the natural draft nature of the under-firing system. The necessary retrofitting could have a catastrophic impact on coke production or the battery itself. Such costs and long-term implications are not addressed in this paper.

5) The proposed PM grain loading requirement for Battery Stacks can likely be met with conventional fabric filter (baghouse) technology if the PM particle size is greater than approximately one micron (>1 μm) aerodynamic diameter. However, there are significant doubts that such a technology can be used effectively in controlling PM particles less than 1 μm in diameter.

6) As demonstrated by other industries, Hg can be captured using ACI or DSI technologies. However, the reduction efficiency is difficult to predict for byproduct recovery coke plant operations due to plant-specific conditions and emissions characteristics (including low concentrations and the type or form of mercury present).

7) No technology was identified that would be feasible to control HCN emissions.

8) The control of AGs is theoretically feasible in a DSI using hydrated lime, sodium bicarbonate, or other reagents. However, Battery Stack and PEC System emissions potentially include other acid gases, such as $SO_2$. $SO_2$ in the gas stream will compete for reagent reaction and will lower the conversion/destruction of AGs. This complication makes the evaluation very difficult and complex because auxiliary equipment such as Reaction Towers, reagent storage silos, and large vertical duct runs to allow for sufficient reaction time, will be necessary. The need for such auxiliary equipment will necessitate significant site-specific engineering studies and, likely, the need for large available footprints at space-constrained byproduct recovery coke plants. In the Battery Stack scenario, $SO_2$ will compete for reagent targeted toward HCl and HF. The resulting increased injection rate would

---

[17] "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024.

also substantially increase annual operating costs. This limitation is amplified for any batteries that do not include desulfurization.

As discussed above, based on Trinity's expertise and research, together with information provided by APC vendors, no viable technologies exist for controlling the targeted pollutants from byproduct recovery coke plants. EPA's evaluation of potential controls for Hg at these plants did not consider the additional technologies that would be required (e.g., baghouses with ACI for Hg control and heat exchangers to optimize gas stream temperatures for effective control). In sum, there are no technologies available that would control all the proposed pollutants in each of the two exhaust gas streams (from Battery Stacks and PEC Systems).

Vendor cost data relative to the model coke plant specifications developed by Trinity are very limited. Trinity developed cost estimates for certain technologies using available public data and cost estimating tools. These cost estimates are significantly higher than those estimated in EPA's proposed rule. As indicated in Table 6, EPA's estimates grossly understate the actual costs of retrofitting these APC technologies.

While APC technologies exist that address certain targeted pollutants, there is no single technology that addresses all of these pollutants in combination. Furthermore, with respect to potentially feasible APCs, we found no evidence of any byproduct recovery coke plants using these technologies to control Battery Stack or PEC System emissions. Indeed, site-specific engineering evaluations, which have not been conducted by EPA, would be needed to design and estimate the cost of *potentially* effective APCs. Trinity applied a conservative retrofit cost factor of 1.25 to account for some of this uncertainty.

Furthermore, it is unlikely that the byproduct recovery coke industry could consistently achieve compliance with the proposed standards, and any APCs would not be effective in achieving the proposed standards as supported by this evaluation. Along with ineffective pollutant removal efficiencies, total control costs to industry associated with the evaluated APC technologies and cost effectiveness values are extremely high as summarized in Table 6 and Appendix A.

Industry-wide total capital costs are estimated to be nearly $1.3 Billion, and industry-wide annual costs are estimated to be over $220 Million/year. The resulting cost effectiveness values are over $1 Million/ton for AGs from Battery Stacks, over $1.1 Million/lb for Hg from Battery Stacks, and over $193 Million/ton for PAHs from PEC Systems. These cost effectiveness values are dramatically higher than those EPA has historically determined to be acceptable. The high financial investments reflected in this paper are not acceptable, particularly given that EPA has already determined that risk to public health associated with the entire PQBS source category is low and acceptable and provides an ample margin of safety.

Finally, in light of the numerous technical limitations for controlling the target pollutants at these sources, the costs detailed below are likely to be significantly understated, therefore, EPA should revise the proposed standards upwards for AGs, PAHs, Hg, HCN, and PM.

Table 6. Summary of Estimated Control Costs to Byproduct Recovery Coke Industry[18]

| Source or Process | Target Pollutant | Control Technology | TCI per Emissions Source ($)* | TAC per Emission Source ($)* | No. of Industry Sources | Industry TCI ($)* | Industry TAC ($)* | Industry Total Pollutant Reductions per EPA Baseline (tpy)[19] | Industry Total $/lb or $/Ton Removed |
|---|---|---|---|---|---|---|---|---|---|
| PEC with New Fabric Filter | Hg | ACI + Fabric Filter | 25,446,261 | 4,359,610 | 12 | 305,355,132 | 52,315,324 | 0.0007 | 35,710,236 ($/lb) |
| PEC with New Fabric Filter | PAHs | ACI + Fabric Filter | 25,446,261 | 4,359,610 | 12 | 305,355,132 | 52,315,324 | 0.27 | 193,359,544 ($/ton) |
| PEC with New Fabric Filter | AGs | DSI + Fabric Filter | 25,783,761 | 4,064,202 | 12 | 309,405,132 | 48,770,424 | 5.13 | 9,513,924 ($/ton) |
| Battery Stacks | AGs | DSI + Fabric Filter + New Stack (with desulfurization) | 22,873,652 | 3,701,624 | 10 | 343,104,785 | 62,236,450 | 54.3 | 1,032,154 ($/ton) |
| Battery Stacks | AGs | DSI + Fabric Filter + New Stack (without desulfurization) | 22,873,652 | 5,044,042 | 5 | | | | |
| Battery Stacks | Hg | ACI + Fabric Filter + New Stack | 22,536,152 | 3,915,379 | 15 | 338,042,285 | 58,730,684 | 0.049 | 599,924 ($/lb) |
| **Total Industry Cost** | Hg | PEC – ACI/Fabric Filter<br>Battery Stack - ACI/Fabric Filter | | | | 643,397,417 | 111,046,008 | 0.05 | 1,117,163 ($/lb) |
| **Total Industry Cost** | PAHs | PEC – ACI/Fabric Filter | | | | 305,355,132 | 52,315,324 | 0.27 | 193,359,544 ($/ton) |
| **Total Industry Cost** | AGs | PEC – DSI/Fabric Filter<br>Battery Stack - DSI/Fabric Filter | | | | 652,509,917 | 111,006,874 | 59.43 | 1,867,859 ($/ton) |
| **Total Industry Cost – All Pollutants[20]** | | | | | | **1,295,907,334** | **222,052,882** | | |

*TCI = Total Capital Investment; TAC = Total Annual Cost

---

[18] Costs are understated based on the technical concerns discussed in this white paper (e.g., battery idling, space constraints, redundant equipment, compatibility studies, rerouting of combustion exhaust).

[19] Baseline emissions are those used in EPA's control cost evaluation (EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx). Control efficiencies of 90%, 95%, and 80% were used for AGs, Hg, and PAHs, respectively.

[20] Total Industry Costs are calculated as the sum of total costs for Hg and AGs shown above. The combination of controls evaluated for PAH emissions from PEC Systems would theoretically be the same combination of controls used for Hg from PEC Systems; therefore, the Total Industry Costs calculation does not include the total costs shown above for PAHs in order to avoid duplication.

1) Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

2) Table 10 – Summary of Proposed Amendments to 40 CFR 63, Subparts 5C and L, Federal Register/Vol. 88, No. 157, Page 55893, August 16, 2023/Proposed Rules.

3) Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

4) COETF comments to EPA (Dr. Donna Lee Jones), October 2, 2023.

5) Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC, July 1, 2023.

6) EPA-450/2-77-019, Sept. 1977. EPA Guideline Series, control of sulfuric acid mist emissions from existing sulfuric acid production units.

7) SZhen-Shu Llu, Journal of Environmental Engineering, May 2006.

8) IPM Model – Updates to Cost and Performance for APC Technologies, Mercury Control Incremental Operating Cost Methodology, Sargent & Lundy, LLC; March 2023.

9) Installation Permit Application for USS Proposed C Battery Project, January 2008.

10) Intech 2012 Hein and Kaiser, Air Pollution – A Comprehensive Perspective Environmental Control and Emission Reduction for Coking Plants, Chapter 10, 2012.

11) Comments of the American Iron and Steel Institute and United States Steel Corporation on Proposed National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Residual Risk and Technology Review, Proposed Rule, 84 Fed. Reg. 42,704 (Aug. 16, 2019) and attachments, Nov. 7, 2019.

12) US EPA, Summary of Public Comments and Responses for Lime Manufacturing Plants Residual Risk and Technology Review, May 2020.

13) US EPA, Economic Impact Analysis (EIA) for the Manganese Ferroalloys RTR Supplemental Proposal Final Report, September 2014.

14) Schulz. M, and Klaus-Peter Paul Leuchtmann et al, AISTech, 2015; Hyundai Steel and ThyssenKrupp Industrial Solutions USA, Using modern coke oven technology at the new Hyundai Steel coke plant.

15) Dickerman, Jim; and Mike Schantz, Lhoist North America; IMPROVED DSI PERFORMANCE WITH OPTIMIZED HYDRATED LIME, DSI with Sorbacal®SP, c. 2013.

16) Portland Cement NESHAP docket; EPA-HQ-OAR-2002-0051, July 2018.

17) COETF "Compliance Schedule Concerns 020924.pdf" to EPA, February 9, 2024.

# APPENDIX A. APC COST DATA BACKUP

**Costs of Controls for the Byproduct Recovery Plant Battery Stacks**

| Summary of Capital and Annual Costs | No. APCD Configurations[1] | ABC-Tarrant-AL | AM-BurnsHarbor-IN | AM-Monessen-PA | AM-Warren-OH | EES-RiverRouge-MI | USS-Clairton-PA | |
|---|---|---|---|---|---|---|---|---|
| | | 2 | 2 | 2 | 1 | 1 | 7 | |
| **Capital Cost[2]** | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) |
| Ductwork | $33,761 | $67,522 | $67,522 | $67,522 | $33,761 | $33,761 | $236,327 | $506,414 |
| Activated Carbon Injection Capital Costs | $412,500 | $825,000 | $825,000 | $825,000 | $412,500 | $412,500 | $2,887,500 | $6,187,500 |
| Dry Sorbent Injection Capital Costs | $750,000 | $1,500,000 | $1,500,000 | $1,500,000 | $750,000 | $750,000 | $5,250,000 | $11,250,000 |
| Replacement Stack Capital Costs | $10,000,000 | $20,000,000 | $20,000,000 | $20,000,000 | $10,000,000 | $10,000,000 | $70,000,000 | $150,000,000 |
| Fabric Filter Capital Costs | $12,089,891 | $24,179,783 | $24,179,783 | $24,179,783 | $12,089,891 | $12,089,891 | $84,629,240 | $181,348,370 |
| **Total Capital Cost (ACI + Fabric Filter + Stack)** | **$22,536,152** | **$45,072,305** | **$111,341,979** | **$67,162,196** | **$44,626,044** | **$508,513,762** | **$489,101,437** | **$338,042,285** |
| **Total Capital Cost (DSI + Fabric Filter + Stack)** | **$22,873,652** | **$45,747,305** | **$45,747,305** | **$45,747,305** | **$22,873,652** | **$22,873,652** | **$160,115,566** | **$343,104,785** |
| **Annual Cost** | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) |
| Ductwork | $12,769 | $25,538 | $25,538 | $25,538 | $12,769 | $12,769 | $89,384 | $191,537 |
| Activated Carbon Injection Annual Costs | $622,243 | $1,244,486 | $1,244,486 | $1,244,486 | $622,243 | $622,243 | $4,355,700 | $9,333,642 |
| Dry Sorbent Injection Annual Costs (sites with desulfurization) | $408,488 | $3,501,813 | $3,501,813 | $816,975 | $408,488 | $1,750,906 | $2,859,414 | $12,839,408 |
| Dry Sorbent Injection Annual Costs (sites without desulfurization) | $1,750,906 | | | | | | | |
| Replacement Stack Annual Costs | $1,380,922 | $2,761,844 | $2,761,844 | $2,761,844 | $1,380,922 | $1,380,922 | $9,666,453 | $20,713,829 |
| Fabric Filter Annual Costs | $1,899,445 | $3,798,890 | $3,798,890 | $3,798,890 | $1,899,445 | $1,899,445 | $13,296,115 | $28,491,676 |
| **Total Annual Costs (ACI + Fabric Filter + Stack )** | **$3,915,379** | **$7,830,758** | **$17,671,859** | **$11,111,125** | **$7,195,746** | **$76,083,453** | **$76,613,157** | **$58,730,684** |
| **Total Annual Costs (DSI + Fabric Filter + Stack )** | **$5,044,042** | **$10,088,085** | **$10,088,085** | **$7,403,248** | **$3,701,624** | **$5,044,042** | **$25,911,367** | **$62,236,450** |
| **Uncontrolled Pollutant (Ton/yr)** | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY[4] | | Industry Total TPY |
| Uncontrolled Hg Emission Rate (Ton/yr) | | 1.3E-03 | 3.0E-02 | 6.5E-04 | 2.1E-03 | 5.8E-03 | 1.1E-02 | 0.052 |
| Uncontrolled Acid Gas Emission Rate (Ton/yr) | | 2.3E+00 | 1.5E+01 | 1.7E+00 | 4.6E+00 | 1.3E+01 | 2.4E+01 | 60.3 |
| Uncontrolled HCN Emission Rate (Ton/yr) | | 9.9E-01 | 2.3E+00 | 8.7E-02 | 2.8E-01 | 7.5E-01 | 2.7E-01 | 4.7 |
| Uncontrolled Total HAP[2] Emission Rate (Ton/yr) | | 3.2E+00 | 1.8E+01 | 1.8E+00 | 4.9E+00 | 1.3E+01 | 2.4E+01 | 65 |
| **Pollutant Reductions (Ton/yr)** | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | | Industry Total TPY |
| Hg Emission Reduction w/ ACI | | 1.2E-03 | 2.9E-02 | 6.2E-04 | 2.0E-03 | 5.5E-03 | 1.1E-02 | 0.049 | 95.00% |
| Acid Gas Reduction w/ DSI | | 2.0E+00 | 1.4E+01 | 1.6E+00 | 4.2E+00 | 1.1E+01 | 2.1E+01 | 54.3 | 90.00% |
| HCN Reduction (Not Available) | | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0 | 0.00% |
| Total HAP[2] Reduction | | 2.0E+00 | 1.4E+01 | 1.6E+00 | 4.2E+00 | 1.1E+01 | 2.1E+01 | 54.32 | |
| **Pollutant Cost Effectiveness ($/Ton)** | | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Industry Total $/Ton ($/lb Mercury) |
| Hg Cost Effectiveness ($/lb w/ ACI and FF (Stack) | | $3,141,995 | $305,170 | $9,006,760 | $1,777,221 | $6,876,740 | $3,622,354 | $599,923 |
| Acid Gas Cost Effectiveness ($/Ton) w/ DSI and FF (Stack) | | $4,482,659 | $653,280 | $4,246,594 | $800,886 | $399,378 | $1,097,475 | $1,032,154 |
| HCN Cost Effectiveness ($/Ton) (Not Available) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Total HAP[2] Cost Effectiveness ($/Ton) w/ Ductwork+ACI+DSI+FF (Stack) | | $5,591,724 | $813,715 | $5,509,441 | $1,038,956 | $498,253 | $1,423,693 | $1,317,641 |

[1] There are six ByProduct recovery coke plants that have a total of 15 Battery Stacks.

[2] Where Total HAP is the sum of Hg, Acid Gas, and HCN emissions for which the EPA is setting MACT floors.

[3] Costs noted above do not consider numerous concerns regarding retrofitting of these emissions sources. For example, there are significant space constraints such that vertical construction/design may be needed. Moreover, battery stacks are natural draft with the underfire stream predominantly underground. The impacts of added fans and equipment will need to be studied to ensure adequate heating of the batteries, as well as enough physical space to install additional equipment. All this will pose crucial obstacles and engineering challenges for any new add-on equipment. Furthermore, changes to the underfiring system will necessitate the planning and scheduling of battery outages, during which purchased natural gas will be needed to keep the battery hot; all coke production would cease; and battery refractory brick and other equipment could suffer unanticipated damage, adding more time and expense to address. Costs for loss of production are also not considered. Electrical needs will also need to be reviewed.

[4] Emission rates reflect removal of Batteries 1,2 and 3 at the Clairton byproduct recovery which have been permanently closed.

**Activated Carbon Injection Model Costs (ACI Only)[1,2,3]**

| Parameters | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 | (updated to remove any batteries no longer operable) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Activated Carbon Cost, $/lb (ACC) | $0.75 | Cost for FF from IPM,[2] cost for scrubber from email from Albemarle[3] |
| Dust Disposal Cost, $/Ton (DDC, Non-Hazardous) | $40.00 | Cost from EPA |
| Dust Disposal Cost, $/Ton (DDC, Hazardous) | $400.00 | Cost from EPA |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |
| ACI Adjustment Factor (AF) | 0.95 | Calculated control efficiency |
| ACI Injection Rate (lb/MMacf) | 6 | Updated based on Sargent & Lundy Study[4] |

| | | |
|---|---|---|
| Total Capital Investment, $ (TCI)(1 system) | $275,000 | Reflects high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $137,500 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$412,500** | |

| Direct Annual Cost, $/yr (DAC) | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $82,500 | Calculated using 0.2 x TCI |
| Activated Carbon | $330,622 | |
| Dust Disposal (Non-Hazardous) | $8,728 | Calculated using ACI injection rate, 99% capture efficiency, and non-hazardous disposal cost |
| Dust Disposal (Hazardous) | $87,284 | Calculated using ACI injection rate, 99% capture efficiency, and hazardous disposal cost |

| Indirect Annual Cost, $/yr (IAC) | | |
|---|---|---|
| Overhead | $55,265 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $16,500 | Calculated using 0.04 x TCI |
| Capital Recovery | $40,463 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| Total Annual Cost (Non-Hazardous) | $543,687 | Sum of DAC + IAC |
| Total Annual Cost (Hazardous) | $622,243 | Sum of DAC + IAC |
| **Total Annual Cost (Hazardous)** | **$622,243** | (used in total cost estimates) |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

[2] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2011

[3] Email from Daryl Lipscomb, Albemarle to Bradley Nelson, EC/R, 8/30/2011

[4] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2023

**Battery Stack - ACI Injection Rate Calculation**

| | | |
|---|---|---|
| 0.46 | MMSCF/hr | Example Battery (Monessen (PA) Batt. 2 Comb Stack - 2016 ICR test) |
| 500 | btu/scf | estimate |
| 230 | MMBtu/hr | (heat input) |
| 2014800 | MMBtu/yr | |
| 2.015 | Tbtu/yr | |
| 3.86E-06 | lb Hg/ton coke (uncontrolled, from EPA's Baseline TP values) | |
| 2.20E-04 | tpy Hg (uncontrolled, from EPA's Baseline TP values) | |
| 2.19E-01 | lb/Tbtu uncontrolled | |
| 1.09E-02 | lb/Tbtu controlled | |
| **6** | **lb/Mmacf** | **Using Premium/Baghouse** |

**Injection Rate / Emission Rate Calculations**

Current Injection Rate:

$$x = \frac{\ln\left(\frac{y}{a}\right)}{b}$$

Where,

x is the **current injection rate** (lb/MMacf),
y is the **current** emission rate (lb/TBtu), and
a and b are coefficients dependent on the fuel, particulate collection device, and PAC type (see table below).

Option 1 – Achievable Emission Rate based on New Injection Rate (Recommended Maximum 20% Increase):

$$y = a * e^{b*x}$$

Option 2 – New Injection Rate based on New Emission Rate (Per Minimum Limits Above):

$$x = \frac{\ln\left(\frac{y}{a}\right)}{b}$$

Where,

x is the **new injection rate** (lb/MMacf),
y is the **new** emission rate (lb/TBtu), and
a and b are coefficients dependent on the fuel, particulate collection device, and PAC type (see table below).

| Fuel Type | PRB or Bituminous | | Lignite | |
|---|---|---|---|---|
| Particulate Control Type | Baghouse | ESP | Baghouse | ESP |
| **Coefficient 'a'** | | | | |
| Premium PAC | 4.3552 | 4.3552 | 21.567 | 21.567 |
| Standard PAC | 3.7609 | 3.7609 | 25.886 | 25.886 |
| **Coefficient 'b'** | | | | |
| Premium PAC | -0.988 | -0.593 | -1.647 | -1.086 |
| Standard PAC | -0.636 | -0.381 | -0.987 | -0.69 |

**New Baghouse Model Costs[1,2]**

| | |
|---|---|
| Control Device | Fabric Filter |
| Annual Operating Hours, hr/yr (H) | 8760 |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 (revised removal of sites no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 |
| Retrofit Factor | 1.25 (conservatively set at 1.25, consistent with EPA value for ductwork) |

| | | |
|---|---|---|
| Total Installed, $ (TCI) | $9,671,913 | BMB ($) = J*B*L^0.81; J = 530 for a 6.0 Air-to-Cloth unit |
| TCI, $ (redundant system components) | $2,417,978 | (25% estimate for extra compartments, fans, etc.) |
| **TCI $** | **$12,089,891** | BMB ($) = J*B*L^0.81; J = 530 for a 6.0 Air-to-Cloth unit |

1. Cost calculated per Table 3 of  https://www.epa.gov/system/files/documents/2021-09/attachment_5-7_pm_control_cost_development_methodology.pdf
2. Note that in response to the proposed II&S rules, industry estimated $7.5 million for purchased cost of a new baghouse with ACI for a BOF. ( EPA-HQ-OAR-2002-0083-1612_attachment_1.pdf)

**Annual Costs**

| | | |
|---|---|---|
| Operating factor (hr/yr): | 8,760 | |
| Operating labor rate ($/hr): | $30.52 | |
| Maintenance labor rate ($/hr): | $30.52 | |
| Operating labor factor (hr/sh): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Maintenance labor factor (hr/sh): | 1 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Annual interest rate (fraction): | 0.075 | |
| Control system life (years): | 20 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor: | 0.098092192 | |
| Bag life (years): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor (bags): | 0.556927711 | |
| Taxes, insurance, admin. factor: | 0.04 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |

| Item | | |
|---|---|---|
| --- | --- | --- |
| Oper. labor | $66,839 | |
| Supv. labor | $10,026 | 15% Operating Labor |
| Maint. labor | $33,419 | |
| Maint. matl. | $33,419 | Equal to maint. Labor |
| Overhead | $86,222 | 60% of (Oper, Supv, Maint. Costs) |
| Tax,ins.,adm | $483,596 | |
| Cap. recov. | $1,185,924 | |
| --- | --- | --- |
| **Total Annual Cost** | **$1,899,445** | |

**New Battery Stack Model Costs**

| | |
|---|---|
| Control Device | Fabric Filter |
| Annual Operating Hours, hr/yr (H) | 8760 |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 (revised removal of sites no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 |
| Retrofit Factor | 1.25 (conservatively set at 1.25 consistent with EPA value for ductwork) |

**Total Capital Investment ($)**   **$10,000,000**   (example from battery stack project in 2019 was greater than $10 million including temporary stack)

**Annual Costs**

| | | |
|---|---|---|
| Annual interest rate (fraction): | 0.075 | |
| Control system life (years): | 20 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor: | 0.098092192 | |
| Bag life (years): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor (bags): | 0.556927711 | |
| Taxes, insurance, admin. factor: | 0.04 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |

| Item | |
|---|---|
| ------------------------------------------------------------------------------------------------------------- | |
| Tax,ins.,adm | $400,000 |
| Cap. recov. | $980,922 |
| ------------------------------------------------------------------------------------------------------------- | |

**Total Annual Cost**   **$1,380,922**

**Dry Sorbent Injection Model Costs (DSI Only at Sites with Desulfurization)[1]**

Parameters

| | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 | (updated to remove any batteries no longer operable) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |

| | | |
|---|---|---|
| Total Capital Investment, $ (TCI)(1 system) | $500,000 | Reflected of high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $250,000 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$750,000** | |

Direct Annual Cost, $/yr (DAC)

| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $150,000 | Calculated using 0.2 x TCI |
| Approximate SO2 emissions (tpy per stack) | 57.33 | |
| Lime Cost ($/yr, 2010) = 0.3 * lbs SO2/yr | $34,400 | |
| Lime Cost ($/yr, 2023) = 2010 $/yr * CEPCI 2023/ CEPCI 2010 | $49,546 | Given the relative emissions of SO2 and HCl, control will primarily result in reductions of SO2. The amount of lime injection must consider SO2 emissions, although HCl is the target pollutant for this cost estimate. SO2 based on 2020 air emissions data published for Clairton (PA) and Monessen (PA) byproduct recovery coke plants. |

Indirect Annual Cost, $/yr (IAC)

| | | |
|---|---|---|
| Overhead | $95,765 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $30,000 | Calculated using 0.04 x TCI |
| Capital Recovery | $73,569 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| **Total Annual Cost** | **$408,488** | Sum of DAC + IAC |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

**Dry Sorbent Injection Model Costs (DSI Only at Sites without Desulfurization)[1]**

Parameters

| | |
|---|---|
| Control Device | Fabric Filter |
| Annual Operating Hours, hr/yr (H) | 8760 |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 (updated to remove any batteries no longer operable) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 |
| Operating Labor Rate, $/hr (LR) | $30.52 |
| Annual interest rate (fractional): | 0.075 |
| Economic life (years): | 20 |
| Capital Recovery Factor (CRF) | 0.098092192 CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 |
| GDP, 2008 | 94.419 |
| GDP, 1991 | 65.783 |

| | |
|---|---|
| Total Capital Investment, $ (TCI)(1 system) | $500,000 Reflected of high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $250,000 (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$750,000** |

Direct Annual Cost, $/yr (DAC)

| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $150,000 | Calculated using 0.2 x TCI |
| Approximate SO2 emissions (tpy per stack) | 1610.77 | |
| Lime Cost ($/yr, 2010) = 0.3 * lbs SO2/yr | $966,462 | |
| Lime Cost ($/yr, 2023) = 2010 $/yr * CEPCI 2023/ CEPCI 2010 | $1,391,964 | Given the relative emissions of SO2 and HCl, control will primarily result in reductions of SO2. The amount of lime injection must consider SO2 emissions, though HCl is the target pollutant for this cost estimate. SO2 based on average of 2022 combustion stack emissions for Burns Harbor (IN). |

Indirect Annual Cost, $/yr (IAC)

| | | |
|---|---|---|
| Overhead | $95,765 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $30,000 | Calculated using 0.04 x TCI |
| Capital Recovery | $73,569 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| **Total Annual Cost** | **$1,750,906** | Sum of DAC + IAC |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

**Costs for Pushing Emissions Control (PEC) Systems**

| Summary of Capital and Annual Costs | | ABC-Tarrant-AL | AM-BurnsHarbor-IN | AM-Monessen-PA | AM-Warren-OH | EES-RiverRouge-MI | USS-Clairton-PA | |
|---|---|---|---|---|---|---|---|---|
| | No. PEC Systems[1] | 3 | 2 | 1 | 1 | 1 | 4 | |
| Capital Cost[3] | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) |
| Ductwork | $33,761 | $101,283 | $67,522 | $33,761 | $33,761 | $33,761 | $135,044 | $405,132 |
| Activated Carbon Injection Capital Cost | $412,500 | $1,237,500 | $825,000 | $412,500 | $412,500 | $412,500 | $1,650,000 | $4,950,000 |
| New Fabric Filter | $25,000,000 | $75,000,000 | $50,000,000 | $25,000,000 | $25,000,000 | $25,000,000 | $100,000,000 | $300,000,000 |
| Dry Sorbent Injection Capital Cost | $750,000 | $2,250,000 | $1,500,000 | $750,000 | $750,000 | $750,000 | $3,000,000 | $9,000,000 |
| **Total Capital Cost (ACI + Fabric Filter)** | $25,446,261 | $76,338,783 | $50,892,522 | $25,446,261 | $25,446,261 | $25,446,261 | $101,785,044 | $305,355,132 |
| **Total Capital Cost (DSI + Fabric Filter)** | $25,783,761 | $77,351,283 | $51,567,522 | $25,783,761 | $25,783,761 | $25,783,761 | $103,135,044 | $309,405,132 |
| Annual Cost | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) |
| Ductwork | $13,221 | $39,664 | $26,443 | $13,221 | $13,221 | $13,221 | $52,886 | $158,657 |
| Activated Carbon Injection Annual Cost | $664,159 | $1,992,476 | $1,328,317 | $664,159 | $664,159 | $664,159 | $2,656,634 | $7,969,903 |
| New Fabric Filter | $3,682,230 | $11,046,691 | $7,364,461 | $3,682,230 | $3,682,230 | $3,682,230 | $14,728,921 | $44,186,763 |
| Dry Sorbent Injection Capital Cost | $368,750 | $1,106,251 | $737,501 | $368,750 | $368,750 | $368,750 | $1,475,001 | $4,425,004 |
| **Total Annual Costs (ACI + Fabric Filter)** | $4,359,610 | $13,078,831 | $8,719,221 | $4,359,610 | $4,359,610 | $4,359,610 | $17,438,441 | $52,315,324 |
| **Total Annual Costs (DSI + Fabric Filter)** | $4,064,202 | $12,192,606 | $8,128,404 | $4,064,202 | $4,064,202 | $4,064,202 | $16,256,808 | $48,770,424 |
| Uncontrolled Pollutant (Ton/yr) | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Industry Total TPY |
| Uncontrolled Acid Gas Emission Rate (Ton/yr) | | 3.79E-01 | 2.26E+00 | 1.96E-01 | 2.30E-01 | 6.29E-01 | 2.00E+00 | 5.70 |
| Uncontrolled HCN Emission Rate (Ton/yr) | | 2.36E-01 | 7.95E-01 | 1.24E-01 | 9.33E-02 | 2.55E-01 | 8.11E-01 | 2.31 |
| Uncontrolled Hg Emission Rate (Ton/yr) | | 2.65E-05 | 2.10E-04 | 3.74E-05 | 4.00E-05 | 1.09E-04 | 3.48E-04 | 0.0008 |
| Uncontrolled PAH Emission Rate (Ton/yr) | | 1.71E-01 | 4.73E-02 | 8.42E-03 | 9.00E-03 | 2.46E-02 | 7.83E-02 | 0.34 |
| Uncontrolled Total HAP[2] Emission Rate (Ton/yr) | | 7.86E-01 | 3.10E+00 | 3.28E-01 | 3.33E-01 | 9.09E-01 | 2.89E+00 | 8.35 |
| Pollutant Reductions (Ton/yr) | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Industry Total TPY | |
| Acid Gas Reduction w/ DSI | | 3.41E-01 | 2.03E+00 | 1.76E-01 | 2.07E-01 | 5.66E-01 | 1.80E+00 | 5.13 | 90.00% |
| HCN Reduction (Not Available) | | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00 | 0.00% |
| Hg Reduction w/ACI | | 2.52E-05 | 2.00E-04 | 3.55E-05 | 3.80E-05 | 1.04E-04 | 3.30E-04 | 0.0007 | 95.00% |
| PAH Reduction w/ACI | | 1.37E-01 | 3.78E-02 | 6.73E-03 | 7.20E-03 | 1.97E-02 | 6.26E-02 | 0.27 | 80.00% |
| Total HAP[2] Reduction | | 4.77E-01 | 2.07E+00 | 1.83E-01 | 2.14E-01 | 5.86E-01 | 1.87E+00 | 5.40 | |
| Pollutant Cost Effectiveness ($/Ton) | | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Industry Total $/Ton ($/lb Mercury) | |
| Acid Gas Cost Effectiveness ($/Ton) w/DSI | | $35,770,190 | $3,997,621 | $23,047,434 | $19,612,208 | $7,177,169 | $9,020,491 | $9,513,924 | |
| HCN Cost Effectiveness ($/Ton) (Not Available) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | |
| Hg Cost Effectiveness ($/lb) w/ACI | | $259,338,475 | $21,838,895 | $61,357,851 | $57,385,689 | $21,000,532 | $26,394,127 | $35,710,236 | |
| PAH Cost Effectiveness ($/Ton) w/ACI | | $95,799,475 | $230,477,756 | $647,542,821 | $605,622,434 | $221,630,058 | $278,551,601 | $193,359,544 | |
| Total HAP[2] Cost Effectiveness ($/Ton) w/Ductwork+ACI+DSI | | $6,573,819 | $1,010,100 | $5,713,162 | $22,047,266 | $1,785,076 | $2,243,539 | $3,008,017 | |

[1] There are six existing byproduct recovery coke plants with a total of 12 PEC systems.

[2] Where Total HAP is the sum of Acid Gas, HCN, Hg, and PAH emissions for which the EPA is setting MACT floors.

[3] Costs noted above do not consider numerous concerns regarding retrofitting of these emissions sources, including potential retrofit of existing PM controls. For example, there are significant space constraints such that vertical construction/design may be needed. Electrical needs will also need to be reviewed.

**Activated Carbon Injection Model Costs (ACI Only) [1,2,3]**

Parameters

| Control Device | Fabric Filter | |
|---|---|---|
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 153,807 | (revised removal of sites no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 127,926 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Activated Carbon Cost, $/lb (ACC) | $0.75 | Cost for FF from IPM,[2] cost for scrubber from email from Albemarle [3] |
| Dust Disposal Cost, $/Ton (DDC, Non-Hazardous) | $40.00 | Cost from EPA |
| Dust Disposal Cost, $/Ton (DDC, Hazardous) | $400.00 | Cost from EPA |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |
| ACI Adjustment Factor (AF) | 0.95 | Calculated control efficiency |
| | | Updated based on Sargent & Lundy Study [4] (Based on same rate as battery |
| ACI Injection Rate (lb/MMacf) | 6.0 | stack review given similar flowrates and equivalent or smaller concentrations) |
| Total Capital Investment, $ (TCI)(1 system) | $275,000 | Reflected of high level budget estimates from vendor |
| TCI, $ (redundant system components) | $137,500 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$412,500** | |

Direct Annual Cost, $/yr (DAC)

| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $82,500 | Calculated using 0.2 x TCI |
| Activated Carbon | $363,784 | |
| Dust Disposal (Non-Hazardous) | $9,604 | Calculated using ACI injection rate, 99% capture efficiency, and non-hazardous disposal cost |
| Dust Disposal (Hazardous) | $96,039 | Calculated using ACI injection rate, 99% capture efficiency, and hazardous disposal cost |

Indirect Annual Cost, $/yr (IAC)

| | | |
|---|---|---|
| Overhead | $55,265 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $16,500 | Calculated using 0.04 x TCI |
| Capital Recovery | $40,463 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| Total Annual Cost (Non-Hazardous) | $577,724 | Sum of DAC + IAC |
| Total Annual Cost (Hazardous) | $664,159 | Sum of DAC + IAC |
| **Total Annual Cost (Hazardous)** | **$664,159** | (used in total cost estimates) |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

[2] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2011

[3] Email from Daryl Lipscomb, Albemarle to Bradley Nelson, EC/R, 8/30/2011

[4] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2023

**New PEC Baghouse Model Costs (and Supporting Upgrades)** [1,2]


**Total Installed, $ (TCI)**        **$25,000,000**  Cliffs Warren Site engineering estimate

1.  Cost calculated per Table 3 of  https://www.epa.gov/system/files/documents/2021-09/attachment_5-7_pm_control_cost_development_methodology.pdf

**Annual Costs**

| | | |
|---|---|---|
| Operating factor (hr/yr): | 8,760 | |
| Operating labor rate ($/hr): | $30.52 | |
| Maintenance labor rate ($/hr): | $30.52 | |
| Operating labor factor (hr/sh): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Maintenance labor factor (hr/sh): | 1 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Annual interest rate (fraction): | 0.075 | |
| Control system life (years): | 20 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor: | 0.098092192 | |
| Bag life (years): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor (bags): | 0.556927711 | |
| Taxes, insurance, admin. factor: | 0.04 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |


| Item | | |
|---|---|---|
| ------------------------------------------------------------------------------------------------------------- | | |
| Oper. labor | $66,839 | |
| Supv. labor | $10,026 | 15% Operating Labor |
| Maint. labor | $33,419 | |
| Maint. matl. | $33,419 | Equal to maint. Labor |
| Overhead | $86,222 | 60% of (Oper, Supv, Maint. Costs) |
| Tax,ins.,adm | $1,000,000 | |
| Cap. recov. | $2,452,305 | |
| ------------------------------------------------------------------------------------------------------------- | | |
| **Total Annual Cost** | **$3,682,230** | |

**Dry Sorbent Injection Model Costs (DSI Only)**[1]

| Parameters | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 153,807 | (updated to remove batteries no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 127,926 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |
| | | |
| Total Capital Investment, $ (TCI)(1 system) | $500,000 | Reflective of high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $250,000 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$750,000** | |

| Direct Annual Cost, $/yr (DAC) | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $150,000 | Calculated using 0.2 x TCI |
| Approximate SO2 emissions (tpy per stack) | 11.35 | |
| Lime Cost ($/yr, 2010) = 0.3 * lbs SO2/yr | $6,810 | |
| Lime Cost ($/yr, 2023) = 2010 $/yr * CEPCI 2023/ CEPCI 2010 | $9,808 | Given the relative emissions of SO2 and HCl, control will primarily result in reductions of SO2. The amount of lime injection must consider SO2 emissions, although HCl is the target pollutant for this cost estimate. SO2 based on 2020 air emissions data published for Clairton (PA) and Monessen (PA) byproduct recovery coke plants. |

| Indirect Annual Cost, $/yr (IAC) | | |
|---|---|---|
| Overhead | $95,765 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $30,000 | Calculated using 0.04 x TCI |
| Capital Recovery | $73,569 | Calculated using CRF x TCI |

| **Total Annual Cost** | **$368,750** | Sum of DAC + IAC |
|---|---|---|

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

| Company Name/Vendor | Technology |
|---|---|
| LDX Solutions | DSI, CSR, FF, ACI |
| Babcock & Wilcox | DSI, ACI |
| Calgon Carbon Corporation | DSI, ACI |
| Solvay (SolvAir Solutions) | DSI |
| Tri-Mer Corporation | Wet Scrubbing |

| Parameter | PEC System (with existing baghouse) | Battery Stack |
|---|---|---|
| Flowrate (dscfm) | ~135,000 | ~40,000 to 60,000 |
| Temperature (degrees Fahrenheit) | ~115 | ~500 |
| Moisture (%) | ~2 | ~14 |
| Polycyclic Aromatic Hydrocarbons Range (µg/m3) | 300 to 1,100 | Not applicable |
| Hydrogen Cyanide Range (µg/m3) | 1,000 to 4,000 | 100 to 1,200 |
| Mercury Range (µg/m3) | 1 to 5 | 20 to 100 |
| Acid Gas Range (Hydrogen Chloride and Hydrogen Fluoride) (µg/m3) | 4,000 to 20,000 | 40,000 to 180,000 |

*The parameters listed above are a simplification for the purposes of initial vendor outreach and do not necessarily reflect any given individual byproduct recovery coke battery.

**Approximate values.

# **Exhibit D**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| AMERICAN COKE AND COAL CHEMICALS INSTITUTE and COKE OVEN ENVIRONMENTAL TASK FORCE,<br><br>Petitioners,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 24-1287 (consolidated with 24-1288, 24-1290) |

## DECLARATION OF IAN DONALDSON

I, Ian Donaldson, am over 18 years of age and make the following declaration pursuant to 28 U.S.C. § 1746:

1.     I am a consulting engineer for Trinity Consultants Inc. (Trinity) and serve as a Principal Consultant and Operations Manager. I hold a Bachelor of Science in Meteorology and, as a consulting engineer, I am an expert in Clean Air Act (CAA) compliance solutions including for National Emissions Standard for Hazardous Air Pollutants (NESHAP) standards and industrial air pollution control. I have 19 years of experience with the steel manufacturing industry and numerous other heavy industries in estimating,

identifying, and scoping air pollution controls, and ensuring sources comply with NESHAPs.

2.   Trinity is a leading national provider of CAA compliance services to regulated sources where I work with a team of more than 600 consulting engineering and science professionals. Trinity has provided CAA compliance solutions to regulated entities for more than 50 years.

3.   I am providing this declaration on behalf of the American Coake and Coal Chemicals Institute (ACCCI) and Coke Oven Environmental Task Force (COETF) motion for stay of the U.S. Environmental Protection Agency (EPA) final rule "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55684-55757 (July 5, 2024) (Final Rule).

4.   Among other requirements, the Final Rule contains new "gap-fill" limits for mercury (Hg), acid gases (AGs) (including hydrochloric acid [HCl] and hydrofluoric acid [HF]), hydrogen cyanide (HCN) and polycyclic aromatic hydrocarbons (PAHs).  Based on our review, Trinity developed and provided an analysis to EPA regarding these new standards, including that the limitations being established are based on a limited data set that does not account for variability in raw materials (e.g., coal blends) or process

variability (e.g., long-term operating conditions, changes in coking times, etc.).[1] Given the limited data set used to set the standards, the final limits cannot continuously be met for all sources without additional add-on pollution controls.

5.     On behalf of the COETF, Trinity performed an air pollution control technology review for coke battery stacks and pushing emissions in the form of a white paper based on requirements in the August 16, 2023 proposed rule.[2] The overall conclusions of the Trinity Cost White Paper remain unchanged as a result of the Final Rule.

6.     This declaration is based on my personal knowledge of facts and information pertaining to potential control requirements, existing plant operations, and the requirements in the Final Rule. My knowledge is based on my history in the industry, and the pollution control feasibility and cost analysis provided in the Trinity White Paper.

---

[1] *See Upper Prediction Limit Calculations with Intra-Mine Variability Factor*, Trinity Consultants (May 3, 2024) (Trinity Variability White Paper) (Ex. A).
[2] *See White Paper – Air Pollution Control Technology Review for Coke Battery Stacks and Pushing Emissions Under EPA's Proposed Coke Ovens Risk & Technology Review*, Trinity Consultants (March 6, 2024) (Trinity Cost White Paper) (Ex. B).

## I.  No Demonstrated Controls for New Pollutant Standards

7.  Based on Trinity's review, control of the gap-filling pollutants (Hg, AGs, HCN, PAHs) has not been demonstrated by any byproduct recovery coke plant in the U.S. or globally. Furthermore, due to the low concentrations of the new limitations and the failure to account for variability in raw materials which affects HAP emissions, there is significant concern that any technologies could achieve continuous compliance.

8.  Based on available test data and information on intra-mine variability of naturally occurring Hg, chlorine, and fluorine in coal that was provided to EPA during the rulemaking, the final limits cannot be assumed to be continuously met without additional pollution controls. Given the lack of demonstrated technology available to mitigate these HAP emissions, Trinity communicated with control technology vendors to identify potential control technologies for Hg, AGs, HCN and PAHs.

9.  Trinity did not identify any potential technologies that would be feasible for the control of HCN emissions.  Trinity determined that no single technology exists to control Hg, AGs, and PAHs.  The technologies that Trinity identified and evaluated ("candidate controls") for feasibility and cost included activated carbon injection (ACI) with fabric filter and dry sorbent injection (DSI) with fabric filter.

## II.    Cost of Candidate Controls

10.    Significant unresolved challenges associated with ACI-fabric filters and DSI-fabric filters include, but are not limited to, very low HAP concentrations in the gas streams to be controlled, the need for additional related equipment (e.g., heat exchangers, power supply, secondary controls, etc.), the need for redundant equipment due to the fact that the final standards apply at all times, and physical space limitations.

11.    The resulting total capital investment (TCI) and total annual cost (TAC) of these controls for the byproduct recovery coke industry is extreme – approximately $1.5 Billion in TCI and $222 Million in annual operating costs, as summarized in Table 1.  By way of one example, on a per source basis, the TCI would exceed $50 Million and TAC would exceed $8 Million per year for a single PEC.[3]

---

[3] Combination of costs for ACI and DSI totals. *See* Trinity Cost White Paper, p. 38 (Ex. B).

**Table 1. Summary of Estimated Control Costs to Byproduct Recovery Coke Industry**

| Target Pollutant | Source/Candidate Control Technology | Industry Total TCI ($) | Industry Total TAC ($) |
|---|---|---|---|
| Hg | PEC – ACI/Fabric Filter<br><br>Battery Stacks - ACI/Fabric Filter | 643,397,417 | 111,046,008 |
| PAHs | PEC – ACI/Fabric Filter | 305,355,132 | 52,315,324 |
| AGs | PEC – DSI/Fabric Filter<br><br>Battery Stack - DSI/Fabric Filter | 652,509,917 | 111,006,874 |
| **Total Industry Costs[4]** | | **1,295,907,334** | **222,052,882** |

## III. Cost Effectiveness of Candidate Controls

12. Based on Trinity's analysis, the application of candidate controls to battery stacks and PECs would not be cost-effective in terms of cost of pollutant

---

[4] Total Industry Costs are calculated as the sum of total costs for Hg and AGs shown above. The combination of controls evaluated for PAH emissions from PEC Systems would theoretically be the same combination of controls used for Hg from PEC Systems; therefore, the Total Industry Costs calculation does not include the total costs shown above for PAHs in order to avoid duplication.

reduced ($/lb or $/ton). The extreme cost-ineffectiveness is due to significant TCI and TAC coupled with low HAP concentrations, which result in minimal HAP reductions. A summary of Trinity's cost-effectiveness calculations for each target HAP is provided in Table 2 below.

13. These cost-effectiveness values are drastically higher than those EPA has historically deemed to be acceptable.

**Table 2. Summary of Estimated Control Effectiveness of Candidate Controls**

| Target Pollutant | Source/Candidate Control Technology | Industry Total $/lb or $/Ton Removed |
|---|---|---|
| Hg | PEC – ACI/Fabric Filter<br><br>Battery Stacks - ACI/Fabric Filter | 1,117,163 ($/lb) |
| PAHs | PEC – ACI/Fabric Filter | 193,359,544 ($/ton) |
| AGs | PEC – DSI/Fabric Filter<br><br>Battery Stack - DSI/Fabric Filter | 1,867,859 ($/ton) |

## IV.  Conclusion

14. Based on Trinity's analysis, there are no control technologies that have been demonstrated within the industry to achieve the new MACT limits for Hg, PAHs, AGs, or HCN.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: September 30, 2024

_____

Ian Donaldson
Principal Consultant – Ops. Manager
Trinity Consultants, Inc.

# **Exhibit A**



**To:**     David Ailor, COETF

**From:**   Susan Barnes and Ian Donaldson, Trinity Consultants

**Date:**   May 3, 2024

**RE:**     Upper Prediction Limit Calculations with Intra-Mine Variability Factor

On August 16, 2023, the U.S. Environmental Protection Agency (EPA) proposed revisions to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for the Coke Ovens: Pushing, Quenching, and Battery Stacks (PQBS) source category, 40 CFR 63 Subpart CCCCC, and the NESHAP for the Coke Oven Batteries source category, 40 CFR 63 Subpart L. As part of the proposed Subpart CCCCC rule, EPA proposed standards for several previously unregulated hazardous air pollutants (HAPs), including new limits for mercury.

The Coke Oven Environmental Task Force (COETF), which represents all four companies that operate byproduct recovery coke plants in the U.S., previously commented to EPA that the proposed limits are not achievable and do not account for variability of raw materials, including mercury (Hg), fluorine, and chlorine.[1] Each coke plant has unique specifications for cokemaking, including metallurgical coal sources and properties. Thus, the potential variation of mercury, fluorine, and chlorine in coal blends introduced to the batteries over the course of normal operations is high, indicating the need for consideration of raw material (metallurgical coal) variability in establishing Hg, hydrogen fluoride (HF), and hydrochloric acid (HCl) emission limitations. The COETF has requested Trinity's assistance in determining how to address this raw material variability in calculating emission limitations for the industry, following EPA's established methodologies in other rulemakings.

In several other rulemakings, EPA has properly acknowledged that an intra-quarry variability (IQV) factor should be used to set MACT limits that reflect the effects of raw material input variability.[2] In these rulemakings, EPA has applied an IQV factor to EPA's computed upper prediction limit (UPL) to reflect the MACT floor emission rates.[3]

In this memorandum, Trinity is recommending how EPA should apply its well-established methodology for addressing mercury, fluorine, and chlorine content variability in raw materials utilized by byproduct recovery coke plants, to set MACT floor emission limits for Battery Stacks and Pushing Emission Control Devices

---

[1] See Comments of the COETF on the Proposed Rule National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (EPA-HQ-OAR-2002-0085, EPA-HQ-OAR-2003-0051), October 2, 2023; "Coke Ovens RTR Proposed Rule: White Paper on Proposed Standards" submitted by the COETF to EPA on December 29, 2023; and "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024.

[2] See the final Portland Cement NESHAP, 40 CFR 63 Subpart LLL; final Brick and Structural Clay Products Manufacturing NESHAP, 40 CFR 63 Subpart JJJJJ; and Lime NESHAP, 40 CFR 63 Subpart AAAAA as proposed on February 9, 2024.

[3] In this memorandum, we have revised the term "intra-quarry variability" (IQV) factor to "intra-mine variability" (IMV) factor. This simply acknowledges that the key raw materials used in byproduct recovery coke plants (blends of metallurgical coals) are sourced from deposits more commonly referred to as "mines," and not from "quarries." Nevertheless, the technical concept remains identical in that the requisite raw materials (metallurgical coals) from coal mines contain inherently varying and naturally occurring concentrations of Hg and other HAP-related constituents outside the control of the coke plant operator and which are used in existing MACT floor sources on a regular basis.

(PECs) at those plants. The variability in concentrations of HAP-related constituents in emissions from these sources is directly proportional to the concentration of these constituents that naturally occur in blends of key raw materials (i.e., metallurgical coals) used in the byproduct recovery cokemaking process. Coke producers must ensure that the coke they produce achieves the quality specifications dictated by their customers. Coke quality is determined by the coking process utilized and the coals charged to their batteries to meet battery and customer specifications. This means that they must limit the sources of coals they supply to their batteries based on the coke quality specifications imposed on them by the process and their customers, and not by the concentrations of HAP-related constituents in the raw material they utilize (metallurgical coal).

## MACT Floors

The existing sources that EPA chooses as the basis for the emission limits are referred to as the "best performing sources" (aka, "MACT floor sources"). For source categories with fewer than 30 sources, the MACT floor is typically the best-performing five emission units. In the proposed rule, EPA has identified the MACT floors for each pollutant and emission unit category. In several cases, this includes the AKS-Middletown-OH facility, which is no longer operating (and, hence, which Trinity has removed from the MACT floor sources). In addition, EES Coke Battery, LLC (EES) recently submitted additional stack testing data to EPA. Trinity has incorporated these data into the analysis.

## Upper Prediction Limit

Once the best performing sources are established, EPA uses a UPL calculation to establish an emission standard. The UPL represents the value below which one can expect the average of a future specified number of observations to fall, within a certain predicted confidence interval. For example, if the MACT floor consists of a data set of 1-hour runs from stack testing results for a specific type of source, a UPL can be used to predict the maximum average of any future three 1-hour runs for an emission unit in that specific source group (assuming the data set is part of the same population of data) within a specified confidence interval. The UPL takes into account the average emissions and variability in emissions within sources in the MACT floor. MACT emission limits are typically set using a 99% confidence interval.

EPA calculated the emission limits in this proposed rule using the UPL approach.[4] However, the UPL calculation itself does not capture additional variability from naturally occurring elements (e.g., mercury, chlorine, fluorine) in the key raw materials utilized (i.e., metallurgical coals). Below we discuss the nature and methodology Trinity used, similar to that used by EPA in prior rulemakings, and how this methodology should be incorporated into a final MACT limit to account for the variability for trace amounts of naturally occurring mercury, fluorine, and chlorine in metallurgical coals utilized in byproduct recovery coke plants.

## Intra-Mine Variability Factor

While the UPL calculation accounts for variability in the test run data collected (i.e., stack measurement variability, or run-to-run variability), it does not account for variability caused by differences in raw materials at a source, or between sources. EPA has accounted for variability in the mercury content in raw materials in establishing mercury standards in the cement, lime, and brick industries. Like these industries, the mercury content in key raw materials (i.e., metallurgical coals) being utilized in byproduct recovery coke plants has a direct impact on the mercury emissions from Battery Stacks and PECs. In addition, HCl and HF emissions from these emissions sources are directly related to the chlorine and fluorine contents,

---

[4] Refer to equations from *Use of the Upper Prediction Limit for Calculating MACT Floors*, Tina Ndoh, EPA Office of Air Quality Planning and Standards, July 30, 2014.

respectively, in these raw materials (i.e., metallurgical coals). Therefore, incorporating this variability into the standard UPL calculation for mercury, HCl, and HF will better predict future emissions from these emission sources, helping to ensure that the calculated MACT Floor is "achieved in practice."

In prior rulemakings, EPA accounted for an IQV factor with a "pooled" variability factor ($s^2$). By incorporating the IQV, the UPL equation should predict the highest average of a specified number of future runs with the defined confidence level for a source in the specified emission category utilizing raw materials with naturally varying mercury content. EPA has calculated the IQV, as follows:

$$IQV = (RSD \times Mean)^2$$

Where:

| | | |
|---|---|---|
| *IQV* | = | Intra-Quarry Variability factor |
| *RSD* | = | Relative Standard Deviation (i.e., standard deviation divided by arithmetic mean) of raw material mercury content data |
| *Mean* | = | Arithmetic mean of emissions data in the MACT floor |

In this analysis, Trinity has used this same formula for calculating an Intra-Mine Variability (IMV) factor for normally distributed data sets. For those MACT floor data sets for the proposed rule that are lognormally distributed, Trinity has revised this IQV formula and calculated an IMV factor for the byproduct recovery coke industry, as follows:[5]

$$IMV = (RSD \times Logmean)^2$$

Where:

| | | |
|---|---|---|
| *IMV* | = | Intra-Mine Variability factor |
| *RSD* | = | Relative Standard Deviation (i.e., standard deviation divided by arithmetic mean) of coal mercury content data |
| *Logmean* | = | Arithmetic mean of log-transformed emissions data in the MACT floor |

## Mercury

In this analysis, Trinity has evaluated the mercury content of raw materials (metallurgical coals) from three byproduct recovery coke plants: Monessen, Clairton, and Burns Harbor. These plants were chosen because they are in both the Battery Stack and PEC MACT floors and because metallurgical coal mercury content data are available.[6] The data set consists of 646 coal samples analyzed for mercury from 2015 and 2023, where each sample was associated with a specific mine (data from 65 coal mines included in data set). This is a very robust data set, with significantly more data than were used in establishing MACT limits via an IQV for other industries. The brick industry, for example, provided 167 samples nationwide, with the final IQV

---

[5] In byproduct recovery coke plants, the critical parameters of coal play a pivotal role in determining coke quality, yield, and performance. Proximate and petrographic analyses, coking properties, ash fusion temperature, size, grindability, and thermal properties are among the key factors that must be carefully evaluated and controlled. By understanding and optimizing these parameters, these plants can produce coke that will enhance the efficiency, sustainability, and competitiveness of steelmaking processes, as well as high-quality coke for diverse industrial applications.

[6] The Warren plant uses the same coal sources as Monessen and these data are also representative for that plant. This plant is not in the MACT Floor for mercury, although would be subject to the proposed emission limits.

being based on seven samples from four plants.[7] Mercury content of metallurgical coals used in this analysis ranges from 0.008 to 0.360 parts per million (ppm), as shown in Figure 1. This wide range clearly indicates the need for consideration of coal mercury variability in establishing mercury emission limitations.

**Figure 1. Mercury Content of Metallurgical Coals**



Due to differences in the available precedents for setting the relative standard deviation (RSD) upon which an IQV is set, two different methods are provided in this memorandum: (1) evaluating the RSD of all available data, and (2) evaluating the RSD of the average mercury content of each coal mine. These are discussed in more detail below. Calculations supporting this analysis are provided in the attached spreadsheet.

## Option 1: IMV Factor Based on RSD of All Available Data from MACT Floor Sources

The most recent proposed version of the Lime MACT[8] set an IQV using the mercury content of individual samples for two plants in the MACT floor. To follow this precedent, under option 1, Trinity has calculated the RSD as follows:

$$RSD = \frac{SD}{Mean}$$

Where:

| | | |
|---|---|---|
| *RSD* | = | Relative standard deviation |
| *SD* | = | Standard deviation of 646 mercury content values |
| *Mean* | = | Arithmetic mean of 646 mercury content values |

The RSD calculated in this manner is 0.70.

---

[7] EPA-HQ-OAR-2013-0291-0660, Appendix E.

[8] EPA-HQ-OAR-2017-0015-0172.

## Option 2: IMV Factor Based on RSD of Coal Mine Averages from MACT Floor Sources

Mercury limits in the Brick MACT were established based on the RSD between plant average mercury content.[9] Following this methodology for byproduct recovery coke plants is best achieved by calculating the RSD as follows:

$$RSD = \frac{SD_{AVG}}{Mean_{AVG}}$$

Where:

| | | |
|---|---|---|
| $RSD$ | = | Relative standard deviation |
| $SD_{AVG}$ | = | Standard deviation of average mercury content of 65 mines |
| $Mean_{AVG}$ | = | Arithmetic mean of average mercury content of 65 mines |

The RSD calculated in this manner is 0.72.

## Proposed Emission Limits

Table 1 below shows the resulting UPL-based mercury limitations after updating the MACT floor and adding an IMV as described above.

### Table 1. Proposed Mercury Limits

| Emission Unit | Emission Limitation Using Option 1 RSD (lb/ton coke) | Emission Limitation Using Option 2 RSD (lb/ton coke) |
|---|---|---|
| Existing Battery Stacks | 1.3E-4 | 1.3E-4 |
| Existing PEC | 3.6E-6 | 3.7E-6 |

## Acid Gases

In this analysis, Trinity has evaluated the fluorine and chlorine content of raw materials (metallurgical coals) from three byproduct recovery coke plants: Monessen, Clairton, and Burns Harbor.[10] These plants were chosen because they are in both the Battery Stack and PEC MACT floors and because metallurgical coal fluorine and chlorine content data are available. The data set consists of 124 coal samples analyzed for fluorine and chlorine content, where each sample was associated with a specific coal mine (data from 33 coal mines included in data set). This is a very robust data set, with significantly more data than were used in establishing MACT limits via an IQV for other industries.

Fluorine content of metallurgical coals used in this analysis ranges from 22 to 126 ppm as shown in Figure 2.

---

[9] EPA-HQ-OAR-2013-0291-0660, Appendix E.

[10] The Warren plant uses the same coal sources as Monessen and these data are also representative for that plant. This plant is not in the MACT Floor for acid gases, although it would be subject to the proposed emission limits.

**Figure 2. Fluorine Content of Metallurgical Coals**



Chlorine content of metallurgical coals used in this analysis ranges from 42 to 2,985 ppm as shown in Figure 3.

**Figure 3. Chlorine Content of Metallurgical Coals**



As shown in Figures 2 and 3, data for both fluorine and chlorine show high variability. In setting an acid gas emission limit, which is the sum of HF and HCl, this variability must be properly addressed in order to ensure that the MACT floor is representative of raw material variability and that emission limits are achievable.

As with mercury, Trinity calculated the RSD of the fluorine and chlorine content using two different methodologies, as shown in Table 2.

**Table 2. Fluorine and Chlorine Concentration Relative Standard Deviation**

|  | Fluorine | Chlorine |
|---|---|---|
| Option 1 – RSD of All Available Data | 0.49 | 0.51 |
| Option 2 – RSD of Mine Averages | 0.45 | 0.46 |

## Proposed Emission Limits

Using the RSDs from Table 2 and the updated MACT floors, Trinity calculated UPLs separately for HF and HCl and then summed them to determine an acid gas emission limit. Tables 3 and 4 below show the results of this analysis for battery stacks and PECs, respectively.

**Table 3. Proposed Acid Gas Limits for Battery Stacks**

|  | IMV Based on Option 1 RSD (lb/ton coke) | IMV Based on Option 2 RSD (lb/ton coke) |
|---|---|---|
| UPL for HF | 1.36E-3 | 1.35E-3 |
| UPL for HCL | 1.50E-1 | 1.45E-1 |
| Proposed Acid Gas Limit | 1.6E-1 | 1.5E-1 |

**Table 4. Proposed Acid Gas Limits for PECs**

|  | IMV Based on Option 1 RSD (lb/ton coke) | IMV Based on Option 2 RSD (lb/ton coke) |
|---|---|---|
| UPL for HF | 6.01E-4 | 5.94E-4 |
| UPL for HCL | 1.42E-2 | 1.33E-2 |
| Proposed Acid Gas Limit | 1.5E-2 | 1.4E-2 |

## Hydrogen Cyanide

Trinity did not calculate an IMV factor for hydrogen cyanide (HCN). However, the EES data did include stack testing data for HCN. Accordingly, Table 5 provides updated UPL calculations to reflect the update to the MACT floor.

**Table 5. Proposed HCN Limits**

| Emission Unit | Emission Limitation (lb/ton coke) |
|---|---|
| Existing Combustion Stacks | 3.9E-2 |
| Existing PEC | 3.2E-2 |

## Conclusion

Mercury, HF, and HCl emissions from Battery Stacks and PECs at byproduct recovery coke plants are directly related to the mercury, fluorine, and chlorine content, respectively, of the key raw materials (metallurgical coals) required to produce quality coke. EPA's established methodology for incorporating an IQV into MACT standards for other industries should be applied to the proposed mercury limits for coke Battery Stacks and PECs.

Using the specific statistical precedents set in the final Brick and proposed Lime MACT rulemakings, Trinity has presented two options above for calculating an RSD which could be added to UPL calculations to account for intra-mine variability (IMV) in mercury, fluorine, and chlorine concentrations. Accounting for this variability is essential to ensure that the MACT floor coke plants can continuously comply with the established emission limits over time, because the mercury, fluorine, and chlorine content varies in the raw materials (metallurgical coals) those plants must use to produce quality coke.

EPA should adjust the MACT floor source category data to account for the fact that the AKS-Middletown-OH facility has ceased operations and to reflect newly available stack testing data for EES. EPA should then follow the precedent in the Brick MACT of choosing the higher RSD of the evaluated options and incorporating this RSD into an IMV factor to the UPL calculation to establish the final MACT floor limits for Battery Stacks and PECs.

A summary of the revised MACT floor emission limits for existing Battery Stacks and PECs calculated using an IMV is provided in Table 6 below.

### Table 6. Summary of Revised Emission Limits for Existing Sources

| Pollutant | Battery Stacks Emission Limit (lb/ton coke) | PEC Emission Limit (lb/ton coke) |
|---|---|---|
| Mercury | 1.2E-4 | 3.7E-6 |
| Acid Gases | 1.6E-1 | 1.5E-2 |
| Hydrogen Cyanide | 3.9E-2 | 3.2E-2 |

# Exhibit B

# COKE OVEN ENVIRONMENTAL TASK FORCE (COETF)

## White Paper - Air Pollution Control Technology Review for Coke Battery Stacks and Pushing Emissions under EPA's Proposed Coke Ovens Risk & Technology Review

**Prepared By:**

**TRINITY CONSULTANTS**
4500 Brooktree Road
Suite 310
Wexford, PA 15090


March 6 2024



# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**     **2**

**INTRODUCTION**     **5**

**CONTROL TECHNOLOGY REVIEW PROCESS**     **10**

**CONTROL TECHNOLOGY REVIEW – BATTERY STACK EMISSIONS**     **15**

**CONTROL TECHNOLOGY REVIEW – PUSHING EMISSIONS CONTROL SYSTEMS**     **21**

**CONCLUSIONS**     **25**

**REFERENCES**     **28**

**APPENDIX A. APC COST DATA BACKUP**     **A**

**APPENDIX B. VENDOR OUTREACH**     **B**

**APPENDIX C. MODEL BATTERY PARAMETERS**     **C**

On August 16, 2023, the U.S. Environmental Protection Agency (EPA) proposed revisions to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for the Coke Ovens: Pushing, Quenching, and Battery Stacks (PQBS) source category, 40 CFR 63 Subpart CCCCC, and the NESHAP for the Coke Oven Batteries source category, 40 CFR 63 Subpart L. As part of the proposed Subpart CCCCC rule, EPA proposed new standards for several previously unregulated hazardous air pollutants (HAPs), including new limits for the following HAPs: mercury (Hg), acid gases (AGs) (including hydrochloric acid [HCl] and hydrofluoric acid [HF]), hydrogen cyanide (HCN), and polycyclic aromatic hydrocarbons (PAHs).  The proposed rule also includes a proposed particulate matter (PM) limit for Battery Stacks.

The Coke Oven Environmental Task Force (COETF), which represents all four companies that operate byproduct recovery coke plants in the U.S., previously submitted comments setting forth concerns with EPA's proposed rule[1] and also has submitted supplemental comments to EPA regarding an analysis of the lack of achievability of the proposed limits.[2] In summary, the COETF's concerns are that EPA is not required by Clean Air Act section 112(d), or by any mandated interpretation of the *LEAN* decision,[3] to set new "gap filling" standards where, as here:

- Further reductions of the target pollutants are not necessary due to very low risk of the PQBS source category;

- Controlling these pollutants has not been demonstrated for any byproduct recovery coke plant in the U.S. or globally;

- The proposed limits cannot continuously be met without controls (and even considering controls, the proposed limits are not achievable because the target pollutant concentrations are low and beyond the capability of current technology);

- The proposed limits were based on a very limited database of test results that do not account for demonstrated variability in operating conditions, coal blend characteristics, and other factors;

- The cost of adding air pollution controls for Battery Stacks and Pushing Emissions Control (PEC) Systems would be exorbitant and would not be assured of achieving compliance with the proposed limits; and

- The proposed limits are not cost-effective in terms of cost per lb/ton of pollutant reduced due to the extreme cost of controls and the minimal reductions in target pollutants that would be achieved.

---

[1] Comments of the Coke Oven Environmental Task Force (COETF) on the Proposed Rule National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review (Docket Nos. EPA-HQ-OAR-2002-0085, EPA-HQ-OAR-2003-0051), Oct. 2, 2023.

[2] See the "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024. The COETF also has commented separately on EPA's proposed technology review of Subpart L, noting that (i) EPA lacks authority to lower the limits for doors/lids/offtakes because there has not been any development in practices, processes, or control technologies that would authorize a change; and (ii) EPA's proposed limits are based on annual average leak rate data that do not adequately account for shorter-term process, raw material, and seasonal variability. See the "Coke Battery Leak Rates.pdf" submitted to EPA on February 5, 2024.

[3] The COETF's comments note that nothing in the *LEAN* decision alters EPA's obligations under section 112(d) to consider, among other things, costs, non-air quality impacts and achievability, when completing its residual risk and technology review and establishing standards under 112(d).  However, when proposing the new standards and gap filling, EPA has not followed Congress' direction as it has failed to appropriately consider such factors.

The COETF's concerns are heightened because there are no air pollution control (APC) technologies currently employed by the industry (or, in some cases, by any other industry), that can achieve the low concentrations of the proposed new HAP limits (i.e., for Hg, AGs, HCN, and PAHs).

Prompted by these concerns, the COETF retained Trinity Consultants (Trinity) to perform an evaluation of the potentially available air pollution control technologies that have either been demonstrated within the byproduct recovery coke industry or that have been demonstrated in other industries to control the proposed target HAPs and to calculate control costs and cost effectiveness values for each potential control technology and target HAP.

As part of this evaluation, Trinity communicated with several technology equipment vendors to identify potential control technologies for Hg, AGs, HCN, and PAHs from Battery Stacks and PEC Systems. Based on the information provided by these vendors, Trinity identified activated carbon injection with fabric filter, and dry sorbent injection with fabric filter as the only technologies potentially feasible for controlling Hg, AGs, and PAHs. No technology was identified that would be feasible to control HCN emissions.

Based on Trinity's experience with the byproduct recovery coke industry and this evaluation of potential APC technologies and costs, coupled with COETF's expertise and input, a significant number of feasibility, engineering, and cost issues were identified. For example, a multipollutant control approach would be required under EPA's proposed rule; however, no single APC technology exists to control all of the target HAPs. As discussed in this paper, control technology for the multiple pollutants proposed in EPA's "beyond the floor" control analysis is not feasible. In addition to multiple pollutant considerations, costs to the industry as a result of the proposed new limits would be exorbitant and unreasonable.

As summarized in Table ES-1 below, the resulting total capital costs for the byproduct recovery coke industry are estimated to be nearly $1.3 Billion, and industry-wide annual costs are estimated to be more than $220 Million/year. These exorbitant control costs result in excessive cost effectiveness values, particularly in light of the minimal HAP reductions that would be achieved. The lb/ton costs of each target pollutant removed are over $1 Million/ton for AGs from Battery Stacks, over $1.1 Million/lb for Hg from Battery Stacks, and over $193 Million/ton for PAHs from PEC Systems. These cost effectiveness values are drastically higher than those EPA has historically determined to be acceptable.

**Table ES-1. Summary of Estimated Control Costs to Byproduct Recovery Coke Industry**

| Target Pollutant | Source/Control Technology | Industry Total TCI* ($) | Industry Total TAC * ($) | Industry Total $/lb or $/Ton Removed |
|---|---|---|---|---|
| Hg | PEC – ACI/Fabric Filter<br><br>Battery Stacks - ACI/Fabric Filter | 643,397,417 | 111,046,008 | 1,117,163 ($/lb) |
| PAHs | PEC – ACI/Fabric Filter | 305,355,132 | 52,315,324 | 193,359,544 ($/ton) |
| AGs | PEC – DSI/Fabric Filter<br><br>Battery Stack - DSI/Fabric Filter | 652,509,917 | 111,006,874 | 1,867,859 ($/ton) |
| **Total Industry Costs[4]** | | **1,295,907,334** | **222,052,882** | |

*TCI = Total Capital Investment; TAC = Total Annual Cost

In conclusion, no control technologies are currently in use within the byproduct recovery coke industry, either in the U.S. or globally, that control emissions of Hg, AGs, HCN, or PAHs from Battery Stacks or PEC Systems. For control systems that theoretically could be used to control these target HAPs, the estimated cost effectiveness of control for the byproduct recovery coke industry would be exorbitant and would far exceed the cost effectiveness for HAP reduction that EPA has historically considered acceptable, particularly given that EPA has determined that risk to public health associated with the entire PQBS source category is low and acceptable and provides an ample margin of safety.

---

[4] Total Industry Costs are calculated as the sum of total costs for Hg and AGs shown above. The combination of controls evaluated for PAH emissions from PEC Systems would theoretically be the same combination of controls used for Hg from PEC Systems; therefore, the Total Industry Costs calculation does not include the total costs shown above for PAHs in order to avoid duplication.

EPA has proposed amendments to the National Emission Standards for Hazardous Air Pollutants (NESHAP) for Coke Ovens: PQBS source category [40 CFR 63 Subpart CCCCC], and the NESHAP for the Coke Oven Batteries source category [40 CFR 63 Subpart L].[5] EPA's proposed rule presents the results of a residual risk and technology review (RTR) for the PQBS source category, and a periodic technology review for the Coke Oven Batteries source category.

In the proposed rule, EPA has determined that risks due to emissions of HAPs from the PQBS source category are acceptable and that the existing PQBS NESHAP protects public health with an ample margin of safety. Under the technology review for the PQBS NESHAP, EPA concluded that there are no developments in practices, processes, or control technologies that necessitate revision of standards for this source category.

However, EPA has proposed new standards for several previously unregulated HAPs for Battery Stacks and PEC Systems, as summarized in Table 1 below.

**Table 1. Proposed Standards for Existing Sources**

| Source or Process | Pollutant | Existing Affected Source Standard | Units for Standard |
|---|---|---|---|
| Pushing | Acid gases (AGs) | 0.0052 | Lbs/ton coke |
| Pushing | Hydrogen Cyanide (HCN) | 0.011 | Lbs/ton coke |
| Pushing | Mercury (Hg) | 8.97E-07 | Lbs/ton coke |
| Pushing | Polycyclic Aromatic Hydrocarbons (PAHs) | 3.4E-04 | Lbs/ton coke |
| Battery Stacks | Acid gases (AGs) | 0.083 | Lbs/ton coke |
| Battery Stacks | Hydrogen Cyanide (HCN) | 0.0039 | Lbs/ton coke |
| Battery Stacks | Mercury (Hg) | 5.8E-05 | Lbs/ton coke |
| Battery Stacks | Particulate Matter (PM) | 0.10 | gr/dscf |

Trinity's evaluation confirms EPA's conclusion that there are no identified developments in practices, processes, or control technologies for the PQBS source category.[6] Yet, EPA has proposed new HAP emission standards for Battery Stacks and PEC Systems, despite EPA's determination that the entire PQBS source category presents low and acceptable risk to public health with an ample margin of safety.

EPA's proposed standards for Battery Stacks and PEC Systems were established based on very limited data of emissions stack testing for the byproduct recovery coke industry that are not representative of all such

---

[5] Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

[6] Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

coke batteries, the varying composition of raw materials used in these batteries (namely, differing coal blends), and other operational considerations.[7]

In February 2024, the COETF supplied EPA with a 99% UPL statistical analysis of the limited data used by EPA.[8] That analysis demonstrated that the affected sources (i.e., Battery Stacks and PEC Systems) are incapable of consistently achieving compliance with the proposed standards without the use of air pollution control (APC) technologies or other (unidentified) operational changes. Slide 1 summarizing the UPL statistical analysis is provided below.

---

[7] As addressed in comments that the COETF submitted to EPA on October 2, 2023, only 25% of operating by-product coke plants in the U.S. had test data for some subset of the newly proposed limits.

[8] "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024.

## Compliance Schedule Concerns for Combustion Stacks and Pushing Emissions

- COETF member companies have very little test data regarding the proposed standards for combustion stacks (AGs, HCN, Hg, and PM) and pushing emission control devices (PECs) (AGs, HCN, Hg, and PAH). Only 25% of combustion stacks and PECs were tested as part of the Section 114 ICRs.

- Available data exhibit substantial variability and show that the proposed standards are not consistently achievable for all pollutants without additional controls, operational changes, or both. The figures below show the 99% UPL for individual <u>units</u> (for units with 99% UPL exceeding the proposed standards). The confidence level lower than 99% at which the <u>unit UPL</u> equals the proposed standards also is shown. This analysis shows that additional controls and/or operational changes would be needed for these pollutants/sources:

  - Combustion stacks –
    - PM – New baghouse + fans (depending on PM size fraction)
    - Acid Gases – Dry sorbent injection and new baghouse + fans
    - HCN – No practical controls
    - Hg – Activated carbon injection and new baghouse + fans

  - Pushing –
    - Hg – Activated carbon injection + existing baghouse
    - Acid Gases – Dry sorbent injection + existing baghouse
    - HCN – No practical controls
    - Replacement of existing mobile traveling controls with new fixed controls (baghouse or scrubber) and traveling hood





To more fully evaluate the potential APC technologies for Battery Stack and PEC System emissions, Trinity examined the feasibility of various APC technologies for the target pollutants and their capital and annual costs. This evaluation focused on technologies specifically targeting control of air emissions from Battery Stacks and PEC Systems for which EPA is proposing new numerical HAP emission limits for byproduct recovery coke plants. A summary of the technical assessment is presented in the Control Technology Review Process section of this paper.

Based on Trinity's experience with byproduct recovery coke plants and air emissions control technologies, together with EPA's assessment of technologies for the coke making industry sector, Trinity concludes that:

- Byproduct recovery coke plants are already using the latest practices and control technologies to minimize emissions from PQBS sources.

- Emissions data used by EPA to support the proposed HAP limits are insufficient to justify any new MACT standards.

- Although no air pollution controls are currently employed in the coke making industry to reduce Hg, AGs, HCN, and PAHs from Battery Stacks or PEC Systems, several potential control technologies exist. Total control costs and cost effectiveness values, in $/ton of pollutant removed, that Trinity generated from cost data obtained for these technologies are dramatically higher than those EPA has historically determined to be acceptable.

In light of these findings, EPA should revise the proposed standards for AGs, PAHs, Hg, HCN, and PM because:

► No existing control technologies are utilized at any byproduct recovery coke plants in the U.S. or globally to control the target pollutants from Battery Stacks and PEC Systems.

► No other control technologies have been identified that are technically feasible for Battery Stacks and PEC Systems to achieve the proposed standards.

► Compliance with the proposed limits cannot continuously be met without controls. However, even considering controls, the proposed limits are not consistently achievable because the target pollutant concentrations are too low for current technology application.

► The proposed limits were based on very limited testing data that do not account for demonstrated variability in operating conditions, coal blend characteristics, and other factors.

In the proposed rule, EPA also considered several approaches for employing control technologies for achieving "beyond the floor" levels – that is, determining whether or not more stringent MACT limits should be proposed as standards for certain subcategories in the industry, based on achievability and cost-effectiveness. EPA concluded that there were no cost-effective "beyond the floor" options for byproduct recovery coke plants.

In evaluating technical feasibility and costs for "beyond the floor" levels, EPA evaluated the following technologies:

- Activated Carbon Injection (ACI);

- Wet Alkaline Scrubbing (WAS);

- Regenerative Thermal Oxidation (RTO); and

- Fabric Filter/Baghouse Technologies.

Trinity conducted a similar evaluation, considering numerous potential control technologies aimed at controlling emissions of AGs, PAHs, Hg, and HCN. Tables 2 and 3 below present a summary of control technologies evaluated by Trinity for controlling emissions sufficiently to meet EPA's proposed limits for AGs (HCl and HF), HCN, Hg, and PM for Battery Stacks; and AGs (HCl and HF), HCN, Hg, and total PAHs for PEC Systems, respectively. Cost estimates for evaluated technologies are provided in Appendix A. As presented in these tables, most of the technologies evaluated are not technically feasible for reducing emissions from Battery Stacks and PEC Systems, due to one or more of the following inherent limitations:

► Very low pollutant concentrations within gas streams;

► Need for additional equipment (such as a heat exchanger) or complimentary control equipment (such as a second baghouse) with many of the APCs evaluated;

► Physical space limitations within the coke oven battery area; and

► Multipollutant control technology constraints, including equipment limitations and restrictions associated with one pollutant vs. another pollutant (e.g., Hg vs. PAH and AGs vs. $SO_2$ insofar as their competing for sorbent reactions), and due to Battery Stack and PEC System emissions characteristics and conditions (including pollutant interactions, flow rates, chemistry, and temperatures, and constraining available technologies).

These limitations, along with other control technology considerations, are discussed below.

To identify potential APC technologies for the evaluation, Trinity first conducted a screening assessment of technologies currently in place at byproduct recovery coke plants globally, as well as in other industry sectors such as utility power generation, steel and ferroalloy manufacturing, and other metals and non-metals industry production processes. The breadth of this screening process targeted control technologies used in cokemaking operations; but, for purposes of potential technology transfer, it looked outside the targeted byproduct recovery coke industry for theoretically compatible APC systems.

To achieve greater consistency in evaluating a large variety of control technologies, Trinity developed a "model battery" utilizing actual battery operating data and conditions for Battery Stacks, as well as PEC systems. These parameters for the "model battery" are included in Appendix C. The model battery data were used to evaluate control options based on existing real data.

To compile and consolidate the data, operating conditions from all six currently operating byproduct recovery coke plants were reviewed. Data presented in EPA's coke ovens RTR were included in the data analysis, and basic statistics were applied to the data for the purpose of developing a model battery for obtaining feedback from control technology vendors. Finally, utilizing the available data, averages and means were calculated for exhaust gas flow in dry standard cubic feet per minute (dscfm), temperatures in degrees Fahrenheit (°F), and percent moisture. Similarly, stack test results for target pollutants were evaluated to establish a range of concentrations for PAHs, HCN, Hg, AGs, and PM, as defined in the proposed rule.[9]

Tables 2 and 3 below present the results of the initial control technology identification and screening process for Battery Stacks and PEC Systems, respectively. No such control technologies were found to be utilized at any existing byproduct recovery coke plants either in the U.S. or globally. Trinity then identified candidate controls that showed the best potential for theoretical application to Battery Stack and PEC System emissions. The technologies identified by Trinity for consideration in this screening process included:

- Wet Alkaline (Caustic) Scrubbing;
- Dry Scrubbing with and without Fabric Filtration (e.g., baghouse) and Auxiliary Equipment, such as heat exchangers (HTX);
- Activated Carbon Injection (ACI) with and without Fabric Filtration (e.g., baghouse);
- Wet/Reagent Oil Absorption/Scrubber;
- ACI with Specialty Reagent, with and without Fabric Filtration (e.g., baghouse);
- Fabric Filtration with Thermal Oxidation/Incineration; and
- Carbon Adsorption.

Several control technology vendors (see Appendix B. [Vendor Outreach]) were presented with preliminary concepts for controlling the targeted pollutants from both of the byproduct recovery coke plant emission sources being evaluated. The actual "model battery" data in Appendix C, along with the proposed limits for the targeted pollutants, were provided to the vendors. The vendors were asked to provide information on

---

[9] Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC, July 1, 2023.

technical feasibility and, if deemed potentially feasible, estimated costs for conceptual pollutant control equipment designs. The conclusions presented in Tables 2 and 3 include consideration of vendor input.

## General Limitations and Constraints of the Evaluated Technologies for Controlling Emissions

*Technology Limitations and Constraints*

Trinity identified several recurring limitations for controlling the targeted pollutants. Notable limitations are discussed below and in later sections of this paper.

Conventional wet scrubbers, such as wet alkaline scrubbers, theoretically can be used for controlling Hg emissions. However, at the very low Hg concentrations and relatively high flow rates present in the exhaust for both source types, this technology will not be effective. A packed-bed type unit would be recommended over a plate/tray tower or spray tower; but, it would have a low capture effectiveness using caustic solution. Vendors were not supportive of using this technology for these exhaust gas streams.

For example, with respect to Hg emissions control, the type (or species) of Hg present in Battery Stack and PEC System emissions is not apparent from testing and public information. Mercury can be either elemental (Hg) or ionic (a.k.a. mercurous) (Hg+) in nature. The Hg species characterization is important, because it dictates which control technology is more effective -- powdered activated carbon (PAC) or powdered activated carbon with Bromide (or another selected reagent). With respect to carbon or reagent injection technologies, Hg capture occurs primarily within the filter cake dust layer; and the accumulation of mercury at this dust layer is dependent on the Hg species contained in the exhaust gases (i.e., Hg capture efficiency onto activated carbon sites). The removal efficiency (and, therefore, the cost) is greatly related to the dose rate (lb/mmacfm) of carbon and the reagent being used. This presents a significant unknown in the cost evaluation for controlling Hg in either of the target gas streams.

For "acid gases" (AGs), as defined in the proposed rule, control typically is accomplished by reaction with a mineral-based basic reagent (e.g., calcium hydroxide or sodium bicarbonate) through a gas/solid surface reaction. The reaction occurs as the gases and reagent are suspended in-flight between the injection point and a particulate collection device (e.g., fabric filter). The efficiency of the reaction is largely related to the gas temperature, acid gas concentration, and the time of suspension. Sulfur dioxide ($SO_2$) in the flue gas will also react with the sorbent. The concentration of the target acid gases in a byproduct recovery coke plant's gas stream would be very low and would require a high sorbent-to-acid gas ratio (lb/lb) and a predicted reaction time of greater than 12 seconds. This configuration would require a long reaction time and duct run for effective capture. Due to the need for long residence times, additional equipment would have to be incorporated into existing byproduct recovery coke plant footprints, which are typically very limited in available physical space.

*Planning and Engineering Constraints*

For any APC system equipment, including any necessary auxiliary equipment, additional cost will be incurred for:

- Redundant equipment (for use during required periodic maintenance or in case of failure), particularly for sources like coke batteries that operate continuously and cannot be idled or taken out of production without risk of significant damage;

- Electrical power supply or transmission limitations, or both; and

- Risk management relative to catastrophic events associated with new equipment or configuration.

For example, the requirement for continuous compliance necessitates the inclusion of redundant equipment to support compliance during planned maintenance of the primary control device, and in case of malfunction or failure of components or equipment. Redundant systems require additional physical space and essentially a doubling of capital investment. In this paper, the costs for purchasing and installing the necessary technical components for redundant systems have been estimated, but not fully addressed; they should be included in final cost evaluations.

Similarly, it will be necessary to assess whether adding an exhaust system or ancillary equipment to a battery will cause catastrophic or other adverse impacts to the heating process, which will affect coke production and, potentially, damage the battery's refractory brick. Indeed, the risk of compromising the integrity of a battery could make any retrofitting for such emission controls infeasible.

Upgrades to electrical power supply may be needed in order to install additional fans and baghouses or other equipment. Depending on site-specific electrical supply requirements, byproduct recovery coke plants may not have enough power to support large fans without an upgrade of the power systems. Addressing any significant electrical supply needs would be a huge undertaking and very expensive. Although cost assumptions were made for electrical supply, specific cost evaluations for any new equipment will require careful planning to obtain costs for implementation. This level of costing was not within the scope of this evaluation.

Finally, costs relative to any lost production have not been incorporated into this evaluation, as they will be driven by the site-specific Battery Stack or PEC System to be controlled, and the length of time that the coke production may need to be idled for installation of controls. Site-specific considerations, including space and electric power constraints, will drive the timeline for such control implications and the resulting costs of lost production.

**Table 2. Summary of Battery Stack Control Evaluation Matrix**

| Pollutant | Air Pollution Control Technologies | | Technical Feasibility | Technical Feasibility Tier[1,4] | Further Assessment? |
|---|---|---|---|---|---|
| | Control Technology | Control Technology Description | Technical Feasibility and Limitations | 1, 2, or 3 | (Yes/ No) |
| Acid Gases (HF/HCl) | Wet Caustic Scrubbing | Conventional water-based absorption technology. Process where a soluble pollutant is dissolved into a non-volatile liquid with or without chemical reaction. The rich (i.e., contaminated) stream would be further processed, reused, or treated in a wastewater treatment system or other final destruction method.[2] | Not technically feasible due to low pollutant concentrations, generally less than 250 ppmv. | Tier 3 | No |
| Acid Gases (HF/HCl) | Dry Sorbent (DS) Injection (e.g., Dry Scrubbing) and Fabric Filter (FF) and HTX | Inject dry, alkaline or other selected chemical sorbent into flue gas, upstream of fabric filter. Dry sorbent injection avoids potential wet scrubbing issues, including wastewater treatment, corrosion and steam plume problems, and delivery nozzle plugging (spray dryer absorption). DS/FF has more efficient sorbent utilization, relative simplicity, and a small footprint. | Technology will require FF and heat exchanger, but is feasible. Relative to sorbent reaction time, distance between injection point and fabric filter will determine control efficiency. A circulating sorbent reactor (CSR) could potentially be used to increase removal efficiency if space permits. Related technologies include spray dryer absorption, wet scrubbers, and furnace sorbent injection. | Tier 2 | Yes |
| HCN, Mercury, and PM | Activated Carbon and Fabric Filter (baghouse) | Conventional application of a baghouse with activated carbon injection (ACI) upstream of baghouse. Fabric filter to allow desired reaction within dust layer. | Design and ducting configuration of the new baghouse will need to be developed. To help capture HCN, a special reagent (i.e., metalized carbon, bromide) may be needed. $SO_2$ interferes with HCN capture and control, requiring desulfurized coke oven gas (COG); units with undesulfurized COG will require either additional operating cost (for reagent), or additional sulfur control or both. | Tier 3 | No |
| HCN, Mercury, and PM | Reagent-specific (Bromide) Activated Carbon and Fabric Filter (baghouse) | Fabric filter and ACI with special brominated reagent to efficiently capture mercury, HCN, and PAHs. Fabric filter to allow desired reaction within dust layer. | Bromide target reagent; but other metals possible, just not commercially available. Bromide has the potential for higher removal efficiency than traditional injection. $SO_2$ interferes with HCN capture and control, requiring desulfurized coke oven gas (COG); units with undesulfurized COG will require either additional operating cost (for reagent), additional sulfur control, or both. | Tier 3 (HCN) Tier 2 (Others) | Yes |
| HCN, Mercury, and PM | Fabric Filter (baghouse) and Thermal Oxidation/Incineration | Application of a baghouse with a subsequent incineration device; thermal destruction for HCN will be post PM removal. | Due to Hg concentrations generally below 100 ppb, the removal efficiency of mercury expected to be low. The high flow rate and low concentration makes the destruction of HCN by incineration impractical. $SO_2$ interferes with HCN capture and control, requiring desulfurized coke oven gas (COG); units with undesulfurized COG will require either additional operating cost (for reagent), additional sulfur control or both. | Tier 3 | No |
| PM | Fabric Filter (baghouse)[5] | Application of traditional baghouse/fabric filter technology. | Technically feasible in theory; however, the technology would need to be combined with other APC technologies to address other pollutants of concern. | Tier 2 | Yes |
| Mercury | Fixed Carbon Bed/ Regenerative Carbon Bed | Using the adsorption process, gaseous pollutants are removed from an air stream by transferring the pollutants to the solid surface of an adsorbent, usually activated carbon. Other commonly used adsorbents include zeolites and polymers. Adsorbents typically are regenerated (desorbed/removed) either off-site or on-site. | Requires significant space for carbon beds and regeneration process, given the flow rates in question. Saturation capacity (the maximum capacity the adsorbent can hold) and breakthrough capacity (the amount of pollutant that can be adsorbed before a significant pollutant concentration exits or breaks through the bed) must be determined for relevant pollutants. | Tier 3 | No[3] |
| Mercury | Fabric Filter Carbon-embedded Bags | Hg captured by carbon embedded in fabric structure and bags replaced when break through occurs. | Can be included in baghouse filter design; will inherently reduce PM (and other pollutants to a lesser degree. including acid gases (chlorides/fluorides) and HCN, depending on chemistries). | Tier 3 | No |

NOTES:
1. Technical Feasibility Tier, where: Tier 1 [Technically Feasible and Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; Tier 2 [Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; and Tier 3 [Technically Not Feasible and Not Demonstrated Anywhere in the U.S. or Globally].
2. EPA-450/2-77-019, Sept. 1977. EPA Guideline Series, control of sulfuric acid mist emissions from existing sulfuric acid production units.
3. Trinity contacted several vendors regarding this technology, including those specializing in carbon adsorption technology. Also, other vendors tried to gain insights into the technology's viability for these pollutants and from these exhaust streams. These efforts have not identified compatible carbon adsorption technology.
4. Concerns identified during site-specific engineering may result in certain technologies being determined technically infeasible (Tier 3), rather than potentially technically feasible (Tier 2). Some of these potential concerns are noted in this paper.
5. PM particle sizes less than 1 μm might be captured with wet ESP technology. However, this technology is less practical in any other circumstance and was not considered further in this evaluation.

**Table 3. Summary of Pushing Emissions Control System Control Evaluation Matrix**

| Pollutant | AIR POLLUTION CONTROL TECHNOLOGIES | | TECHNICAL FEASIBILITY | TECHNICAL FEASIBILITY TIER[1,5] | FURTHER ASSESSMENT? |
|---|---|---|---|---|---|
| | Control Technology | Control Technology Description | Technical Feasibility and Limitations | 1, 2, or 3 | (Yes/ No) |
| Acid Gases (HF/HCl) | Wet Scrubbing | Conventional water-based absorption technology. | Not technically feasible due to low pollutant concentrations generally less than 100 ppmv. Multiple reaction vessels required and would not be practical. | Tier 3 | No |
| Acid Gases (HF/HCl) | Dry Sorbent Injection (i.e., Dry Scrubbing (DS) and Existing Fabric Filter (FF))[4] | Inject a dry, alkaline or other selected chemical sorbent into flue gas, upstream of fabric filter. Dry sorbent injection avoids potential wet scrubbing issues, including wastewater treatment, corrosion and steam plume problems, and delivery nozzle plugging (spray dryer absorption). DS/FF has more efficient sorbent utilization, relative simplicity, and a small footprint. | Technology is feasible. Relative to sorbent reaction time, distance between injection point and fabric filter will determine control efficiency. A circulating sorbent reactor (CSR) could potentially be used to increase removal efficiency if space permits (compatible with capture systems utilized by four COETF member company plants). | Tier 2 | Yes |
| HCN, Mercury, and PAHs | Activated Carbon and Existing Fabric Filter (baghouse)[4] | Conventional application of a baghouse with activated carbon injection (ACI) upstream of baghouse. Fabric filter to allow desired reaction within dust layer. | The air:cloth ratio on existing baghouse may not be sufficient. To help capture HCN, selective reagent (i.e., metalized carbon, bromide) may be needed. SO₂ interferes with HCN capture and control – requires desulfurized coke oven gas (COG); units with undesulfurized COG will require additional operating cost (for reagent) and/or additional sulfur control. | Tier 3 (HCN) Tier 2 (Others) | Yes |
| HCN, Mercury, and PAHs | Reagent-specific (Bromide) Activated Carbon and Existing Fabric Filter (baghouse)[4] | Fabric filter and ACI with special metalized reagent (e.g., bromide) to efficiently capture mercury, HCN, and PAHs. Fabric filter to allow desired reaction within dust layer. | The air:cloth ratio on existing baghouse may not be sufficient. Mercury species will dictate whether a conventional ACI or reagent (e.g., bromide) system will be required. This technology will not work with coke plants lacking a desulfurization process. SO₂ interferes with HCN capture and control – requires desulfurized coke oven gas (COG); units with undesulfurized COG will require additional operating cost (for reagent) and/or additional sulfur control. | Tier 3 (HCN) Tier 2 (Others) | Yes |
| HCN and PAHs | Thermal Oxidation (TO)/Incineration | TO/incineration would be situated post existing fabric filter (assuming HCN and PAHs not controlled with ACI system). | The low sensible heat of exhaust will require substantial natural gas to combust HCN and PAHs. Will likely substantially increase CO₂. | Tier 3 | No |
| PAHs | Wet Oil/Reagent Scrubbing | Conventional oil-based absorption technology. Soluble pollutant is dissolved into scrubbant (oil wash). The rich (i.e., contaminated) stream would be further processed, reused, or treated in a wastewater treatment system or sent offsite for destruction/disposal. | Not feasible for low concentrations and multi-pollutant control systems. | Tier 2 | No |
| Mercury | Fixed Carbon Bed after Existing Fabric Filter[4] | Using the adsorption process, gaseous pollutants are removed from an air stream by transferring the pollutants to the solid surface of an adsorbent, usually activated carbon. Other commonly used adsorbents include zeolites and polymers. Adsorbents typically are regenerated (desorbed/removed) either off-site or on-site. | Requires significant space for carbon beds and regeneration process equipment. Saturation capacity (the maximum capacity the adsorbent can hold) and breakthrough capacity (the amount of pollutant that can be adsorbed before a significant pollutant concentration exits or breaks through the bed) must be determined for relevant pollutants. | Tier 3 | No[3] |
| Mercury | Regenerative Carbon Bed after Existing Fabric Filter[4] | Adsorption technology with activated carbon or other media that can be regenerated/reactivated onsite with steam or chemical treatment. | Requires significant space for carbon beds and regeneration process equipment, given the flowrates in question. Saturation capacity (the maximum capacity the adsorbent can hold) and breakthrough capacity (the amount of pollutant that can be adsorbed before a significant pollutant concentration exits or breaks through the bed) must be determined for relevant pollutants. | Tier 3 | No[3] |
| Mercury & PAHs | Fabric Filter Carbon-embedded Bags after Existing Fabric Filter[4] | Hg captured by carbon embedded in fabric structure. Bags replaced when breakthrough occurs. | Commercial use appears rare or non-existent. Retrofit alternatives need further evaluation. Has potential to enhance multipollutant control, including PM and other pollutants. Research² addresses all EPA-proposed PAHs except perylene, but does include Benzo(g,h,i) perylene. | Tier 3 | No |

NOTES:
1. Technical Feasibility Tier, where: Tier 1 [Technically Feasible and Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; Tier 2 [Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally]; and Tier 3 [Technically Not Feasible and Not Demonstrated Anywhere in the U.S. or Globally].
2. SZhen-Shu Llu, Journal of Environmental Engineering, May 2006.
3. Trinity contacted vendors regarding this technology, including those specializing in carbon adsorption technology. Also, other vendors tried to gain insights into the technology's viability for these pollutants and from these exhaust streams. These efforts have not identified compatible carbon adsorption technology.
4. At least one byproduct recovery coke plant does not have an existing baghouse for its PEC System and would require a new movable hood, ductwork, baghouse and related high voltage power line and substation for new equipment.
5. Concerns identified during site-specific engineering may result in certain technologies being technically infeasible (Tier 3) rather than potentially technically feasible (Tier 2). Some of these potential concerns are noted in this paper.

# CONTROL TECHNOLOGY REVIEW – BATTERY STACK EMISSIONS

In assessing a control strategy for Battery Stack emissions, Trinity performed additional evaluation of the Tier 2 technologies (Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally) presented in Table 2, including:

- Activated Carbon Injection (ACI) with Reagent-specific addition combined with Fabric Filter (for Hg and PM); and
- Dry Sorbent Injection (DSI) combined with Fabric Filter (for AGs [HCl] and PM).

An application evaluation of the technologies was considered by vendors, and preliminary control technology designs and configurations were developed based on the above discussed model battery and proposed emissions limits. Costs for these preliminary designs/configurations were developed based on equipment vendor data, EPA cost estimating techniques, and general APC technology concepts.

Regarding the dry scrubbing technologies (i.e., DSI), challenges associated with controlling AGs from Battery Stacks include:

- Due to the required long reaction time between sorbent and pollutants, a recirculating sorbent reactor vessel would be required between the injection point and fabric filter to increase time for reaction; this would overcome the poor removal efficiency. This approach would have physical space constraints.
- Physical space available near most Battery Stacks is limited such that placement of a control system (such as injectors, fabric filter, ID fan, and stack) would be problematic.

## Technical and Economic Considerations for Battery Stacks

Controlling emissions from Battery Stacks presents several physical and control chemistry challenges which limit the ability to implement controls. The general design of battery underfire combustion systems include coke oven gas (COG) burners for individual ovens and regenerative heat exchangers (i.e., "checkers") for flue gas heat recovery and preheating of combustion air. After heat recovery, the flue gases are directed to waste gas collection mains and pass underground through a refractory-lined duct to the Battery Stack. The gases are then exhausted by natural draft suction to the Battery Stack. Because the existing waste gas duct at all byproduct recovery coke plants is located underground, the gases would need to be diverted to an above-ground abatement system for connection, which would require a scheduled battery outage for construction and tie-in of the diversion. During the outage, most batteries will need to purchase natural gas to keep the battery hot (cost for this is not included in this study); all coke production would cease; and battery refractory brick and other equipment could suffer unanticipated damage, the repairing of which would add expense. The costs of any repairs or lost production are not included in EPA's evaluation.

Adding equipment such as sorbent injection systems, fabric filtration, and heat exchangers (HEX) would interrupt this balance by adding static pressure loss, necessitating use of an induced draft (ID) fan to overcome the increased static pressure loss. The impacts of added fans and equipment require more study beyond this evaluation to ensure adequate heating of the batteries and enough physical space to install additional equipment. Finally, to accommodate equipment to address the natural draft exhaust and route the stream through new APC(s), a new Battery Stack likely will be needed after these new gas cleaning steps.

In summary, the challenges associated with controlling emissions from Battery Stacks include:

1) Physical redesign of the battery underfire combustion heating system and waste gas ducting, which would require installation of an ID fan;

2) Battery outage for construction and tie-in;

3) Construction or modification of Battery Stacks;

4) Challenges of adding APCs to existing equipment; the byproduct recovery coke industry has never attempted to add the APCs in question (EPA addressed this in its assumptions using a severely understated retrofit cost factor);

5) Potential need for expanded or upgraded electrical power supply;

6) Costs and space constraints for redundant systems to continuously meet emission limits; and

7) Costs to repair any damage to refractory brick and other equipment that occur as a result of any battery outage.

Based on the limited data available (which are discussed in previous COETF comments on the proposed rule),[10] the fact that none of these controls have been demonstrated in the byproduct recovery coke industry (either domestically or globally), and the low concentrations of pollutants that will have to be removed, it is likely that any selected APC system will fail to achieve the desired destruction or removal efficiency and continually achieve the levels in the proposed rule (see Table 1).

In evaluating the technical feasibility and cost estimates across the byproduct recovery coke industry, Trinity considered the following elements for a "model" Battery Stack to normalize the emissions from the various Battery Stacks:

• Underfire heat input and coke oven gas (COG) heat value that are oven-specific (i.e., based on the number and size of ovens, and COG's higher heating value); and

• For the "model" Battery Stack, the number of ovens, coal charge/oven ratios, rates of coke produced per oven, COG generation rates (cubic feet/ton coal charge or coke produced), and the percentage of COG fired in the underfire heating system.

These elements, together with the technical challenges described above, result in significant uncertainties in APC technology efficiencies. The issues related to controlling the target emissions are further complicated by multipollutant control challenges. No single APC technology is able to control all the targeted pollutants covered by the proposed rule.

Along with the technical challenges of new APC technologies and auxiliary equipment, the available physical space at existing byproduct recovery coke plants is very limited. Depending on the equipment configurations and layouts at existing plants, additional engineering and planning are crucial to overcoming the physical space limitations associated with the placement of any new APC device and auxiliary equipment. As a general matter, all the above factors will likely result in costs higher than those presented in Table 4, which are already more than those estimated by EPA.

---

[10] An equipment redundancy cost of 50% was applied to the capital investment figures to account for redundant components.

**Control Cost Estimation Approach**

Trinity reviewed all of the control cost estimates for existing sources that EPA provided as part of the rulemaking docket. Trinity utilized information in document EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx to supplement vendor supplied information and cost data and to serve as the starting point for the evaluation. Using the general approach contained in EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx ensured a consistent approach, where possible, to that used by EPA with respect to control cost estimating methods as well as assumed pre- and post-control emission rates. The resulting cost estimates and cost effectiveness calculations are presented in Appendix A and summarized in Table 4 below. Key differences between Trinity's methods and those presented by EPA in the proposed rule include the following:

- ACI
  - o Trinity's analysis used updated 2024 total capital investment (TCI) based on a preliminary budget estimate provided by a vendor.
  - o Trinity applied a redundancy cost of 50% to the capital investment figures to account for redundant components.
  - o Trinity updated the exhaust gas flow rate to only include the average for byproduct recovery coke batteries that are still in operation.
  - o Trinity updated the ACI injection rate to approximately 6 lb/mmacf based on an updated study by Sargent & Lundy.[11] The derivation of this injection rate is included in Appendix A and is based on heat input data from 2016 ICR testing conducted by one byproduct recovery coke plant on its Battery Stack. This impacts the Total Annual Cost (TAC), which includes use of EPA's approach for capital recovery considering equipment life and interest rates. Trinity's analysis retained EPA's assumptions for equipment life and interest rates.

- DSI
  - o Trinity added calculations in lieu of the use of a wet scrubber (EPA's assumed control) for the reasons noted in Table 2 above.
  - o Trinity used cost methodology similar to that used for ACI, with the exception of TCI and sorbent costs.
  - o Considering that AG reductions using DSI are highly variable (particularly in exhaust streams with $SO_2$), Trinity assumed 90% control, given uncertainties regarding application of this technology to the byproduct recovery coke industry.
  - o Trinity assumed that TCI was based on a budget estimate provided by a vendor in 2024.
  - o A redundancy cost of 50% was applied to the capital investment figures to account for redundant components.
  - o Trinity assumed a sorbent injection rate based on a formula contained in the Portland Cement NESHAP docket (in document EPA-HQ-OAR-2002-0051). $SO_2$ can compete for agent reaction, thus lowering the effectiveness of AG controls without increased injection. The resulting increased injection rate would also substantially increase annual operating costs. This limitation is amplified for any byproduct recovery coke batteries without desulfurization.

---

[11] IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, Sargent & Lundy, LLC; March 2023

As such, two annual operating costs were developed: one for a Battery Stack at a site with an existing desulfurization system; and one at a site without an existing desulfurization system. For the desulfurization scenario, $SO_2$ emissions for this equation were based on the average Battery Stack emissions for calendar year 2020 operations at the Monessen (PA) and Clairton (PA) byproduct recovery coke plants (i.e., based on readily available data). For the scenario without desulfurization, actual emissions from the Burns Harbor (IN) Plant were used for the $SO_2$ emissions in the equation.

- Fabric Filter
  - Trinity determined that a fabric filter was the most likely candidate control technology, whereas EPA did not assume an additional PM control device was needed for Battery Stacks.

  - Trinity computed capital costs for a new baghouse based on https://www.epa.gov/system/files/documents/2021-09/attachment_5-7_pm_control_cost_development_methodology.pdf.[12]

  - Trinity applied a redundancy cost of 25% to the capital investment figures to account for redundant components (fans, oversizing of compartments, etc.).

  - Trinity utilized operating costs for a fabric filter based on EPA's baghouse cost template in Attachment 5 referenced above (cost for electricity and air excluded for simplicity).

- Ductwork
  - Trinity used EPA's cost for ductwork; however, EPA's costs are severely understated. The cost for ductwork will increase due to the complexities of retrofitting or installing a control device or auxiliary equipment (such as a heat exchanger) in the space-constrained area of byproduct recovery coke batteries.

- "Cost of Controls" Summary Table
  - Baseline emissions for cost effectiveness calculations are those taken from EPA's control costs evaluation (EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx).

  - Additional costs for retrofitting were not included due to the need for further site-specific evaluations. These costs include, but are not limited to, costs for heat exchangers to reduce the temperature to the desired inlet temperature; significant costs associated with battery outages, including natural gas needed to keep the battery hot; costs for new or modified Battery Stacks; and costs for potential vertical construction or relocation of other assets. The cost for a new Battery Stack was included, based on readily available information for replacing a Battery Stack at one existing coke plant.

  - There will be a need for redundant equipment (i.e., key portions of the emission control system) to continuously comply with the limits. The costs for these redundant systems are addressed, to the extent possible, as noted above.

  - Trinity utilized a retrofit factor of 1.25, consistent with EPA's control cost calculations for ductwork. But, the actual retrofit factor, while undefined now, would be much greater than 1.25 due to space constraints, costs due to loss of production, and other factors.

  - Based on vendor-supplied information, Trinity determined that HCN control was not available or quantifiable.

---

[12] IPM Model – Updates to Cost and Performance for APC Technologies, Particulate Control Cost Development Methodology Final, Sargent & Lundy, LLC; April 2017

- o Byproduct recovery coke batteries that have been permanently closed were removed from the cost evaluations. These include batteries in Follansbee, WV; Middletown, OH; Birmingham, AL (Bluestone Coke); and Clairton, PA (Batteries 1-3).
- o Costs and technologies were updated per the Trinity assessment. Given the assumptions made in these updated control costs calculations, and significant technical impediments not included due to the site-specific engineering necessary to adequately address them, the costs presented are conservatively low.

**Table 4. Battery Stack Control Options Summary (Cost Per Application)[13]**

| Technology | TCI Est.* (EPA) | TAC Est.* (EPA) | TCI Est.* (Trinity)** | TAC Est.* (Trinity) | Target Pollutants |
|---|---|---|---|---|---|
| ACI with Fabric Filter and New Stack | $81,498 | $167,201 | $22,536,152 | $3,915,379 | Hg |
| DSI with Fabric Filter and New Stack (Sites with Desulfurization) | Not evaluated | Not evaluated | $22,873,652 | $3,701,624 | AGs |
| DSI with Fabric Filter and New Stack (Sites without Desulfurization)[14] | Not evaluated | Not evaluated | $22,873,652 | $5,044,042 | AGs |

*TCI = Total Capital Investment; TAC = Total Annual Cost
**Cost includes conservatively low assumptions for redundancy (50% for ACI and DSI; 25% for fabric filter).

[13] Costs are understated based on the technical concerns discussed in this evaluation (e.g., battery idling, space constraints, rerouting of combustion exhaust, etc.). Trinity applied a retrofit factor of 1.25 consistent with EPA's value for duct work. Once site-specific engineering is conducted, it is possible that certain technologies may be infeasible.

[14] Total Annualized Costs for certain technologies (i.e., ACI and DSI) may have substantial additional operating costs. These costs are further complicated by the potential interference caused by $SO_2$ in the exhaust stream. DSI costs have been estimates for coke plants with and without desulfurization systems. It is possible that a desulfurization unit may be necessary for the injection system to achieve the proposed standards. This cost is not included in this evaluation.

# CONTROL TECHNOLOGY REVIEW – PUSHING EMISSIONS CONTROL SYSTEMS

As with the evaluation of APC technologies for Battery Stack emissions, Trinity performed an assessment of the Tier 2 technologies (Potentially Technically Feasible but Not Demonstrated within Byproduct Recovery Coke Industry in the U.S. or Globally) for PEC Systems as presented in Table 3, including:

- Activated Carbon Injection (ACI) with and without Reagent-Specific Addition, combined with Fabric Filter (for Hg, PAHs); and

- DSI combined with Fabric Filter (for AGs).

Trinity assessed preliminary control technology designs and configurations for these technologies. Capital and operating costs for these preliminary designs were developed based on equipment vendor data, EPA cost estimating techniques, and general APC technology concepts.

**Technical and Economic Considerations for PEC Systems**

Controlling emissions from PEC Systems presents physical and control chemistry challenges similar to those for Battery Stack emissions. With one exception, the general design of PEC Systems at existing byproduct recovery coke plants relies on pushing emissions capture-and-control via a fabric filter baghouse. While the end-of-pipe control device is similar (that is, a baghouse), there are several different types of emissions capture devices in use, as indicated below. The one exception to the PEC System baghouse is a byproduct recovery coke plant that uses a mobile scrubber car system.

For PEC Systems that currently use a fabric filter baghouse to control pushing emissions, the four types of systems include:

1) Moveable hood, belt sealed duct (to fabric filter);

2) Moveable hood, dampered ports (to fabric filter);

3) Stationary shed (to fabric filter); and

4) Enclosed coke guide and scrubber car (not included in this evaluation).

Based on this evaluation, it is acknowledged that existing control systems may not be adequate to address the additional loading from proposed injection systems. As such, Table 5 costs account for installation of a new fabric filter system at each site. The costs presented reflect a "model" PEC System at a byproduct recovery coke plant.

**Control Cost Estimation Approach**

Similar to the analysis performed for Battery Stacks, Trinity reviewed existing control cost estimates provided by EPA as part of the rulemaking docket. Trinity referenced document EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx to supplement vendor supplied information and cost data, and to serve as the starting point for the updated evaluation. The resulting cost estimates and cost effectiveness calculations are presented in Appendix A and summarized in Table 5. Key differences between Trinity's methods and those in the proposed rule include the following:

- ACI
  - Trinity updated the 2024 TCI based on a preliminary budget estimate provided by a vendor.
  - Trinity applied a redundancy cost of 50% to the capital investment figures to account for redundant components.
  - Trinity updated the exhaust gas flowrate to only consider the average for the byproduct recovery coke batteries that are still in operation.
  - Trinity updated the ACI injection rate to 6 lb/mmacf. Based on similar flowrates and small concentration loading, this value was retained from the Battery Stacks analysis.

- DSI
  - Trinity added these calculations in lieu of assuming the use of a wet alkaline scrubber (EPA's assumed control) for the reasons noted in Table 3.
  - Trinity used a cost methodology similar to that used for ACI, with the exception of TCI and sorbent costs.
  - Because AG reductions using DSI are highly variable, Trinity assumed 90% control, given the uncertainties regarding application of this technology to the byproduct recovery coke industry.
  - Trinity used a 2024 TCI based on a budget estimate provided by a vendor.
  - Trinity applied a redundancy cost of 50% to the capital investment figures to account for redundant components.
  - Trinity used a sorbent injection rate based on a formula included in the Portland Cement NESHAP docket (in document EPA-HQ-OAR-2002-0051). $SO_2$ emissions for this equation were based on the average PEC System emissions for calendar year 2020 operations at the Monessen (PA) and Clairton (PA) byproduct recovery coke plants (i.e., from readily available data).

- Fabric Filter
  - Trinity assumed that each byproduct recovery coke plant will need to include a new fabric filter.
  - Capital costs are based on estimates for application of new technology to the Warren (OH) plant's PEC system.
  - The costs for electricity and air were excluded from total annual costs for simplicity.

- Ductwork
  - Trinity used EPA's cost for ductwork, but that cost is significantly understated (as noted previously).

- "Cost of Controls" Summary Table
  - Baseline emissions for cost effectiveness are those taken from EPA's control costs evaluation (EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx).
  - Additional costs for retrofitting, for known engineering considerations that were not included due to the need for further site-specific evaluations, include, but are not limited to: heat exchangers to increase temperature to the desired inlet temperature; and potential vertical construction or relocation of other assets.

- o Trinity utilized a retrofit factor of 1.25, consistent with EPA's control cost calculations for ductwork. The actual retrofit factor, while not estimated in this paper, would be significantly greater than 1.25 due to space constraints, costs due to loss of production, etc.

- o Based on vendor discussions, HCN control was determined not to be available or quantifiable.

- o There will be a need for redundant equipment (i.e., key portions of the emission control system) to continuously comply with the limits. The costs for these redundant systems are addressed, to the extent possible, as noted above.

- o Byproduct recovery coke batteries that have been permanently closed were removed from the cost evaluations. These include batteries in Follansbee, WV; Middletown, OH; Birmingham, AL (Bluestone Coke); and Clairton, PA (Batteries 1-3).

- o Costs and technologies were updated per the Trinity assessment. Given the assumptions made in these revised control cost calculations, and significant technical impediments not included due to the site-specific engineering necessary to adequately address them, the costs presented are conservatively low.

**Table 5. PEC Systems with Existing Baghouse Options Summary (Cost Per Application)[15]**

| Technology | TCI Est.* (EPA) | TAC Est.* (EPA)[16] | TCI Est.* (Trinity)** | TAC Est.* (Trinity) | Target Pollutants |
|---|---|---|---|---|---|
| ACI with New Fabric Filter | Not evaluated | Not evaluated | 25,446,261 | 4,359,610 | Hg, PAHs |
| DSI with New Fabric Filter[13] | Not evaluated | Not evaluated | 25,783,761 | 4,064,202 | AGs |

*TCI = Total Capital Investment; TAC = Total Annual Cost
**Cost includes conservatively low assumptions for redundancy (50% for ACI and DSI).

---

[15] Costs are understated based on the technical concerns discussed in this analysis (e.g., space constraints). Trinity applied a retrofit factor of 1.25 consistent with EPA's value for duct work. Once site-specific engineering is conducted, certain technologies may be infeasible.

[16] Total Annualized Costs for certain technologies (i.e., ACI and DSI) may have substantial operating costs. These costs are further complicated by the potential interference caused by $SO_2$ in the exhaust stream.

Trinity evaluated several potential APC systems to control emissions from Battery Stacks and PEC Systems, as presented in Tables 2 and 3. Table 6 below summarizes the estimated costs for several APC systems that were selected for further evaluation, including a technical and economic feasibility review, with technology vendors. The potential APC systems selected for further evaluation, and some of the technical (and schedule) concerns with them, were summarized in "Compliance Schedule Concerns" comments that the COETF provided to EPA on February 9, 2024.[17]

In an effort to obtain realistic input on APC technology applications and associated costs, Trinity obtained information from several APC technology vendors and reached the following conclusions:

1) None of the identified APC technologies are currently demonstrated in the byproduct recovery coke industry, either in the U.S. or globally.

2) Wet alkaline scrubbers cannot adequately address AGs, considering the low exhaust stream concentrations with high exhaust flow rates common with these streams.

3) Due to equipment configurations and layouts at existing byproduct recovery coke plants, additional engineering and planning will be crucial to overcoming limitations of physical space associated with the placement of any new APC device and auxiliary equipment.

4) Significant challenges exist with respect to control of Battery Stack emissions, including the need to perform a planned battery outage and address the natural draft nature of the under-firing system. The necessary retrofitting could have a catastrophic impact on coke production or the battery itself. Such costs and long-term implications are not addressed in this paper.

5) The proposed PM grain loading requirement for Battery Stacks can likely be met with conventional fabric filter (baghouse) technology if the PM particle size is greater than approximately one micron (>1 μm) aerodynamic diameter. However, there are significant doubts that such a technology can be used effectively in controlling PM particles less than 1 μm in diameter.

6) As demonstrated by other industries, Hg can be captured using ACI or DSI technologies. However, the reduction efficiency is difficult to predict for byproduct recovery coke plant operations due to plant-specific conditions and emissions characteristics (including low concentrations and the type or form of mercury present).

7) No technology was identified that would be feasible to control HCN emissions.

8) The control of AGs is theoretically feasible in a DSI using hydrated lime, sodium bicarbonate, or other reagents. However, Battery Stack and PEC System emissions potentially include other acid gases, such as $SO_2$. $SO_2$ in the gas stream will compete for reagent reaction and will lower the conversion/destruction of AGs. This complication makes the evaluation very difficult and complex because auxiliary equipment such as Reaction Towers, reagent storage silos, and large vertical duct runs to allow for sufficient reaction time, will be necessary. The need for such auxiliary equipment will necessitate significant site-specific engineering studies and, likely, the need for large available footprints at space-constrained byproduct recovery coke plants. In the Battery Stack scenario, $SO_2$ will compete for reagent targeted toward HCl and HF. The resulting increased injection rate would

---

[17] "Compliance Schedule Concerns 020924.pdf" submitted by the COETF to EPA on February 9, 2024.

also substantially increase annual operating costs. This limitation is amplified for any batteries that do not include desulfurization.

As discussed above, based on Trinity's expertise and research, together with information provided by APC vendors, no viable technologies exist for controlling the targeted pollutants from byproduct recovery coke plants. EPA's evaluation of potential controls for Hg at these plants did not consider the additional technologies that would be required (e.g., baghouses with ACI for Hg control and heat exchangers to optimize gas stream temperatures for effective control). In sum, there are no technologies available that would control all the proposed pollutants in each of the two exhaust gas streams (from Battery Stacks and PEC Systems).

Vendor cost data relative to the model coke plant specifications developed by Trinity are very limited. Trinity developed cost estimates for certain technologies using available public data and cost estimating tools. These cost estimates are significantly higher than those estimated in EPA's proposed rule. As indicated in Table 6, EPA's estimates grossly understate the actual costs of retrofitting these APC technologies.

While APC technologies exist that address certain targeted pollutants, there is no single technology that addresses all of these pollutants in combination. Furthermore, with respect to potentially feasible APCs, we found no evidence of any byproduct recovery coke plants using these technologies to control Battery Stack or PEC System emissions. Indeed, site-specific engineering evaluations, which have not been conducted by EPA, would be needed to design and estimate the cost of *potentially* effective APCs. Trinity applied a conservative retrofit cost factor of 1.25 to account for some of this uncertainty.

Furthermore, it is unlikely that the byproduct recovery coke industry could consistently achieve compliance with the proposed standards, and any APCs would not be effective in achieving the proposed standards as supported by this evaluation. Along with ineffective pollutant removal efficiencies, total control costs to industry associated with the evaluated APC technologies and cost effectiveness values are extremely high as summarized in Table 6 and Appendix A.

Industry-wide total capital costs are estimated to be nearly $1.3 Billion, and industry-wide annual costs are estimated to be over $220 Million/year. The resulting cost effectiveness values are over $1 Million/ton for AGs from Battery Stacks, over $1.1 Million/lb for Hg from Battery Stacks, and over $193 Million/ton for PAHs from PEC Systems. These cost effectiveness values are dramatically higher than those EPA has historically determined to be acceptable. The high financial investments reflected in this paper are not acceptable, particularly given that EPA has already determined that risk to public health associated with the entire PQBS source category is low and acceptable and provides an ample margin of safety.

Finally, in light of the numerous technical limitations for controlling the target pollutants at these sources, the costs detailed below are likely to be significantly understated, therefore, EPA should revise the proposed standards upwards for AGs, PAHs, Hg, HCN, and PM.

Table 6. Summary of Estimated Control Costs to Byproduct Recovery Coke Industry[18]

| Source or Process | Target Pollutant | Control Technology | TCI per Emissions Source ($)* | TAC per Emission Source ($)* | No. of Industry Sources | Industry TCI ($)* | Industry TAC ($)* | Industry Total Pollutant Reductions per EPA Baseline (tpy)[19] | Industry Total $/lb or $/Ton Removed |
|---|---|---|---|---|---|---|---|---|---|
| PEC with New Fabric Filter | Hg | ACI + Fabric Filter | 25,446,261 | 4,359,610 | 12 | 305,355,132 | 52,315,324 | 0.0007 | 35,710,236 ($/lb) |
| PEC with New Fabric Filter | PAHs | ACI + Fabric Filter | 25,446,261 | 4,359,610 | 12 | 305,355,132 | 52,315,324 | 0.27 | 193,359,544 ($/ton) |
| PEC with New Fabric Filter | AGs | DSI + Fabric Filter | 25,783,761 | 4,064,202 | 12 | 309,405,132 | 48,770,424 | 5.13 | 9,513,924 ($/ton) |
| Battery Stacks | AGs | DSI + Fabric Filter + New Stack (with desulfurization) | 22,873,652 | 3,701,624 | 10 | 343,104,785 | 62,236,450 | 54.3 | 1,032,154 ($/ton) |
| Battery Stacks | AGs | DSI + Fabric Filter + New Stack (without desulfurization) | 22,873,652 | 5,044,042 | 5 | | | | |
| Battery Stacks | Hg | ACI + Fabric Filter + New Stack | 22,536,152 | 3,915,379 | 15 | 338,042,285 | 58,730,684 | 0.049 | 599,924 ($/lb) |
| **Total Industry Cost** | Hg | PEC – ACI/Fabric Filter  Battery Stack - ACI/Fabric Filter | | | | 643,397,417 | 111,046,008 | 0.05 | 1,117,163 ($/lb) |
| **Total Industry Cost** | PAHs | PEC – ACI/Fabric Filter | | | | 305,355,132 | 52,315,324 | 0.27 | 193,359,544 ($/ton) |
| **Total Industry Cost** | AGs | PEC – DSI/Fabric Filter  Battery Stack - DSI/Fabric Filter | | | | 652,509,917 | 111,006,874 | 59.43 | 1,867,859 ($/ton) |
| **Total Industry Cost – All Pollutants[20]** | | | | | | **1,295,907,334** | **222,052,882** | | |

*TCI = Total Capital Investment; TAC = Total Annual Cost

[18] Costs are understated based on the technical concerns discussed in this white paper (e.g., battery idling, space constraints, redundant equipment, compatibility studies, rerouting of combustion exhaust).

[19] Baseline emissions are those used in EPA's control cost evaluation (EPA-HQ-OAR-2002-0085-0859_attachment_6.xlsx). Control efficiencies of 90%, 95%, and 80% were used for AGs, Hg, and PAHs, respectively.

[20] Total Industry Costs are calculated as the sum of total costs for Hg and AGs shown above. The combination of controls evaluated for PAH emissions from PEC Systems would theoretically be the same combination of controls used for Hg from PEC Systems; therefore, the Total Industry Costs calculation does not include the total costs shown above for PAHs in order to avoid duplication.

1) Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

2) Table 10 – Summary of Proposed Amendments to 40 CFR 63, Subparts 5C and L, Federal Register/Vol. 88, No. 157, Page 55893, August 16, 2023/Proposed Rules.

3) Federal Register/Vol. 88, No. 157, Page 5585, August 16, 2023/Proposed Rules.

4) COETF comments to EPA (Dr. Donna Lee Jones), October 2, 2023.

5) Coke NESHAP Redline Version of Proposed Rule Changes for 40 CFR part 63, subpart CCCCC, July 1, 2023.

6) EPA-450/2-77-019, Sept. 1977. EPA Guideline Series, control of sulfuric acid mist emissions from existing sulfuric acid production units.

7) SZhen-Shu Llu, Journal of Environmental Engineering, May 2006.

8) IPM Model – Updates to Cost and Performance for APC Technologies, Mercury Control Incremental Operating Cost Methodology, Sargent & Lundy, LLC; March 2023.

9) Installation Permit Application for USS Proposed C Battery Project, January 2008.

10) Intech 2012 Hein and Kaiser, Air Pollution – A Comprehensive Perspective Environmental Control and Emission Reduction for Coking Plants, Chapter 10, 2012.

11) Comments of the American Iron and Steel Institute and United States Steel Corporation on Proposed National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Residual Risk and Technology Review, Proposed Rule, 84 Fed. Reg. 42,704 (Aug. 16, 2019) and attachments, Nov. 7, 2019.

12) US EPA, Summary of Public Comments and Responses for Lime Manufacturing Plants Residual Risk and Technology Review, May 2020.

13) US EPA, Economic Impact Analysis (EIA) for the Manganese Ferroalloys RTR Supplemental Proposal Final Report, September 2014.

14) Schulz. M, and Klaus-Peter Paul Leuchtmann et al, AISTech, 2015; Hyundai Steel and ThyssenKrupp Industrial Solutions USA, Using modern coke oven technology at the new Hyundai Steel coke plant.

15) Dickerman, Jim; and Mike Schantz, Lhoist North America; IMPROVED DSI PERFORMANCE WITH OPTIMIZED HYDRATED LIME, DSI with Sorbacal®SP, c. 2013.

16) Portland Cement NESHAP docket; EPA-HQ-OAR-2002-0051, July 2018.

17) COETF "Compliance Schedule Concerns 020924.pdf" to EPA, February 9, 2024.

**Costs of Controls for the Byproduct Recovery Plant Battery Stacks**

| Summary of Capital and Annual Costs | No. APCD Configurations[1] | ABC-Tarrant-AL | AM-BurnsHarbor-IN | AM-Monessen-PA | AM-Warren-OH | EES-RiverRouge-MI | USS-Clairton-PA | Industry Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2 | 2 | 2 | 1 | 1 | 7 | | |
| **Capital Cost[2]** | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) | |
| Ductwork | $33,761 | $67,522 | $67,522 | $67,522 | $33,761 | $33,761 | $236,327 | $506,414 | |
| Activated Carbon Injection Capital Costs | $412,500 | $825,000 | $825,000 | $825,000 | $412,500 | $412,500 | $2,887,500 | $6,187,500 | |
| Dry Sorbent Injection Capital Costs | $750,000 | $1,500,000 | $1,500,000 | $1,500,000 | $750,000 | $750,000 | $5,250,000 | $11,250,000 | |
| Replacement Stack Capital Costs | $10,000,000 | $20,000,000 | $20,000,000 | $20,000,000 | $10,000,000 | $10,000,000 | $70,000,000 | $150,000,000 | |
| Fabric Filter Capital Costs | $12,089,891 | $24,179,783 | $24,179,783 | $24,179,783 | $12,089,891 | $12,089,891 | $84,629,240 | $181,348,370 | |
| **Total Capital Cost (ACI + Fabric Filter + Stack)** | $22,536,152 | $45,072,305 | $111,341,979 | $67,162,196 | $44,626,044 | $508,513,762 | $489,101,437 | $338,042,285 | |
| **Total Capital Cost (DSI + Fabric Filter + Stack)** | $22,873,652 | $45,747,305 | $45,747,305 | $45,747,305 | $22,873,652 | $22,873,652 | $160,115,566 | $343,104,785 | |
| **Annual Cost** | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total ($2022) | |
| Ductwork | $12,769 | $25,538 | $25,538 | $25,538 | $12,769 | $12,769 | $89,384 | $191,537 | |
| Activated Carbon Injection Annual Costs | $622,243 | $1,244,486 | $1,244,486 | $1,244,486 | $622,243 | $622,243 | $4,355,700 | $9,333,642 | |
| Dry Sorbent Injection Annual Costs (sites with desulfurization) | $408,488 | $3,501,813 | $3,501,813 | $816,975 | $408,488 | $1,750,906 | $2,859,414 | $12,839,408 | |
| Dry Sorbent Injection Annual Costs (sites without desulfurization) | $1,750,906 | | | | | | | | |
| Replacement Stack Annual Costs | $1,380,922 | $2,761,844 | $2,761,844 | $2,761,844 | $1,380,922 | $1,380,922 | $9,666,453 | $20,713,829 | |
| Fabric Filter Annual Costs | $1,899,445 | $3,798,890 | $3,798,890 | $3,798,890 | $1,899,445 | $1,899,445 | $13,296,115 | $28,491,676 | |
| **Total Annual Costs (ACI + Fabric Filter + Stack)** | $3,915,379 | $7,830,758 | $17,671,859 | $11,111,125 | $7,195,746 | $76,083,453 | $76,613,157 | $58,730,684 | |
| **Total Annual Costs (DSI + Fabric Filter + Stack)** | $5,044,042 | $10,088,085 | $10,088,085 | $7,403,248 | $3,701,624 | $5,044,042 | $25,911,367 | $62,236,450 | |
| **Uncontrolled Pollutant (Ton/yr)** | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY[4] | Industry Total TPY | |
| Uncontrolled Hg Emission Rate (Ton/yr) | | 1.3E-03 | 3.0E-02 | 6.5E-04 | 2.1E-03 | 5.8E-03 | 1.1E-02 | 0.052 | |
| Uncontrolled Acid Gas Emission Rate (Ton/yr) | | 2.3E+00 | 1.5E+01 | 1.7E+00 | 4.6E+00 | 1.3E+01 | 2.4E+01 | 60.3 | |
| Uncontrolled HCN Emission Rate (Ton/yr) | | 9.9E-01 | 2.3E+00 | 8.7E-02 | 2.8E-01 | 7.5E-01 | 2.7E-01 | 4.7 | |
| Uncontrolled Total HAP[2] Emission Rate (Ton/yr) | | 3.2E+00 | 1.8E+01 | 1.8E+00 | 4.9E+00 | 1.3E+01 | 2.4E+01 | 65 | |
| **Pollutant Reductions (Ton/yr)** | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Industry Total TPY | |
| Hg Emission Reduction w/ ACI | | 1.2E-03 | 2.9E-02 | 6.2E-04 | 2.0E-03 | 5.5E-03 | 1.1E-02 | 0.049 | 95.00% |
| Acid Gas Reduction w/ DSI | | 2.0E+00 | 1.4E+01 | 1.6E+00 | 4.2E+00 | 1.1E+01 | 2.1E+01 | 54.3 | 90.00% |
| HCN Reduction (Not Available) | | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0E+00 | 0.0 | 0.00% |
| Total HAP[2] Reduction | | 2.0E+00 | 1.4E+01 | 1.6E+00 | 4.2E+00 | 1.1E+01 | 2.1E+01 | 54.32 | |
| **Pollutant Cost Effectiveness ($/Ton)** | | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Industry Total $/Ton ($/lb Mercury) | |
| Hg Cost Effectiveness ($/lb) w/ ACI and FF (Stack) | | $3,141,995 | $305,170 | $9,006,760 | $1,777,221 | $6,876,740 | $3,622,354 | $599,923 | |
| Acid Gas Cost Effectiveness ($/Ton) w/ DSI and FF (Stack) | | $4,482,659 | $653,280 | $4,246,594 | $800,886 | $399,378 | $1,097,475 | $1,032,154 | |
| HCN Cost Effectiveness ($/Ton) (Not Available) | | N/A | N/A | N/A | N/A | N/A | N/A | | |
| Total HAP[2] Cost Effectiveness ($/Ton) w/ Ductwork+ACI+DSI+FF (Stack) | | $5,591,724 | $813,715 | $5,509,441 | $1,038,956 | $498,253 | $1,423,693 | $1,317,641 | |

[1] There are six ByProduct recovery coke plants that have a total of 15 Battery Stacks.

[2] Where Total HAP is the sum of Hg, Acid Gas, and HCN emissions for which the EPA is setting MACT floors.

[3] Costs noted above do not consider numerous concerns regarding retrofitting of these emissions sources. For example, there are significant space constraints such that vertical construction/design may be needed. Moreover, battery stacks are natural draft with the underfire stream predominantly underground. The impacts of added fans and equipment will need to be studied to ensure adequate heating of the batteries, as well as enough physical space to install additional equipment. All this will pose crucial obstacles and engineering challenges for any new add-on equipment. Furthermore, changes to the underfiring system will necessitate the planning and scheduling of battery outages, during which purchased natural gas will be needed to keep the battery hot; all coke production would cease; and battery refractory brick and other equipment could suffer unanticipated damage, adding more time and expense to address. Costs for loss of production are also not considered. Electrical needs will also need to be reviewed.

[4] Emission rates reflect removal of Batteries 1,2 and 3 at the Clairton byproduct recovery plant which have been permanently closed.

**Activated Carbon Injection Model Costs (ACI Only)[1,2,3]**

Parameters
| | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 | (updated to remove any batteries no longer operable) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Activated Carbon Cost, $/lb (ACC) | $0.75 | Cost for FF from IPM,[2] cost for scrubber from email from Albemarle[3] |
| Dust Disposal Cost, $/Ton (DDC, Non-Hazardous) | $40.00 | Cost from EPA |
| Dust Disposal Cost, $/Ton (DDC, Hazardous) | $400.00 | Cost from EPA |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |
| ACI Adjustment Factor (AF) | 0.95 | Calculated control efficiency |
| ACI Injection Rate (lb/MMacf) | 6 | Updated based on Sargent & Lundy Study[4] |

| | | |
|---|---|---|
| Total Capital Investment, $ (TCI)(1 system) | $275,000 | Reflects high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $137,500 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$412,500** | |

Direct Annual Cost, $/yr (DAC)
| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $82,500 | Calculated using 0.2 x TCI |
| Activated Carbon | $330,622 | |
| Dust Disposal (Non-Hazardous) | $8,728 | Calculated using ACI injection rate, 99% capture efficiency, and non-hazardous disposal cost |
| Dust Disposal (Hazardous) | $87,284 | Calculated using ACI injection rate, 99% capture efficiency, and hazardous disposal cost |

Indirect Annual Cost, $/yr (IAC)
| | | |
|---|---|---|
| Overhead | $55,265 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $16,500 | Calculated using 0.04 x TCI |
| Capital Recovery | $40,463 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| Total Annual Cost (Non-Hazardous) | $543,687 | Sum of DAC + IAC |
| Total Annual Cost (Hazardous) | $622,243 | Sum of DAC + IAC |
| **Total Annual Cost (Hazardous)** | **$622,243** | (used in total cost estimates) |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

[2] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2011

[3] Email from Daryl Lipscomb, Albemarle to Bradley Nelson, EC/R, 8/30/2011

[4] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2023

**Battery Stack - ACI Injection Rate Calculation**

| | | |
|---|---|---|
| 0.46 | MMSCF/hr | Example Battery (Monessen (PA) Batt. 2 Comb Stack - 2016 ICR test) |
| 500 | btu/scf | estimate |
| 230 | MMBtu/hr | (heat input) |
| 2014800 | MMBtu/yr | |
| 2.015 | Tbtu/yr | |
| 3.86E-06 | lb Hg/ton coke (uncontrolled, from EPA's Baseline TP values) | |
| 2.20E-04 | tpy Hg (uncontrolled, from EPA's Baseline TP values) | |
| 2.19E-01 | lb/Tbtu uncontrolled | |
| 1.09E-02 | lb/Tbtu controlled | |
| **6** | **lb/Mmacf** | **Using Premium/Baghouse** |

**Injection Rate / Emission Rate Calculations**

Current Injection Rate:

$$x = \frac{\ln\left(\frac{y}{a}\right)}{b}$$

Where,

x is the **current injection rate** (lb/MMacf),
y is the **current** emission rate (lb/TBtu), and
a and b are coefficients dependent on the fuel, particulate collection device, and PAC type (see table below).

Option 1 – Achievable Emission Rate based on New Injection Rate (Recommended Maximum 20% Increase):

$$y = a * e^{b*x}$$

Option 2 – New Injection Rate based on New Emission Rate (Per Minimum Limits Above):

$$x = \frac{\ln\left(\frac{y}{a}\right)}{b}$$

Where,

x is the **new injection rate** (lb/MMacf),
y is the **new** emission rate (lb/TBtu), and
a and b are coefficients dependent on the fuel, particulate collection device, and PAC type (see table below).

| Fuel Type | PRB or Bituminous | | Lignite | |
|---|---|---|---|---|
| **Particulate Control Type** | Baghouse | ESP | Baghouse | ESP |
| **Coefficient 'a'** | | | | |
| Premium PAC | 4.3552 | 4.3552 | 21.567 | 21.567 |
| Standard PAC | 3.7609 | 3.7609 | 25.886 | 25.886 |
| **Coefficient 'b'** | | | | |
| Premium PAC | -0.988 | -0.593 | -1.647 | -1.086 |
| Standard PAC | -0.636 | -0.381 | -0.987 | -0.69 |

**New Baghouse Model Costs**[1,2]

| Control Device | Fabric Filter | |
|---|---|---|
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 | (revised removal of sites no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 | |
| Retrofit Factor | 1.25 | (conservatively set at 1.25, consistent with EPA value for ductwork) |

| | | |
|---|---|---|
| Total Installed, $ (TCI) | $9,671,913 | BMB ($) = J*B*L^0.81; J = 530 for a 6.0 Air-to-Cloth unit |
| TCI, $ (redundant system components) | $2,417,978 | (25% estimate for extra compartments, fans, etc.) |
| **TCI $** | **$12,089,891** | BMB ($) = J*B*L^0.81; J = 530 for a 6.0 Air-to-Cloth unit |

1. Cost calculated per Table 3 of  https://www.epa.gov/system/files/documents/2021-09/attachment_5-7_pm_control_cost_development_methodology.pdf
2. Note that in response to the proposed II&S rules, industry estimated $7.5 million for purchased cost of a new baghouse with ACI for a BOF. ( EPA-HQ-OAR-2002-0083-1612_attachment_1.pdf)

**Annual Costs**

| | | |
|---|---|---|
| Operating factor (hr/yr): | 8,760 | |
| Operating labor rate ($/hr): | $30.52 | |
| Maintenance labor rate ($/hr): | $30.52 | |
| Operating labor factor (hr/sh): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Maintenance labor factor (hr/sh): | 1 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Annual interest rate (fraction): | 0.075 | |
| Control system life (years): | 20 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor: | 0.098092192 | |
| Bag life (years): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor (bags): | 0.556927711 | |
| Taxes, insurance, admin. factor: | 0.04 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |

| Item | | |
|---|---|---|
| Oper. labor | $66,839 | |
| Supv. labor | $10,026 | 15% Operating Labor |
| Maint. labor | $33,419 | |
| Maint. matl. | $33,419 | Equal to maint. Labor |
| Overhead | $86,222 | 60% of (Oper, Supv, Maint. Costs) |
| Tax,ins.,adm | $483,596 | |
| Cap. recov. | $1,185,924 | |
| **Total Annual Cost** | **$1,899,445** | |

**New Battery Stack Model Costs**

Control Device       Fabric Filter
Annual Operating Hours, hr/yr (H)       8760
Exhaust Gas Flow Rate, acfm (Qa)       138,402   (revised removal of sites no longer in operation)
Exhaust Gas Flow Rate, dscfm (Q)       68,684
Retrofit Factor       1.25   (conservatively set at 1.25 consistent with EPA value for ductwork)

**Total Capital Investment ($)**       **$10,000,000**   (example from battery stack project in 2019 was greater than $10 million including temporary stack)

**Annual Costs**

Annual interest rate (fraction):       0.075
Control system life (years):       20       (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx)
Capital recovery factor:       0.098092192
Bag life (years):       2       (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx)
Capital recovery factor (bags):       0.556927711
Taxes, insurance, admin. factor:       0.04       (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx)

| Item | |
|---|---|
| Tax,ins.,adm | $400,000 |
| Cap. recov. | $980,922 |

**Total Annual Cost**       **$1,380,922**

**Dry Sorbent Injection Model Costs (DSI Only at Sites with Desulfurization)[1]**

Parameters

| | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 | (updated to remove any batteries no longer operable) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |

| | | |
|---|---|---|
| Total Capital Investment, $ (TCI)(1 system) | $500,000 | Reflected of high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $250,000 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$750,000** | |

Direct Annual Cost, $/yr (DAC)

| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $150,000 | Calculated using 0.2 x TCI |
| Approximate SO2 emissions (tpy per stack) | 57.33 | |
| Lime Cost ($/yr, 2010) = 0.3 * lbs SO2/yr | $34,400 | |
| Lime Cost ($/yr, 2023) = 2010 $/yr * CEPCI 2023/ CEPCI 2010 | $49,546 | Given the relative emissions of SO2 and HCl, control will primarily result in reductions of SO2. The amount of lime injection must consider SO2 emissions, although HCl is the target pollutant for this cost estimate. SO2 based on 2020 air emissions data published for Clairton (PA) and Monessen (PA) byproduct recovery coke plants. |

Indirect Annual Cost, $/yr (IAC)

| | | |
|---|---|---|
| Overhead | $95,765 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $30,000 | Calculated using 0.04 x TCI |
| Capital Recovery | $73,569 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| **Total Annual Cost** | **$408,488** | Sum of DAC + IAC |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

**Dry Sorbent Injection Model Costs (DSI Only at Sites without Desulfurization)[1]**

| Parameters | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 138,402 | (updated to remove any batteries no longer operable) |
| Exhaust Gas Flow Rate, dscfm (Q) | 68,684 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |

| | | |
|---|---|---|
| Total Capital Investment, $ (TCI)(1 system) | $500,000 | Reflected of high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $250,000 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$750,000** | |

Direct Annual Cost, $/yr (DAC)

| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $150,000 | Calculated using 0.2 x TCI |
| Approximate SO2 emissions (tpy per stack) | 1610.77 | |
| Lime Cost ($/yr, 2010) = 0.3 * lbs SO2/yr | $966,462 | |
| Lime Cost ($/yr, 2023) = 2010 $/yr * CEPCI 2023/ CEPCI 2010 | $1,391,964 | Given the relative emissions of SO2 and HCl, control will primarily result in reductions of SO2. The amount of lime injection must consider SO2 emissions, though HCl is the target pollutant for this cost estimate. SO2 based on average of 2022 combustion stack emissions for Burns Harbor (IN). |

Indirect Annual Cost, $/yr (IAC)

| | | |
|---|---|---|
| Overhead | $95,765 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $30,000 | Calculated using 0.04 x TCI |
| Capital Recovery | $73,569 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| **Total Annual Cost** | **$1,750,906** | Sum of DAC + IAC |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

**Costs for Pushing Emissions Control (PEC) Systems**

| Summary of Capital and Annual Costs | No. PEC Systems[1] | ABC-Tarrant-AL | AM-BurnsHarbor-IN | AM-Monessen-PA | AM-Warren-OH | EES-RiverRouge-MI | USS-Clairton-PA | |
|---|---|---|---|---|---|---|---|---|
| | | 3 | 2 | 1 | 1 | 1 | 4 | |
| **Capital Cost[3]** | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) |
| Ductwork | $33,761 | $101,283 | $67,522 | $33,761 | $33,761 | $33,761 | $135,044 | $405,132 |
| Activated Carbon Injection Capital Cost | $412,500 | $1,237,500 | $825,000 | $412,500 | $412,500 | $412,500 | $1,650,000 | $4,950,000 |
| New Fabric Filter | $25,000,000 | $75,000,000 | $50,000,000 | $25,000,000 | $25,000,000 | $25,000,000 | $100,000,000 | $300,000,000 |
| Dry Sorbent Injection Capital Cost | $750,000 | $2,250,000 | $1,500,000 | $750,000 | $750,000 | $750,000 | $3,000,000 | $9,000,000 |
| **Total Capital Cost (ACI + Fabric Filter)** | $25,446,261 | $76,338,783 | $50,892,522 | $25,446,261 | $25,446,261 | $25,446,261 | $101,785,044 | $305,355,132 |
| **Total Capital Cost (DSI + Fabric Filter)** | $25,783,761 | $77,351,283 | $51,567,522 | $25,783,761 | $25,783,761 | $25,783,761 | $103,135,044 | $309,405,132 |
| **Annual Cost** | Unit Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Total Facility Cost ($2022) | Industry Total Cost ($2022) |
| Ductwork | $13,221 | $39,664 | $26,443 | $13,221 | $13,221 | $13,221 | $52,886 | $158,657 |
| Activated Carbon Injection Annual Cost | $664,159 | $1,992,476 | $1,328,317 | $664,159 | $664,159 | $664,159 | $2,656,634 | $7,969,903 |
| New Fabric Filter | $3,682,230 | $11,046,691 | $7,364,461 | $3,682,230 | $3,682,230 | $3,682,230 | $14,728,921 | $44,186,763 |
| Dry Sorbent Injection Capital Cost | $368,750 | $1,106,251 | $737,501 | $368,750 | $368,750 | $368,750 | $1,475,001 | $4,425,004 |
| **Total Annual Costs (ACI + Fabric Filter)** | $4,359,610 | $13,078,831 | $8,719,221 | $4,359,610 | $4,359,610 | $4,359,610 | $17,438,441 | $52,315,324 |
| **Total Annual Costs (DSI + Fabric Filter)** | $4,064,202 | $12,192,606 | $8,128,404 | $4,064,202 | $4,064,202 | $4,064,202 | $16,256,808 | $48,770,424 |
| **Uncontrolled Pollutant (Ton/yr)** | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Industry Total TPY |
| Uncontrolled Acid Gas Emission Rate (Ton/yr) | | 3.79E-01 | 2.26E+00 | 1.96E-01 | 2.30E-01 | 6.29E-01 | 2.00E+00 | 5.70 |
| Uncontrolled HCN Emission Rate (Ton/yr) | | 2.36E-01 | 7.95E-01 | 1.24E-01 | 9.33E-02 | 2.55E-01 | 8.11E-01 | 2.31 |
| Uncontrolled Hg Emission Rate (Ton/yr) | | 2.65E-05 | 2.10E-04 | 3.74E-05 | 4.00E-05 | 1.09E-04 | 3.48E-04 | 0.0008 |
| Uncontrolled PAH Emission Rate (Ton/yr) | | 1.71E-01 | 4.73E-02 | 8.42E-03 | 9.00E-03 | 2.46E-02 | 7.83E-02 | 0.34 |
| Uncontrolled Total HAP[2] Emission Rate (Ton/yr) | | 7.86E-01 | 3.10E+00 | 3.28E-01 | 3.33E-01 | 9.09E-01 | 2.89E+00 | 8.35 |
| **Pollutant Reductions (Ton/yr)** | | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Total Facility TPY | Industry Total TPY | |
| Acid Gas Reduction w/ DSI | | 3.41E-01 | 2.03E+00 | 1.76E-01 | 2.07E-01 | 5.66E-01 | 1.80E+00 | 5.13 | 90.00% |
| HCN Reduction (Not Available) | | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00 | 0.00% |
| Hg Reduction w/ACI | | 2.52E-05 | 2.00E-04 | 3.55E-05 | 3.80E-05 | 1.04E-04 | 3.30E-04 | 0.0007 | 95.00% |
| PAH Reduction w/ACI | | 1.37E-01 | 3.78E-02 | 6.73E-03 | 7.20E-03 | 1.97E-02 | 6.26E-02 | 0.27 | 80.00% |
| Total HAP[2] Reduction | | 4.77E-01 | 2.07E+00 | 1.83E-01 | 2.14E-01 | 5.86E-01 | 1.87E+00 | 5.40 | |
| **Pollutant Cost Effectiveness ($/Ton)** | | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Total Facility $/Ton ($/lb Mercury) | Industry Total $/Ton ($/lb Mercury) | |
| Acid Gas Cost Effectiveness ($/Ton) w/DSI | | $35,770,190 | $3,997,621 | $23,047,434 | $19,612,208 | $7,177,169 | $9,020,491 | $9,513,924 | |
| HCN Cost Effectiveness ($/Ton) (Not Available) | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Hg Cost Effectiveness ($/lb w/ACI | | $259,338,475 | $21,838,895 | $61,357,851 | $57,385,689 | $21,000,532 | $26,394,127 | $35,710,236 | |
| PAH Cost Effectiveness ($/Ton) w/ACI | | $95,799,475 | $230,477,756 | $647,542,821 | $605,622,434 | $221,630,058 | $278,551,601 | $193,359,544 | |
| Total HAP[2] Cost Effectiveness ($/Ton) w/Ductwork+ACI+DSI | | $6,573,819 | $1,010,100 | $5,713,162 | $22,047,266 | $1,785,076 | $2,243,539 | $3,008,017 | |

[1] There are six existing byproduct recovery coke plants with a total of 12 PEC systems.

[2] Where Total HAP is the sum of Acid Gas, HCN, Hg, and PAH emissions for which the EPA is setting MACT floors.

[3] Costs noted above do not consider numerous concerns regarding retrofitting of these emissions sources, including potential retrofit of existing PM controls. For example, there are significant space constraints such that vertical construction/design may be needed. Electrical needs will also need to be reviewed.

**Activated Carbon Injection Model Costs (ACI Only)** [1,2,3]

Parameters

| Control Device | Fabric Filter | |
|---|---|---|
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 153,807 | (revised removal of sites no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 127,926 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Activated Carbon Cost, $/lb (ACC) | $0.75 | Cost for FF from IPM,[2] cost for scrubber from email from Albemarle [3] |
| Dust Disposal Cost, $/Ton (DDC, Non-Hazardous) | $40.00 | Cost from EPA |
| Dust Disposal Cost, $/Ton (DDC, Hazardous) | $400.00 | Cost from EPA |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |
| ACI Adjustment Factor (AF) | 0.95 | Calculated control efficiency |
| | | Updated based on Sargent & Lundy Study [4] (Based on same rate as battery |
| ACI Injection Rate (lb/MMacf) | 6.0 | stack review given similar flowrates and equivalent or smaller concentrations) |
| Total Capital Investment, $ (TCI)(1 system) | $275,000 | Reflected of high level budget estimates from vendor |
| TCI, $ (redundant system components) | $137,500 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$412,500** | |

| Direct Annual Cost, $/yr (DAC) | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $82,500 | Calculated using 0.2 x TCI |
| Activated Carbon | $363,784 | |
| Dust Disposal (Non-Hazardous) | $9,604 | Calculated using ACI injection rate, 99% capture efficiency, and non-hazardous disposal cost |
| Dust Disposal (Hazardous) | $96,039 | Calculated using ACI injection rate, 99% capture efficiency, and hazardous disposal cost |

| Indirect Annual Cost, $/yr (IAC) | | |
|---|---|---|
| Overhead | $55,265 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $16,500 | Calculated using 0.04 x TCI |
| Capital Recovery | $40,463 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| Total Annual Cost (Non-Hazardous) | $577,724 | Sum of DAC + IAC |
| Total Annual Cost (Hazardous) | $664,159 | Sum of DAC + IAC |
| **Total Annual Cost (Hazardous)** | **$664,159** | (used in total cost estimates) |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

[2] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2011

[3] Email from Daryl Lipscomb, Albemarle to Bradley Nelson, EC/R, 8/30/2011

[4] Sargent & Lundy, IPM Model - Revisions to Cost and Performance for APC Technologies, Mercury Control Cost Development Methodology Final, March 2023

**New PEC Baghouse Model Costs (and Supporting Upgrades)** [1,2]


**Total Installed, $ (TCI)**        **$25,000,000**  Cliffs Warren Site engineering estimate

1.  Cost calculated per Table 3 of  https://www.epa.gov/system/files/documents/2021-09/attachment_5-7_pm_control_cost_development_methodology.pdf

**Annual Costs**

| | | |
|---|---|---|
| Operating factor (hr/yr): | 8,760 | |
| Operating labor rate ($/hr): | $30.52 | |
| Maintenance labor rate ($/hr): | $30.52 | |
| Operating labor factor (hr/sh): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Maintenance labor factor (hr/sh): | 1 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Annual interest rate (fraction): | 0.075 | |
| Control system life (years): | 20 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor: | 0.098092192 | |
| Bag life (years): | 2 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |
| Capital recovery factor (bags): | 0.556927711 | |
| Taxes, insurance, admin. factor: | 0.04 | (from EPA baghouse cost template in EPA-HQ-OAR-2002-0085-0859_attachment_5.xlsx) |

| Item | | |
|---|---|---|
| ----------------------------------------------------------------------------------------------------------------------- | | |
| Oper. labor | $66,839 | |
| Supv. labor | $10,026 | 15% Operating Labor |
| Maint. labor | $33,419 | |
| Maint. matl. | $33,419 | Equal to maint. Labor |
| Overhead | $86,222 | 60% of (Oper, Supv, Maint. Costs) |
| Tax,ins.,adm | $1,000,000 | |
| Cap. recov. | $2,452,305 | |
| ----------------------------------------------------------------------------------------------------------------------- | | |
| **Total Annual Cost** | **$3,682,230** | |

**Dry Sorbent Injection Model Costs (DSI Only)**[1]

Parameters

| | | |
|---|---|---|
| Control Device | Fabric Filter | |
| Annual Operating Hours, hr/yr (H) | 8760 | |
| Exhaust Gas Flow Rate, acfm (Qa) | 153,807 | (updated to remove batteries no longer in operation) |
| Exhaust Gas Flow Rate, dscfm (Q) | 127,926 | |
| Operating Labor Rate, $/hr (LR) | $30.52 | |
| Annual interest rate (fractional): | 0.075 | |
| Economic life (years): | 20 | |
| Capital Recovery Factor (CRF) | 0.098092192 | CRF calculated assuming 20-year equipment life and 7.5% interest |
| GDP, 2022 | 126.45 | |
| GDP, 2008 | 94.419 | |
| GDP, 1991 | 65.783 | |
| | | |
| Total Capital Investment, $ (TCI)(1 system) | $500,000 | Reflective of high level budget estimates from vendor (2024) |
| TCI, $ (redundant system components) | $250,000 | (50% estimate) |
| **TCI, $ (system and redundant parts)** | **$750,000** | |

Direct Annual Cost, $/yr (DAC)

| | | |
|---|---|---|
| Operating Labor | $8,355 | Calculated using (0.25 hr/8-hr shift) x H x LR |
| Supervisory Labor | $1,253 | Calculated using 0.15 x Operating Labor |
| Maintenance | $150,000 | Calculated using 0.2 x TCI |
| Approximate SO2 emissions (tpy per stack) | 11.35 | |
| Lime Cost ($/yr, 2010) = 0.3 * lbs SO2/yr | $6,810 | |
| Lime Cost ($/yr, 2023) = 2010 $/yr * CEPCI 2023/ CEPCI 2010 | $9,808 | Given the relative emissions of SO2 and HCl, control will primarily result in reductions of SO2. The amount of lime injection must consider SO2 emissions, although HCl is the target pollutant for this cost estimate. SO2 based on 2020 air emissions data published for Clairton (PA) and Monessen (PA) byproduct recovery coke plants. |

Indirect Annual Cost, $/yr (IAC)

| | | |
|---|---|---|
| Overhead | $95,765 | Calculated using 0.6 x (Labor + Maintenance) |
| Property Tax, Insurance, & Admin | $30,000 | Calculated using 0.04 x TCI |
| Capital Recovery | $73,569 | Calculated using CRF x TCI |

| | | |
|---|---|---|
| **Total Annual Cost** | **$368,750** | Sum of DAC + IAC |

[1] Memorandum from Amanda Singleton and Susan McClutchey, ERG to Jim Eddinger, EPA, Revised Methodology for Estimating Control Costs for Industrial, Commercial, Institutional Boilers and Process Heaters National Emissions Standards for Hazardous Air Pollutants - Major Source, Appendix F, January 2011.

| Company Name/Vendor | Technology |
|---|---|
| LDX Solutions | DSI, CSR, FF, ACI |
| Babcock & Wilcox | DSI, ACI |
| Calgon Carbon Corporation | DSI, ACI |
| Solvay (SolvAir Solutions) | DSI |
| Tri-Mer Corporation | Wet Scrubbing |

| Parameter | PEC System (with existing baghouse) | Battery Stack |
|---|---|---|
| Flowrate (dscfm) | ~135,000 | ~40,000 to 60,000 |
| Temperature (degrees Fahrenheit) | ~115 | ~500 |
| Moisture (%) | ~2 | ~14 |
| Polycyclic Aromatic Hydrocarbons Range (µg/m3) | 300 to 1,100 | Not applicable |
| Hydrogen Cyanide Range (µg/m3) | 1,000 to 4,000 | 100 to 1,200 |
| Mercury Range (µg/m3) | 1 to 5 | 20 to 100 |
| Acid Gas Range (Hydrogen Chloride and Hydrogen Fluoride) (µg/m3) | 4,000 to 20,000 | 40,000 to 180,000 |

*The parameters listed above are a simplification for the purposes of initial vendor outreach and do not necessarily reflect any given individual byproduct recovery coke battery.

**Approximate values.

# **Exhibit E**

**Evaluation of Modeling Methodology Used by EPA to Determine a Benzene Fenceline Monitoring Proposed Action Level in the Coke Ovens Proposed Rule**

**AECOM**
**Feb. 2, 2024**

In the preamble to the Proposed Rule,[1] EPA describes its methodology for developing an action level for the fenceline monitoring program as follows:

> "We estimated the long-term ambient benzene concentrations at each coke oven facility using the emission inventory and the EPA's American Meteorological Society/EPA Regulatory Model dispersion modeling system (AERMOD). Concentrations were estimated by the model at a set of polar grid receptors centered on each facility, as well as surrounding census block centroid receptors extending from the facility outward to 50 km.  For purposes of this modeling analysis, we assumed that the nearest off-site polar grid receptor was the best representation of each facility's fenceline concentration, unless there was a census block centroid nearer to the fenceline than the nearest off-site polar grid receptor or an actual receptor was identified from review of the site map.  In those instances, we estimated the fenceline concentration as the concentration at the census block centroid.  Only receptors (either the polar or census block) that were estimated to be outside the facility fenceline were considered in determining the maximum benzene level for each facility.  The maximum benzene concentration modeled at the fenceline for any coke oven facility is 3 μg/m³ (annual average)."

The methodology EPA used in the Proposed Rule for estimating fenceline benzene concentrations underestimates the concentration of benzene at the actual coke facility fenceline.  EPA's method described above merely approximates a fenceline for each facility using a polar receptor grid, which incorrectly assumes each facility's fenceline is circular (as shown in Figure 1).  Using a polar receptor grid does not accurately represent the true fenceline of a byproduct recovery coke facility where benzene monitors would be located under the proposed fenceline monitoring requirements. Many or all of the polar grid receptors at each facility EPA modeled are located outside of the facility's actual fenceline, resulting in lower modeled concentration estimates than what may be measured by monitors at the true fenceline of the coke facility.  All byproduct recovery coke facilities have irregularly shaped or elongated fencelines similar to that shown in Figure 2 for the AM-Warren-OH facility, which was modeled by EPA to have one of the highest fenceline concentrations.

Furthermore, EPA's modeling was conducted using actual emissions for byproduct recovery facilities, rather than allowable emissions, which understates the predicted fenceline benzene concentrations that inform the action level.  An action level

---

[1] 88 Fed. Reg. 55858 (Aug. 16, 2023).

established based on actual emissions is not appropriate and would not properly account for expected emission rates that would occur when production is at or near permitted/allowable capacity. Because benzene emissions associated with non-category sources at a facility have greater uncertainty, and are based on actual emissions rather than allowables, the modeled emission rates should be scaled up based on permitted/allowable throughput. Emissions fluctuate frequently over time and the action level that EPA has proposed by using actual emissions for byproduct recovery sources does not take into account these fluctuations. When a facility's source category allowable emissions are included in the analysis, the monitored benzene concentrations are likely to exceed the proposed action level even though the facility is operating within allowable permit limits.

**Figure 1. Modeled Sources and Polar Grid Receptors at AM-Warren-OH**



In addition, the approach EPA used in the Proposed Rule does not account for the fact that fenceline monitoring would not differentiate between source category and non-source category benzene emissions, nor between onsite and offsite sources. Fenceline monitors would be expected to predominantly measure benzene emissions from low-lying, less buoyant non-source category sources compared to source category sources, such as coke batteries and battery combustion stacks, which have highly buoyant emission plumes due to temperature. Highly buoyant plumes have much greater potential to disperse far above fenceline monitors and other ground level receptors. Accordingly, fenceline monitors would predominantly register concentrations resulting from low-lying emissions sources, such as byproduct recovery facilities (which are not part of the source category), as well as from offsite regional sources.

**Figure 2. Actual Fenceline at AM-Warren-OH**



To demonstrate the impact of EPA's methodology, AECOM initially remodeled the AM-Warren-OH facility using receptors located at the facility's true fenceline as shown in Figure 3. Emissions used in the remodeling were based on whole facility allowable emissions estimated by applying a throughput scale-up to actual emissions for the byproduct recovery facility. The initial remodeling indicated that the receptors with the highest benzene modeled concentrations at the facility's fenceline were overwhelmingly due to the byproduct recovery facility (99.06%), while the category sources resulted in very low modeled concentrations (0.94%).

Because the receptor spacing for the initial remodeling run was very wide (approximately 150 meters), additional receptors were added at approximately 25-meter spacing to refine the fenceline remodeling as shown in Figure 4.  The highest remodeled fenceline concentration of 11.3 µg/m$^3$ was nearly four times the proposed benzene action level (3 µg/m$^3$) in the Proposed Rule.

If EPA decides to move forward with finalizing any fenceline monitoring requirements, EPA must revise the modeling methodology to establish an action level that accurately reflects the expected concentrations that would be measured <u>at the true fenceline</u> of each facility using <u>allowable</u> emissions for all facility sources.

**Figure 3. Remodeled Fenceline Receptors and Sources at AM-Warren-OH**



**Figure 4. Refined Modeled Fenceline Receptors and Sources at AM-Warren-OH**



Legend
- Domain center
- Polar Receptor
- Source: Area/BLP
- Source: Point
- User Added Receptor

2.8 µg/m³
3.7 µg/m³
5.0 µg/m³
7.2 µg/m³
9.9 µg/m²
11.3 µg/m³
8.9 µg/m²
7.7 µg/m³

# **Exhibit F**

June 14, 2024

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Dear Administrator Regan:

We write to you today regarding three U.S. Environmental Protection Agency (EPA) rules that together threaten the economic competitiveness of the American integrated steel industry. We urge EPA to grant the petitions filed by the domestic integrated steel industry seeking administrative reconsiderations and stays of all three final rules until the EPA can complete a comprehensive review of each rule through the administrative reconsideration process.

Working together, EPA and industry have achieved notable reductions in environmental impacts to air, water, and land over the past 50 years. The steel industry in the U.S. is the world's cleanest major producer of steel and is already subject to more environmental regulation than its global competitors, resulting in a cleaner environment. While we appreciate EPA's efforts to address concerns raised by multiple stakeholders – including steel companies, the United Steelworkers (USW), coke producers, and numerous Members of Congress – throughout the rulemaking process, we remain concerned that the final rules contain flaws that will undermine the domestic steel industry and national security while driving production overseas. We are specifically concerned about the following three rules:

- National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing (EPA-HQ-OAR-2017-0664)
- National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-OAR-2002-0083)
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries (EPA–HQ–OAR–2002–0085 and EPA– HQ–OAR–2003–0051).

A failure to get these regulations right will not only have a negative impact on domestic steel production and American steelworkers, but it will also likely fail to achieve a net reduction in emissions from the steel industry globally. In fact, emissions will likely rise as production moves to countries, like China, with far less stringent rules and regulations. By granting the requested administrative reconsideration and stay of the rules, the EPA and industry can build on their shared track record of success and continue to work together in a constructive manner to achieve durable rules that both protect the environment and our domestic integrated steel industry.

Throughout the rulemaking process, EPA worked to address technical and analytical flaws with these rules raised by multiple stakeholders. The modifications incorporated into the final rules in response to stakeholder feedback were important steps in the right direction, but we remain concerned they did not go far enough in addressing fundamental flaws with the rules. Further modifications are needed to address new information provided to EPA by stakeholders to ensure the rules are achievable by the industry, as required by the Clean Air Act, and that the regulations do not induce unintended consequences, such as loss of domestic steelmaking capacity and jobs. Given all that is at stake in terms of our country's advanced steel manufacturing capabilities and the good-paying, middle class union jobs the steel industry sustains, it is critically important that these rules are technically and economically feasible and do not undermine the competitiveness of the industry.

A stay of these rules will allow EPA to continue to work with industry stakeholders, including domestic companies and the USW, to obtain a complete and thorough understanding of the new information, equipment, and processes and ensure regulations moving forward are sound policy. Absent a stay, the steel industry will be forced to proceed with planning and spending for unproven technologies and work practices while the final provisions of the rules remain uncertain. Given that these regulations will impact nearly every aspect of the integrated iron and steelmaking process, it is imperative that EPA grant both the petitions for reconsideration and requests for stay of the rules.

We urge EPA to grant the industry's petitions for reconsideration and stay requests to ensure that these regulations both safeguard our environment and preserve production capacity and jobs in our strategically important integrated iron and steel sector. Thank you for your work to date with us on these important matters.

Sincerely,

Sherrod Brown
United States Senator

Mike Braun
United States Senator

Robert P. Casey, Jr.
United States Senator

J.D. Vance
United States Senator

Amy Klobuchar
United States Senator

Todd Young
United States Senator

cc: Janet McCabe, Deputy Administrator, U.S. Environmental Protection Agency

# **Exhibit G**



# United States Senate

WASHINGTON, DC 20510

December 6, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Dear Administrator Regan:

We write to you today regarding the U.S. Environmental Protection Agency's (EPA) three proposed rules related to steel manufacturing and related supply chains. We have serious concerns with these proposed rules because they would dramatically undermine the domestic steel industry and national security while driving production overseas likely resulting in no net reduction in emissions from the steel industry globally. Reducing the emission of harmful air pollutants should be done based upon sound science and with proven technology that is both technically and economically feasible. The irony is that the United States' steel industry is world's cleanest major producer of steel[1]. American steel manufacturers take seriously their commitment to protecting the environment; however, rules that drive production overseas are bad for our economy, bad for national security, and bad for the environment.

These rules:

1) National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-EPA-OAR-2002-0083), 2) National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries. (EPA–HQ–OAR–2002–0085 and EPA– HQ–OAR–2003–0051), and 3) National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments (EPA-HQ-OAR-2017-0664), if finalized as proposed, would require billions of dollars in capital investments and increased annual operating costs for the U.S. steel industry.

We support reducing harmful air pollution. We also support rules that are durable, realistic, and based upon proven technology and reflect a consensus view among stakeholders on how to best improve public health while protecting good paying jobs and supporting industries essential to our national and economic security. These rules fail to meet those standards.

As you move forward with these rulemakings, we urge you to take an inclusive approach – working directly with major stakeholders in developing technically-sound final rules that achieve further emissions reductions while not harming the competitiveness of our American steel companies. Written properly, regulations can help American steel manufacturers lead the world in clean steel production. Poorly written rules undermine domestic manufacturing and promote reliance upon inputs made by foreign manufacturers – manufacturers that pollute more than their American counterparts. Regulations that cost

---

[1] "Steel Climate Impact - An International Benchmarking of Energy and $CO_2$ Intensities." Found at: https://www.bluegreenalliance.org/wp-content/uploads/2022/04/Steelclimateimpact-benchmarkingreport7April2022.pdf

American jobs, undermine national security, and are likely to result in no net reduction in emissions globally must be rejected.

Sincerely,

Sherrod Brown
United States Senator

J.D. Vance
United States Senator

Mike Braun
United States Senator

Joe Manchin
United States Senator

Robert P. Casey, Jr.
United States Senator

Amy Klobuchar
United States Senator

Shelley Moore Capito
United States Senator

Todd Young
United States Senator

# **Exhibit H**

December 18, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460


Dear Administrator Regan:

As Chairman and Vice Chairman of the Congressional Steel Caucus, we write to express our concerns regarding the proposed rules below from the U.S. Environmental Protection Agency (EPA):

- National Emission Standards for Hazardous Air Pollutants: National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments (EPA-HQ-OAR-2017-0664)
- Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-EPA-OAR-2002-0083)
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries (EPA–HQ–OAR–2002–0085 and EPA– HQ–OAR–2003–0051).

The American steel industry and its manufacturing workforce produces the world's cleanest steel, made possible by years of substantial investments into climate initiatives. According to the American Iron and Steel Institute, the steel industry has reduced its energy intensity per ton of production by 35 percent and carbon dioxide emissions intensity by 37 percent in the past three decades. We also would highlight that these efforts will continue to be augmented by research and technology investments being made under current law.

We are grateful for your efforts to assist in the implementation of these laws and want to ensure that the proposed rules do not hinder the ability of the American steel industry to make robust investments into these important environmental initiatives.

Industry leaders have shared with us that these rules, as drafted, pose a threat to the competitiveness of steel producers and tens of thousands of good-paying union jobs. Our understanding is that these rules do not consider current technology capabilities and economic feasibility and may jeopardize the industry's ability to meet other environmental initiatives and health requirements for workers. We also are concerned that any action to diminish the ability of the American steel industry to meet the demands of our economy will be manufactured by

foreign-made and illegally subsidized steel entities that do not meet our current environmental, labor, and accountability standards.

As you move forward, we would strongly encourage you to more openly communicate with steel industry experts and other stakeholders to ensure that proposed requirements are based on proven technology and robust scientific data. It is essential to ensure that proposed rules are technically feasible, financially reasonable, and continue protecting the livelihoods, health, and safety of workers and steel-producing communities throughout our nation.

Sincerely,

Eric A. "Rick" Crawford
Member of Congress
Chair, Congressional Steel Caucus

Frank Mrvan
Member of Congress
Vice-Chair, Congressional Steel Caucus

# Exhibit I



**David McCall**
International President

June 24, 2024

<u>**Via Email**</u>
The Honorable Michael Regan
Administrator
U.S. Environmental Protection Agency
Washington, D.C. 20460

> **RE: United Steelworkers urges review of the reconsideration petition filed by the domestic integrated steel industry.**

Dear Administrator Regan:

I am writing on behalf of the members of the United Steelworkers union (USW). As you know, USW is the largest union representing workers in the steel industry and its supply chain. Over the last year, our union has engaged, in close coordination with our members' employer companies, with the U.S. Environmental Protection Agency (EPA) on the following recently rules impacting the steel industry:

- National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing (EPA-HQ-OAR-2017-0664);
- National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities (EPA-HQ-OAR-2002-0083); and
- National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries (EPA–HQ–OAR–2002–0085 and EPA–HQ–OAR–2003–0051).

Our union proudly worked to pass the Clean Air Act, and we fully support EPA's mandate under the statute to reduce air pollution. We appreciate the efforts that EPA has taken to address certain technical and analytical flaws, as well as addressing feasibility. That being the case, the changes incorporated by EPA in the final rules do not address all the technical and economic concerns expressed by the industry and our union.

These modifications are needed to prevent unintended consequences, such as job loss, loss of domestic steelmaking capacity, and a demand on capital investment that detracts from other Biden administration priorities including reinvestment in domestic industry and decarbonization.

**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION**

60 Boulevard of the Allies, Pittsburgh, PA 15222 • 412-562-2400 • 412-562-2598 • damccall@usw.org

We urge EPA to grant the reconsideration petitions filed by the domestic integrated steel industry, and ensure that stays are issued for all three final rules while EPA conducts the administrative reconsideration process. Thank you, in advance, for standing up for Steelworker jobs.

Sincerely,

David McCall
International President

CC: Janet McCabe, Deputy Administrator, U.S. Environmental Protection Agency

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION

60 Boulevard of the Allies, Pittsburgh, PA 15222 • 412-562-2400 • 412-562-2598 • damccall@usw.org