**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-1287

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN COKE AND COAL CHEMICALS INSTITUTE, *et al.*,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

---

Petition for Review of Action of the U.S. Environmental Protection Agency

---

**RESPONDENT EPA'S CONSOLIDATED RESPONSE TO
MOTIONS TO STAY FINAL RULE PENDING JUDICIAL REVIEW**

---

TODD KIM
*Assistant Attorney General*

DANIEL J. MARTIN
ALBERT LIN
Environment and Natural Resources Division
Of Counsel:                         U.S. Department of Justice
                                    Post Office Box 7611
ADAN SCHWARTZ                       Washington, D.C. 20044
U.S. Environmental Protection Agency   (202) 307-1056
Washington, D.C.                    Daniel.Martin3@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY ........................................................................................................ viii

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 2

    I.    Statutory Background ................................................................................ 2

    II.    Factual Background .................................................................................. 4

    III.    Regulatory Background ........................................................................... 4

STANDARD OF REVIEW ................................................................................. 7

ARGUMENT ....................................................................................................... 9

    I.    PETITIONERS ARE UNLIKELY TO SUCCEED ON THE MERITS. ...... 9

        A.    EPA lawfully performed its statutory duty to "revise as necessary" the coke oven battery and coke oven pushing, quenching, and battery stacks emission standards. ................................................................................ 9

            1.    EPA considered all relevant factors in determining whether to revise the emission standards for the coke oven pushing, quenching, and battery stacks source category. ....................................................... 10

            2.    The Clean Air Act prohibits EPA from considering costs in setting first-time MACT floors. ............................................................... 13

            3.    EPA complied with the Clean Air Act's requirement to establish numeric MACT floor limits when feasible. ................................... 15

        B.    EPA Properly Acted Based on the Data Provided to It During the Comment Period. ................................................................................ 17

            1.    EPA Provided Adequate Time for Notice and Comment. ............... 17

2.     EPA Properly Considered the Data Before It. .................................20

3.     EPA Properly Evaluated Variability in Applying its UPL Methodology. .................................................................................21

C.    EPA Acted Reasonably to Set Modest, Achievable Standards Based on the Data Before it. .................................................................................23

1.     EPA reasonably subcategorized coke facilities. ..............................23

2.     EPA reasonably set benzene fenceline monitoring requirements. ...24

3.     SunCoke has not exhausted its claim that the MACT floor requirements for SunCoke's bypass stacks are not feasible. .............28

II.    PETITIONERS WILL NOT SUFFER IMMINENT, IRREPARABLE HARM ABSENT A STAY. .................................................................................30

III.   UPHOLDING THE RULE IS IN THE PUBLIC INTEREST. ...................33

CONCLUSION .................................................................................34

(Page 3 of Total)

## TABLE OF AUTHORITIES

**Cases**

*A.O. Smith Corp. v. FTC*,
  530 F.2d 515 (3d Cir. 1976) ..................................................................31

*Am. Petroleum Inst. v. Costle*,
  665 F.2d 1176 (D.C. Cir. 1981).......................................................... 19, 21

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998)................................................................29

*Ass'n of Battery Recyclers v. EPA*,
  716 F.3d 667 (2013) .............................................................................14

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006).................................................................30

*Citizens for PA's Future v. Wheeler*,
  469 F. Supp. 3d 920 (N.D. Cal. 2020).......................................................5

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003).................................................................21

*Duncan v. Walker*,
  533 U.S. 167 (2001) .............................................................................12

*La. Envtl. Action Network v. EPA*,
  955 F.3d 1088 (D.C. Cir. 2020)............................................. 1, 5, 10, 11, 12, 14

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ...........................................................................8

*Maryland v. EPA*,
  958 F.3d 1185 (D.C. Cir. 2020)................................................................8

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .............................................................................7, 9

*Miss. Comm'n on Env't Quality v. EPA*,
    790 F.3d 138 (D.C. Cir. 2015)........................................................... 20, 21

*Mossville Env't Action Now v. EPA*,
    370 F.3d 1232 (D.C. Cir. 2004)........................................ 2, 3, 12, 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...........................................................................8

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015)..........................................................13

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
    489 F.3d 1221 (D.C. Cir. 2007)............................................... 28, 29

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*,
    134 F.3d 1095 (D.C. Cir. 1998)....................................................29

*Nat'l Lime Ass'n v. EPA*,
    233 F.3d 625 (D.C. Cir. 2000)................................................ 12, 14

*Nken v. Holder*,
    556 U.S. 418 (2009) .........................................................................8

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
    930 F.3d 519 (D.C. Cir. 2019)......................................................31

*Sampson v. Murray*,
    415 U.S. 61 (1974) .........................................................................30

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981)......................................................18

*Sierra Club v. EPA*,
    479 F.3d 875 (D.C. Cir. 2007)......................................................12

*Sierra Club v. EPA*,
    884 F.3d 1185 (D.C. Cir. 2018).....................................................23

iv

*Sierra Club v. EPA*,
  895 F.3d 1 (D.C. Cir. 2018)..............................................................22

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ......................................................................9

*TRW Inc. v. Andrews*,
  534 U.S. 19 ......................................................................................12

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016)................................................ 14, 21, 22

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ............................................................... 33, 34

*Winter v. NRDC*,
  555 U.S. 7 (2008) ..............................................................................9

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)..........................................................31

**Statutes**

42 U.S.C. § 7401(b)(1)..........................................................................33

42 U.S.C. § 7412(d)(1)-(3).....................................................................12

42 U.S.C. § 7412(d)(2)-(3).....................................................................27

42 U.S.C. § 7412(d)(1)................................................................... 2, 23

42 U.S.C. § 7412(d)(2)................................................................ 2, 3, 34

42 U.S.C. § 7412(d)(3)(B) ............................................................... 2, 20

42 U.S.C. § 7412(d)(6)................................ 3, 5, 10, 12, 13, 14, 25, 26, 27

42 U.S.C. § 7412(d)(8)............................................................................2

42 U.S.C. § 7412(f)(2) ........................................................ 3, 11, 12, 13

v

42 U.S.C. § 7412(h)(1)..................................................................... 3, 15

42 U.S.C. § 7412(h)(2)..................................................................... 15, 16

42 U.S.C. § 7412(i)(3)(A) ....................................................................34

42 U.S.C. § 7412(i)(8).........................................................................2

42 U.S.C. § 7414 ........................................................................... 24, 26

42 U.S.C. § 7607(d)(1)(C) ...................................................................8

42 U.S.C. § 7607(d)(7)(A) ............................................................... 8, 19

42 U.S.C. § 7607(d)(7)(B) ..................................................................28

42 U.S.C. § 7607(d)(8)......................................................................19

42 U.S.C. § 7607(d)(9)(A) ...................................................................8

42 U.S.C. § 7607(h) ..........................................................................18

## Code of Federal Regulations

40 C.F.R. § 63.7352 ...........................................................................4

## Federal Registers

58 Fed. Reg. 57,898 (Oct. 27, 1993)........................................................4

68 Fed. Reg. 18,008 (Apr. 14, 2003) ......................................................5

69 Fed. Reg. 60,813 (Oct. 13, 2004)........................................................5

70 Fed. Reg. 19,992 (Apr. 15, 2005) ......................................................4

70 Fed. Reg. 44,285 (Aug. 2, 2005)........................................................5

80 Fed. Reg. 75,178 (Dec. 1, 2015)........................................................26

88 Fed. Reg. 55,858 (Aug. 16, 2023) ...................................................... 5, 25, 27, 30

89 Fed. Reg. 42,932 (May 16, 2024) ....................................................................26

89 Fed. Reg. 55,684 (July 5, 2024)............................................... 1, 4, 5, 6, 7, 11, 14, ......................................................... 16, 17, 20, 22, 23, 24, 25, 26, 32, 33, 34

## **GLOSSARY**

**Terms**

| | |
|---|---|
| ACCCI | ACCCI/COETF |
| Air Toxics | Hazardous Air Pollutants |
| EPA | U.S. Environmental Protection Agency |
| MACT | Maximum Achievable Control Technology |
| The Act | Clean Air Act, 42 U.S.C. §§ 7401–7671 |
| SunCoke | SunCoke Energy Inc. |

viii

## <u>INTRODUCTION</u>

The Clean Air Act ("Act") obligates EPA to set emission standards to ensure the maximum achievable reduction in emissions of hazardous air pollutants ("air toxics"). In 2020, this Court held that EPA's routine review of emission standards for major source categories of hazardous air pollutants must address unregulated air toxics. *La. Envtl. Action Network v. EPA* ("*LEAN*"), 955 F.3d 1088, 1097 (D.C. Cir. 2020). In the rule under review, EPA did just that for air toxics emitted by coke oven facilities. "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55,684 (July 5, 2024) ("Rule"). Coke ovens heat coal to separate the gas, water, and tar from the coal to produce coke, a fuel and carbon source for steelmaking.

This Court should deny the motions of Industry Petitioners ACCCI/COETF ("ACCCI") and SunCoke Energy Inc. ("SunCoke") to stay the Rule. Industry Petitioners are unlikely to prevail on the merits of their claims because the Rule fulfills the Act's requirements, is well-supported by EPA's technical findings, and establishes eminently achievable emission standards for all affected facilities. In fact, EPA determined that all affected facilities should already be able to attain the Rule's requirements, and so Industry Petitioners will not suffer any irreparable

harm from the Rule. Insofar as the Rule carries out Congress's balancing of the public interest in favor of preventing air toxics emissions, a stay is inconsistent with the purpose of the Act.

## BACKGROUND

### I.    Statutory Background

The Act directs EPA to set technology-based emission standards for each category or subcategory of major sources that emit one or more designated air toxics. 42 U.S.C. § 7412(d)(1). Congress specifically targeted coke oven emissions for regulation. *See id.* § 7412(d)(8), (i)(8). EPA's standards must "require the maximum degree of reduction in emissions . . . that the Administrator . . . determines is achievable." *Id.* § 7412(d)(2). To that end, the Act sets out a two-step process for EPA to set standards based on the "maximum achievable control technology" ("MACT"). *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1235 (D.C. Cir. 2004).

At step one, EPA establishes a minimum required reduction in emissions that covered sources must achieve, commonly referred to as the "MACT floor". *Id.* at 1235. For categories of thirty or fewer existing sources, as here, the MACT floor must be at least as stringent as the average limitation already achieved by the five best performing sources in the category. 42 U.S.C. § 7412(d)(3)(B).

At step two, if EPA determines that "standards more stringent than those

2

actually achieved by the best performing sources are possible," *Mossville*, 370 F.3d at 1235, the Agency "shall" set standards based on the "maximum" achievable emission reductions, 42 U.S.C. § 7412(d)(2). In setting these "beyond-the-floor" MACT standards, EPA must consider factors in addition to the emission levels actually achieved by existing sources, specifically including the costs of achieving additional emission reductions and any non-air quality health and environmental impacts and energy requirements of the standards. *Id.* If a numeric emission standard is not feasible, then the Act authorizes EPA to "promulgate a design, equipment, work practice, or operational standard" in lieu of a numeric emission standard. *Id.* § 7412(h)(1).

The Act also instructs EPA to periodically reassess existing MACT standards pursuant to two distinct and independent provisions. Under 42 U.S.C. § 7412(f)(2), within eight years of promulgating initial MACT standards, EPA must conduct a residual risk review to ensure that the standards address relevant health risks and provide "an ample margin of safety" to protect public health and the environment. Separately, 42 U.S.C. § 7412(d)(6) requires EPA to undertake a technology review at least every eight years "and revise as necessary" the MACT standards "taking into account developments in practices, processes, and control technologies." Neither the residual risk review requirement, the technology review requirement, nor any other provision of the Act restricts EPA from promulgating or

3

updating emission standards whenever appropriate.

## II.     Factual Background

There are two types of coke-producing facilities: (1) byproduct facilities, which recover chemical byproducts; and (2) heat and nonrecovery facilities, which do not recover chemical byproducts but may recover heat. 89 Fed. Reg. at 55,688. Both types of facilities include multiple points and processes from which air toxics can be emitted. Relevant here are (1) coke oven batteries, which are a group of coke ovens with shared walls; (2) coke oven pushing, which is the process of pushing coke out of the coke oven batteries; (3) coke oven quenching, which is the process of cooling the coke; and (4) coke oven battery stacks, which are the vertical flues through which some combustion gases are discharged. 40 C.F.R. § 63.7352.

## III.    Regulatory Background

The Rule regulates air toxics emissions from two coke oven source categories: coke oven batteries; and (collectively) coke oven pushing, quenching, and battery stacks. 89 Fed. Reg. at 55,685. EPA first promulgated MACT standards for coke oven batteries in 1993, addressing emissions from coke oven charging and leaks from topside ports, offtake ducts, and oven doors. 58 Fed. Reg. 57,898 (Oct. 27, 1993). The Agency subsequently amended the standards in 2005 as part of a residual risk and technology review. 70 Fed. Reg. 19,992 (Apr. 15,

4

2005). EPA separately promulgated MACT standards in 2003 for coke oven pushing, quenching, and battery stacks. 68 Fed. Reg. 18,008 (Apr. 14, 2003). The Agency amended these standards in 2004 and 2005. 70 Fed. Reg. 44,285 (Aug. 2, 2005); 69 Fed. Reg. 60,813 (Oct. 13, 2004). Each iteration of the coke oven battery standards and the coke oven pushing, quenching, and battery stacks standards regulated some, but not all, of the air toxics those points and processes emitted. 89 Fed. Reg. at 55,686.

In 2020, this Court held in *LEAN* that, when EPA conducts a technology review under 42 U.S.C. § 7412(d)(6), EPA must address *all* unregulated air toxics that a major source category emits. 955 F.3d at 1097. That same year, a district court ordered EPA to complete a technology review of the coke oven battery emission standards and a residual risk and technology review of the coke oven pushing, quenching, and battery stacks emission standards by December 2022. *Citizens for Pennsylvania's Future v. Wheeler*, 469 F. Supp. 3d 920, 934 (N.D. Cal. 2020). The district court subsequently extended that deadline to May 23, 2024, simultaneously explaining that it "will not grant any further extensions." Order Granting Motion to Amend the Judgment, *Citizens for Pennsylvania's Future v. Regan*, No. 19-cv-2004-VC (N.D. Cal. Nov. 22, 2022).

In light of these rulings, EPA proposed new and revised air toxics emission standards for coke oven emissions on August 16, 2023. 88 Fed. Reg. at 55,858.

5

Following public notice and comment, EPA signed the Rule on May 23, 2024, and published it in the Federal Register on July 5, 2024. EPA's Notice of Completion, *Citizens for Pennsylvania's Future*, No. 19-cv-2004-VC (N.D. Cal. May 24, 2024); 89 Fed. Reg. at 55,684.

The Rule amended the emission standards for coke oven batteries at byproduct facilities by lowering emission leak limits for coke oven doors, lids, and offtakes; requiring fenceline ambient monitoring for benzene as a surrogate for coke oven emissions and establishing a benzene ambient concentration action level; and revising EPA's leak estimate equation for oven doors. 89 Fed. Reg. at 55,686. For coke oven batteries at heat and nonrecovery facilities, the Rule established a requirement for facility operators to demonstrate that there are zero leaks from oven doors to ensure negative pressure in the ovens or common tunnels. *Id.* EPA based these standards on statements from the heat and nonrecovery coke producers that their ovens have no leaks and that they already monitor their ovens to ensure there are no leaks. *Id.* at 55,703. The Rule codifies this practice. *Id.* The Rule required affected facilities to come into compliance with these standards by July 7, 2025. *Id.* at 55,690.

EPA also promulgated 18 new unique MACT floor emission standards for previously unregulated air toxics for the coke oven pushing, quenching, and battery stacks source category. Specifically, EPA established:

6

- standards for acid gases, hydrogen cyanide, mercury, and polycyclic aromatic hydrocarbons from pushing operations;

- standards for acid gases, hydrogen cyanide, mercury, and particulate matter from battery stacks at byproduct facilities;

- one work practice standard for polycyclic aromatic hydrocarbons, dioxin and furans, and volatile organic hazardous air pollutant emissions from battery stacks at byproduct facilities;

- standards for acid gases, mercury, polycyclic aromatic hydrocarbons, and particulate matter from heat and nonrecovery facilities' steam generating stacks; and

- standards for acid gases, formaldehyde, mercury, polycyclic aromatic hydrocarbons, and particulate matter from heat and nonrecovery facilities' bypass/waste heat stacks.

*Id.* at 55,689. Affected facilities are required to come into compliance with these standards, except for the work practice standard, by January 5, 2026. *Id.* at 55,690. Affected facilities have until July 7, 2025, to comply with the work practice standard. *Id.*

EPA determined that "all covered facilities are expected to already have [air toxics] emissions levels that are below the final limits, based on facility data available to the EPA." *Id.* at 55,723.

## **STANDARD OF REVIEW**

A stay "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Petitioners must establish that:

7

(1) they are likely to succeed on the merits; (2) they will be imminently and irreparably injured absent a stay; (3) a stay will not injure other parties, and (4) a stay would be consistent with the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Where, as here, "the Government is the opposing party," the final two factors merge. *Id.* at 436.

The Act's judicial review provision provides the standard of review for the merits. *See* 42 U.S.C. § 7607(d)(1)(C). That provision limits this Court's review to the record before the Agency at the time of its decision, *id.* § 7607(d)(7)(A), and states that this Court must uphold EPA's action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 7607(d)(9)(A). To determine whether an action is arbitrary and capricious for purposes of the Act's judicial review provision, this Court applies the same standard as under the Administrative Procedure Act. *Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020). Under that standard, this Court gives "deference to the EPA's evaluation of scientific data within its technical expertise." *Id.* (cleaned up); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (noting that the Administrative Procedure Act "mandate[s] that judicial review of agency policymaking and factfinding be deferential"). So long as EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decision must be upheld. *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I.      PETITIONERS ARE UNLIKELY TO SUCCEED ON THE MERITS.**

The Industry Petitioners have not made the requisite "clear showing,"

*Mazurek*, 520 U.S. at 972, that they are "likely" to prevail, *Starbucks Corp. v.*

*McKinney*, 144 S. Ct. 1570, 1578 (2024) (quoting *Winter v. NRDC*, 555 U.S. 7, 20

(2008)), on the merits of their petitions for review.

In issuing the Rule, EPA complied with all the Act's requirements and based

its technical determinations on a well-developed record. EPA set the MACT floors

based on Industry Petitioners' own emissions data achieved by the top-performing

facilities and adjusted for variability. As required by the Act, EPA disregarded the

cost of compliance when setting the MACT floors and took cost into account only

when considering beyond-the-floor standards. The result is a Rule containing

modest emission standards that all affected facilities will be able to achieve within

the reasonable timeframes the Rule allows.

**A.      EPA lawfully performed its statutory duty to "revise as necessary" the coke oven battery and coke oven pushing, quenching, and battery stacks emission standards.**

Congress instructed that EPA "shall review, and revise as necessary (taking

into account developments in practices, processes and control technologies),

emission standards promulgated under [42 U.S.C. § 7412] no less often than every

9

8 years." 42 U.S.C. § 7412(d)(6). If a category's emissions standards do not include any limits on some of the emitted air toxics, EPA must establish those limits when it conducts this technology review. *LEAN*, 955 F.3d at 1098. The establishment of such limits constitutes "not a recalculation of existing limits within a source standard, but . . . [setting] first time MACT limits." *Id.*

    **1.    EPA considered all relevant factors in determining whether to revise the emission standards for the coke oven pushing, quenching, and battery stacks source category.**[1]

Congress only required EPA to consider "developments in practices, processes, and control technologies" when determining whether to revise a source category's emission standards. 42 U.S.C. § 7412(d)(6). The statute does not mandate that EPA consider whether there are any residual health risks as part of this analysis. *See id.*

EPA based its determination of whether to revise the coke oven pushing, quenching, and battery stack source category emission standards on the congressionally identified factors. Specifically, EPA solicited information from Industry Petitioners regarding the practices, processes, and control technologies they employ as well as the emission levels that their facilities achieve. Exh. 1,

---

[1] Petitioners do not assert that EPA failed to consider any statutory criteria in conducting its technology review of the coke oven battery standards. *See generally* ACCCI Br. at 2–3, 5–8 (discussing risks "from the coke oven battery pushing, quenching, and battery stacks (PQBS) source category"); SunCoke Br. at 10–14 (challenging EPA's justification for setting new MACT floors).

10

EPA-HQ-OAR-2002-0085-0809 at 11. The Agency used that information to identify whether there were any unregulated air toxics and whether there were any developments in practices, processes, and control technologies that required revising the previously established emission standards. *See generally* Exh. 2, EPA-HQ-OAR-2002-0085-1618. Upon determining that the existing emission standards did not regulate certain air toxics the category emits, EPA properly set new MACT standards at the minimum stringency level required by the Clean Air Act for the applicable air toxics-process combinations.[2] *LEAN*, 955 F.3d at 1097; *see also* 89 Fed. Reg. at 55,686. The Agency further found that permitting data indicated that the industry had improved its practices such that a 20 percent opacity limit for heat nonrecovery bypass and waste stacks was appropriate. 89 Fed. Reg. at 55,707.

Although EPA considered all relevant factors, Industry Petitioners assert that EPA should have declined to revise the emission standards because the Agency determined that the existing standards provided an adequate margin of safety when conducting the residual risk review under 42 U.S.C. § 7412(f)(2). ACCCI Br. at 5–8; SunCoke Br. at 10, 13.

Industry Petitioners' assertion suffers from two major defects. First, the Act requires EPA to set emission standards for every air toxic that a source category

---

[2] An "air toxic-process combination" is comprised of a process, *e.g.*, pushing, and a corresponding air toxic that the process emits.

11

emits, as this Court has consistently recognized. 42 U.S.C. § 7412(d)(1)–(3); *LEAN*, 955 F.3d at 1092 (quoting *Sierra Club v. EPA*, 479 F.3d 875, 878, 883 (D.C. Cir. 2007); *Mossville*, 370 F.3d at 1236, 1242 (D.C. Cir. 2004); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000)). This Court has consequently explained that "adding limits for . . . overlooked toxics is a 'necessary' revision under [42 U.S.C. § 7412(d)(6)]." *LEAN*, 955 F.3d at 1097.

Second, even if *LEAN* left any ambiguity—and it did not—Industry Petitioners' assertion that EPA must take into consideration an acceptable-residual-risk determination in deciding whether emissions standards are "necessary" under 42 U.S.C. § 7412(d)(6) is inconsistent with the Act's plain text. Congress established two distinct and independent avenues by which EPA may revise emission standards: a technology review under 42 U.S.C. § 7412(d)(6), and a residual risk review under 42 U.S.C. § 7412(f)(2). "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Yet Industry Petitioners' position that an acceptable-residual-risk determination under 42 U.S.C. § 7412(f)(2) eliminates the need for any technology-based revisions reads 42 U.S.C. § 7412(d)(6) out of the Act.

12

According to Industry Petitioners, once EPA determines that there is an acceptable residual risk level, EPA need never again conduct another technology review. But the statute is clear that EPA must conduct technology reviews on an ongoing basis—at least once every eight years. 42 U.S.C. § 7412(d)(6); *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015). In contrast, Congress only required EPA to perform a residual risk review once. 42 U.S.C. § 7412(f)(2); *Nat'l Ass'n for Surface Finishing*, 795 F.3d at 5. If an acceptable-residual-risk determination was sufficient to render future technology-based revisions unnecessary, then Congress would not have required EPA to continue conducting technology reviews at eight-year intervals.

Therefore, Petitioners' argument that EPA was required to consider the acceptable-residual-risk determination in evaluating whether revisions were "necessary" under 42 U.S.C. § 7412(d)(6) lacks merit.

### 2. The Clean Air Act prohibits EPA from considering costs in setting first-time MACT floors.

Nor does the Act require that EPA consider costs in the process of setting first-time MACT floors when "revis[ing] as necessary" under 42 U.S.C. § 7412(d)(6).

Contrary to the view of ACCCI, which argues that EPA misinterpreted the Act as prohibiting consideration of costs, EPA agrees that it may consider costs when conducting a 42 U.S.C. § 7412(d)(6) analysis to consider potential *revision*

13

of standards for regulated pollutants. 89 Fed. Reg. at 55,688 ("The EPA may consider cost in deciding whether to revise the standards pursuant to [42 U.S.C. § 7412(d)(6)]."); *see also Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 673 (2013) (upholding EPA's consideration of costs). EPA thus did not reach a contrary conclusion on the law.

In doing so, EPA correctly applied *LEAN* by recognizing that when it revisits previously *unregulated* air toxics during an eight-year 42 U.S.C. § 7412(d)(6) review, EPA is dealing with "revising source standards to include *for the first time* MACT limits for many of the [air toxics] the source category emits." 955 F.3d at 1098 (emphasis added). Specifically, EPA must "add [42 U.S.C. § 7412(d)(2)–(3)] controls for listed but unaddressed pollutants." *Id.* at 1096. This Court's precedents uniformly establish that, when undertaking first-time MACT setting, EPA may not consider costs. *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (D.C. Cir. 2016) ("When setting the MACT floor, the EPA considers only the performance of the cleanest sources in a category or subcategory; it does not take into account other factors, including the cost of putting a source in line with its better-performing counterparts."); *Battery Recyclers*, 716 F.3d at 673 (holding the Act "bars cost consideration in setting MACT floors"); *Nat'l Lime*, 233 F.3d at 640 ("[C]ost may not influence the determination of a MACT floor, which depends exclusively upon the emissions reductions achieved by the best-performing

14

sources.").

EPA thus correctly did not consider costs when establishing first-time MACT floors for previously unregulated air toxics.

> **3.      EPA complied with the Clean Air Act's requirement to establish numeric MACT floor limits when feasible.**

Congress authorized EPA to "promulgate a design, equipment, work practice, or operational standard, or combination thereof" if it is "not feasible" for EPA to prescribe or enforce a numeric emission standard. 42 U.S.C. § 7412(h)(1). The Act provides that such standards are "not feasible" in only two situations: (1) when "a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law" and (2) when "the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations." *Id.* § 7412(h)(2).

In this Rule, when setting the 18 emission standards for previously unregulated air toxics from the coke oven pushing, quenching, and battery stacks source category, EPA established 17 numeric MACT floor limits and one work practice standard. The Agency explained that it was practicable to measure emissions for the 17 numeric MACT floor limits because Petitioners' data showed that those emissions were reliably measured in at least half of the completed test

15

runs. 89 Fed. Reg. at 55,707. In contrast, EPA set a work practice standard for the remaining air toxics-process combinations because "it is not economically and technically feasible to reliably measure emissions of these [air toxics], as evidenced by the large percent of test runs that are [below detection limits]." *Id.* at 55,707–08.

Nevertheless, SunCoke contends, at 11–14, that EPA acted arbitrarily and capriciously in deciding when to use numeric MACT floor limits instead of work practice standards. This contention is inapt. Congress narrowly circumscribed EPA's authority to set work practice standards in lieu of numeric MACT floor limits. 42 U.S.C. § 7412(h)(2). Insofar as Petitioners' own data showed that it is feasible to measure reliably emissions from 17 previously unregulated air toxics-process combinations, EPA followed the Act's plain requirement for numeric limits where measurement is practicable. *Id.*; *see also* Exh. 2, EPA-HQ-OAR-2002-0085-1618 at 8–9 & tbl.4. EPA's decision to set a work practice standard for the remaining air toxics-process combinations—which the data showed are "not economically and technically feasible to reliably measure," 89 Fed. Reg. at 55,707–08—also aligned with Congress's mandate.

Moreover, SunCoke's assertion, at 11, that EPA misread *LEAN* to conclude that the Agency must establish numeric MACT floor limits is wrong. EPA never asserted that *LEAN* required EPA to set numeric MACT floor limits. *See* 89 Fed.

16

Reg. at 55,711. Rather, the Rule made clear that EPA was addressing SunCoke's contention "that it is not 'necessary' to amend the MACT standard to include [new] limits" based on EPA's then-proposed acceptable-residual-risk determination. *Id.*

Thus, EPA reasonably set numeric limits for measurable emissions and a work practice standard for non-measurable emissions.

## B. EPA Properly Acted Based on the Data Provided to It During the Comment Period.

### 1. EPA Provided Adequate Time for Notice and Comment.

EPA provided ample opportunity for interested parties like SunCoke to provide input on the Rule. For instance, EPA solicited data from Industry Petitioners regarding their facilities' practices, processes, and control technologies as well as the emission levels achieved. Exh. 1, EPA-HQ-OAR-2002-0085-0809 at 11. The Agency also provided a 45-day comment period on the proposal. 88 Fed. Reg. at 55,858. During that time, EPA received 519 comment letters in the coke oven battery docket and 550 comment letters in the coke oven pushing, quenching, and battery stacks docket, including comments from SunCoke and ACCCI. Exh. 3, EPA-HQ-OAR-2002-0085-1603 at xi; *see also* Exh. 4, EPA-HQ-OAR-2002-0085-0968 (SunCoke Comments); Exh. 5, EPA-HQ-OAR-2002-0085-0967 (ACCCI Comments). EPA therefore satisfied its obligation under the Act to provide "a

17

reasonable period for public participation of at least 30 days." 42 U.S.C. § 7607(h).

SunCoke's contention, at 18–19, that EPA did not provide adequate time for SunCoke to comment on the Proposal is unavailing. At the outset, SunCoke does not point to any authority requiring that EPA provide a longer comment period. *See id.* (absence). Nor does SunCoke identify any particular information that it would have provided EPA had the comment period been longer. Instead, SunCoke simply claims that it "could have" provided data that EPA "lacked[,] showing the numerical MACT floors are infeasible or unachievable." SunCoke Mot. at 19 (emphasis added).

It is also not clear why SunCoke would have required more time to provide data to EPA. SunCoke had ample opportunity to submit information to EPA and, as further discussed below, submitted some of the very data on which EPA based the emission standards at issue. *See* Exh. 1, EPA-HQ-OAR-2002-0085-0809 at 13–14 tbl.1. SunCoke's "mere wishes . . . for more time to respond to documents in the record to which it already had opportunity to respond cannot force an agency to delay rulemaking simply because some new rebuttal evidence may be forthcoming; this is particularly so when the statute mandates speedy promulgation of the rule." *Sierra Club v. Costle*, 657 F.2d 298, 399–400 (D.C. Cir. 1981).

To the extent SunCoke relies on the March 2022 Haverhill 1 plant data as an

18

example of information it could have submitted,[3] nothing prevented SunCoke from submitting that data alongside more recent test results such as the October 2022 test report for the Haverhill bypass vent stack. *See* Exh. 6, EPA-HQ-OAR-2002-0085-0765 Attach.2. Regardless, the Act provides a discrete and "exclusive[]" list of materials that comprise the record for judicial review. 42 U.S.C. § 7607(d)(7)(A). Extra-record declarations of the sort proffered by SunCoke are not among those materials and so cannot "undercut the Administrator's conclusions on [judicial] review." *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1186 n.3 (D.C. Cir. 1981).

Nor does SunCoke's claim meet the Act's high standard for procedural error, as EPA's decision not to extend the comment period was not "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. § 7607(d)(8). Insofar as SunCoke does not identify any specific information that it would have provided had the comment period been longer, SunCoke cannot and does not show that the Rule would be significantly different in such a circumstance. *See id.*

Consequently, SunCoke's contention that EPA did not provide adequate

---

[3] SunCoke implies that it submitted this data to EPA. SunCoke Mot. at 14. A review of the record indicates that EPA never received this data.

19

time for notice and comment is meritless.

### 2.     EPA Properly Considered the Data Before It.

For source categories with fewer than 30 facilities, the Act requires EPA to establish the MACT floors for existing sources based on "the average emission limitation achieved by the best performing 5 sources (for which [EPA] has or could reasonably obtain emissions information)." 42 U.S.C. § 7412(d)(3)(B).

In 2016 and 2022, EPA solicited data from Petitioners regarding their facilities' processes, control devices, and emissions test data. Exh. 1, EPA-HQ-OAR-2002-0085-0809 at 11. Petitioners provided responsive data. *See id.* Notably, SunCoke submitted emissions data dating from 2006 to 2022. 89 Fed. Reg. at 55,713. EPA used data from these responses to develop an emissions database and, in turn, the emission standards at issue. Exh. 1, EPA-HQ-OAR-2002-0085-0809 at 11; 89 Fed. Reg. at 55,715.

SunCoke asserts, at 14–15, that EPA failed to consider relevant data it submitted and instead "ignored" SunCoke's data. To the contrary, EPA explained that it incorporated SunCoke's submitted test reports "that were within five years prior to 2016 and that matched the requirements for testing in the [42 U.S.C. § 7414 data] requests." 89 Fed. Reg. at 55,715.

As this Court has recognized, EPA is not required to rely on data it considers unsound if the Agency "adequately explain[s] its reasons for rejecting . . . data."

*Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 154–55 (D.C. Cir. 2015) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 248 (D.C. Cir. 2003)). Here, EPA reasonably established data quality requirements. For example, EPA's 2016 information collection request made clear that the Agency sought "only the submittal of the test reports representative of [the facilities' then] current operations." Exh. 7, EPA-HQ-OAR-2002-0085-0322 Attach.1 at 3. EPA also identified specific testing parameters, methods, and procedures for respondents to follow to ensure that it received "data of a quality sufficient for decision making." Exh. 8, EPA-HQ-OAR-2002-0085-0322 Attach.3 at 22. Thus, EPA reasonably rejected SunCoke's data that did not meet the Agency's data quality requirements. *Miss. Comm'n on Envtl. Quality*, 790 F.3d at 154–55.

Furthermore, EPA logically cannot consider, much less rely on, data that is not in its possession and included in the record. SunCoke now relies on March 2022 testing to assert that the particulate matter standard could not be achieved by the Haverhill 1 plant. SunCoke Mot. at 14 & Quanci Decl. ¶ 22a. Yet SunCoke never submitted a March 2022 particulate matter test report to EPA. Such extra-record material cannot be considered on judicial review. *Am. Petroleum Inst.*, 665 F.2d at 1186 n.3.

### 3.    EPA Properly Evaluated Variability in Applying its UPL Methodology.

A MACT floor must reflect a "reasonable estimate of the emissions achieved

21

in practice by the best-performing sources." *U.S. Sugar*, 830 F.3d at 639.

To calculate that "reasonable estimate" here, EPA adjusted for the variability seen in the record data when setting the emission standards. 89 Fed. Reg. at 55,713–14; *see also* Exh. 9, EPA-HQ-OAR-2003-0051-0662. EPA adjusted those averages using the Upper Prediction Limit, a statistical tool designed to address variability in setting emission limits for air toxics. As explained in *Sierra Club v. EPA*:

> Because [emission test] results are variable, the upper prediction limit applies statistical methods to the results in order to derive an emissions limit that accounts for that variability . . . [which] factors in the average of the best performing source's stack test results, the distribution of the results, the variance of the results, and the total number of tests in order to calculate a MACT floor.

895 F.3d 1, 13–14 (D.C. Cir. 2018).

This Court has upheld EPA's adjustment of record data using the Upper Prediction Limit before. In *U.S. Sugar*, this Court upheld EPA's use of the Upper Prediction Limit after finding that its application "reflects a reasonable estimate of the emissions achieved in practice by the best-performing sources." 830 F.3d at 639. So too here. EPA applied the Upper Prediction Limit to adjust the data in the same way. 89 Fed. Reg. at 55,714.

ACCCI agrees that the Upper Prediction Limit is a good method of dealing with variability over time but argues that it is insufficient to adjust for *input* variability from different chemical compositions of coal seams and mines. ACCCI

22

Mot. at 9. But where the industry practice is to acquire inputs from across the country and then blend the inputs to achieve desired results (like in the coke ovens scenario), the required analysis's complexity escalates exponentially compared to intra-quarry analysis in a single mine. Thus, EPA has never attempted to account for input variability in these situations, and no commenter has ever requested it. Here, ACCCI did not submit the Trinity report detailing ideas for how EPA could conduct this analysis until May 3, 2024, well after the comment period closed. As such, that analysis cannot form the basis of ACCCI's challenge here.

### C. **EPA Acted Reasonably to Set Modest, Achievable Standards Based on the Data Before it.**

#### 1. **EPA reasonably subcategorized coke facilities.**

The Act authorizes EPA to "distinguish among classes, types, and sizes of sources within a category." 42 U.S.C. § 7412(d)(1). Under the Act's standard for judicial review, this Court defers to EPA's "reasonable" subcategorization decisions. *Sierra Club v. EPA*, 405, 884 F.3d 1185, 1201 (D.C. Cir. 2018).

ACCCI contends, at 11–13, that EPA arbitrarily and capriciously created a new subcategory of one facility based on two inferences: "that there must have been 'improvements in leak control,'" and that "higher coke production capacity leads to lower leak rates."

To the contrary, EPA thoroughly explained the basis for its decision to subcategorize based on size. The Rule recognized that the leak rate data

demonstrated a significant decrease in leak rate. 89 Fed. Reg. at 55,701–02. Faced with that data, EPA investigated and eliminated potential causes of the decrease such as new technology, and from that elimination inferred that decreased leaks must be the result of work practices such as observing and more quickly and efficiently sealing the leaks. *Id.* at 55,702. No commenter provided an alternative explanation. *Id.* To date, there is still no valid alternative explanation for the data.

EPA then moved from its reasonable interpretation of the leak rate data to determining what restrictions to employ. At that point, EPA noted that larger capacity facilities were experiencing significantly reduced leak rates compared to smaller facilities. *Id.* There is no obvious reason for this difference because individual ovens in a facility are sealed in the same manner regardless of facility size. *Id.* So rather than use the single (largest) facility in the dataset as the best-performing facility for the entire industry, EPA explained that it was not confident "that smaller facilities can reasonably achieve the same performance as larger facilities." *Id.* Therefore, the agency reasonably subcategorized by distinguishing between most (smaller) facilities and the single facility that is over twice as large as the rest. *Id.*

### 2. EPA reasonably set benzene fenceline monitoring requirements.

ACCCI also claims that 42 U.S.C. § 7414 does not authorize EPA to set fenceline monitoring requirements, and that EPA improperly based its action level

24

on (1) facilities' actual emission rates instead of their allowable emission rates and (2) incorrectly located receptors. ACCCI Mot. at 13–16.

These claims are all incorrect. EPA explained in the proposed rule that it was proposing a fenceline monitoring work practice standard that would prevent fugitive air toxics emissions by requiring sources to investigate and, if necessary, take corrective action when air toxics exceeded an annual average concentration level. 88 Fed. Reg. 55,858, 55,885 (Aug. 16, 2023). EPA decided to use benzene as a surrogate for these fugitive emissions because of its close correlation with regulated air toxics and its own high degree of dangerousness. *Id.* EPA set the maximum modeled fenceline benzene concentration as the action level so that the action level would correlate to the highest level of emissions reported by a facility. *Id.* at 55,885–86. EPA then finalized the Rule with a higher benzene action level than in the proposed rule after responding to industry feedback about how to locate fenceline receptors more accurately for modeling purposes. 89 Fed. Reg. at 55,695.

EPA thoroughly explained how it arrived at these requirements based on the data before it. ACCCI's challenges to these requirements are thus not supportable.

As an initial matter, ACCCI challenges EPA's statutory authority to promulgate fenceline monitoring requirements without addressing EPA's actual Rule. *See* ACCCI Mot. at 13–14. EPA explained that the primary basis for fenceline monitoring authority is 42 U.S.C. § 7412(d)(6). 89 Fed. Reg. at 55,697.

25

That section, which authorizes EPA to control air toxics "emissions," authorizes fenceline monitoring because air toxics emissions within a source's fenceline are attributable to that source. 42 U.S.C. § 7412(d)(6); 89 Fed. Reg. at 55,697 (citing 89 Fed. Reg. 42,932 (May 16, 2024); 80 Fed. Reg. 75,178 (Dec. 1, 2015)); *see also* 80 Fed. Reg. at 75,192 (Dec. 1, 2015) ("[T]he purpose of the fenceline monitoring work practice is to ensure that sources are limiting [air toxics] emissions at the fenceline, which are solely attributable to emissions from sources within the facility."). ACCCI attacks EPA's authority to require fenceline monitoring under 42 U.S.C. § 7414 but does not contest that EPA has authority to promulgate fenceline monitoring requirements under Section 7412(d)(6). *See* ACCCI Mot. at 13–14 (absence). ACCCI thus cannot demonstrate likelihood of success on the merits on this point merely by attacking an alternative basis for EPA's authority.

Turning to ACCCI's preserved arguments, EPA reasonably explained the basis of its fenceline monitoring requirements. *First*, EPA reasonably established the action level, including by taking into account receptor locations timely suggested by industry. *See* Exh. 10, EPA-HQ- OAR-2002-0085-1561 at 2. Contrary to ACCCI's unsupported assertion that EPA did not use the Industry Petitioner-proposed receptor locations, EPA incoporated each of those points except for one not provided to EPA until February 2024—once more long after the comment period had closed. *See id.*; 89 Fed. Reg. at 55,692, 55,695. ACCCI

26

suggests, without record support, that this single receptor discrepancy is responsible for the action level being approximately 60% more stringent than is appropriate. To the contrary, the discrepancy between EPA's 7µg/m³ action level and ACCCI's preferred action level comes from different calculations of the maximum average benzene concentration, as explained below.

*Second*, ACCCI's argument about the use of actual emissions versus allowable emissions is undeveloped and speculative. Again, EPA imposed fenceline monitoring requirements for air toxics to prevent fugitive emissions. 88 Fed. Reg. at 55,885. By setting the action level at the maximum modeled benzene concentration based on the highest levels of benzene documented in the data before it, EPA established an achievable level for facilities to meet based on current emissions reduction technology. 88 Fed. Reg. at 55,886. This comports with the Act's general requirement to set emission standards based on achieved emission levels. *See* 42 U.S.C. § 7412(d)(2)–(3), (6).

Under these circumstances, ACCCI's assertion, at 15, that using actual emissions will result "in a de facto mandate to reduce emissions below permitted levels without following required procedures for amending permits" disregards the Act's requirements. Nor has ACCCI identified any legal basis requiring EPA to base such fenceline limits on allowable emissions. EPA's fenceline monitoring action level based on actual emissions is well-supported and reasonable.

27

ACCCI has thus failed to substantiate its challenges to the fenceline monitoring requirements as to show clear entitlement to relief here.

### 3. SunCoke has not exhausted its claim that the MACT floor requirements for SunCoke's bypass stacks are not feasible.

Finally, SunCoke has forfeited its claim of impossibility. In any event, the record supports EPA's determination that emissions from SunCoke's bypass stacks are controllable.

SunCoke argues that the MACT floor limits for heat and nonrecovery facilities' bypass stacks are not feasible because technological controls (1) would limit the bypass stacks' functionality and (2) would not be operable in the event of power outage. SunCoke Mot. at 17–18 (citing Declaration of John Quanci ¶¶ 50-54 & Exh.A at 34). However, SunCoke did not raise either concern with EPA during the comment period. Rather, SunCoke cursorily asserted that "it is not technically feasible to install controls directly on waste heat stacks." Exh. 4, EPA-HQ-OAR-2002-0085-0968 at 34.

The Act requires commenters to raise objections "with reasonable specificity during the period for public comment" before that objection can be raised for judicial review. 42 U.S.C. § 7607(d)(7)(B). "Objections must be prominent and clear enough to place the agency 'on notice.'" *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007) (quoting *Mossville*, 370 F.3d at 1240). "The purpose of the exhaustion requirement is to ensure that the agency is given

the first opportunity to bring its expertise to bear on the resolution of a challenge to a rule." *Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998).

Here, SunCoke's cursory statement was not clear enough to put EPA on notice of this claim. Specifically, SunCoke's comments did not provide any explanation for why it is not technically feasible for SunCoke to install controls on its waste heat stacks. *Compare* Exh. 4, EPA-HQ-OAR-2002-0085-0968 at 34, *with* SunCoke Mot. at 17–18. At best, SunCoke indicated that "[a]dditional controls *may* be required" and that designing and installing controls could be a complex and costly endeavor. Exh. 4, EPA-HQ-OAR-2002-0085-0968 at 34 (emphasis added). These statements could not have put EPA on notice that technological controls would limit functionality or be inoperable during a power outage. *Cf. Appalachian Power*, 135 F.3d at 818. Under these circumstances, SunCoke forfeited this argument by failing to raise it with reasonable specificity during the notice and comment period. *See Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1231; *see also, e.g.*, *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1111 (D.C. Cir. 1998) (explaining that "scattered references" do not "suffice[] to provide an agency . . . with a 'fair opportunity' to pass on the issue.").

Had SunCoke properly identified its concerns regarding power outages, EPA would have had the opportunity to explain that potential power outages do not provide any basis to forego air pollution controls that could still be used while

power is available. There is no record evidence that requiring facilities to install pollution controls on bypass stacks is infeasible or that such equipment cannot be operated while the facilities are powered. In fact, facilities routinely route emissions through bypass stacks when the emissions cannot be routed through their heat recovery equipment. 88 Fed. Reg. at 55,877. This may occur for a variety of reasons, such as when the facility is performing maintenance on the recovery equipment, and not just during "power failure or other malfunction" events. *Id.*; *cf.* SunCoke Mot. at 17. Indeed, SunCoke is permitted to route emissions through its bypass stacks for more than 160,000 hours per year across all of its facilities and bypass stacks. Exh. 11, EPA-HQ-OAR-2002-0085-1596 at 16. Insofar as SunCoke does not dispute that controls can be installed and operated during these anticipated operating conditions, SunCoke's power failure parade of horribles is illusory.

## II.    PETITIONERS WILL NOT SUFFER IMMINENT, IRREPARABLE HARM ABSENT A STAY.

A showing of irreparable harm "has always" been a prerequisite to issuing a stay. *Sampson v. Murray*, 415 U.S. 61, 88 (1974). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a [stay], even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

"This court has set a high standard for irreparable injury." *Id*. To demonstrate their entitlement to a stay, movants must show that their injury is

30

certain, great, and imminent, creating "a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Likewise, "[t]his court has said time and again that the degree of proof required for irreparable harm is high, and that a failure to surmount it provides grounds for refusing to issue." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (internal quotations omitted). None of Petitioners' asserted harms is sufficiently great, sufficiently imminent, or sufficiently supported by proof to justify a stay.

First, and most importantly, the need to spend some money to initiate a process that will lead to regulatory compliance does not generally support a claim of irreparable injury. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. Rather, a movant must show that the anticipated economic harm is "great." *Id*. Industry Petitioners have not demonstrated with evidence that their businesses are threatened by the Rule, and so their assertions of unrecoverable compliance costs do not demonstrate irreparable harm. Indeed, if the normal activities that accompany a new regulatory effort constitute irreparable harm, then virtually *every* challenged federal regulation would *per se* be deemed to create irreparable harm. *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses

31

profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction."). That is not this Court's standard.

Second, SunCoke argues that it will be irreparably harmed because the standards under the Rule are impossible to meet. SunCoke Mot. at 21. But that is a red herring; whether or not a regulation is achievable speaks to the Rule's validity on the merits, not a petitioners' asserted harm for the purpose of a stay motion. And in any case, EPA found that all facilities will be able to meet the standards here without any modifications at all, because EPA based these standards on the documented performance that is already achieved at Industry Petitioners' own facilities. *See* 89 Fed. Reg. at 55,686. This argument therefore does not show irreparable harm.

But even taking SunCoke's argument at face value, SunCoke admits that its alleged injuries are speculative and not certain. For instance, SunCoke estimates its potential compliance costs to range from $0 to $1.2 billion. SunCoke Mot. Zebell Decl. ¶¶ 22, 29. SunCoke goes on to admit that "it is not known at this time whether SunCoke will be forced to spend such exorbitant sums." SunCoke Mot. Quanci Decl. ¶ 45; *see also* SunCoke Mot. Zebell Decl. ¶ 20 ("[I]t is difficult to know or even to estimate the total cost that SunCoke will incur by bringing its plants into compliance with the MACT floor limits.").

Finally, ACCCI's invocation of national security through coke ovens' support of the steel industry has no bearing on irreparable harm to the Industry Petitioners. ACCCI Mot. at 17–18. These letters from individual members of Congress and steel unions concern perceived harm to the United States—the party *opposing* a stay. Regardless, EPA determined that all sources would be able to meet the Rule's standards, so the Agency does not anticipate a decline in domestic steel and cast iron production. 89 Fed. Reg. at 55,720.

Accordingly, Industry Petitioners fail to show a likelihood of certain and great irreparable harm that would support this essential stay application element.

## III.    UPHOLDING THE RULE IS IN THE PUBLIC INTEREST.

Finally, the public interest counsels against staying the Rule. In the context of EPA air toxics rulemaking, like the Rule here, this Court should hesitate to disturb EPA action that is taken directly pursuant to Congress's direction to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1).

Where, as here, a movant seeks to stay an agency action implementing an Act of Congress, the legislature's policy choices reflected in the act provide a strong indication of where the public interest and balance of equities lie. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

In the Act, Congress struck a balance with respect to air toxics, directing

33

EPA to set emission standards that are "achievable" while also ensuring "the maximum degree of reduction" in air toxics emissions, 42 U.S.C. § 7412(d)(2), and to set compliance deadlines that are at once "expeditious[]" and "practicable," *id.* § 7412(i)(3)(A). EPA effectuated that balance in issuing the Rule, which calls for modest and easily attainable air toxics reductions. Rather than "reject the balance that Congress has struck in a statute," this Court should respect Congress' policy choices and deny Industry Petitioners' stay motions. *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497.

Industry Petitioners may concede this point in general, but counter that this Rule in particular does not advance the public interest because it has no environmental benefits. *See* ACCCI Mot. at 19; SunCoke Mot. at 22. However, the movants cannot have their cake and eat it too. EPA explained that it did not quantify any benefits with the Rule precisely *because* "all covered facilities are expected to already have [air toxics] emissions levels that are below the final limits, based on facility data available to the EPA." 89 Fed. Reg. at 55,723. So, if the covered facilities now believe—contrary to the data they submitted during rulemaking—that they must invest in technology and practices to comply with the Rule, those additional air toxics reductions will redound to the public's benefit.

## CONCLUSION

For the foregoing reasons, Petitioners' stay motions should be denied.

34

DATED: October 22, 2024

Respectfully submitted,

TODD KIM
Assistant Attorney General

/s/ Albert Lin
DANIEL J. MARTIN
ALBERT LIN
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
Phone: (202) 307-1056
Email: Daniel.Martin3@usdoj.gov

OF COUNSEL:

ADAN SCHWARTZ
Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*Counsel for Respondents*

35

## CERTIFICATE OF COMPLIANCE UNDER FED. R. APP. P. 27

I hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 27 because this Motion contains 7,849 words, excluding the parts of the Motion that are exempt under applicable rules. This Motion complies with the typeface requirements of Fed. R. App. P. 27 and 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6), because the Motion was prepared in proportionally spaced typeface using Microsoft Word 14-point Times New Roman type.

So certified this 22nd day of October 2024.

/s/ Albert Lin
ALBERT LIN
Counsel for Respondents

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filing to the attorneys of record for Petitioners and all other parties who have registered with the Court's CM/ECF system.

So certified this 22nd day of October 2024.

/s/ Albert Lin
ALBERT LIN
Counsel for Respondents