**<u>ORAL ARGUMENT NOT YET SCHEDULED</u>**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |  |
|---|---|---|
| AMERICAN COKE AND COAL CHEMICALS INSTITUTE and COKE OVEN ENVIRONMENTAL TASK FORCE, <br><br> *Petitioners*, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, U.S. Environmental Protection Agency, <br><br> *Respondents*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 24-1287 (consolidated with 24-1288, 24-1290) |

**OPPOSITION OF GASP, CLEAN AIR COUNCIL, HOOSIER
ENVIRONMENTAL COUNCIL, JUST TRANSITION NORTHWEST
INDIANA, PANIC, PENNFUTURE, AND SIERRA CLUB TO
PETITIONERS' MOTIONS FOR A STAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................iv

GLOSSARY OF ACRONYMS AND ABBREVIATIONS...................................ix

INTRODUCTION ..............................................................................1

BACKGROUND ................................................................................4

    I.     BASICS OF COKING ................................................................4

    II.    TOXIC COKE OVEN POLLUTION ......................................5

    III.   STATUTORY BACKGROUND.............................................6

    IV.   EPA'S PRIOR FAILURES TO LAWFULLY REGULATE COKE OVENS ...........................................................8

    V.    COKE OVEN COMMUNITIES' LITIGATION TO FORCE EPA TO PROTECT THEM FROM COKE OVENS .......................................11

    VI.   EPA'S 2024 COKE OVENS RULE ...................................12

STANDARD OF REVIEW .................................................................14

ARGUMENT ..................................................................................15

    I.     INDUSTRY HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS. ..........................................15

        A.   The Final Rule's New Floor Standards Are Lawful and Not Arbitrary...........................................................15

            1.   Industry's Statutory Arguments Are Contrary to the Act's Plain Text and Binding Precedent. ................................15

            2.   Industry's Arbitrary and Capricious Arguments Were Largely Not Raised in Comments and Do Not Have Merit in Any Event.......................................20

        B.   EPA's Revisions of Standards Pursuant to Section 7412(d)(6) Are Lawful and Not Arbitrary .................................................23

ii

1.      Industry's Objections to Fenceline Monitoring Are
        Meritless. .................................................................23

2.      The Final Rule's Updated Limits on Coke Oven Leaks
        Are Lawful and Not Arbitrary. ......................................28

C.      SunCoke Fails to Demonstrate a Procedural Deficiency in the
        Rulemaking Process. ...................................................29

II.     A STAY WOULD HARM COKE OVEN COMMUNITIES AND
        THE PUBLIC WHO HAVE BEEN WAITING YEARS FOR THE
        FINAL RULE'S PROTECTIONS. ....................................30

A.      Industry Incorrectly Asserts that Existing Standards Adequately
        Protect Public Health and that the Final Rule Accordingly Has
        No Health Benefits. .....................................................30

B.      The Final Rule Will Provide Important Health Benefits. ......... 32

C.      EPA's Brief Addresses Industry's Public Interest
        Arguments. .................................................................36

III.    THE RECORD REFUTES INDUSTRY'S ALLEGED HARMS,
        WHICH ARE SPECULATIVE AT BEST.. ......................................37

IV.     INDUSTRY'S REQUEST TO STAY THE ENTIRE RULE IS
        OVERBROAD ..............................................................40

CONCLUSION ...............................................................43

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Apotex, Inc. v. FDA,*
  449 F.3d 1249 (D.C. Cir. 2006)...................................................................... 14, 37

*Appalachian Power Co. v. EPA,*
  249 F.3d 1032 (D.C. Cir. 2001)...................................................................... 21, 26

*Ass'n of Battery Recyclers v. EPA,*
  716 F.3d 667 (D.C. Cir. 2013)........................................................................17

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,*
  72 F.4th 284 (D.C. Cir. 2023)........................................................................40

*Cement Kiln Recycling Coal.v. EPA,*
  255 F.3d 855 (D.C. Cir. 2001)...................................................................... 16, 21

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006)........................................................................14

*Citizens for Pa.'s Future v. Wheeler,*
  469 F. Supp. 3d 920 (N.D. Cal. 2020)............................................................11

*Clean Wis. v. EPA,*
  964 F.3d 1145 (D.C. Cir. 2020).......................................................................31

*Cuomo v. U.S. Nuclear Regul. Comm'n,*
  772 F.2d 972 (D.C. Cir. 1985).........................................................................14

*Finnbin, LLC v. Consumer Prod. Safety Comm'n,*
  45 F.4th 127 (D.C. Cir. 2022).........................................................................20

*Gill v. Whitford,*
  585 U.S. 48 (2018)...........................................................................................40

iv

*La. Env't Action Network v. EPA*,
 955 F.3d 1088 (D.C. Cir. 2020) ............................................................. 7, 17, 18, 19

*Labrador v. Poe*,
 144 S. Ct. 921 (2024) ............................................................................... 14, 37

*Loper Bright Enterprises v. Raimondo*,
 603 U.S. __ (2024) ...................................................................................19

*Mexichem Specialty Resins, Inc v. EPA*,
 787 F.3d 544 (D.C. Cir. 2015) ...................................................................40

*Minnesota v. Reagan*
 (20-1392), Doc. No. 2078098 (D.C. Cir. Oct. 3, 2024) .................................15

*Nat'l Lime Ass'n v. EPA*,
 233 F.3d 625 (D.C. Cir. 2000) .................................................................7, 16

*Nat'l Treasury Emps. Union v. Yeutter*,
 918 F.2d 968 (D.C. Cir. 1990) ...................................................................40

*Nken v. Holder*,
 556 U.S. 418 (2009) .................................................................................14

*Ohio v. EPA*,
 144 S. Ct. 2040 (2024) ............................................................................39

*Petry v. Block*,
 737 F.2d 1193 (D.C. Cir. 1984) .................................................................29

*Sierra Club v. EPA*,
 479 F.3d 875 (D.C. Cir 2007) ............................................................ 7, 16, 19, 21

*Sierra Club v. EPA*,
 536 F.3d 673 (D.C. Cir. 2008) ...................................................................27

*Sierra Club v. EPA*,
 895 F.3d 1 (D.C. Cir. 2018) .......................................................................17

v

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016) ...................................................................17

*Va. Petrol. Jobbers Ass'n. v. Fed. Power Comm'n.*,
    259 F.2d 921 (D.C. Cir. 1958) ............................................................ 14, 37

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................ 14, 38, 39, 40

**STATUTES**

42 U.S.C. § 7412(b) ....................................................................................6

42 U.S.C. § 7412(c) ....................................................................................6

42 U.S.C. § 7412(d)(1).................................................................................6

42 U.S.C. § 7412(d)(2)..................................................................................7

42 U.S.C. § 7412(d)(3)(B) ..........................................................................16

42 U.S.C. § 7412(d)(6)....................................................................... 6, 7, 11, 28

42 U.S.C. § 7412(e)(1)(E)...........................................................................10

42 U.S.C. § 7412(f)(2) ..........................................................................6, 11

42 U.S.C. § 7412(f)(2)(A).............................................................................8

42 U.S.C. § 7414(a)(1)(C) ..........................................................................26

42 U.S.C. § 7414(a)(1)(D) ......................................................................... 26

42 U.S.C. § 7607(d)(7)(B) ................................................................ 20, 21, 22

42 U.S.C. § 7607(h) ...................................................................................29

(Page 6 of Total)

## REGULATIONS

40 C.F.R. § 63.314 ...................................................................................23

40 C.F.R. § 63.314(d)(1).........................................................................23

40 C.F.R. § 63.314(f) ..............................................................................24

40 C.F.R. § 63.314(f)(2)(i).......................................................................24

40 C.F.R. Part 61, subpart L ...................................................................... 8

40 C.F.R. Part 63, subpart CCCCC ............................................................8

40 C.F.R. Part 63, subpart L .......................................................................8

## FEDERAL REGISTER NOTICES

58 Fed. Reg. 57,898 (Oct. 27, 1993)..........................................................9

66 Fed. Reg. 4,500 (Jan. 17, 2001) .............................................................6

68 Fed. Reg. 18,008 (Apr. 14, 2003) ........................................................10

69 Fed. Reg. 48,338 (Aug. 9, 2004)............................................................9

70 Fed. Reg. 19,992 (Apr. 15, 2005) .....................................................9, 11

80 Fed. Reg. 75,178 (Dec. 1, 2015) ..........................................................34

88 Fed. Reg. 55,858 (Aug. 16, 2023)................................................... 10, 26

89 Fed. Reg. 1,150 (Jan. 9, 2024) ..............................................................27

89 Fed. Reg. 55,684 (July 5, 2024)............. 1, 4, 5, 10, 12, 13, 15, 18, 21, 23, 24, 26
                                              28, 30, 31, 32, 33, 36, 37, 40, 42

(Page 7 of Total)

**OTHER AUTHORITIES**

EPA, Residual Risk Assessment (May 2023) ("2023 Risk Assessment")..... 4, 5, 10

EPA, Risk Assessment Document for Coke Oven MACT Residual Risk (Mar. 31, 2005) ("2005 Risk Assessment").................................................................. 5, 9, 10

EPA, Summary of Public Comments and Responses (May 2024)............. 13, 24, 34

viii

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to DC Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| ACCCI/COETF | American Coke and Coal Chemicals Institute and Coke Ovens Environmental Task Force |
| EPA | United States Environmental Protection Agency |
| HAP | Hazardous Air Pollutant |

ix

**INTRODUCTION**

Coke Oven Communities[1] have been waiting two decades for the United States Environmental Protection Agency ("EPA") to lawfully and adequately regulate coke oven emissions under the Clean Air Act. EPA failed to set standards in the timeframes mandated by Congress. When it did set standards, EPA failed to establish limits for many hazardous air pollutants emitted by coke ovens. And EPA failed to assess and address the risks posed by the vast majority of operating coke ovens.

Here, EPA took modest steps to address some of these deficiencies. "National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review," 89 Fed. Reg. 55,684 (July 5, 2024) ("Final Rule"). EPA finally set limits—known as floors—on emissions of pollutants that it had previously left unregulated in prior rules. These floor standards prevent backsliding: they do not require the installation of new pollution controls, but they will prevent an increase in the already significant pollution that coke ovens generate.

---

[1] Here, GASP, Clean Air Council, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club, who are proposed intervenors in Case Nos. 24-1287 & 24-1288 and petitioners in Case No. 24-1290.

1

Additionally, EPA required some coke oven facilities to monitor pollution levels at their fencelines and, when the monitors show excess levels of air pollution, take corrective action until measured pollution levels drop below a specified threshold. Coke ovens across the country routinely violate their emission limits and fenceline monitoring has a proven track record of quickly detecting violations and bringing facilities back into compliance.

Nevertheless, the Industry Movants[2] ask the Court to stay these modest requirements but fail to carry their burden at every step of the analysis. On the merits, they misapprehend the law, misstate the record, and improperly rely on arguments and evidence they failed to timely present to the agency. For example, Industry Movants raise a number of statutory challenges to the new floor standards that fly in the face of the Act's text and this Court's precedents. Indeed, their arguments mirror those of a similar motion to stay new floor standards, which this Court considered and rejected just this month. As to the new fenceline monitoring and corrective action standard, Industry Movants claim the standard unlawfully regulates facilities known as byproduct recovery plants, ignoring EPA's express

---

[2] Movants are American Coke and Coal Chemicals Institute and Coke Oven Environmental Task Force (together, "ACCCI/COETF"), ACCCI/COETF Mot. to Stay (Doc. No. 2077499), and SunCoke Energy, Inc. ("SunCoke"), SunCoke Mot. to Stay (Doc. No. 2077531) (collectively, "Industry," "Movants," or "Industry Movants").

2

statement that such plants are not required to conduct corrective action. Finally, they repeatedly rely on objections that they did not raise before the agency, including reports that were written long after the comment period closed.

On the equities, Industry Movants imply that there are no health benefits from the Final Rule, a conclusion the record does not support. To the contrary, EPA found health benefits from preventing backsliding and more quickly catching violations, but concluded the benefits were too difficult to quantify. Moreover, Industry Movants ignore that EPA has not reviewed the risks posed by any of the currently operating coke oven batteries and that EPA admits it has an outstanding obligation to conduct another risk review. Thus, their suggestion that communities are already adequately protected is wrong.

Finally, while Industry Movants assert billions in compliance costs from having to install new pollution controls, EPA's expert judgment was that no new controls would be required. And Industry's own hired consultant admits, at most, that new controls might be required to comply with many of the new standards.

The Court should deny the requests for a stay and allow the sensible protections of the Final Rule to go into effect without further delay.

3

**BACKGROUND**

## I.    BASICS OF COKING

Coke is a high-carbon fuel, used to melt metals, that is made by placing coal into an oven where it is heated for hours to remove impurities from the carbon. *See* EPA, Residual Risk Assessment at 5 (May 2023) ("2023 Risk Assessment") (available at https://www.regulations.gov/document/EPA-HQ-OAR-2002-0085-0814), attached as Attachment A; *id.* App. 1 at 5. Multiple connected ovens are known as an oven battery, and coke oven facilities are made up of one or more batteries. *Id.* App. 1 at 5; *see also* Final Rule, 89 Fed. Reg. at 55,755.

There are two types of designs for coke oven batteries, which handle the oven waste gases in different ways. At byproduct-type ovens, waste gases are removed through an exhaust system and sent to an on-site chemical plant (known as a byproduct recovery plant) that recovers chemicals for commercial use. *Id.* App. 1 at 5. At non-recovery-type ovens, waste gases are either sent to a heat recovery steam generator—which uses the waste to produce power—or vented to the air through waste heat stacks. *Id.*

At both types of coke ovens, after the coking cycle is complete, the oven doors are opened and the incandescent coke is "pushed" out of the oven into a quench car, i.e., an open top rail car. 2023 Risk Assessment, App 1. at 5; *id.* at 5.

4

The quench car then travels to a nearby quenching tower where the coke is doused with thousands of gallons of water to cool. 2023 Risk Assessment, at 5.

## II.     TOXIC COKE OVEN POLLUTION

At both types of coke ovens and at every step of the process—from coking, to pushing, to quenching—coke ovens spew tons of highly toxic pollutants into the air. Most recently, EPA estimated that coke oven facilities emitted nearly 2,500 tons of hazardous air pollutants per year. 2023 Risk Assessment, App. 1 at 9.

"Coke oven emissions are among the most toxic of all air pollutants." EPA, *Fact Sheet-Coke Oven NESHAP* (available at https://www.epa.gov/sites/default/files/2016-01/documents/cokefact.pdf) (last visited Sept. 29, 2024). Coke oven facilities emit dozens of toxic pollutants, including benzene, lead, arsenic, mercury, formaldehyde, and acid gases. Final Rule, 89 Fed. Reg. at 55,686; EPA, Risk Assessment Document for Coke Oven MACT Residual Risk at 10-11 (Mar. 31, 2005) ("2005 Risk Assessment") (available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-0212), attached as Attachment B. These pollutants cause or are associated with adverse health effects including cancer and premature death. 2005 Risk Assessment at 10-11. Chronic exposure to benzene is associated with blood disorders and adverse reproductive and developmental effects. *Id.* Coke ovens also

5

emit lead, which is a persistent, bioaccumulative, and toxic metal that threatens the neurological development of children. *Id.*; *see* 66 Fed. Reg. 4,500, 4,501-04 (Jan. 17, 2001).

Recent, peer-reviewed analysis demonstrates that reductions in coke oven pollution lead to immediate health benefits. The closure of one coke oven facility in Pennsylvania was followed by an immediate 42% decline in cardiovascular emergency department visits. Wuyue Yu & George D. Thurston, *An interrupted time series analysis of the cardiovascular health benefits of a coal coking operating closure*, 1 Environmental Health Research 045002 (July 31, 2023) (available at https://iopscience.iop.org/article/10.1088/2752-5309/ace4ea/pdf).

## III.    STATUTORY BACKGROUND

Congress listed "coke oven emissions" and many of its individual toxic constituents as hazardous air pollutants ("HAP"). 42 U.S.C. § 7412(b) (listing, e.g., benzene, arsenic, and lead). The Clean Air Act ("Act") mandates that EPA identify and list all categories of major sources of these HAPs. 42 U.S.C. § 7412(c). For each listed source category, EPA must (1) establish initial standards, then (2) periodically review and revise those standards if certain statutory criteria are met. 42 U.S.C. § 7412(d)(1), (d)(6), (f)(2).

6

To begin, section 7412(d) creates a "clear statutory obligation" for EPA to establish limits for each HAP that a source category emits. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 633-634 (D.C. Cir. 2000). Section 7412(d)(3)'s minimum stringency ("floor") provision mandates that limits for existing sources must be at least as stringent as the average emission limitation achieved by the best performing sources.[3] *Id.* at 629. In establishing floors, EPA does not consider costs. *Sierra Club v. EPA*, 479 F.3d 875, 877 (D.C. Cir 2007).

Next, after EPA has established the initial standards for a source category, it must review those standards and revise them if either of two statutory criteria are met. First, section 7412(d)(6) requires EPA to review these standards every eight years and revise them "as necessary" taking into account "developments" in pollution control technologies and practices. 42 U.S.C. § 7412(d)(6). During this review, EPA must ensure its existing standards for a source category "conform []to the basic requisites for 'emission standards' under § [7412]." *Louisiana Environmental Action Network v. EPA*, 955 F.3d 1088, 1098 (D.C. Cir. 2020) *("LEAN")*. In particular, where the agency's existing standards are missing limits

---

[3] When establishing a limit on emissions of a pollutant from a source category, EPA may also set a standard more stringent than the floor, but EPA chose not to do so here. *See* 42 U.S.C. § 7412(d)(2).

for one or more HAPs, EPA must establish those limits for the first time when it completes a section 7412(d)(6) review. *Id.* at 1096-1100.

Additionally, within eight years after the promulgation of standards under section 7412(d), including the promulgation of standards under section 7412(d)(6), EPA must review the health and environmental risks that remain under the preexisting standards. 42 U.S.C. § 7412(f)(2)(A). EPA must issue new standards if needed to ensure an ample margin of safety to protect public health. *Id.*

## IV. EPA'S PRIOR FAILURES TO LAWFULLY REGULATE COKE OVENS

EPA has engaged in piecemeal, halting, and deficient regulation of coke ovens. EPA has segmented coke oven facilities into different categories that cover different emission points, each with its own set of standards: Coke Oven Batteries, 40 C.F.R. Part 63, subpart L ("Oven Batteries"); and Coke Ovens: Pushing, Quenching and Battery Stacks ("Pushing-Quenching-Stacks"), 40 C.F.R. Part 63, subpart CCCCC.[4] EPA has routinely violated its statutory obligations to regulate these two source categories and left communities at risk.

---

[4] Another set of standards (that predate the enactment of section 7412) cover the byproduct recovery plants located at byproduct-type ovens. *See* 40 C.F.R. Part 61, subpart L.

EPA first established standards for the Oven Batteries Category in 1993. 58 Fed. Reg. 57,898 (Oct. 27, 1993). Those standards largely relied on observers to visually record emissions from the ovens—i.e., how many oven doors or lids were leaking, how long emissions were visible—rather than pollution control devices. *Id.* at 57,899, 57,913, 57,920.

For the Oven Batteries Category, EPA was required to conduct a technology review under section 7412(d)(6) and a risk review under section 7412(f) within 8 years—by 2001. But EPA delayed completing the first risk and technology review for the category until 2005. 70 Fed. Reg. 19,992 (Apr. 15, 2005). When EPA ultimately completed these reviews, its revised rules continued to rely on visual observations as the predominant method to control emissions. *See id.* at 19,994.

Moreover, EPA's risk review for the Oven Batteries Category was incomplete because EPA only reviewed the risks posed by four coke oven facilities, all of which were byproduct-type ovens. 2005 Risk Assessment at 4, 14-15; *see also* 69 Fed. Reg. 48,338, 48,340 (Aug. 9, 2004). EPA excluded the remaining coke oven facilities—including most byproduct-type ovens operating at the time and all non-recovery-type ovens—from the scope of the risk assessment. *See, e.g.,* 2005 Risk Assessment at 4 (explaining EPA's exclusion of "LAER track batteries"). All four of the coke ovens included in the risk assessment have

9

subsequently closed.[5] Thus, there are <u>no</u> currently operating coke oven batteries for which EPA has assessed the risks as required by section 7412(f)(2).

Similarly, EPA has violated its obligations to regulate the emissions covered by the Pushing-Quenching-Stacks Category. EPA was required to establish standards for this category by 2000, 42 U.S.C. § 7412(e)(1)(E), but did not do so until 2003, 68 Fed. Reg. 18,008 (Apr. 14, 2003). Not only were these standards delayed by years, but they were also substantively deficient as EPA entirely failed to set limits for various HAP emissions.[6]

Subsequently, EPA failed to complete additional mandatory reviews for both source categories. For the Oven Batteries Category, EPA was required to complete new risk and technology reviews for the category by 2013, eight years after its

---

[5] Of the coke ovens that were covered by the 2005 risk review, only one—a byproduct-type oven in Middletown, Ohio—was still in operation when EPA conducted this rulemaking. *Compare,* 2005 Risk Assessment at 15, *with* 2023 Risk Assessment, App. 1 at 11. That facility has subsequently closed. Final Rule, 89 Fed. Reg. at 55,692.

[6] EPA acknowledged this failure decades after the fact. 88 Fed. Reg. 55,858, 55,861 (Aug. 16, 2023) ("Proposed Rule") ("identify[ing] 17 unregulated HAP or emissions sources" in the Pushing-Quenching-Stacks Category).

10

2005 risk and technology reviews.[7] 42 U.S.C. § 7412(d)(6), (f)(2). Similarly, EPA

was required to conduct the first risk and technology reviews for the Pushing-

Quenching-Stacks Category by 2011, eight years after it first established standards.

*Id.* But EPA did not timely act on either category.

## V.    COKE OVEN COMMUNITIES' LITIGATION TO FORCE EPA TO PROTECT THEM FROM COKE OVENS

In 2019, several groups—including three of the Coke Oven Communities—

brought suit in the Northern District of California to compel EPA to complete these

mandatory rulemakings. *See Citizens for Pennsylvania's Future v. Wheeler*, 469 F.

Supp. 3d 920 (N.D. Cal. 2020) ("*PennFuture*"). The court concluded that EPA had

failed to fulfill its non-discretionary duties to complete: the technology review for

both the Oven Batteries and Pushing-Quenching-Stacks Categories under section

7412(d)(6); and the risk review for the Pushing-Quenching-Stacks Category under

section 7412(f)(2). *Id.* at 932. Applying a clear statement rule mandated by Ninth

Circuit precedent, the court concluded it lacked jurisdiction over the plaintiffs'

claims that EPA was required to conduct a new risk review for the Oven Batteries

---

[7] Because the 2005 rulemaking promulgated standards pursuant to section 7412(d), *e.g.,* 70 Fed. Reg. at 19,994 (promulgating opacity standards), EPA was obligated to conduct a new risk review within eight years. 42 U.S.C. § 7412(f)(2). Coke Oven Communities have filed a petition for review of this rule challenging EPA's refusal to do so. Non-Binding Statement of Issues to Be Raised at 3, *ACCCI v. EPA* (24-1287), Doc. No. 2078399 (Oct. 4, 2024).

11

Category. *Id.* at 925-32. The court ordered EPA to complete the mandated rulemakings within 30 months of the June 2020 order date—December 2022. *Id.* at 934.

Following this Court's decision in *LEAN*, EPA identified several HAPs that were not regulated under the existing standards and moved to extend the district court's deadline so that the agency could collect additional data. Unopposed Motion to Amend Order and Judgment at 5-6, *PennFuture* (3:19-cv-02004), ECF No. 46 (N.D. Cal. Jun. 2, 2022). The district court granted EPA's request to extend the deadline until May 2024. Order, *PennFuture* (3:19-cv-02004), ECF No. 79 (N.D. Cal. Nov. 22, 2022).

## VI. EPA'S 2024 COKE OVENS RULE

The Final Rule sets standards for the first time for previously unregulated HAP emissions from the Pushing-Quenching-Stacks Category. 89 Fed. Reg. at 55,686. It also lowers the existing limits for allowable leaks from the Oven Batteries Category. *Id.* And for the Oven Batteries Category, the Final Rule establishes a fenceline monitoring and corrective action standard. 89 Fed. Reg. at 55,684, 55,686; *see also* EPA, *Fact Sheet* (available at

https://www.epa.gov/system/files/documents/2024-05/factsheet_cokeovens_final.pdf) (last visited Sep. 29, 2024).

12

Critically, the Final Rule does nothing to address EPA's ongoing failure to evaluate and address the risks posed by coke oven batteries. As described above, EPA's prior risk review of the Oven Batteries Category covered none of the eleven coke oven plants currently operating today. EPA did not correct that failing here. Instead, the Final Rule's risk review was limited to the Pushing-Quenching-Stacks Category, for which EPA found that risks are acceptable. 89 Fed. Reg. at 55,684 (determining "risks due to emissions of hazardous air pollutants [] from the PQBS source category are acceptable").

Furthermore, EPA forthrightly acknowledged that it has not assessed the risks posed by coke oven batteries and conceded its obligation to conduct a further risk review. *See id.* at 55,693 (committing that EPA "will undertake" another risk review). EPA indefinitely deferred assessing those risks to some future rulemaking, stating: "The risk from Coke Oven Batteries facilities will be addressed in a future rulemaking." EPA, Summary of Public Comments and Responses at 199 (May 2024) ("Response to Comments") (available at https://www.regulations.gov/document/EPA-HQ-OAR-2002-0085-1603), attached as Attachment C.

13

## STANDARD OF REVIEW

A stay pending appeal is an "extraordinary remedy." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). A movant must show (1) a likelihood of success on the merits; (2) irreparable harm absent a stay; (3) a lack of harm to other parties from a stay; and (4) that the public interest supports a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). A movant must show irreparable harm that is "imminen[t]," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), "certain and great," and "directly result[ing] from the action," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). A "possibility" of "other corrective relief . . . weighs heavily against a claim of irreparable harm." *Va. Petrol. Jobbers Ass'n. v. Fed. Power Comm'n.*, 259 F.2d 921, 925 (D.C. Cir. 1958). If a movant cannot show it will likely succeed on the merits, the reviewing court need not consider the other factors. *See, e.g.*, *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (declining to consider other factors where movant showed "little likelihood" of success on the merits). Likewise, if a movant has not shown irreparable harm, the court need not "delv[e] into the merits." *Labrador v. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring).

14

**ARGUMENT**

## I. INDUSTRY HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. The Final Rule's New Floor Standards Are Lawful and Not Arbitrary.

EPA finalized new standards for the Pushing-Quenching-Stacks Category to address HAP emissions that EPA had failed to previously regulate. Final Rule, 89 Fed. Reg. at 55,686. Industry Movants challenge these new standards on both statutory and arbitrary and capricious grounds, neither of which have merit.

#### 1. Industry's Statutory Arguments Are Contrary to the Act's Plain Text and Binding Precedent.

Although Industry Movants do not contest EPA's statutory obligation to address previously unregulated HAP emissions, they nonetheless argue that EPA violated the Act by refusing to consider factors like costs and health risks when establishing new limits. ACCCI/COETF Mot. at 5-7. These arguments are based on a misreading of the statutory text and this Court's precedents. Indeed, this Court rejected similar arguments in another recent stay motion, which also challenged EPA's approach to establishing limits for previously unregulated HAPs. *See* Order at 2, *Minnesota v. Reagan* (20-1392), Doc. No. 2078098 (D.C. Cir. Oct. 3, 2024) ("Taconite Order") (holding that the argument that EPA "should have considered costs in setting a floor standard" was unlikely to succeed on the merits).

15

1.    Looking to this Court's precedents, the Act requires that: (1) EPA must establish limits for every HAP emitted from a source category; (2) in establishing limits, EPA must calculate floors based on the emissions of the best performing sources, without considering costs; and (3) if EPA initially fails to establish limits for a HAP, it must do so at the same time it conducts a technology review under section 7412(d)(6).

As this Court has held repeatedly, EPA has a clear statutory obligation to set limits for each HAP that a source category emits. *See, e.g.*, *National Lime Ass'n*, 233 F.3d at 633-34; *Sierra Club*, 479 F.3d at 883. For categories like coke ovens with less than thirty sources, EPA must set floor standards that are at least as stringent as the emissions achieved by the five best performing sources in the category for which EPA has information. 42 U.S.C. § 7412(d)(3)(B); *Sierra Club v. EPA*, 479 F.3d at 880-881.

Section 7412(d)(3) unambiguously provides that floors "apply without regard to either costs or the other factors and methods listed in section 7412(d)(2)." *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 857-858 (D.C. Cir. 2001) (cleaned up); *Sierra Club*, 479 F.3d at 877 (same). Thus, "[w]hen setting the []floor, the EPA considers only the performance of the cleanest sources in a category or subcategory; it does not take into account other factors, including the

16

cost of putting a source in line with its better-performing counterparts." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (D.C. Cir. 2016) (emphasis in original). *See also Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013) (The Act "bars cost consideration in setting [] floors under section [7412(d)(3)]"); *Sierra Club v. EPA*, 895 F.3d 1, 19 (D.C. Cir. 2018) (similar).

In *LEAN*, this Court addressed EPA's obligations when the agency has failed to establish limits for emissions of a HAP. *LEAN*, 955 F.3d at 1096-1100. The Court held that, when EPA conducts a technology review under section 7412(d)(6), it has an unambiguous statutory obligation to "add section [7412(d)(2)-(d)(3)]" emission limits for any previously unregulated HAP. *Id.* at 1096; *see, also, id.* at 1095-96 (adopting "[p]etitioners' reading" that EPA "must add limits, calculated consistent with section [7412(d)(2)-(3)], for any air toxics the source emits that the existing standard does not address"). Thus, *LEAN* creates a timing requirement for EPA to establish limits for previously unregulated HAPs, but affirms that these limits must be calculated consistent with the requirements of section 7412(d)(3).

In the Final Rule, EPA concluded that the previous standards for the Pushing-Quenching-Stacks Category left various HAPs unregulated and, under section 7412(d)(3), set floor standards for those pollutants without considering

17

costs. 89 Fed. Reg. at 55,686, 55,689; *see also* EPA Stay Opp'n at 11-15. In doing so, EPA did not exceed its statutory authority.

2.    ACCCI/COETF faults EPA for following the text of section 7412(d)(2) and this Court's precedents, arguing that EPA failed to consider risk and cost as required under section 7412(d)(6). ACCCI/COETF Mot. at 5-7. According to ACCCI/COETF, EPA misapplied *LEAN* in concluding that the agency is precluded from considering factors such as risk and cost. *Id.*

ACCCI/COETF's arguments are meritless because the substantive requirements of section 7412(d)(6), including consideration of costs, do not apply when EPA establishes floors for previously unregulated HAPs. *See* Taconite Order at 2 (citing *LEAN*). Instead, in *LEAN* this Court held that when EPA first establishes standards for previously unregulated HAPs, those standards must be calculated in the manner required by section 7412(d)(2)-(d)(3). *LEAN*, 955 F.3d at 1095-98. And in establishing floors under section 7412(d)(3), EPA is restricted to considering what the best performing sources have achieved, not costs or risks. *Supra* 16-17. That is true regardless of whether EPA is establishing floors when first promulgating standards for a category or, as here, during a subsequent gap-filling exercise when EPA conducts a section 7412(d)(6) technology review.

18

*LEAN* did not—and could not—modify EPA's substantive obligations under section 7412(d)(3). By its own terms *LEAN* concerned the timing of EPA's obligations to backfill missing emission limits. *See LEAN*, 955 F.3d at 1099 ("This is further confirmation that the Act is best read to require any underinclusive emission standards be 'revised' as 'necessary' to comply with section 112(d)(2)-(3) <u>during the eight-yearly review</u> set by section 112(d)(6).") (emphasis added).

ACCCI/COETF's reliance on *Loper Bright Enterprises v. Raimondo*, 603 U.S. __ (2024), ACCCI/COETF Mot. at 6, is misplaced because the Court's relevant precedents—including *LEAN*—reflect not only the best reading of the statute, but the only reading. For example, *LEAN* held that EPA's obligations to set floors for previously unregulated HAPs, calculated consistent with section 7412(d)(3), was "unambiguous" and the "best read[ing]." *LEAN*, 955 F.3d at 1096, 1099. Similarly, this Court's precedents hold that the Act unambiguously prohibits the consideration of costs in establishing floors under section 7412(d)(3). *See Sierra Club*, 479 F.3d at 880 (holding the decisions in *Cement Kiln Recycling* and *National Lime* reflect the plain, unambiguous meaning of the statute).

3.    Finally, Industry Movants' position—that costs and risks should displace section 7412(d)(3)'s requirement for calculating the floors—would impermissibly negate the floors as a minimum standard for all HAP emissions. *See*

19

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 133 (D.C. Cir. 2022) (citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts § 4 (2012) (Presumption against Ineffectiveness)). In Industry Movants' view, once EPA leaves a HAP unregulated in the first rulemaking for a source category, EPA is prohibited from establishing a floor standard in the manner commanded by Congress. This interpretation must be rejected because, for pollutants EPA has previously left unregulated, it "would make [section 7412(d)(3)'s] command impossible for [EPA] to carry out." *Finnbin*, 45 F.4th at 133.

> **2.    Industry's Arbitrary and Capricious Arguments Were Largely Not Raised in Comments and Do Not Have Merit in Any Event.**

Industry's arbitrary and capricious arguments fare no better. At least three of their arguments were not "raised with reasonable specificity during the period for public comment" and thus cannot be raised for the first time in this Court. 42 U.S.C. § 7607(d)(7)(B). And their objections fail on their own terms.

1.    ACCCI/COETF argues EPA arbitrarily failed to account for the variable characteristics of coal used in coking, "which directly affect[s] HAP emissions from coke ovens." ACCCI/COETF Mot. at 8. This argument is predicated on a report by Trinity Consultants, *id.* at 8-9, which ACCCI/COETF

20

only submitted to the agency on May 3, 2024, just weeks before the deadline for the Final Rule and well after the comment period closed. ACCCI/COETF Email (May 3, 2023) (available at https://www.regulations.gov/document/EPA-HQ-OAR-2003-0051-1882). EPA was under no obligation to consider this late-submitted data. *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments that are not timely filed."); 42 U.S.C. § 7607(d)(7)(B).

2.      SunCoke's argument that the Final Rule's standards for bypass stacks are not achievable is wrong three times over. SunCoke Mot. at 17-18. First, SunCoke argues that the standards are unachievable because the stacks at one of its facilities sometimes emit at 204% of the Final Rule's limits. *Id.* at 18. Yet, the fact that an individual facility within the source category does not currently comply with a floor standard does not establish that the standard is unachievable. *See Cement Kiln Recycling Coalition,* 255 F.3d at 861-862*; Sierra Club,* 479 F.3d at 878, 880-881. Second, SunCoke's impossibility claims are premised on a representation that the new limits require the installation of pollution controls, SunCoke Mot. at 17-18, but EPA concluded that no new pollution controls are necessary, Final Rule, 89 Fed. Reg. at 55,717, and SunCoke has not shown that conclusion to be arbitrary. Third, SunCoke argues that the limits on bypass stacks

21

are impossible to comply with for safety reasons, SunCoke Mot. at 17-18, but EPA ably explains both how SunCoke failed to exhaust the issue in comments and why EPA's determination was nonetheless reasonable, EPA Stay Opp'n at 28-30.

3.      SunCoke argues that because EPA established work practices and surrogate standards for some previously unregulated HAP emissions, EPA acted arbitrarily in establishing numeric standards for other previously unregulated emissions. SunCoke Mot. 10-14. EPA's brief addresses SunCoke's argument on the merits. EPA Stay Opp'n at 15-17.

Additionally, SunCoke's argument—that EPA failed to explain why it used work practices for some unregulated HAP emissions and numerical limits for others when "measurement is infeasible" for both—fails because it does not appear in SunCoke's comments. *Compare* SunCoke Mot. at 12, *with* SunCoke Mot., Quanci Decl., Ex. A (Comments on Proposed Rule). Therefore, SunCoke cannot raise that argument here. 42 U.S.C. § 7607(d)(7)(B).

4.      EPA addresses SunCoke's argument that the new numerical floor limits are arbitrary and capricious because EPA rejected additional test data submitted by SunCoke from 2006-2022. *Compare* EPA Stay Opp'n at 20-21, *with* SunCoke Mot. at 14-15.

22

**B.     EPA's Revisions of Standards Pursuant to Section 7412(d)(6) Are Lawful and Not Arbitrary.**

**1.     Industry's Objections to Fenceline Monitoring Are Meritless.**

In the Final Rule, EPA established a fenceline monitoring and corrective action standard for byproduct-type coke ovens as part of the technology review for the Oven Batteries Category. *See* 89 Fed. Reg. at 55,684, 55,686. Under this standard the operator of byproduct-type ovens must place air monitors "along the perimeter of [the] facility" to measure the level of benzene in the air at the fenceline. *Id.* at 55,694. Where the measured benzene levels exceed a specified "action level," the facility operator must conduct a "root cause" analysis—i.e., figure out why benzene levels have increased—and then take "corrective action" at the coke oven battery to bring benzene levels below the action level. *Id.* at 55,694; *id.* at 55,738-42 (codifying fenceline monitoring and corrective action standard at 40 C.F.R. § 63.314). The Final Rule allows the coke oven operator to "determine appropriate corrective action" in the first instance. *Id.* at 55,739 (codifying 40 C.F.R. § 63.314(d)(1)).

ACCCI/COETF raises three meritless arguments regarding EPA's decision to require fenceline monitoring.

23

1.    ACCCI/COETF argues that EPA exceeded its statutory authority, based on the mistaken premise that fenceline monitoring and corrective action requirements apply to byproduct recovery plants, which are not a source category regulated under section 7412. ACCCI/COETF Mot. at 13-14.[8] ACCCI/COETF's argument fails because it misstates the scope of the Final Rule, whose provisions expressly do not require corrective action at, or otherwise regulate, byproduct recovery plants. *See* 89 Fed. Reg. at 55,697.

First, the Final Rule expressly imposes "no requirement to conduct corrective action at [byproduct recovery plants]." 89 Fed. Reg. at 55,697. Instead, the Final Rule allows each Oven Battery facility "to develop a [site specific monitoring plan] . . . to account for" benzene emitted by the byproduct recovery plant in determining whether the action level is breached. *Id.; see also id.* at 55,740-41 (codifying site-specific monitoring plan provisions at 40 C.F.R. § 63.314(f)). This means that facility operators can subtract out emissions from byproduct recovery plants, such that their emissions should not cause exceedances of the action level. *Id.* at 55,741 (codifying 40 C.F.R. § 63.314(f)(2)(i)); *id.* at

---

[8] ACCCI/COETF does not appear to challenge EPA's authority to require fenceline monitoring and corrective action for the Oven Batteries Category, nor could it. Starting in 2015, EPA has lawfully and successfully implemented fenceline monitoring and corrective action for a number of source categories. Response to Comments at 106.

24

55,698 ("Sources that contribute to the fenceline benzene concentrations above the action level that are not subject to a regulation codified in 40 CFR part 63 may be accounted for through the SSMP.").

EPA made further allowances for potential imprecision in the site-specific monitoring plan, thereby ensuring that no corrective action is required at byproduct recovery plants. If the action level is triggered and the resulting "root cause investigation demonstrates that a primary or other contributing cause of an exceedance of the corrective action level are due to emissions from a [byproduct recovery plant], no corrective action would be required" at the byproduct recovery plant under the Final Rule. *Id.* at 55,697.

Second, ACCCI/COETF argues EPA lacked authority under either section 7412 or 7414 to require monitoring of byproduct recovery plant emissions. ACCCI/COETF Mot. at 13-14. ACCCI/COETF identifies nothing in the text, structure, or context of section 7412 that suggests EPA lacks authority to require monitoring by regulated source categories—like Oven Batteries—simply because non-regulated sources emit pollution nearby.

Regardless, even if fenceline monitoring could be understood as a requirement for byproduct recovery plants to monitor their emissions, it would nonetheless be authorized under the plain text of section 7414. *Contra*

25

ACCCI/COETF Mot. at 14 (arguing that section 7414 "does not contain authority for EPA to codify permanent information collection requests"). Section 7414 expressly authorizes EPA to require "any person who owns or operates any emission source . . . on a one time, periodic, or continuous basis . . . to install, use, and maintain such monitoring equipment; [and to] sample such emissions . . . during such periods and in such manner as the Administrator shall prescribe." 42 U.S.C. § 7414(a)(1)(C), (D). In arguing that "EPA fail[ed] to identify any language in [section 7414]," ACCCI/COETF Mot. at 14, ACCCI/COETF ignores EPA's express statement in the Final Rule that it was relying on that section 7414 authority. *See* 89 Fed. Reg. at 55,697 (stating that under section 7414, EPA may "require the owner or operator of a source of emissions to monitor emissions, including by periodic sampling").

2.    ACCCI/COETF argues that the action level EPA selected arbitrarily relies on improper boundary modeling, but this argument is premised on an AECOM modeling report that was created in February 2024, months after the October 2, 2023, deadline for comments. ACCCI/COETF Mot. at 15-16; Proposed Rule, 88 Fed. Reg. at 55,858 (setting comment deadline). Accordingly, EPA was under no obligation to consider this late-submitted data. *Appalachian Power Co.*, 249 F.3d at 1059.

26

3.      Finally, ACCCI/COETF argues that the action level is arbitrary because it is based on actual emission rates rather than allowable emissions, thereby requiring corrective action even where a facility is operating within the limits established by its operating permit. ACCCI/COETF Mot. at 14-15. This argument is unlikely to succeed on the merits because it is not an argument premised on any source of law—whether statutory or regulatory text, prior administrative practice, or judicial precedent. *See id.* (absence). ACCCI/COETF's inability to provide a single supportive legal citation is fatal.

The argument also fails on its own terms, inverting the Clean Air Act by suggesting that EPA cannot set standards for a source category that are more stringent than the limits contained in the permits of individual facilities within the category. *See* ACCCI/COETF Mot. at 15. That has it exactly backwards; facility operating permits do not constrain EPA's authority to set limits, they simply reflect the limits EPA has already set under section 7412 and other provisions of the Act. *Sierra Club v. EPA*, 536 F.3d 673, 674 (D.C. Cir. 2008) ("permits [] include relevant emission limits and monitoring requirements"); 89 Fed. Reg. 1,150, 1,153-54 (Jan. 29, 2024) (the "operating permit program is a vehicle for compiling air quality control requirements from other CAA programs").

27

## 2. The Final Rule's Updated Limits on Coke Oven Leaks Are Lawful and Not Arbitrary.

1. ACCCI/COETF argues that lowered limits for leaks were arbitrary because EPA failed to identify any development in leak control practices, processes, or control technology. *See* ACCCI/COETF Mot. at 11-12. Under the preexisting regulations, leak control is principally accomplished through a work practice standard, in which: only a set percentage of equipment leaks are allowed; a person visually observes the number of leaking pieces of equipment; and leaks above the thresholds constitute violations. *See supra* at 9. In the Final Rule, EPA found that facilities had significantly reduced the amount of leaking equipment—a factual finding Industry Movants do not contest—and concluded that there necessarily had been "improvements" in work practices to control leaks. 89 Fed. Reg. at 55,702. EPA determined the improvements were relevant "developments in practices [or] processes," 42 U.S.C. § 7412(d)(6), which it rationally took into account in determining tightened standards were necessary. Final Rule, 89 Fed. Reg. at 55,702.

2. As EPA states in its brief, the agency also explained its decision to set different leak standards for larger capacity coke facilities, taking into account operational data and reasonable inferences. *Compare* EPA Stay Opp'n at 23-24, *with* ACCCI/COETF Mot. at 11-13.

28

### C. SunCoke Fails to Demonstrate a Procedural Deficiency in the Rulemaking Process.

SunCoke argues that the 45-day comment period EPA provided was insufficient, SunCoke Mot. at 18-19, while conceding that the text of the Act establishes a 30-day comment period as the statutory minimum, 42 U.S.C. § 7607(h). And the precedent cited by SunCoke cuts against it, holding that an agency had good cause to forego notice and comment entirely because it was operating under a mandatory deadline which made notice and comment "impracticable." *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (cleaned up).

In arguing that it had insufficient time to comment, SunCoke never acknowledges that it actively sought to shorten the rulemaking timeframe. After EPA requested more time from the district court to complete these rulemakings, SunCoke and COETF sought to intervene to deny EPA the needed time to collect and analyze additional emissions data and issue a rule that complied with *LEAN* and EPA's other obligations under the Act. *See* Mot. to Intervene at 6, *PennFuture* (3:19-cv-02004), ECF No. 47 (N.D. Cal. Jun. 8, 2022) (arguing for a "narrowly tailored" extension); *see also* COETF Amicus Brief at 3, *PennFuture* (3:19-cv-02004), ECF No. 73 (N.D. Cal. Oct. 3, 2022) (arguing that the court "should only grant an extension to May 23, 2023"). Rather than arguing for more time for EPA,

29

these petitioners argued that EPA should be given less time. Now, SunCoke faults

EPA for rushing.

## II.    A STAY WOULD HARM COKE OVEN COMMUNITIES AND THE PUBLIC WHO HAVE BEEN WAITING YEARS FOR THE FINAL RULE'S PROTECTIONS.

### A.    Industry Incorrectly Asserts that Existing Standards Adequately Protect Public Health and that the Final Rule Accordingly Has No Health Benefits.

Industry Movants misapprehend EPA's findings and prior actions in

contending that existing coke oven standards adequately protect health and that,

therefore, the Final Rule's emission limits provide no benefits. *See* ACCCI Mot. at

19; SunCoke Mot. at 22-23. Because EPA has never found that HAP emissions

from coke ovens "are already adequately controlled," the new standards are not

"pointless." *Contra* SunCoke Mot. at 22-23.

EPA's determination in the Final Rule was narrow and limited. It concluded

that the risks posed by current emission levels from the Pushing-Quenching-Stacks

Category were "acceptable" and that existing standards governing those particular

emission points "provide[] an ample margin of safety." Final Rule, 89 Fed. Reg. at

55,684. The Final Rule's new standards prevent increased emissions and risks

above the levels that EPA deemed acceptable, *id.* at 55,723, and Industry Movants

are wrong to claim that preventing backsliding provides no health benefits.

30

Moreover, any suggestion that people living near coke ovens are adequately protected ignores that EPA has not reviewed the risks posed by <u>any</u> of the currently operating Oven Batteries. *See supra* at 9-10. Here, EPA acknowledged that the earlier 2005 risk review for the Oven Batteries Category excluded a number of facilities, and recognized it still needs to do another risk review for the Category. *See* Final Rule, 89 Fed. Reg. at 55,693. Thus, Industry Movants are wrong to suggest that the existing sets of standards adequately protect communities living near coke ovens.

Coke ovens emit thousands of tons of toxic pollutants, including many, like lead, benzene, and other carcinogens, for which there is no safe level of exposure.[9] *See supra* 5-6. Any reduction in exposure to these pollutants is beneficial. *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (where no level of exposure to a given pollutant "is known to be harmless," increased exposure to that pollutant is harmful). As the Final Rule's new standards will prevent additional exposure, they are not "pointless." SunCoke Mot. at 2.

---

[9] *See* NIOSH, Chemical Carcinogen Policy ("there is no safe level of exposure to a carcinogen") (available at https://www.cdc.gov/niosh/cancer/about/niosh-chemical-carcinogen-policy.html) (last accessed Oct. 23, 2024); EPA, Basic Information about Lead in Drinking Water ("The best available science [] shows there is no safe level of exposure to lead.") (available at https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water) (last updated Oct. 22, 2024).

31

**B.      The Final Rule Will Provide Important Health Benefits.**

Coke Oven Communities and the 1.3 million people living in close proximity to coke ovens have been waiting on the Final Rule's protections for years if not decades. *See* 89 Fed. Reg. at 55,725 (noting that 1.3 million people live within 10 km of coke oven facilities).

1.      The Final Rule will reduce the level of allowable emissions for both coke oven source categories by preventing backsliding, and therefore will "ensure that emissions of HAP do not increase and that air quality does not degrade over time." 89 Fed. Reg. at 55,723.

2.      Coke oven facilities flagrantly violate applicable emission standards and the Final Rule's fenceline monitoring requirements will reduce those violations. Three coke oven facilities have had high priority Clean Air Act violations in all 12 of the last 12 quarters, and two have had multiple high priority

32

violations over the last three years.[10] Thus, nearly half the industry has a pattern of repeatedly violating the Act.

The fenceline monitoring and corrective action standard will address these flagrant violations. EPA determined the standard will "improve compliance assurance" and "increase the likelihood of facilities successfully detecting any HAP emissions in excess of the specified thresholds, allowing for earlier corrective action and thus preventing pollution increases that could otherwise occur." Final Rule, 89 Fed. Reg. at 55,723-24.

That determination is well founded. Over a decade ago, EPA identified fenceline monitoring as one of the "next generation" of methods for improving compliance with air pollution standards. Cynthia Giles, Next Generation Compliance, Environmental Forum, at 24 (2013), attached as Attachment D. EPA

---

[10] *See* Mot. to Intervene, Decls. of Movant-Intervenors, Ansari Decl. ¶ 6, Doc. No. 2077508 (Sept. 30, 2024) (discussing violations at Clairton); EPA, Clairton Plant Detailed Facility Report (available at https://echo.epa.gov/detailed-facility-report?fid=110042043384#summary; EPA); EES Coke Battery LLC Detailed Facility Report (available at https://echo.epa.gov/detailed-facility-report?fid=110070374301); EPA, Haverhill Coke Company Detailed Facility Report (available at https://echo.epa.gov/detailed-facility-report?fid=110054816703); EPA, ABC Coke Detailed Facility Report (available at https://echo.epa.gov/detailed-facility-report?fid=110000366817#enforcement); EPA, Jewell Company Coke Plants Detailed Facility Report (available at https://echo.epa.gov/detailed-facility-report?fid=110060335524) (each last accessed Oct. 23, 2024).

33

recognized monitors were becoming "more accurate, more mobile, and cheaper" thereby enabling "prompt action…to fix problems before they become serious health concerns." *Id.* Since then, EPA has required fenceline monitoring across a number of source categories under section 7412. *See* Response to Comments at 106.

The effectiveness of fenceline monitoring standards is demonstrated by the petroleum refineries category. *See* 80 Fed. Reg. 75,178, 75,192-93 (Dec. 1, 2015). Like Oven Batteries subject to the Final Rule's fenceline monitoring standard, refineries must conduct root cause analysis and corrective action when benzene emissions exceed the corrective action level. *Id.* Implementation of the fenceline monitoring standard at refineries has led to greater compliance, as benzene emissions and exceedances of the corrective action level have dropped significantly. EPA's own data shows that the number of refineries exceeding the action level for benzene fell by half from the end of 2020 to 2023. Environmental Integrity Project, *Cancer-Causing Benzene Pollution from U.S. Refineries Down Significantly* (May 16, 2024).[11] For facilities that saw sustained periods of excess

---

[11] Available at https://environmentalintegrity.org/news/cancer-causing-benzene-pollution-from-u-s-refineries-down-significantly/#:~:text=Only%206%20of%20the%20115,Environmental%20Integrity%20Project%20(EIP) (last accessed Oct. 25, 2024).

34

pollution, fenceline monitoring has resulted in improved detection and eventual compliance in the long run. Environmental Integrity Project, *Monitoring for Benzene at Refinery Fencelines* at 8 (February 6, 2020).[12]

EPA found that fenceline monitoring and corrective action will protect Coke Oven Communities from additional toxic air pollution, and Industry Movants do not even attempt to refute that conclusion. Thus, any delay in the implementation of fenceline monitoring standards will harm Coke Oven Communities and other people living near coke ovens. *See* Mot. to Intervene, Abetya, Ansari, and Powell Decls. (describing experience living near coke oven facilities with a pattern of violations).[13]

3.      The Final Rule's public health benefits will accrue to historically marginalized populations that have been disproportionately exposed to coke oven emissions. EPA's environmental justice analysis found that communities living within 10 km of a coke oven facility are disproportionately African American and

---

[12] Available at https://environmentalintegrity.org/wp-content/uploads/2020/02/Benzene-Report-2.6.20.pdf (last accessed Oct. 25, 2024).
[13] In addition, fenceline monitoring will provide Coke Oven Communities with useful emissions data that they can use in their advocacy for reducing harmful coke oven pollution. *See* Mot. to Intervene, Brooks, Fox, Isherwood, McDonnell, and Powell Decls. Many Coke Oven Communities seek to educate policymakers and their members on the public health risks associated with air pollution, and fenceline monitoring data will assist these efforts. *Id.*

living below the poverty line. Final Rule, 89 Fed. Reg. at 55,726-27. By preventing coke oven emissions from increasing and reducing the incidence of emission standards violations, the Final Rule will mitigate environmental injustice. *See, e.g.,* Max Blau, *The Tragedy of North Birmingham*, Pro Publica (Sept. 1, 2022) (available at https://www.propublica.org/article/bluestone-jim-justice-north-birmingham) (detailing history of environmental injustice surrounding coke oven facility in Birmingham, Alabama).

4.    To be sure, EPA did not "quantify" these benefits, SunCoke Mot. at 22-23, but Industry Movants do not disprove their existence. As EPA explained, it was "difficult to estimate" future scenarios in which facilities stopped violating the law or were prevented from increasing pollution beyond existing levels. Final Rule, 89 Fed. Reg. at 55,686, 55,723, 55,724. Given that Coke Oven Communities have been waiting for over a decade for these protections, Industry Movants offer no compelling reason why the Communities should be made to wait further simply because EPA failed to quantify these clear benefits.

**C.    EPA's Brief Addresses Industry's Public Interest Arguments.**

1.    EPA demonstrates why Industry Movants' suggestion that the Final Rule will cripple the steel and national defense industries is unsupported. *Compare* EPA Stay Opp'n at 33, *with* ACCCI/COETF Mot. at 18; SunCoke Mot. at 23.

36

2.    Similarly, EPA correctly explains how EPA's implementation of the Act as reflected in the Final Rule reflects Congress' conclusive determination of what is in the public interest. EPA Stay Opp'n at 33-34; *see also Va. Petrol.*, 259 F.2d at 925 ("interests of private litigants must give way to the realization of public purposes").

## III.   THE RECORD REFUTES INDUSTRY'S ALLEGED HARMS, WHICH ARE SPECULATIVE AT BEST.

Because Industry Movants have not shown a likelihood of success on the merits, this Court need not even consider whether they will be irreparably harmed. *See Apotex*, 449 F.3d at 1253-1254. Nonetheless, Industry Movants' failure to show irreparable harm provides an independent reason to deny their stay motions. *See Labrador*, 144 S. Ct. at 929 (Kavanaugh, J., concurring).

1.    Industry Movants assert that they will incur billions of dollars in non-recoverable expenditures to comply with the Final Rule. ACCCI/COETF Mot. at 17; SunCoke Mot. at 20. But those costs are speculative at best. EPA concluded, "[b]ased on the available data, [it] expect[s] all facilities to be able to meet [] floor limits without the need for additional controls." Final Rule, 89 Fed. Reg. at 55,717. Indeed, all of the test data results before the agency were "below the promulgated [] floor limits." *Id.*

37

In the face of EPA's findings in the record regarding the Final Rule's modest cost impacts, Industry Movants seek to rely on their own far higher cost numbers, which rely on factual claims that the record directly refutes. *See* ACCCI/COETF Mot. at 17; SunCoke Mot. at 20. ACCCI/COETF's cost estimate derives from analysis that assumes the adoption of new technologies to comply with the Final Rule's new floor limits on certain pollutants emitted from byproduct-type battery stacks and pushing emission controls. *See* ACCCI/COETF Mot., Ex. C, Long Decl. But ACCCI/COETF has no basis to assert irreparable harm from undertaking development and evaluation of novel emissions controls that are unnecessary for compliance with the Final Rule.

Similarly, SunCoke submits a declaration claiming that SunCoke will need to invest millions of dollars to conduct testing to determine whether SunCoke's plants can meet the Final Rule's numeric emission limits. *See* SunCoke. Mot., Quanci Decl. ¶ 32. Given that EPA has already made findings in the record that all existing coke plants can comply with the Final Rule's limits based on existing operating practices, SunCoke's claimed testing expenditures are not "directly result[ing] from," the Final Rule's requirements. *Wis. Gas Co.*, 758 F.2d at 674.

Moreover, as EPA points out in its brief, SunCoke also admits that its allegations of harm rest upon conjecture and guesswork. *See* EPA Stay Opp'n at

38

32. Indeed, their own hired expert simply says only that they "[m]ight [n]eed to [i]nstall [a]dditional [c]ontrols" to comply with many of the new standards. SunCoke Mot., Zebell Decl. at 5. Such speculation falls far short of demonstrating harm that is sufficiently "certain" so as to justify the extraordinary remedy of a stay. *Wis. Gas Co.*, 758 F.2d at 674.

2. Even if Industry Movants' asserted costs might constitute irreparable harm, they have not shown that they will incur any expenses before this case can be resolved, and the possibility that they might incur costs afterwards does not show they will suffer harm in the absence of a stay. This case will almost certainly be decided within a one-year timeframe. Thus, even if the Final Rule were ultimately held unlawful, compliance costs would only be unrecoverable if they had to be incurred within the next year and could not be deferred. *See Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (finding movants would incur costs "during the pendency of this litigation"). Although Industry Movants submit various declarations reciting laundry lists of activities they believe must occur to effectuate compliance with the Final Rule, they neglect to explain, much less substantiate, why any specific activity must be completed before this case can be decided.

3. Any costs Industry Movants could potentially incur before this case is resolved—a point on which they have not shouldered their burden of proof—

39

would not be "great." *Wis. Gas Co.*, 758 F.2d at 674. EPA estimates that the annualized compliance cost of the Final Rule amounts to less than one percent of the yearly revenue for each of the five firms that operate active coke facilities. 89 Fed. Reg. at 55,723; *see Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555-56 (D.C. Cir. 2015). Given the modest price tag of the Final Rule, it is unlikely that letting the regulations go into effect will undermine the coke and steel industries or have any of the destabilizing effects on local and national economies that Industry Movants claim. *Contra* ACCCI/COETF Mot. at 17-18.

## IV.    INDUSTRY'S REQUEST TO STAY THE ENTIRE RULE IS OVERBROAD.

Rather than seeking to stay individual provisions of the Final Rule, both sets of Industry Movants seek to stay the entire Rule but fail to justify such sweeping relief. *E.g.,* SunCoke Mot. at 2 ("This Court should stay the rule."). Movants are only entitled to relief "narrowly tailored to remedy the harm shown," *Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990), and "limited to the inadequacy" that injured them, *Gill v. Whitford*, 585 U.S. 48, 68 (2018). Moreover, the Final Rule's provisions—which independently regulate different processes and emissions at coke ovens—are severable. *See Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284 (D.C. Cir. 2023) ("[R]egulations—like statutes—are presumptively severable").

40

Consequently, Movants bear the burden of demonstrating that specific provisions must be stayed. Yet, they do not even attempt to do so, claiming hundreds of millions, if not billions, of dollars in compliance costs without specifying what provisions purportedly cause those costs. ACCCI/COETF Mot. at 16-17 (costs for byproduct-type ovens); SunCoke Mot. at 19-21 (costs for non-recovery-type ovens).

1.    Industry Movants do not even allege, let alone prove, any quantifiable monetary harms from new standards for leaks and fenceline monitoring in the Oven Batteries Category. ACCCI/COETF claim $1.3 billion in capital costs and $222 million in annual costs from the Final Rule, as a whole. ACCCI/COETF Mot. at 16-17. But their supporting declarations make clear that these costs are solely attributable to provisions covering the Pushing-Quenching-Stacks Category. *Id.,* Ex. B, DeLibero Decl. ¶ 20 (attributing these costs to controlling pushing-quenching ("PEC") and stack pollution). Thus, they do not allege any costs, and have failed to prove any harms, resulting from the challenged limits on leaks from Oven Batteries. *See id.* 11-13. Nor have they alleged any costs or harms resulting from the challenged fenceline monitoring standard at Oven Batteries. *See id.* 13-16.

41

And SunCoke cannot be harmed by the lowered leak limits or fenceline monitoring provisions. These provisions only apply at byproduct-type ovens, and SunCoke only operates non-recovery type ovens. *See* Final Rule, 89 Fed. Reg. at 55,686.

Thus, even as Industry Movants fault EPA for failing to quantify the benefits from tightened standards, they fail to even allege, let alone quantify, any harm resulting from the new leak limits or fenceline monitoring standards for Oven Batteries.

2.      Even as to the alleged monetary harms from the new floors for the Pushing-Quenching-Stacks Category, Industry Movants fail to connect the dots. EPA established 18 separate floor standards for different combinations of pollutants and emission points covered by the Category. Final Rule, 89 Fed. Reg. at 55,689. Yet, looking to Industry's briefs, one cannot say which of those 18 standards drive their cost estimates. *See* ACCCI/COETF Mot. at 16-17 (describing costs "to comply with the Coke Rule"); SunCoke Mot. at 19-20 (describing costs to "meet the Final Rule's [] floor limits").

Industry Movants' failure to connect the dots between the provisions they challenge and the harms they allege prevents the Court from assessing how much it

42

will cost Industry to comply with any individual provision of the Final Rule. That is fatal to their attempts to stay the Rule in its entirety.

## CONCLUSION

For the reasons set forth above, Industry Movants' motions for a stay should be denied.

DATED:    October 28, 2024        Respectfully submitted,

/s/ *Haley Lewis*
Haley Lewis
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, D.C. 20006
(202) 263-4449
hlewis@environmentalintegrity.org

Patton Dycus
Environmental Integrity Project
919 Millworks Way
Bozeman, MT 59715
(404) 446-6661
pdycus@environmentalintegrity.org

*Counsel for Clean Air Council and PANIC*

/s/ *Tosh Sagar*
Tosh Sagar
Adrienne Y. Lee
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org
alee@earthjustice.org

*Counsel for GASP, Hoosier Environmental Council, Just Transition Northwest Indiana, PennFuture, and Sierra Club*

43

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), counsel hereby certifies that the foregoing Opposition of GASP, Clean Air Council, Hoosier Environmental Council, Just Transition Northwest Indiana, PANIC, PennFuture, and Sierra Club to Petitioners' Motions for a Stay contains 8,857 words, as counted by counsel's word processing system, and thus complies with the Court's Order, Doc. No. 2078284 ("Environmental groups' consolidated response to the motions for stay not to exceed 10,400 words").

Further, this document complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

Dated: October 28, 2024

*/s/ Tosh Sagar*
Tosh Sagar

44